# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

| | |
|---|---|
| K.O. and E.O., Jr., by and through their parents and next friends, E.O. and L.J.; and C.J, by and through his father and next friend F.C.; each individually and on behalf of all others similarly situated, | ) ) ) ) ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| JEFFERSON BEAUREGARD SESSIONS III, Attorney General of the United States; KIRSTJEN NIELSEN, Secretary of the United States Department of Homeland Security (DHS); JOHN F. KELLY, White House Chief of Staff; STEPHEN MILLER, Senior Advisor to the President; GENE HAMILTON, Counselor to the Attorney General Sessions; THOMAS HOMAN, former Director of United States Immigration and Customers Enforcement (ICE); RONALD D. VITIELLO, Acting Director of ICE; L. FRANCIS CISSNA, Director of United States Citizenship and Immigration Services (USCIS); KEVIN K. MCALEENAN, Commissioner of United States Customs and Border Protection (CBP); ALEX AZAR, Secretary of the United States Department of Health and Human Services (HHS); SCOTT LLOYD, Director of the United States Office of Refugee Resettlement (ORR); JOHN DOE ICE AGENTS; JOHN DOE CBP AGENTS; and JOHN DOE ORR PERSONNEL, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| | ) |
| Defendants. | ) |

CIVIL ACTION NO._____

_____)

## CLASS ACTION COMPLAINT AND JURY DEMAND

### Introduction

1.      The United States of America was founded on the bedrock principle that our

nation is a beacon of hope to people everywhere seeking refuge from poverty, persecution, and

violence.  Emma Lazarus's sonnet on the Statue of Liberty famously rings out: "Give me your

1

tired, your poor, your huddled masses yearning to be free." Defendants have betrayed this fundamental principle. In doing so, they have betrayed the United States Constitution and harmed those most vulnerable: children. Through this lawsuit, Plaintiffs, on behalf of a class of similarly situated children, seek to hold Defendants accountable for their actions in accordance with the rule of law.

2.      Plaintiffs seek damages and the establishment of a fund for the mental health treatment of all class members to remedy the harm caused by the Defendants' forcible separation of well over 2,500 children from their parents with no legal justification and for the express purpose of inflicting emotional and psychological harm to deter immigration, particularly from Central and South American countries. Many of these children and their parents, including the Plaintiffs in this case, fled their native countries to lawfully seek asylum upon arriving in the United States.

3.      Defendants forcibly separated these young children from their parents without any allegations of abuse, neglect, or parental unfitness, and without legal proceedings or hearings of any kind. Defendants then detained these young, terrified children in facilities often thousands of miles from their parents.

4.      Defendants forcibly separated these families even though there were ways for Defendants to keep immigrant children together with their parents, including shelters that house families together and immigration family detention centers where families can be detained together while they await the adjudication of their immigration cases, as well as electronic ankle monitoring programs assuring appearances of adults at immigration hearings.

5.      Forced separation of children from their parents causes severe and often permanent emotional and psychological harm to young children, particularly when those children are already traumatized from fleeing violence and persecution in their home countries.

6.      The Defendants have violated the fundamental right to family integrity protected by the Due Process Clause of the Fifth Amendment of the United States Constitution by forcibly taking young children from their parents with no legal justification and without a hearing and later coercing parents into waiving their children's rights to pursue asylum, withholding of removal, and other statutory claims available to migrant children and their families.  Defendants have also violated the Due Process Clause by subjecting children to punitive conditions while they were being held in civil immigration detention and failing to provide them adequate and necessary mental health treatment.  In addition, Defendants have violated the Equal Protection guarantee of the Fifth Amendment by discriminating against immigrant children, particularly those from Central and South American countries, on the basis of race, ethnicity, or national origin.

7.      Moreover, based on Defendants' conduct, the United States government is liable for the torts of intentional and negligent infliction of emotional distress, false imprisonment, false arrest, assault and battery, and for the loss of consortium that the minor Plaintiffs have suffered as a result of the harm caused to their parents by Defendants' conduct.  Plaintiffs intend to present tort claims to the appropriate federal agencies under the Federal Tort Claims Act based on the allegations in this Complaint.  Plaintiffs reserve the right to seek leave to amend this Complaint in due course should Plaintiffs' claims be finally denied by any of those agencies.  *See* 28 U.S.C. § 2675.

## Parties

8.      Plaintiff K.O. brings this lawsuit through her parents and next friends, E.O. and L.J., as a result of her incapacity due to her minor status.

9.      Plaintiff E.O., Jr. is K.O.'s brother and he brings this lawsuit through his parents and next friends, E.O. and L.J., as a result of his incapacity due to his minor status.

10.     K.O., E.O., Jr., and their parents all reside in Westborough, Worcester County, Massachusetts.  They are all seeking asylum in the United States and fleeing violence and persecution in Guatemala.

11.     Plaintiff C.J. brings this lawsuit through his father and next friend, F.C., as a result of his incapacity due to his minor status.

12.     C.J. and F.C. reside in Westborough, Worcester County, Massachusetts.  They are seeking asylum in the United States and fleeing violence and persecution in Guatemala.

13.     Plaintiffs bring this action on their own behalf and on behalf of all others similarly situated nationwide.

14.     Defendant Jefferson Beauregard Sessions III is the Attorney General of the United States and is sued in his individual capacity. General Sessions has responsibility for the administration of the immigration laws under 8 U.S.C. § 1103, oversees the Executive Office of Immigration Review, is empowered to grant asylum or other relief, and was a legal custodian of Plaintiffs when they were held in detention.  Defendant Sessions has responsibility for implementing United States immigration laws, policies, and practices, including practices related to family separation and family detention at the United States Southwestern border.

15.     Defendant Kirstjen Nielsen is the Secretary of DHS and is sued in her individual capacity.  Secretary Nielsen directs each of the component agencies within DHS, including ICE,

CBP, and USCIS. Defendant Nielsen has responsibility for the administration of the immigration laws under 8 U.S.C. § 1103, is empowered to grant asylum or other relief, and was a legal custodian of Plaintiffs when they were held in detention. Defendant Nielsen is responsible for implementing United States immigration laws, policies, and practices, including practices related to family separation and family detention at the United States Southwestern border.

16.     Defendant John F. Kelly is currently the White House Chief of Staff and he is sued in his individual capacity. Kelly served as the Secretary of DHS from January 20, 2017 through July 31, 2017. In that role, Secretary Kelly directed each of the component agencies of DHS, including ICE, CBP, and USCIS, had responsibility for the administration of the immigration laws under 8 U.S.C. § 1103, and was empowered to grant asylum or other relief. Defendant Kelly was responsible for implementing United States immigration laws, policies, and practices, including practices related to family separation and family detention at the United States Southwestern border. Kelly continued to have an important role in the development, adoption, and implementation of the family separation practice in his role as White House Chief of Staff.

17.     Defendant Stephen Miller is a Senior Advisor to the President of the United States and is sued in his individual capacity. Mr. Miller is widely reported to have been the architect of the Defendants' practice of forcibly separating migrant families at the Southwestern border.

18.     Defendant Gene Hamilton is a Counselor to the Attorney General and is sued in his individual capacity. Mr. Hamilton is widely reported to have been closely involved in the development of the Defendants' practice of forcibly separating migrant families at the Southwestern border.

19.     Defendant Thomas Homan served as the Director of ICE from January 30, 2017 through his retirement on June 29, 2018 and he is sued in his individual capacity.  In his role as Director of ICE, Mr. Homan had responsibility for enforcing federal immigration law including along the Southwestern border.

20.     Defendant Ronald D. Vitiello is currently the Acting Director of ICE, which office he assumed on June 30, 2018, and is sued in his individual capacity.  Before serving as Acting Director of ICE, Vitiello was the Acting Deputy Commissioner of CBP from April 25, 2017 through June 29, 2018.  In his role as Acting Director of ICE, Mr. Homan has responsibility for enforcing federal immigration law including along the Southwestern border.  In his role as Acting Deputy Commissioner of CBP, Mr. Vitiello had responsibility for processing and detaining noncitizens apprehended near the United States border.

21.     Defendant L. Francis Cissna is the Director of USCIS and is sued in his individual capacity.  In his role as Director of USCIS, Cissna is responsible for processing immigration and naturalization applications and, through its Asylum Officers, conducts interviews of certain individuals apprehended at the border to determine whether they have a credible fear of persecution and should be permitted to apply for asylum.

22.     Defendant Kevin K. McAleenan is the Commissioner of CBP and is sued in his individual capacity.  Commissioner McAleenan is responsible for the initial processing and detention of noncitizens who are apprehended near the United States border.

23.     Defendant Alex Azar is the Secretary of HHS and is sued in his individual capacity.  Secretary Azar is responsible for "unaccompanied" noncitizen children in his role as Secretary of HHS.

24.     Defendant Scott Lloyd is the Director of ORR and is sued in his individual capacity.  Director Lloyd is responsible for providing care and placement for "unaccompanied" noncitizen children in his role as Director of ORR, which is a component of HHS.

25.     Defendants John Doe ICE Agents are sued in their individual capacities. Defendants were federal law enforcement agents employed by ICE and DHS whose identities are at this time unknown to Plaintiffs. The ICE Agents were empowered by law and practice to execute searches, make arrests for violations of federal law, and make or enforce custodial determinations with regard to the Plaintiffs which resulted in a prolonged separation from their parents.  When and if the identities of Defendants John Doe ICE Agents become known to Plaintiff, Plaintiff may amend this Complaint to add said ICE Agents as named Defendants.

26.     Defendants John Doe CBP Agents are sued in their individual capacities. Defendants were federal law enforcement agents employed by CBP and DHS whose identities are at this time unknown to Plaintiffs.  The CBP Agents were empowered by law and practice to execute searches, make arrests for violations of federal law, and make or enforce custodial determinations with regard to the Plaintiffs which resulted in a prolonged separation from their parents.  When and if the identities of Defendants John Doe CBP Agents become known to Plaintiffs, Plaintiffs may amend this Complaint to add said CBP Agents as named Defendants.

27.     Defendants John Doe ORR Personnel are sued in their individual capacities. Defendants were either federal employees employed by ORR and HHS or employees of entities with which ORR and HHS contracted to provide services and whose identities are at this time unknown to Plaintiffs.  The ORR Personnel were empowered by law and practice to make or enforce custodial determinations with regard to Plaintiffs which resulted in a prolonged separation from their parents.  When and if the identities of Defendants John Doe ORR

Personnel become known to Plaintiffs, Plaintiffs may amend this Complaint to add said ORR Personnel as named Defendants.

28.     At all relevant times, the Defendants have acted under color of federal law in the course and scope of their duties and functions as agents, employees, and officers of the United States in engaging in the conduct described in this Complaint.

29.     At all relevant times, the Defendants each violated clearly established law of which a reasonable person would have known, including the class members' statutory rights, procedural and substantive due process rights, and their right to equal protection of the laws.

## Jurisdiction and Venue

30.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question).

31.     This Court has personal jurisdiction over all Defendants under M.G.L. c. 223A, § 3(d), because Plaintiffs' claims arise from Defendants' having caused tortious injury in Massachusetts by an act or omission outside Massachusetts and each Defendant regularly does or solicits business or engages in a persistent course of conduct in Massachusetts.

32.     Venue is proper in this District under 28 U.S.C. § 1391(b)(3), because the Defendants are subject to personal jurisdiction in this District, and under 28 U.S.C. § 1391(e)(1) because the Plaintiffs reside in this district and no real property is involved in the action.

## Facts

### Legal Framework Under Federal Immigration Law

33.     Pursuant to Section 208(a)(1) of the Immigration and Nationality Act ("INA"), "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters)," may generally

8

apply for asylum "irrespective of such alien's status." *See* 8 U.S.C. § 1158(a)(1). [1]  The INA and

its accompanying regulations establish procedures for the adjudication of asylum claims.  *Id*; *see*

*also* INA § 235(b), 8 U.S.C. § 1225(b); 8 C.F.R. §§ 208.1-208.31.

34.     Even individuals who initially fall within the INA's "expedited removal"

procedures, meaning they would bypass formal removal proceedings, are entitled to pursue

asylum once the person indicates an intention to apply for asylum and demonstrates a credible

fear of persecution at an interview before an asylum officer.  8 U.S.C. §§ 1225(b)(1)(A)(i),

1225(b)(1)(B); 8 C.F.R. §§ 235.1-235.13.

35.     The January 1997 settlement agreement in *Flores v. Reno*, 85-cv-4544 (C.D. Cal.)

governs the detention and release of "alien" children.  The *Flores* settlement remains binding on

federal agencies, including DHS, HHS, and all respective agency components such as ICE, CBP,

USCIS, and ORR.[2]  In 2008, Congress enacted the Trafficking Victims Protection

Reauthorization Act (the "TVPRA"), Pub. L. 110-457, 110 Stat. 5044 (2008), which paralleled

certain aspects of the *Flores* settlement and affirmed ORR's responsibility for the care and

custody of unaccompanied minors.

36.     The *Flores* settlement and its progeny, including the statutory rights and

obligation within the TVPRA, provide a "nationwide policy for the detention, release, and

treatment of minors in the custody of INS [which is the predecessor to ICE, CBP, and USCIS],"

which requires the government to treat "all minors in its custody with dignity, respect and special

concern for their particular vulnerability as minors."  Exhibit 1, *Flores* Settlement ¶¶ 9-11; *see* 8

---

[1] The INA defines the term "alien" as "any person not a citizen or national of the United States."
INA § 101(a)(3), 8 U.S.C. § 1101(a)(3).

[2] In 2002, Congress enacted the Homeland Security Act, Pub. L. 107–296, 116 Stat. 2135 (2002),
and transferred authority over the care and placement of unaccompanied minors to ORR.

U.S.C. § 1232.  A "minor" is "any person under the age of eighteen (18) years who is detained in the legal custody of the INS."  *See id*. ¶ 4; 8 U.S.C. § 1232(g)(2); *Flores v. Lynch*, 828 F.3d 898, 905-06 (9th Cir. 2016).

37.     Paragraph 14 of the *Flores* settlement requires that "[w]here the INS determines that the detention of the minor is not required either to secure his or her timely appearance before the INS or the immigration court, or to ensure the minor's safety or that of others, the INS shall release a minor from its custody without unnecessary delay." Exhibit 1, *Flores* Settlement ¶ 14. Paragraph 14 also sets forth the "order of preference" for the release of a child and release to a parent is preferred.  *Id*.

38.     Critically, the *Flores* settlement requires the federal government to "place each detained minor in the **least restrictive setting** appropriate to the minor's age and special needs, provided that such setting is consistent with its interests to ensure the minor's timely appearance before the INS and the immigration courts and to protect the minor's well-being and that of others."  Exhibit 1, *Flores* Settlement ¶ 11 (emphasis added); 8 U.S.C. § 1232(c)(2)(A).

39.     Under the *Flores* Settlement, children must be released from detention within five days, or within twenty days in certain emergency circumstances, to a parent, legal guardian, adult relative, adult designated by a legal guardian, or (if none of these are available) a licensed program willing to accept legal custody.  *Id*.  ¶¶ 12, 14.

40.     Ordinarily when DHS, usually through ICE or CBP, detains an undocumented child who is traveling alone and unaccompanied by a parent, the relevant federal agencies follow an established process.  ICE or CBP may detain an unaccompanied child for up to 72 hours as other federal agencies locate an appropriate facility for that child.  ICE or CBP then must turn the child over to HHS.  8 U.S.C. § 1232(b)(3).

41.     Once the unaccompanied children are in ORR custody, they are typically supervised and placed in ORR-funded and supervised facilities, where staff must attempt to locate a parent and determine if family reunification is possible.  *See generally* 8 U.S.C. §§ 1232(c)(2)-(c)(3).  If not, ORR staff will try to locate another family member, relative, family friend, or caretaker in the United States to serve as a sponsor who can care for the child during the pendency of the child's immigration proceedings.  *Id.*

42.     When ORR cannot find a sponsor, the unaccompanied children are moved to secondary ORR-contracted and state-licensed facilities throughout the country.  *Id.*  If DHS places the child in removal proceedings or the child has an affirmative pathway to legal immigration status, ORR will place the child in an ORR-contracted and state-licensed long-term foster care program while the immigration process continues.  *See* 8 U.S.C. § 1232(a)(5)(D).

**Defendants' Practice of Forcibly Separating Children from their Parents**

43.     For over a year, the United States government has forcibly separated thousands of migrant children from their families for no legitimate purpose.  These children have been held as civil immigration detainees, and not for any criminal charge or conviction.  Yet these children were separated from their parents indefinitely and without providing information to family members about one another.  Defendants have adopted and implemented this practice for the express purposes of demonstrating to immigrants the agony that parents should expect if they dare to enter the United States with their children.

44.     Families presenting at Southwestern ports of entry to seek asylum were refused entry into the United States.  Border officials turned these families away unlawfully on the false claim that the United States is "full" or no longer accepting asylum seekers.  This unlawful

practice artificially created illegal entry violations along the Southwestern border at places other than official ports of entry that would not have occurred otherwise.

45.     Children forcibly separated from their parents were transferred to the custody of ORR and sent to makeshift detention facilities and temporary housing.  ORR deemed these children "unaccompanied minors."  Under ORR policies, an unaccompanied minor can be released from ORR custody only after ORR completes an onerous and lengthy procedure to determine that a potential custodian, or "sponsor," is suitable for providing for the child's physical and mental well-being.  As a result of ORR's deeming the children "unaccompanied minors," their parents were wrongfully treated as "sponsors" (instead of parents) of their own children.

46.     As early as March 2017, a senior DHS official acknowledged that Defendants were considering a proposal to separate children from their parents at the Southwestern border. M. Mallonee, *DHS Considering Proposal to Separate Children from Adults at Border*, March 4, 2017, available at https://www.cnn.com/2017/03/03/politics/dhs-children-adults-border/index.html.

47.     On March 7, 2017, then-Secretary of DHS John Kelly confirmed that DHS was considering a practice of separating children from their parents "to deter more movement."  D. Diaz, *Kelly: DHS Considering Separating Undocumented Children from their Parents at the Border*, March 7, 2017, available at https://www.cnn.com/2017/03/06/politics/john-kelly-separating-children-from-parents-immigration-border/index.html .  While Kelly later backtracked after harsh criticism, an inside source reported to the press that the family separation proposal was still under consideration at DHS as of August 2017.  J. Blitzer, *How the Trump Administration Got Comfortable Separating Immigrant Kids from their Parents*, The New

Yorker, May 30, 2018, available at https://www.newyorker.com/news/news-desk/how-the-trump-administration-got-comfortable-separating-immigrant-kids-from-their-parents.

48.     In fact, Defendants at DHS began implementing the practice in secret in the El Paso section of the border in western Texas from July to November 2017.  D. Lind, *Trump's DHS is Using an Extremely Dubious Statistic to Justify Splitting Up Families at the Border*, Vox, May 8, 2018, available at https://www.vox.com/policy-and-politics/2018/5/8/17327512/sessions-illegal-immigration-border-asylum-families.

49.     The forced separation of families continued well into 2018 and took place without a hearing or any process whatsoever regardless of the family's circumstances or the needs of the children.  It also occurred regardless of where or how the family entered, whether they sought asylum, whether they were charged with unlawful entry or whether a family member had passed a credible fear interview under federal asylum law.

50.     Defendants have taken children as young as infants from their parents, often with no warning or opportunity to say goodbye, and with little to no information provided about where the Defendants were taking the children or when they would next see their parents.

51.     Most of these migrant families fled their home countries to lawfully seek asylum once physically present in the United States.  *See* 8 U.S.C. § 1158(a)(1).

52.     Nevertheless, without any allegations that the parents are unfit or abusive, the Defendants forcibly separated these asylee-seeking parents from their young children, who are automatically considered derivative asylee applicants on their parents' claim, and detained the children in facilities for "unaccompanied" minors, often thousands of miles away from their parents who accompanied them in the United States before the government forcibly separated

them.  The government separated families without providing notice to the parents or children of
each other's whereabouts or well-being.

53.     Government officials have torn some children from the arms of their parents
while crying and pleading not to be taken away.

54.     In other cases, government officials have told children they were going to play
with other children, but after separating the children from their parents they were not returned.

55.     In some cases, the parents were falsely told that they would be going to court only
to be taken to a different detention cell, separated from their children.  They were then
transported to a different detention center without the opportunity to say goodbye to their
children or to explain that they would not see each other for some time.

56.     Many parents were told the children would be "adopted" and they would not see
their children again.

57.     Many parents were deported without their children.

58.     During the separation, parents and children were often prevented from
communicating for weeks or longer, and even when allowed to communicate typically children
could only communicate with a parent by telephone for a few short minutes and not permitted to
talk about where they were being held.  These phone calls were closely monitored.  In the
detention facilities where they were kept, children were not allowed to touch each other.  While
staff at many detention facilities were permitted to hold the youngest children, they were
instructed not to hold or touch older children.

59.     Additionally, in some of the makeshift detention centers children were held in
areas with no beds or mattresses.  Some of the children were subjected to abuse by those working
at the detention centers.

14

60.     And the medical care at the detention centers was often grossly inadequate, even leading to the death of a one-year old child who developed a respiratory infection at an immigration jail in Texas.  The child was turned away twice by the facility's health clinic, the treatment she received may have exacerbated the condition given her age, and she was cleared for release without a medical examination.  The child then spent six weeks in two hospitals before dying from bronchiectasis, pulmonitis, pneumothorax, or collapsed lung.  M. Sacchetti, *Mother blames toddler's death on poor medical care in U.S. immigration jail*, Washington Post, August 28, 2018, available at https://wapo.st/2PJRMv5?tid=ss_mail&utm_term=.3dddd9b5a241.

61.     These conditions of confinement further traumatized the children separated from their parents and traumatized the parents who were separated from their children.

62.     Under HHS Secretary Azar's direction, HHS would not allow media cameras into facilities housing immigrant children separated from their parents.  Yet Azar claimed, incredibly, that "[w]e have nothing to hide about how we operate these facilities" and that "[i]t is one of the great acts of American generosity and charity, what we are doing for these unaccompanied kids who are smuggled into our country or come across illegally." M. Rod, *HHS Secretary: We're Performing Great Act of "Generosity and Charity" for Immigrant Children*, July 10, 2018, available at https://www.cnn.com/2018/07/10/politics/azar-hhs-child-separation-immigration-charity-cnntv/index.html.

63.     Ripping children away from their parents when they attempt to cross the Southwestern border, many of them seeking asylum, is the polar opposite of generosity.  It is conduct that shocks the conscience, bespeaks a callous disregard for the human beings in HHS's care, and demonstrates the discriminatory animus behind these practices.  M. Rod, *HHS Secretary: We're Performing Great Act of "Generosity and Charity" for Immigrant Children*,

July 10, 2018, available at https://www.cnn.com/2018/07/10/politics/azar-hhs-child-separation-immigration-charity-cnntv/index.html.

64.    Attempts by parents to be reunited with their children were unlawfully delayed and made unnecessarily cumbersome as a result of the Defendants' deliberate decision to classify the children as "unaccompanied minors" even though they entered the United States with their parents.  This classification meant that parents had to go through a lengthy and complex process to apply to be a "sponsor" of their own children in order to be reunited.  This exacerbated the harm done by the separation by prolonging it and transforming reunification into an unnecessarily arduous journey through a labyrinth of government bureaucracy.

65.    At least one HHS official has stated that "[w]hat went wrong is the children separated from their parents were referred as unaccompanied alien children when in fact they were accompanied."  N. Miroff & K. Memirjian, *Senate Panel Skewers Trump Officials Over Migrant Family Separations*, Wash. Post, July 31, 2018, available at https://www.washingtonpost.com/world/national-security/lawmakers-to-question-trump-officials-on-migrant-family-separations-struggle-to-reunite-them/2018/07/31/ddb61390-9467-11e8-8ffb-5de6d5e49ada_story.html?utm_term=.27575f06d9ea.

66.    During his tenure, Director Lloyd has effectively transformed ORR from an agency designed to care for the health and well-being of migrant children into what former ORR Director Robert Carey has called "a juvenile detention agency."  R. Planas, *A Single Trump Appointee Was Responsible for Keeping Hundreds of Kids Locked Up Longer*, HuffPost, July 26, 2018, available at https://www.huffingtonpost.com/entry/scott-lloyd-refugee-resettlement_us_5b58cd0fe4b0fd5c73cb3c1a.  This was due in part to Director Lloyd's insistence in June 2017, at a time when the forced separation of families was under consideration, that he

personally review and approve release decisions involving unaccompanied minors housed in

staff-secure facilities.  This led to extensive delays in the release of certain minors in ORR

custody.  *Id.*  A federal judge enjoined that practice in June, ruling that the plaintiffs

demonstrated a likelihood of success on the merits of their claims that the practice violated the

Administrative Procedure Act and TVPRA.  *L.V.M. v. Lloyd*, 2018 WL 3133965 (S.D.N.Y. June

27, 2018).

67.     Director Lloyd's intentional delays exacerbated ORR's ability to process the

thousands of children separated from their parents under Defendants' family separation practice.

Under Director Lloyd's leadership, ORR was unequipped to handle the influx of

"unaccompanied" minors, and Director Lloyd deliberately failed to improve the situation until

ordered to do so by a federal judge in California earlier this summer.

**Defendants' "Zero Tolerance Policy" Served as a Pretext to Continue Separating Families**

68.     On April 6, 2018, General Sessions announced  the Trump Administration's so-

called "zero-tolerance policy" for illegal entry into the United States in violation of 8 U.S.C. §

1325(a) as a pretext for these family separations.  In reality, Defendants had been forcibly

separating children from their parents long before the "zero-tolerance policy" was announced.

The express purpose of the family separation was to deter immigration to the United States by

instilling fear in migrants, particularly those from South and Central American countries.  That

practice violates the United States Constitution and state tort law.

69.     After General Sessions' announcement, ICE Director Homan, USCIS Director

Cissna, and CBP Commissioner McAleenan signed onto a letter to DHS Secretary Nielsen

urging her to detain and refer for prosecution all parents caught crossing the Mexican border

illegally with their children.  In other words, Homan, Cissna, and McAleenan pushed for the

across-the-board implementation of the Justice Department's "zero-tolerance policy" at DHS to

serve as a pretext for continuing the Defendants' existing practice of forcibly separating

immigrant children from their parents at the Southwestern border.  M. Sacchetti, *Top Homeland*

*Security Officials Urge Criminal Prosecution of Parents Crossing Border with Children*,

Washington Post, April 26, 2018, available at

https://www.washingtonpost.com/local/immigration/top-homeland-security-officials-urge-

criminal-prosecution-of-parents-who-cross-border-with-children/2018/04/26/a0bdcee0-4964-

11e8-8b5a-3b1697adcc2a_story.html?utm_term=.655fc386e41a.

70.     According to a letter authored by 17 United States Senators in April 2018, under

Director Homan's leadership, ICE "sharply increased arrests and detentions of immigrants with

no criminal background" and "[r]eportedly separated hundreds of children of asylum-seekers

from their parents," among other things.  April 27, 2018 Letter from Sens. to Sec. K. Nielsen,

available at https://www.murray.senate.gov/public/index.cfm/2018/4/immigration-senator-

murray-raises-questions-about-nomination-of-tom-homan-to-head-immigration-and-customs-

enforcement

71.     On June 20, 2018, President Trump issued an Executive Order purporting to end

family separation, but the Executive Order said nothing about reuniting the families who had

already been separated or compensating them for the trauma that the Defendants put these

families through.  Moreover, it took weeks to reunite most of the parents and children and even

today not all of these families have been reunited, in some cases because the parents were

deported while their children remained detained in the United States.

72.     After issuing the Executive Order, President Trump repeatedly emphasized the

lawless nature of the government's approach.  President Trump proposed that DHS simply deport

immigrants without a hearing or any legal process whatsoever.  On June 21, 2018, President Trump stated: "We shouldn't be hiring judges by the thousands, as our ridiculous immigration laws demand, we should be changing our laws, building the Wall, hire Border Agents and Ice and not let people come into our country based on the legal phrase they are told to say as their password."  *See* https://twitter.com/realdonaldtrump/status/1009770941604298753?lang=en.

73.     President Trump again proposed a lawless approach on June 24, 2018:  "We cannot allow all of these people to invade our Country.  When somebody comes in, we must immediately, with no Judges or Court Cases, bring them back from where they came.  Our system is a mockery to good immigration policy and Law and Order.  Most children come without parents…"  K. Rogers & S. Gay Stolberg, *Trump Calls for Depriving Immigrants Who Illegally Cross Border of Due Process Rights*, N.Y. Times, June 24, 2018, available at https://www.nytimes.com/2018/06/24/us/politics/trump-immigration-judges-due-process.html.

74.     These are but a few examples of the torrent of such statements that came from the President and other officials in the Trump Administration.

**Defendants' Practice of Forcibly Separating Children from their Parents was Motivated by Discriminatory Animus and an Express Intent to Deter Immigration to the United States by Instilling Fear in Would-be Migrants**

75.     Defendants and others in the Trump Administration have openly admitted that the practice of forcibly separating families at the Southwestern border, among other enforcement practices, was intended to target immigrants by their race, ethnicity, or national origin. The forcible separation of these families is also consistent with the racist and xenophobic hostility shown toward Latino immigrants, repeatedly voiced and demonstrated by President Trump and carried out by his Administration, including the Defendants in this case.

76.     For example, in June 2015, when then-candidate Trump announced his campaign at Trump Tower, he declared:  "When Mexico sends its people, they're not sending their best. . . .

They're bringing drugs.  They're bringing crime.  They're rapists."  Z. Byron Wolf, *Trump Basically Called Mexicans Rapists Again*, available at

https://www.cnn.com/2018/04/06/politics/trump-mexico-rapists/index.html.  In that speech, Mr. Trump proposed building a wall along the Southwestern border and making Mexico pay for it. President Trump has repeatedly referred to Mexicans as "criminals" and "thugs."

77.     In January of this year, President Trump referred to El Salvador, Haiti, and African countries generally as "shithole countries" and said that the United States should be allowing immigration from countries like Norway instead.  E. O'Keefe & A. Gearan, *Trump, Condemned for "Shithole" Countries Remark, Denies Comment But Acknowledges "Tough" Language*, Washington Post, Jan. 13, 2018, available at

https://www.washingtonpost.com/politics/trump-acknowledges-tough-language-but-appears-to-deny-shithole-remark/2018/01/12/c7131dae-f796-11e7-beb6-c8d48830c54d_story.html?utm_term=.4e58b8638236.   The racism behind that statement is self-evident.

78.     President Trump has impugned the integrity and independence of federal District Judge Gonzalo Curiel because, Trump said, Judge Curiel was of Mexican descent and "very hostile" to Trump because Trump was "very, very strong on the border."

79.     United States House Speaker Paul Ryan appropriately rebuked these outrageous statements, describing them as "the textbook definition of a racist comment."  D. Walsh & M. Raju, CNN, June 7, 2016, available at https://www.cnn.com/2016/06/07/politics/paul-ryan-donald-trump-racist-comment/index.html.

80.     President Trump's clear animus based on race, ethnicity, and national origin provides the context for understanding the unlawful and irrational actions of the Defendants in

this case.  The driving force behind the practice of forcibly separating immigrant families along the Southwestern border was this very animus based on race, ethnicity, and national original, which led to a failure to adhere to the well-established constitutional and statutory rights of Plaintiffs and the class.  Each of the Defendants adopted, implemented, enforced, condoned, sanctioned, acquiesced to, and encouraged that practice of forced family separations with the purpose of discriminating against immigrants based on their race, ethnicity, or national origin. Such intentional discrimination on these bases is unconstitutional.

81.     What is more, Defendants and others in the Trump Administration have made clear that the express purpose of the forced separation of children from their parents was to deter immigrants, particularly from Central and South American countries, from coming to the United States.  The vast majority of immigrants at the Southwestern border are from Central and South American countries and are Latino.

82.     During a press interview in May of 2018, Secretary Kelly said that "a big name of the game is deterrence" when asked whether he was in favor of forced family separation.  He said family separation "would be a tough deterrent.  A much faster turnaround on asylum seekers."  Kelly dismissively stated that the traumatized children "will be taken care of—put into foster care or whatever." *Transcript: White House Chief of Staff John Kelly's Interview with NPR*, National Public Radio, May 11, 2018, available at

https://www.npr.org/2018/05/11/610116389/transcript-white-house-chief-of-staff-john-kellys-interview-with-npr.

83.     On June 6, 2018, former ICE Director Homan made the deterrence goal plain when he stated:  "One thing you got to remember, for that parent who was arrested and his child crying and feeling bad about it, I get it, but what responsibility does he have in this? He chose to

enter the country illegally in violation of federal law. He chose to do that intentionally. . . . He put himself in the position." C. Da Silva, *ICE Chief Defends Separating Families at Border After U.N. Condemns Practice as Rights Violation*, Newsweek, June 6, 2018, available at https://www.newsweek.com/ice-chief-defends-separating-families-border-after-un-condemns-practice-rights-960825.

84.    Defendant Stephen Miller was a driving force in the adoption and implementation of the forcible family separation practice. Mr. Miller has embraced family separation and described it as "a simple decision by the administration . . . . The message is that no one is exempt from immigration law." C. Danner, *Separating Families at the Border Was Always Part of the Plan*, June 17, 2018, N.Y. Magazine, available at http://nymag.com/daily/intelligencer/2018/06/separating-families-at-border-was-always-part-of-the-plan.html.

85.    Mr. Miller's anti-Latino animus is well-known and long-standing. Even in high school he wrote an opinion piece for the Santa Monica Lookout which argued that "very few, if any, Hispanic students" make it to honors classes because the school gives them a "crutch" by ensuring that "all announcements are written in both Spanish and English." S. Tatum, *How Stephen Miller, the Architect Behind Trump's Immigration Policies, Rose to Power*, June 23, 2018, available at https://www.cnn.com/2018/06/23/politics/stephen-miller-immigration-family-separation/index.html.

86.    Mr. Miller's anti-immigrant and anti-Latino animus has only hardened over the years. In fact an outside White House adviser recently stated that "Stephen actually enjoys seeing those pictures at the border" of Central and South American children being separated from their parents. G. Sherman, *"Stephen Actually Enjoys Seeing Those Pictures at the Border":*

*The West Wing is Fracturing Over Trump's Callous Migrant-Family Policy*, Vanity Fair, June 20, 2018, available at https://www.vanityfair.com/news/2018/06/stephen-miller-family-separation-white-house.

87.     Defendant Gene Hamilton, who has been described as "a close ally of Stephen Miller," was reported to be "[a]mong those leading the discussion" about implementing the practice of forcible family separation at the Southwestern border.  J. Blitzer, *How the Trump Administration Got Comfortable Separating Immigrant Kids from their Parents*, The New Yorker, May 30, 2018, available at https://www.newyorker.com/news/news-desk/how-the-trump-administration-got-comfortable-separating-immigrant-kids-from-their-parents.

88.     A former government official has reported to the press that Miller and Hamilton, among others, "want to have a different American, and they're succeeding."  Moreover, "Miller has only seemed to gain allies in the government" as a result of his role in pushing for the forcible separation of immigrant children from their parents.  J. Blitzer, *Will Anyone in the Trump Administration Ever Be Held Accountable for the Zero-Tolerance Policy?*, The New Yorker, August 22, 2018, available at https://www.newyorker.com/news/daily-comment/will-anyone-in-the-trump-administration-ever-be-held-accountable-for-the-zero-tolerance-policy.

89.     In public remarks on the "zero tolerance policy" on May 7, 2018, General Sessions emphasized that "[i]f you are smuggling a child, then we will prosecute you and that child will be separated from you as required by law."  Exhibit 2, DOJ Press Release (May 7, 2018).

90.     Later, General Sessions stated:  "We cannot and will not encourage people to bring their children or other children to the country unlawfully by giving them immunity in the process."  L. Sanchez, *Sessions On Separating Families: If We Build A Wall and Pass*

*Legislation, We Won't Have These "Terrible Choices"*, The Hill, June 18, 2018, available at

http://thehill.com/homenews/administration/392785-sessions-on-separating-families-if-we-build-a-wall-and-pass.

91.      When asked if forced family separation was "absolutely necessary," General

Sessions responded: "Yes. . . . We believe every person that enters the country illegally like that

should be prosecuted. And you can't be giving immunity to people who bring children with them

recklessly and improperly and illegally."  H. Hewitt, *US Attorney General Jeff Sessions on*

*Children Separated from Parents at Broder, F-1 Visas for PRC Students, and Masterpiece*

*Cakeshop Decision*, June 5, 2018, available at http://www.hughhewitt.com/attorney-general-jeff-

sessions-on-the-immigration-policies-concerning-children-apprehended-at-he-border-and-f-1-

visas/.

92.      Likewise, Secretary Nielsen has said that "[i]llegal actions have and must have

consequences. No more free passes, no more get out of jail free cards."  T. Kopan, *"We Will Not*

*Apologize":  Trump DHS Chief Defends Immigration Policy*, June 18, 2018, available at

https://www.cnn.com/2018/06/18/politics/kirstjen-nielsen-immigration-policy/index.html.

93.      At an August 2017 DHS meeting, Mr. Hamilton explained to participants that

they would "need to generate paperwork laying out everything we could do to deter immigrants

from coming to the U.S. illegally, which included "separating parents from their kids at the

border."  J. Blitzer, *How the Trump Administration Got Comfortable Separating Immigrant Kids*

*from their Parents*, The New Yorker, May 30, 2018, available at

https://www.newyorker.com/news/news-desk/how-the-trump-administration-got-comfortable-

separating-immigrant-kids-from-their-parents.

94.      Counselor to the President Kellyanne Conway also made clear the purpose of

Defendants' practice of forcibly separating families:  "Nobody likes seeing babies ripped from

their mothers' arms . . . but we have to make sure that DHS' laws are understood through the

soundbite culture that we live in."  *Kellyanne Conway: 'Nobody Likes' Policy Separating*

*Migrant Kids at the Border* (June 17, 2018), available at https://www.nbcnews.com/politics/first-

read/conway-nobody-likes-policy-separating-migrant-kids-border-n884016.

95.      General Sessions, Secretary Nielsen, Secretary Kelly, Mr. Miller, Mr. Hamilton,

Director Homan and others in the Trump Administration, including the President himself, have

also made clear that the forced separation and traumatization of families is being used as a

negotiating ploy for political gain.

96.      Mr. Miller has stated:  "If we were to have those [Republican sponsored] fixes in

federal law, the migrant crisis emanating from Central America would largely be solved in a very

short period of time," and "[f]amilies would then therefore be able to be kept together and could

be sent home expeditiously and safely."  T. Hesson, *White House's Miller Blames Democrats for*

*Border Crisis*, Politico, May 29, 2018, available at

https://www.politico.com/story/2018/05/29/stephen-miller-democrats-border-574537 ; *see also*

P. Kasperowicz, *ICE Director: Democrats Should "Get Their Facts Straight" Before Protesting*

*Family Separation*, Washington Examiner, June 29, 2018, available at

https://www.washingtonexaminer.com/news/ice-tom-homan-democrats-get-facts-straight-

protesting-family-separation.

**Defendants Were Aware of the Traumatic Harm that Children Would Suffer from Being
Forcibly Separated from their Parents, but Defendants Did It Anyway, and Failed to
Provide the Children with Adequate Mental Health Care**

97.      Separation of a young child from his or her parent is a traumatic event that has a

devastating impact on the child's psychological well-being.  Children are likely to experience

post-traumatic symptoms such as nightmares and other manifestations of anxiety and depression. This damage can be permanent, especially where, as here, the child has already experienced other trauma in their home country, on their journey to the United States, or both.

98.      On January 23, 2018, a group of experts in child welfare, juvenile justice, and child development, including the American Association of Pediatrics, criticized the government's practice of separating migrant children from their parents, pointing out that: "[T]he psychological distress, anxiety, and depression associated with separation from a parent would follow the children well after the immediate period of separation—even after the eventual reunification with a parent or other family."  Exhibit 3, Jan. 23, 2018 Letter to K. Nielsen.

99.      The American Academy of Pediatrics put out another statement opposing the cruel family separation practice on May 8, 2018, in which its President, Colleen Kraft, M.D., wrote:  "Separating children from their parents contradicts everything we stand for as pediatricians – protecting and promoting children's health. In fact, highly stressful experiences, like family separation, can cause irreparable harm, disrupting a child's brain architecture and affecting his or her short- and long-term health. This type of prolonged exposure to serious stress - known as toxic stress - can carry lifelong consequences for children."  C. Kraft, *AAP Statement Opposing Separation of Children and Parents at the Border*, available at

https://www.aap.org/en-us/about-the-aap/aap-press-room/Pages/StatementOpposingSeparationofChildrenandParents.aspx.

100.      Media reports have explained that "many of the children released to their parents are exhibiting signs of anxiety, introversion, regression and other mental health issues." M. Jordan, *A Migrant Boy Rejoins His Mother, But He's Not the Same*, N.Y. Times, July 31, 2018, available at https://www.nytimes.com/2018/07/31/us/migrant-children-separation-anxiety.html.

This includes "acute anxiety around routines that separate [the children] from their parents, such as when the adult bathes or goes into another room." *Id*.

101.    One of the reasons for this is that the children may understand the separation as a punishment. *Id*. "Decades of research have concluded that children traumatically separated from their parents have a high likelihood of developing emotional problems, cognitive delays and long-term trauma." *Id*. "More recent studies have found that separation can impair memory and normal production of cortisol, a hormone produced in response to stress." *Id*.

102.    This psychological harm continues after reunification.

103.    One 5-year old migrant boy loved playing with the yellow Minion characters from the "Despicable Me" movies before being forcibly separated from his mother. "Now his favorite game is patting down and shackling 'migrants' with plastic cuffs." *Id*. The boy, who had not nursed in years, pleaded with his mother to be breast-fed after he was finally reunited with his mother. He hid behind a sofa when guests, including undersigned counsel Jesse M. Bless, Esq., visited the family's new home in Philadelphia. *Id*.

104.    "A 3-year old boy who was separated from his mother has been pretending to handcuff and vaccinate people around him, behavior he almost certainly witnessed in [ICE] custody." *Id*.

105.    "A pair of young siblings burst into tears when they spotted police officers on the street." *Id*.

106.    One three-year-old boy refused to look at his mother and pulled away from her embrace when they were initially reunified. *See* A. Valdes & I. Mejia, *'My Son Is Traumatized': One Separated Family's Reunion*, ACLU Press Release, August 24, 2018, available at

https://www.aclu.org/blog/immigrants-rights/immigrants-rights-and-detention/my-son-traumatized-one-separated-familys.

107.     Similarly, parents who arrived with their children at the United States border and were forcibly separated from their children by the Defendants are likely to experience immediate and acute psychological injury as well as lasting and permanent emotional and psychological harm.  This includes anxiety, depression, post-traumatic stress disorder, and other trauma-related disorders.  The trauma that the children face is compounded by watching their parents suffer and the emotional toll that the parents' own trauma takes on the parent-child relationship.  Making matters worse, the Defendants then failed to adequately provide the children with necessary mental health care while the children were in Defendants' custody.

108.     Indeed, one parent is reported to have committed suicide after his 3-year-old son was taken from his arms.  N. Miroff, *A Family Separated at the Border, and this Distraught Father Took His Own Life*, Washington Post, June 9, 2018, available at https://www.washingtonpost.com/world/national-security/a-family-was-separated-at-the-border-and-this-distraught-father-took-his-own-life/2018/06/08/24e40b70-6b5d-11e8-9e38-24e693b38637_story.html?utm_term=.dca844c151d9.  This harm to the parents, of course, will impact the quality of their relationship with their children for years to come.

109.     There is no doubt that Defendants were aware of the severe psychological and emotional trauma that forcibly separating children from their parents would cause.  Not only is the likelihood of severe harm self-evident, but Defendants were informed of and warned about the likelihood of such harm directly and through many authoritative public statements by other government officials and experts in the field.

110.    For example, on February 12, 2018, 33 United States Senators signed a letter to Secretary Nielsen to express their "deep concern" about "systematically separat[ing] immigrant children from their parents upon arrival in the United States." Exhibit 4, Feb. 12, 2018 Letter from U.S. Sens. to Sec. Nielsen.  The Senators wrote to "condemn" this practice and to urge Secretary Nielsen to reject this "cruel" and "grotesquely inhumane" practice that they recognized would "inflict significant trauma on small children." *Id.*

111.    Moreover, Commander Jonathan White of the United States Public Health Service Commissioned Corps (who organized the government's reunification effort at DHS after a federal court in California ordered reunification earlier this year) testified before the Senate Judiciary Committee on July 31, 2018.   Commander White told the Judiciary Committee "that he had warned his superiors that separating children from their parents carries a 'significant risk of harm' and could inflict 'psychological injury.'"  N. Miroff & K. Memirjian, *Senate Panel Skewers Trump Officials Over Migrant Family Separations*, Wash. Post, July 31, 2018, available at https://www.washingtonpost.com/world/national-security/lawmakers-to-question-trump-officials-on-migrant-family-separations-struggle-to-reunite-them/2018/07/31/ddb61390-9467-11e8-8ffb-5de6d5e49ada_story.html?utm_term=.27575f06d9ea.  Commander White told the Senate panel that his superiors assured him that the government was not planning to separate families.  *Id.*

112.    Even in the face of these clear and direct warnings the Defendants proceeded to traumatized the class members and then exacerbated the trauma by failing to provide the children with adequate and necessary mental health services, even though the Defendants knew that the class members needed mental health care to address the trauma that Defendants themselves inflicted on the class members.

113.    In the words of a current Trump Administration official: "The expectation was that the kids would go to the Office of Refugee Resettlement, that the parents would get deported, and that **no one would care**."  J. Blitzer, *Will Anyone in the Trump Administration Ever Be Held Accountable for the Zero-Tolerance Policy?*, The New Yorker, August 22, 2018 (emphasis added), available at https://www.newyorker.com/news/daily-comment/will-anyone-in-the-trump-administration-ever-be-held-accountable-for-the-zero-tolerance-policy.

**After Traumatizing Children and Parents, Defendants Coerced Parents into Waiving Their Children's and Their Own Rights to Asylum and Other Relief**

114.    After subjecting parents and children to some of the most severe trauma of their lives, Defendants proceeded to coerce many parents into signing forms that waived their own and their children's rights to pursue asylum claims in the hope of being reunited with their children more quickly.

115.    A senior official speaking on condition of anonymity confirmed early this summer that Defendants did not plan to reunite families until after a parent had lost his or her deportation case, effectively punishing parents who may otherwise pursue an asylum claim or other relief and creating tremendous pressure to abandon such claims so that parents may be reunited with their children.  M. Saccheri, M. Miller & R. Moore, *Sen. Warren Visits Detention Center, Says No Children Being Returned to Parents There*, Washington Post, June 24, 2018, available at https://www.washingtonpost.com/local/immigration/desperate-to-get-children-back-migrants-are-willing-to-give-up-asylum-claims-lawyers-say/2018/06/24/c7fab87c-77e2-11e8-80be-6d32e182a3bc_story.html?utm_term=.3118c8f35345.

116.    Parents have been presented with the option to be deported with their children and waive the children's right to asylum or to be deported alone and leave the child in the United States to pursue an asylum claim.  Some who have chosen to be deported alone to let their

children pursue asylum were not even allowed by ICE to say goodbye to their children but had to wave to their children who sat on a bus.  M. Jordan, *Migrant Families Have Been Reunited. Now a Scramble to Prevent Deportations*, N.Y. Times, July 30, 2018, available at https://www.nytimes.com/2018/07/30/us/migrant-families-deportations.html?action=click&module=MoreInSection&pgtype=Article&region=Footer&contentCollection=U.S.

117.    In the past, the government often placed families apprehended at the border in regular removal proceedings without detaining them at all.  For other families, the government used expedited removal procedures and detained members of the families together during these expedited proceedings.  If the government found these family members to have a credible fear of persecution, they would release the family from detention because it often takes years before immigration courts can offer asylee applicants a full and fair hearing on the merits of their claims.

118.    Defendants in the Trump Administration are the first to have a uniform practice of forcibly separating all fit parents from their young children, refusing to reunify them thereafter until ordered by a federal court to do so, and then doubling down by coercing parents to waive their own and their children's rights to asylum and other relief.

**DHS Advisory Council Members Resign in Protest of the Practice of Forced Separation**

119.    As a result of Defendants' unconstitutional actions, four members of the Department of Homeland Security Advisory Council resigned on July 16, 2018 in protest of the forced separation of children from their parents, writing that "routinely taking children from migrant parents [i]s morally repugnant, counter-productive and ill-considered," and therefore

"[w]e cannot tolerate association with the immigration policies of this administration, nor the illusion that we are consulted on these matters."  Exhibit 5, July 16, 2018 Letter from R. Danzig, E. Holtzman, D. Martin, and M. Olsen to Sec. K. Nielsen.

120.    Former Congresswoman Elizabeth Holtzman wrote to Secretary Nielsen in her separate individual resignation letter:

> Under your administration and that of Donald Trump's, DHS has been transformed into an agency that is making war on immigrants and refugees. . . . The final straw has been the separation of children from their parents at the Southwest border.  This is child kidnapping, plain and simple.  Seizing children from their parents in violation of the constitutional rights of both is bad enough (mentally harmful to the children and infinitely painful to both the parents and children), but doing so without creating proper records to enable family reunification shows utter depravity on the part of the government officials involved.

Exhibit 6, July 16, 2018 Letter from Hon. E. Holtzman to Sec. K. Nielsen.

121.    Professor David A. Martin wrote to Secretary Nielsen in his own resignation letter about the "unjust policy of separating families at the border":

> Now it has become clear that the policy was also executed with astounding casualness about precise tracking of family relationships – as though eventual reunification was deemed unlikely or at least unimportant, even for toddlers and preschoolers. . . . From the beginning, however, the administration has opted instead for gratuitously severe actions in the immigration arena . . . . Further, the family separation policy crystallized for many HSAC members profound doubts about the administration's commitment to the rule of law.

122.    Exhibit 7, July 16, 2018 Letter from Prof. D. Martin to Sec. K. Nielsen.


### Individual Plaintiffs' Allegations – K.O. and E.O., Jr.

123.    On May 19, 2018, K.O., E.O., Jr., and their mother L.J. arrived in Texas on foot after fleeing from their home country of Guatemala.  The family fled the violence they had experienced in Guatemala and were seeking asylum in the United States.

124.    At the time of their crossing, K.O. was nine years old and E.O., Jr. was seventeen years old.

125.    The family walked alone for about five hours along the Rio Grande, without food or water and in fear of being robbed or attacked by a poisonous snake or other animal.  They hoped that a CBP Agent would find them to allow them to apply for asylum.

126.    Eventually a single CBP Agent stopped the family and told them to remove their jewelry, belts, and shoes.  The CBP Agent made K.O. remove a small ring that she had received upon her Kindergarten graduation.  The CBP Agent asked them if they had any money, telephones, or identification.  L.J. explained that they only had identification.

127.    The CBP Agent then drove the family in a truck for about thirty minutes. Immediately, K.O. and E.O., Jr. felt relieved, believing that help had arrived and they could finally rest.  K.O. fell asleep.

128.    The family was taken to a detention facility in McAllen, Texas.  They were seated on a cement bench.

129.    After a few minutes, CBP Agents called E.O., Jr. into an extremely small room with about fifty other children ranging in age from about fourteen to seventeen.  When E.O., Jr. was taken from L.J., she had no idea that the Defendants intended to keep them separated.

130.    There was not enough space in the room for E.O., Jr. to sit so he had to stand for almost seven hours.  The air became so thick and heavy that some of the children kept calling for the CBP Agents to help by banging on the door.  Every once in a while, the CBP Agents opened the door, which let some air in, and everyone felt momentary relief.  More than once, the CBP Agents opened the door and screamed at the group of children in Spanish:  "Shut up, you donkeys!"

33

131.     L.J. saw her son E.O., Jr. come out of the room once to be fingerprinted.  The CBP Agents would not let E.O., Jr. talk to L.J.  They were terrified.  They did not know why the CBP Agents had separated them.  They feared they would never see each other again.

132.     About two minutes after taking E.O., Jr., CBP Agents took nine-year-old K.O. and her mother to another holding cell.  About thirty other mothers were in that cell with their children.  One mother had an infant that looked to be only two months old.  The room was freezing cold, the only food was sandwiches for the children, and many of the children were crying the entire time.  Mothers walked with their children on their shoulders and sang songs to them, hoping to help the children fall asleep.

133.     K.O. felt hungry, cold, and afraid in that cell.  L.J. could not do anything to help her.

134.     About twelve to fourteen hours later, CBP Agents brought L.J. into a room with about ten other mothers.  Their children were left alone in a cell.  K.O. grabbed L.J. from behind and said, "Mommy, don't go!"

135.     The CBP Agent had to pry K.O.'s hands off of L.J. and when he did that he yelled at K.O. in Spanish:  "Dejala!"  That means : "Let her go!"  L.J. asked the agent why he was attacking K.O.

136.     As the CBP Agent pulled K.O.'s hands off of L.J., he said to her in Spanish: "You're going to be deported to Guatemala and we're going to adopt your daughter."

137.     K.O. was screaming.  L.J. desperately called out to K.O., telling her:  "I love you with all my heart!  We are going to see each other again soon.  Remember your father's phone number."

138.    E.O., Jr. could see this happening through the window of the room where he was being held.  E.O., Jr. banged on the window to try to stop them from taking his sister, to no avail.

139.    K.O.'s father, E.O., was living in Westborough, Massachusetts and L.J. thought he would be able to help K.O. even if L.J. could not.  When he found out where they were, E.O. began trying to get his children released to him in Massachusetts.

140.    On the day the children were taken from L.J. a CBP Agent or ICE Agent told E.O. that they intended to separate the children from L.J.  Defendants had no legitimate interest in separating K.O. and E.O., Jr. from L.J.  There was no evidence or even allegation of abuse, neglect, or unfitness or that L.J. was not acting in the best interests of her children.  Defendants did not provide K.O., E.O., Jr., or L.J. with any notice or opportunity to be heard before forcibly separating them.

141.    K.O. and E.O., Jr. were placed on a bus with no shoes.  E.O., Jr. tried to hug his sister, but the CBP Agents or ICE Agents separated them immediately.  The bus ride was about ten minutes long.  The CBP Agents or ICE Agents then placed the children in a new detention facility with cells facing across from each other.

142.    E.O., Jr. tried to talk to K.O. to tell her not worry and that she would be out of the cells soon.  K.O. asked her brother:  "What happened to Mommy?"

143.    When E.O., Jr. tried to answer, a CBP Agent or ICE Agent yelled at him and instructed him not to talk to his own sister.  Her question went unanswered.

144.    K.O. and E.O., Jr. stayed at that facility for two days and two nights.  The rooms were freezing.  The only blankets they had were silver thermal blankets.

145.    Small children who appeared to be as young as one or two years old cried on the floor.  The older children tried to take care of the young, crying children.  Boys and girls were separated by something like a metal fence.

146.    At one point, E.O., Jr. looked over at his sister K.O. and she was crying.  E.O., Jr. put his hands together and put his head on his hands, pretending to sleep, to try to help soothe K.O. and stop her from crying.  But E.O., Jr. felt so helpless that he too started crying.

147.    When the children cried, some CBP Agents or ICE Agents insulted them in Spanish, including by shouting at them: "Shut up, you trash!"

148.    Once, a CBP Agent or ICE Agent came up to E.O., Jr. and asked how old he was. When he replied that he was seventeen years old, the CBP Agent or ICE Agent said "you are lying" and kicked E.O., Jr. about ten times in the back.

149.    The CBP Agents or ICE Agents woke K.O. up to take a shower by pulling her ponytail.

150.    E.O., Jr. was removed from this detention facility first.  He told the CBP Agents or ICE Agents that he had to wait for his sister.  The CBP Agents or ICE Agents said that if he stayed he would "lose his opportunity."  E.O., Jr. thought they meant that he would lose his opportunity to be reunited with his father, E.O.  E.O., Jr. still refused to leave, unwilling to leave his sister alone.  The next night, the CBP Agents or ICE Agents made E.O., Jr. bathe in cold water, change his clothes, and prepare to leave.

151.    The CBP Agents or ICE Agents took both E.O., Jr. and K.O. to another facility. When E.O., Jr. asked where his mother was, the CBP Agents or ICE Agents told him they had deported his mother.

152.     E.O., Jr. and K.O. were placed on an airplane to Michigan, seated separately. They arrived at about 1:00 a.m. and they were told they were going to separate locations.  E.O., Jr. asked them to allow him to stay with his sister, but CBP Agents, ICE Agents, or ORR Personnel told E.O., Jr. not to worry and assured him that they would bring K.O. back in the morning.

153.     As soon as the siblings were separated, K.O. started to cry.  She was taken to a foster family with three other children who had been forcibly separated from their parents at the border.  There were two six-year-olds and an eight-year-old.

154.     E.O., Jr. stayed in a facility with about eighteen other boys.  He attended school in the morning and K.O. was able to see her brother at school.  E.O., Jr. was told by ORR Personnel that getting out of the facility would be a terrible, long process.

155.     K.O. and E.O., Jr. did not know where their mother was.  It bothered E.O., Jr. so terribly that he could not sleep or eat.

156.     About five days later, E.O., Jr. was able to call his father, E.O., and tell him where he was being held.

157.     E.O., Jr. was told that he had to be vaccinated again, even though he had already been vaccinated, and he was given ten shots by a medical professional and ORR Personnel.  K.O. was also vaccinated and was given nine shots.  L.J. was not there to comfort her daughter during this process.

158.     K.O. and E.O., Jr. were finally released and reunited with their father in Massachusetts on June 19, 2018.

159.    L.J. spent about eight days in the facility where her children were taken from her. She was not allowed to call her husband, E.O., for about nine days.  Then she was taken to the T. Don Hutto Residential Center in Taylor, Texas, where she was detained for several weeks.

160.    L.J. finally met with an asylum officer in mid-June 2018 who found that L.J. had a credible fear of persecution if she were forced to return to Guatemala.

161.    L.J. was finally released on June 26, 2018 and reunited with her family in Massachusetts after that.  They had been separated for about five weeks at that point.  Needless to say, the family was relieved and joyful.

162.    But the trauma caused by this forcible separation endures.  The horrible, painful memories still torment K.O., E.O., Jr., L.J. and E.O.  K.O. wakes up in the middle of the night, crying, wondering if that mean person would pull her hair again.  Whenever L.J. leaves a room, K.O. follows her mother and fears that she will abandon her again.

163.    The guilt that L.J. feels as a mother is overwhelming.  She feels as if she was unable to protect her children.  The trauma that K.O., E.O., Jr., L.J., and E.O. experienced was life altering and it will continue to affect their mental and emotional well-being for years to come.

164.    The ordeal that K.O. and E.O., Jr. endured is typical of the experiences suffered by the putative class members.

### Individual Plaintiff's Allegations – C.J.

165.    F.C. and his eleven-year-old son, C.J. entered the United States in El Paso, Texas on June 17, 2018 seeking asylum in this country.  They came to the United States for asylum because organized crime members, who worked in concert with the police in Guatemala,

extorted F.C. for money, threatened to kill F.C. and his family, and left them fearing for their lives.

166.    When they crossed the United States border, F.C. saw a CBP vehicle and walked towards it. F.C. was holding C.J.'s hand.  The CBP Agents handcuffed F.C. and both he and C.J. were driven to a detention center.

167.    When F.C. and C.J. arrived at the detention center, CBP Agents told F.C. that he would be separated from C.J.  F.C. felt "devastated" and "destroyed" upon hearing that CBP Agents planned to separate his son from him.  F.C. spent two days with C.J. trying to be brave for his son.   Internally, F.C. kept thinking that despite his efforts, his son was going to be kidnapped.  C.J. cried a lot.  F.C. tried to calm him down and told him that F.C. would ask the CBP Agents to let them stay together.

168.    The detention facility was very cold. The air conditioner was on the highest setting at all times. F.C. and his son slept on the floor and were given one aluminum blanket to share.  F.C. stayed up trying to cover C.J. with his arms.  C.J. shivered and constantly complained about the cold.

169.    C.J. also complained of hunger.  Both days F.C. and C.J. were given one burrito to share, twice a day.  F.C. asked for more food to share with C.J.  The CBP Agents denied them additional food, saying: "You're not here to get fat."  When F.C. asked for water they told him to use the sink.  This was difficult because there were approximately fifteen people, including six children, and one bathroom.

170.    On June 20, 2018, the CBP Agents woke up F.C. and C.J. in the middle of the night and took them to a processing area.  They told F.C. that C.J. would stay there while F.C. went to court.  The CBP Agents told F.C. that he would be back after court.  They told C.J. they

would be putting him in another room until F.C. returned.  F.C. assumed this would take a very short period of time, and F.C. would soon see C.J.

171.    Instead, F.C. did not see his son again until July 26, 2018—36 days later.

172.    The CBP Agents handcuffed F.C., took him away, and never returned him to the detention facility where he was held with C.J.  F.C. was very worried about C.J.

173.    F.C. asked anyone who would listen: "Where is C.J.?"  "Where has he been taken?"  "How do I get in touch with him?"

174.    F.C. knew how scared C.J. must be and F.C. felt heartbroken that he had not protected his son, especially because that was all F.C. had wanted to do by coming to the United States.

175.    When F.C. went to court he was told that he was there because he had committed the federal crime of coming into the country illegally.  The judge asked F.C. if he wanted to leave C.J. in the United States or take C.J. with him if deported.  F.C. felt sheer terror at being deported without C.J.  F.C. told the judge that no matter what they decided to do, F.C. wanted C.J. to be with him.

176.    F.C. was moved to multiple detention facilities.  At every detention center F.C. asked about C.J.  F.C. persisted until an employee from one of the detention centers finally arranged for him to speak to C.J.

177.    When F.C. finally spoke to C.J. it was only for five minutes and C.J. cried very hard the entire time.  F.C. told C.J. not to think about the situation and to play and make new friends. The phone call was heartbreaking because C.J. wanted to know when he would see his father again, but F.C. did not have an answer.

40

178.    On that same day, an employee at the facility asked again if F.C. would authorize C.J. to stay behind if F.C. were to be deported.  F.C. said no.

179.    At some point the CBP Agents turned F.C. over to ICE Agents.  F.C. was very afraid that the ICE Agents would deport C.J. without F.C.  F.C. was worried that C.J. would grow up alone with no family.  F.C. constantly worried about how C.J. was being treated and whether he was safe.

180.    C.J. was held at a facility with many other children similarly separated from their parents. This separation deeply affected C.J.

181.    While at the facility, another child hit C.J. in the eye.  After C.J. told staff about the assault, he noticed that the child who assaulted him went to see a psychologist or mental health doctor and then C.J. never saw the child again.  That incident made C.J. feel deep fear, because he thought that if he made a mistake, he might disappear too.

182.    At the facility, C.J. was sad and cried a lot because he missed his father.  C.J. kept asking the staff when he would see his father again.  Although C.J. was told that it would be "soon," the days went by without any change.  Eventually, C.J. came to believe he would never see his father again and would be at the facility for many years.

183.    C.J. and F.C. were finally reunited on July 26, 2018.  While the relief and joy they both felt at seeing each other again was overwhelming, the harm that Defendants caused to C.J. during the time that he was separated from his father and in Defendants' custody can never truly be remedied.

184.    F.C. tries to assure C.J. that he will be OK, that he is safe, and that F.C. will never leave him again.

185.    But C.J. now wakes up with nightmares, something that never happened before Defendants forcibly separated him from his father.  Sometimes, C.J.'s nightmares are so bad that he falls out of bed.

186.    Defendants' forcible separation of C.J. from his father has caused extreme emotional and psychological harm.  The trauma that both C.J. and F.C. experienced was life altering and it will continue to affect their mental and emotional well-being for years to come.

187.    The ordeal that C.J. endured is typical of the experiences suffered by the putative class members.

### Class Allegations

188.    This action is properly maintained as a class action under Fed. R. Civ. P. 23(a) and 23(b)(1) and 23(b)(3).

189.    Plaintiffs seek to represent a nationwide class consisting of all minor children nationwide who enter or have entered the United States at or between designated ports of entry and who have been or will be separated from a parent or parents by DHS or its sub-agencies (CBP, ICE, or USCIS) and detained in ORR custody, ORR foster care, or CBP or ICE custody without a demonstration in a hearing that the parent is unfit or presents a danger to the child.

190.    The class is so numerous that joinder of all members is impracticable.  While the exact number of class members is unknown at this time and can only be ascertained through appropriate discovery, based on information disclosed in another pending case, the class consists of well over 2,500 children.  *See Ms. L. v. ICE*, No. 18-CV -0428-DMS-MDD, Joint Status Report (July 26, 2018) (Doc. No. 159).

191.    The members of the class are readily ascertainable through Defendants' and government records.

192.    There are questions of law or fact common to the class.  The class members have all been subjected to the Defendants' practice of forcibly separating migrant children from their parents for no legitimate reason.  All class members have been subjected to that practice without an adequate hearing regarding separation.  The common questions of law include whether Defendants' forcible family separation violates the class members' procedural and substantive due process rights and the equal protection guarantee under the Due Process Clause.

193.    Plaintiffs' claims or defenses are typical of the claims or defenses of the Class.

194.    Plaintiffs have no interests that are adverse to or which irreconcilably conflict with the other members of the class.

195.    Plaintiffs are represented by counsel experienced in class action litigation and, in particular, in litigating civil rights claims involving constitutional and statutory violations, tort claims, and immigration matters.  Plaintiffs' counsel has adequate resources to commit to representing the class.

196.    Plaintiffs will therefore fairly and adequately protect the interests of the class.

197.    This action is properly maintained as a class action under Fed. R. Civ. P. 23(b)(1) because prosecuting separate actions by or against individual class members would create a risk of: (a) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standard of conduct for the party opposing the class; or (b) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

198.    This action is also properly maintained as a class action under Fed. R. Civ. P. 23(b)(3) because the questions of law or fact common to the members of the class predominate

over any questions affecting only individual members and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I
### Violation of Substantive Due Process – Right to Family Integrity

199.     Plaintiffs incorporate all of the preceding allegations in this Complaint as if fully set forth here.

200.     At all relevant times, all Defendants were acting under color of federal law.

201.     The Due Process Clause of the Fifth Amendment applies to all "persons" on United States soil and therefore applies to Plaintiffs and to all proposed class members.

202.     Plaintiffs and all class members have a liberty interest under the Due Process Clause in remaining together as a family and in their parents' care and comfort.

203.     The forcible separation of the class members from their parents violates substantive due process because it furthers no legitimate purpose, much less a compelling governmental interest.

204.     The Defendants in this action have adopted, implemented, enforced, condoned, sanctioned, acquiesced to, and encouraged a pattern, practice, or custom of violating the clearly established due process rights of the class members by forcibly separating young children from their parents without justification.

205.     Defendants' conduct shocks the conscience and demonstrates their deliberate indifference to the violation of the class members' constitutional right to due process.

206.     As a direct and proximate result of the Defendants' Due Process violations, the class members have suffered harm.

207.     Defendants' conduct was intentional, wanton, malicious, reckless, callously indifferent, and oppressive, thus entitling the class members to punitive damages.

44

<u>COUNT II</u>
**Violation of Procedural Due Process**

208.    Plaintiffs incorporate all of the preceding allegations in this Complaint as if fully
set forth here.

209.    At all relevant times, all Defendants were acting under color of federal law.

210.    The Due Process Clause of the Fifth Amendment applies to all "persons" on
United States soil and therefore applies to Plaintiffs and to all proposed class members.

211.    The Due Process Clause of the Fifth Amendment prohibits deprivations of life,
liberty, or property without constitutionally adequate procedural safeguards and protects the right
to a fair hearing.

212.    The forcible separation of the class members from their parents violates a
fundamental liberty interest with no notice or opportunity to be heard.

213.    The Defendants in this action have adopted, implemented, enforced, condoned,
sanctioned, acquiesced to, and encouraged a pattern, practice, or custom of violating the clearly
established due process rights of the class members by forcibly separating young children from
their parents without due process of law.

214.    Defendants' conduct shocks the conscience and demonstrates their deliberate
indifference to the violation of the class members' constitutional right to due process.

215.    As a direct and proximate result of the Defendants' Due Process violations, the
class members have suffered harm.

216.    Defendants' conduct was intentional, wanton, malicious, reckless, callously
indifferent, and oppressive, thus entitling the class members to punitive damages.

## COUNT III
### Violation of the Fifth Amendment's Equal Protection Guarantee

217.    Plaintiffs incorporate all of the preceding allegations in this Complaint as if fully set forth here.

218.    At all relevant times, all Defendants were acting under color of federal law.

219.    The Due Process Clause of the Fifth Amendment applies to all "persons" on United States soil and therefore applies to Plaintiffs and to all proposed class members.

220.    The Fifth Amendment contains an implicit guarantee of equal protection that forbids any official action that intentionally discriminates on the basis of race, ethnicity, or national origin.

221.    Defendants' forcible separation of immigrant children and parents, particularly from Central and South America, arriving at the Southwestern border is unconstitutional because it burdens a fundamental right and was motivated, at least in part, by the Defendants' intentional discrimination based on race, ethnicity, or national origin.  This intentional discrimination includes bias against immigrants perceived to come from Central or South America.

222.    Defendants' forcible separation of children and parents, particularly from Central and South America, arriving at the Southwestern border is unconstitutional because it disparately impacts immigrants from Latin America arriving at the border and is motivated by animus and a desire to harm this particular group.

223.    The forcible separation of children from their parents is not narrowly tailored to achieve a compelling governmental interest.

224.    Alternatively, the discriminatory terms and application of the family separation practice are arbitrary and bear no rational relationship to a legitimate federal interest.

225.     Defendants' conduct shocks the conscience and demonstrates their deliberate indifference to the violation of the class members' constitutional right to equal protection of the laws.

226.     As a direct and proximate result of the Defendants' Equal Protection violations, the class members have suffered harm.

227.     Defendants' conduct was intentional, wanton, malicious, reckless, callously indifferent, and oppressive, thus entitling the class members to punitive damages.

### COUNT IV
**Violation of Substantive Due Process – Punishment of Civil Detainees**

228.     Plaintiffs incorporate all of the preceding allegations in this Complaint as if fully set forth here.

229.     At all relevant times, all Defendants were acting under color of federal law.

230.     The Due Process Clause of the Fifth Amendment applies to all "persons" on United States soil and therefore applies to Plaintiffs and to all proposed class members.

231.     Plaintiffs and all class members have a liberty interest under the Due Process Clause in remaining free from punitive conditions during their civil immigration detention.

232.     The Defendants intended to punish the class members during their detention by forcibly separating the children from their parents, purporting to maintain the separation indefinitely, failing to provide meaningful information to parents or children about one another's location and well-being, subjecting the children to appalling and abusive conditions, and preventing them from reliable and ready access to means of communicating with one another.

233.     Regardless of Defendants' intent, the conduct described above is patently excessive in relation to any legitimate objective.

47

234.     Defendants' conduct violates substantive due process because it furthers no legitimate purpose, much less a compelling governmental interest.

235.     The Defendants in this action have adopted, implemented, enforced, condoned, sanctioned, acquiesced to, and encouraged a pattern, practice, or custom of violating the clearly established due process rights of the class members through the unlawful conduct described above.

236.     Defendants' conduct shocks the conscience and demonstrates their deliberate indifference to the violation of the class members' constitutional right to due process.

237.     As a direct and proximate result of the Defendants' Due Process violations, the class members have suffered harm.

238.     Defendants' conduct was intentional, wanton, malicious, reckless, callously indifferent, and oppressive, thus entitling the class members to punitive damages.

## COUNT V
### Violation Due Process – Coerced Waiver of Asylum and Other Immigration Claims

239.     Plaintiffs incorporate all of the preceding allegations in this Complaint as if fully set forth here.

240.     At all relevant times, all Defendants were acting under color of federal law.

241.     The Due Process Clause of the Fifth Amendment applies to all "persons" on United States soil and therefore applies to Plaintiffs and to all proposed class members.

242.     Plaintiffs and all class members have an interest under the Due Process Clause in pursuing asylum and other potential immigration claims without being coerced to waive them.

243.     Defendants' coercive practice of conditioning reunification of children with their parents upon the parents' waiver of their own and their children's right to asylum and other

48

immigration relief violates the Due Process Clause because these waivers were not knowing, intelligent, or voluntary.

244.    Defendants' conduct violates due process because it furthers no legitimate purpose, much less a compelling governmental interest.

245.    The Defendants in this action have adopted, implemented, enforced, condoned, sanctioned, acquiesced to, and encouraged a pattern, practice, or custom of violating the clearly established due process rights of the class members through the unlawful conduct described above.

246.    Defendants' conduct shocks the conscience and demonstrates their deliberate indifference to the violation of the class members' constitutional right to due process.

247.    As a direct and proximate result of the Defendants' Due Process violations, the class members have suffered harm.

248.    Defendants' conduct was intentional, wanton, malicious, reckless, callously indifferent, and oppressive, thus entitling the class members to punitive damages.

### COUNT VI
### Violation of Substantive Due Process
### Failure to Provide Adequate Mental Health Services

249.    Plaintiffs incorporate all of the preceding allegations in this Complaint as if fully set forth here.

250.    At all relevant times, all Defendants were acting under color of federal law.

251.    The Due Process Clause of the Fifth Amendment applies to all "persons" on United States soil and therefore applies to Plaintiffs and to all proposed class members.

252.    Plaintiffs and all class members have a liberty interest under the Due Process Clause in receiving adequate medical care, including mental health care, while in the custody of the Defendants.

253.    The Defendants' failure to provide adequate and necessary mental health care to the class members after forcibly separating them from their parents violates substantive due process because it furthers no legitimate purpose, much less a compelling governmental interest.

254.    Moreover Defendants were aware of the severe harm that their conduct caused to the mental health of the class members, yet they failed to provide adequate and necessary treatment to them.

255.    Defendants' conduct shocks the conscience and demonstrates their deliberate indifference to the violation of the class members' constitutional right to due process.

256.    The Defendants in this action have adopted, implemented, enforced, condoned, sanctioned, acquiesced to, and encouraged a pattern, practice, or custom of violating the clearly established due process rights of the class members by failing to provide adequate mental health care to the class members after forcible separation from their parents.

257.    As a direct and proximate result of the Defendants' Due Process violations, the class members have suffered harm.

258.    Defendants' conduct was intentional, wanton, malicious, reckless, callously indifferent, and oppressive, thus entitling the class members to punitive damages.

### COUNT VII
**Conspiracy to Interfere with Civil Rights in Violation of 42 U.S.C. § 1985(3)**

259.    Plaintiffs incorporate all of the preceding allegations in this Complaint as if fully set forth here.

260.    The Defendants are located in States or Territories of the United States.

261.     The Defendants are "persons" for the purposes of 42 U.S.C. § 1985(3).

262.     Two or more of the Defendants conspired or furthered a conspiracy to deprive Plaintiffs and class members of equal protection of the laws.

263.     The Defendants furthered their conspiracy by, at various times, creating, adopting, implementing, enforcing, condoning, sanctioning, acquiescing to, and encouraging a pattern, practice, or custom of taking children and parents, particularly those from Central and South America, arriving at or between designated ports of entry to the United States into custody and forcibly separating them.

264.     The Plaintiffs and the class members include Central and South American children, sharing characteristics of race, ethnicity, and/or national origin, who arrived at the United States border with their parents and were forcibly separated from them by Defendants.

265.     The Defendants were motivated to discriminate against the Plaintiffs and other class members due to their race, ethnicity, and/or national origin.

266.     As a direct and proximate result of the Defendants' unlawful conspiracy, the Plaintiffs and other class members have suffered pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses and have been deprived of their constitutionally protected rights to substantive and procedural due process and equal protection.

267.     Defendants' conduct was intentional, wanton, malicious, reckless, callously indifferent, and oppressive, thus entitling the Plaintiffs and class members to punitive damages.

268.     The Plaintiffs and class members are entitled to recover costs, reasonable attorney's fees, and expert fees under 42 U.S.C. § 1988.

**COUNT VIII**
**Refusal or Neglect to Prevent or Aid in Preventing**
**Conspiracy to Interfere with Civil Rights in Violation of 42 U.S.C. § 1986**

269.     The Plaintiffs incorporate all of the preceding allegations in this Complaint as if fully set forth here.

270.     The Defendants are "persons" for the purposes of 42 U.S.C. § 1986.

271.     The Defendants possessed knowledge of a conspiracy to injure and interfere with the constitutionally-protected rights of the Plaintiffs and class members in violation of 42 U.S.C. § 1985.

272.     The Defendants had power to prevent or aid in the prevention of such a conspiracy and neglected or refused to do so.

273.     As a direct and proximate result of the unlawful conspiracy which the Defendants knew of but neglected or refused to prevent, the Plaintiffs and class members have suffered pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses.

274.     The nature of the relief sought and the harm suffered by the Plaintiffs meets the jurisdictional requirements and thresholds of this Court.

275.     Defendants' conduct was intentional, wanton, malicious, reckless, callously indifferent, and oppressive, thus entitling the Plaintiffs and class members to punitive damages.

276.     The Plaintiffs and class members are entitled to recover costs, reasonable attorney's fees, and expert fees under 42 U.S.C. § 1988.

WHEREFORE, Plaintiffs K.O. and E.O., Jr., by and through their parents and next friends, E.O. and L.J, and C.J, by and through his father and next friend F.C., on behalf of

themselves and all others similarly situated, respectfully request that the Court grant the

following relief:

    A.  Enter judgment declaring this action to be a class action under Fed. R. Civ. P. 23 and certifying Plaintiffs K.O. and E.O., Jr., by and through their parents and next friends, E.O. and L.J, and C.J, by and through his father and next friend F.C., as the class representatives and Plaintiffs' counsel as class counsel;

    B.  Enter judgment in favor of Plaintiffs and the class, and against Defendants, on all counts of the Complaint;

    C.  Enter an order requiring the Defendants to establish a fund in an amount to be determined at trial for the mental health treatment and ongoing mental health monitoring of the class members;

    D.  Award to Plaintiffs and the class all damages in an amount to be determined at trial sufficient to compensate the class for their injuries, including, but not limited to, emotional pain and suffering, mental anguish, embarrassment, and humiliation;

    E.  Award to Plaintiffs and the class punitive or exemplary damages as permitted by law;

    F.  Award to Plaintiffs and the class their attorneys' fees, costs, and interest as permitted by law; and

    G.  Grant such further and other relief as may be just and proper.

**PLAINTIFFS ON BEHALF OF THEMSELVES AND
ALL OTHERS SIMILARLY SITUATED
DEMAND A TRIAL BY JURY ON ALL CLAIMS AND ISSUES SO TRIABLE**

Respectfully submitted,

K.O. and E.O., Jr., by and through their parents and
next friends, E.O. and L.J.; and C.J, by and through
his father and next friend F.C.; each individually
and on behalf of all others similarly situated, on
behalf of themselves and all others similarly
situated,


By their attorneys,



*Howard M. Cooper*
Howard M. Cooper (BBO # 543842)
Joseph M. Cacace (BBO # 672298)
TODD & WELD LLP
One Federal Street, 27th Floor
Boston, MA 02110
(617) 720-2626
hcooper@toddweld.com
jcacace@toddweld.com

Susan B. Church (BBO # 639306)
Derege Demissie (BBO # 637544)
Heather Yountz (BBO # 669770)
Brittanie Allen (BBO # 697561)
DEMISSIE & CHURCH
929 Massachusetts Avenue, Suite 01
Cambridge, MA 02139
(617) 319-2399
sbc@demissiechurch.com
dd@demissiechurch.com

Jeff Goldman (BBO # 548056)
Jesse M. Bless (BBO # 660713)
THE LAW OFFICES OF JEFF GOLDMAN LLP
125 Washington Street, Ste. 204
Salem, MA 01970
(781) 704-3897
Jeff@@jeffgoldmanimmigration.com
Jesse@jeffgoldmanimmigration.com

54

David A. Vicinanzo (*pro hac vice* to be requested)
Nathan P. Warecki (BBO# 687547)
Lauren Maynard (BBO# 698742)
NIXON PEABODY LLP
100 Summer Street
Boston, MA  02110
(617) 345-1000
dvicinanzo@nixonpeabody.com
nwarecki@nixonpeabody.com
lmaynard@nixonpeabody.com

Iván Espinoza-Madrigal (*pro hac vice* to be
requested)
Oren N. Nimni (BBO # 691821)
Lawyers' Committee for Civil Rights and Economic
Justice
61 Batterymarch Street, 5th Floor
Boston, MA 02110
(617) 988-0624
iespinoza@lawyerscom.org
onimni@lawyerscom.org

Dated:  September 5, 2018

4845-1239-5886, v. 14