UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

| | |
|---|---|
| K.O. and E.O., Jr., by and through their parents and next friends, E.O. and L.J.; and C.J., by and through his father and next friend F.C.; each individually and on behalf of all others similarly situated, | ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| JEFFERSON BEAUREGARD SESSIONS III, Attorney General of the United States; KIRSTJEN NIELSEN, Secretary of the United States Department of Homeland Security (DHS); JOHN F. KELLY, White House Chief of Staff; STEPHEN MILLER, Senior Advisor to the President; GENE HAMILTON, Counselor to the Attorney General Sessions; THOMAS HOMAN, former Director of United States Immigration and Customs Enforcement (ICE); RONALD D. VITIELLO, Acting Director of ICE; L. FRANCIS CISSNA, Director of United States Citizenship and Immigration Services (USCIS); KEVIN K. MCALEENAN, Commissioner of United States Customs and Border Protection (CBP); ALEX AZAR, Secretary of the United States Department of Health and Human Services (HHS); SCOTT LLOYD, Director of the United States Office of Refugee Resettlement (ORR); JOHN DOE ICE AGENTS; JOHN DOE CBP AGENTS; and JOHN DOE ORR PERSONNEL, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

C.A. No. 18-40149-TSH

---

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF THE DEFENDANTS' MOTION TO DISMISS
(LEAVE SOUGHT DECEMBER 21, 2018)**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iv

INTRODUCTION ........................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND ......................................... 2

    a. Individual Allegations and Claims ........................................... 2

    b. Class Allegations ................................................................ 4

STATUTORY AND REGULATORY FRAMEWORK ....................................... 5

    a. Expedited Removal, Credible Fear, and Mandatory Detention under the
       Immigration  and Nationality Act ("INA") ................................. 5

    b. Statutes Governing the Care and Custody of Unaccompanied Alien Children ......... 5

       i. The Homeland Security Act of 2002 ("HSA") ......................... 5

       ii. Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA") ........ 6

    c. Criminal Prosecution for Improper Entry ................................... 7

    d. The "Zero-Tolerance Policy" ................................................. 8

ARGUMENT ................................................................................ 8

I.    THE COURT LACKS PERSONAL JURISDICTION OVER ALL OF THE
     DEFENDANTS. .......................................................................... 8

    a. Plaintiffs Have Failed to Establish That the Massachusetts Long-Arm Statute
       Authorizes Personal Jurisdiction Over Any Defendant. ..................... 12

    b. Plaintiffs Have Failed to Establish That Due Process Permits Personal Jurisdiction
       Over Any Defendant. ............................................................ 13

II.   THE COURT SHOULD DISMISS THE COMPLAINT FOR LACK OF PROPER
     VENUE. ................................................................................. 17

III.  THIS COURT SHOULD REJECT PLAINTIFFS' INVITATION TO EXTEND
     BIVENS TO CHALLENGE THE CONSTITUTIONALITY OF FEDERAL
     PROSECUTION OR DETENTION POLICY OF ALIENS CROSSING THE
     BORDER ............................................................................... 18

    a. Plaintiffs' Claims Involve a New Context ................................... 21

      b.  Multiple Alternative, Existing Processes Preclude the Creation of a *Bivens* Remedy.................................................................................................................. 23

      c.  Other Factors Counsel Strongly Against Implying a *Bivens* Remedy Here ............ 26

         i.  Bivens Actions May Not Be Used to Challenge U.S. Policy.......................... 26

         ii.  Congressional Action in the Context of Immigration Has Been "Frequent and Intense" and Implying a Damages Remedy Would Raise Serious Separation-of-Powers Concerns.......................................................... 29

         iii.  National and Border Security Concerns Counsel Against Creation of an Individual Capacity Cause of Action in this Context ................................... 31

         iv.  Additional Separation-of-Powers Principles Would Be Violated by Creating an Individual Capacity Claim for Prosecutorial Policy Decisions... 32

         v.  The Scope and Number of Governmental Actions and Actors Plaintiffs Challenge Across Agencies Would Make Devising a Workable Individual-Capacity Cause of Action Impracticable....................................... 33

IV.    DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY FOR ALL CONSTITUTIONAL AND FEDERAL STATUTORY CLAIMS ................................. 38

      a.  Plaintiffs Fail to Allege the Violation of a Clearly Established Due Process Right ...................................................................................................................... 40

      b.  Plaintiffs Fail to Allege a Violation of a Clearly Established Equal Protection Right....................................................................................................................... 48

      c.  Defendants Did Not Personally Violate Plaintiffs' Constitutional or Federal Statutory Rights ..................................................................................................... 51

      d.  The Court Should Dismiss Plaintiffs' Federal Statutory Claims For Additional Reasons.................................................................................................................. 56

V.    PLAINTIFFS' CHALLENGE TO PROSECUTORIAL POLICYMAKING IS BARRED  BY ABSOLUTE IMMUNITY.................................................................... 59

CONCLUSION.................................................................................................................. 60

# TABLE OF AUTHORITIES

<u>Cases</u>

*A Corp. v. All Am. Plumbing, Inc.*,
   812 F.3d 54 (1st Cir. 2016) ...................................................................... 9, 10, 12, 16

*Adams v. Baker*,
   909 F.2d 643 (1st Cir. 1990) ............................................................................... 29

*Aguilar v. ICE*,
   510 F.3d 1 (1st Cir. 2007) ........................................................................ 41, 43, 44

*Air Sunshine, Inc. v. Carl*,
   663 F.3d 27 (1st Cir. 2011) ................................................................................. 24

*Alfano v. Lynch*,
   847 F.3d 71 (1st Cir. 2017) ................................................................................. 38

*Alvarez v. INS*,
   539 F.2d 1220 (9th Cir. 1976) ............................................................................ 50

*Anderson v. Creighton*,
   483 U.S. 635 (1987) ...................................................................................... 27, 38

*Andrews v. Miner*,
   301 F. Supp. 3d 1128 (N.D. Ala. 2017) ............................................................. 25

*Arar v. Ashcroft*,
   585 F.3d 559 (2d Cir. 2009) ............................................................................... 32

*Armour v. City of Indianapolis, Ind.*,
   566 U.S. 673 (2012) ........................................................................................... 48

*Ashcroft v. al-Kidd*,
   563 U.S. 731 (2011) ...................................................................................... 36, 38

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ..................................................................................... passim

*Atuahene v. City of Hartford*,
   10 F. App'x 33 (2d Cir. 2001) ............................................................................ 53

*Aulson v. Blanchard*,
   83 F.3d 1 (1st Cir. 1996) .................................................................................... 57

*Bank Markazi v. Peterson*,
   136 S. Ct. 1310 (2016) ....................................................................................... 31

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ......................................................................................... 52, 58

*Bisbee v. Bey,*
  39 F.3d 1096 (10th Cir. 1994) ......................................................................... 39, 52

*Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,*
  403 U.S. 388 (1971) ..................................................................................... 1, 18, 20

*Bolduc v. United States,*
  No. Civ.A.01-CV-11376-PBS, 2002 WL 1760882 (D. Mass. July 30, 2002) .......................... 13

*Bridges v. Wixon,*
  326 U.S. 135 (1945) ................................................................................................. 46

*Bristol-Myers Squibb Co. v. Super. Ct. of Cal.,*
  137 S. Ct. 1773 (2017) ..................................................................................... 9, 11, 13

*Burns v. Reed,*
  500 U.S. 478 (1991) ................................................................................................. 59

*Bush v. Lucas,*
  462 U.S. 367 (1983) ........................................................................................... 19, 20

*Camreta v. Greene,*
  563 U.S. 692 (2011) ........................................................................................... 39, 45

*Carlson v. Green,*
  446 U.S. 14 (1980) ..................................................................................... 18, 25, 36

*Castro v. DHS,*
  835 F.3d 422 (3d Cir. 2016) ................................................................................... 46

*Cervantes v. INS,*
  510 F.2d 89 (10th Cir. 1975) ................................................................................... 44

*Chappell v. Wallace,*
  462 U.S. 296 (1983) ................................................................................................. 26

*Cheney v. U.S. Dist. Ct. for D.C.,*
  542 U.S. 367 (2004) ................................................................................................. 28

*City of Cleburne. v. Cleburne Living Ctr.,*
  473 U.S. 432 (1985) ................................................................................................. 50

*Claasen v. Brown,*
  No. Civ. A. 94-1018-GK, 1996 WL 79490 (D.D.C. 1996) ..................................... 15

*Cobell v. Salazar,*
    679 F.3d 909 (D.C. Cir. 2012) ................................................................. 36

*Collins v. City of Harker Heights, Tex.,*
    503 U.S. 115 (1992) ................................................................................ 40

*Cordis Corp. v. Cardiac Pacemakers,*
    599 F.2d 1085 (1st Cir. 1979) ................................................................. 18

*Corr. Sers. Corp. v. Malesko,*
    534 U.S. 61 (2001) ......................................................................... passim

*Cortez–Flores v. INS,*
    500 F.2d 178 (5th Cir. 1974) ................................................................... 44

*Creative Environments, Inc. v. Estabrook,*
    680 F.2d 822 (1st Cir. 1982) ................................................................... 58

*Cty. of Sacramento v. Lewis,*
    523 U.S. 833 (1998) ................................................................................ 43

*D.B. v. Cardall,*
    826 F.3d 721 (4th Cir. 2016) ................................................................... 46

*D.C. v. Wesby,*
    138 S. Ct. 577 (2018) ......................................................................... 39, 47

*Davis v. Passman,*
    442 U.S. 228 (1979) ................................................................................ 18

*De La Paz v. Coy,*
    786 F.3d 367 (5th Cir. 2015) ............................................................. 30, 31

*de Robles v. INS,*
    485 F.2d 100 (10th Cir. 1973) ........................................................... 43, 44

*Delgado v. INS,*
    637 F.2d 762 (10th Cir. 1980) ................................................................. 44

*Dellums v. Powell,*
    660 F.2d 802 (D.C. Cir. 1981) ................................................................. 60

*Demore v. Kim,*
    538 U.S. 510 (2003) ................................................................................ 43

*DesRosiers v. Moran,*
    949 F.2d 15 (1st Cir. 1991) ..................................................................... 55

*Doe v. Kelly*,
   878 F.3d 710 (9th Cir. 2017) .................................................................. 45

*Doe v. Rumsfeld*,
   683 F.3d 390 (D.C. Cir. 2012) ................................................................ 32

*Edwards v. Johnson*,
   209 F.3d 772 (5th Cir. 2000) .................................................................. 42

*Estelle v. Gamble*,
   429 U.S. 97 (1976) .................................................................................. 22

*F.D.I.C. v. Meyer*,
   510 U.S. 471 (1994) .................................................................... 27, 36, 37

*Fed. Open Mkt. Comm. Of Fed. Reserve Sys. v. Merrill*,
   443 U.S. 340 (1979) ................................................................................ 28

*Fiallo v. Bell*,
   430 U.S. 787 (1977) .......................................................................... 29, 41

*Flores v. Johnson*,
   212 F. Supp. 3d 864 (C.D. Cal. 2015) .................................................... 40

*Flores v. Lynch*,
   212 F. Supp. 3d 907 (C.D. Cal. 2015) .................................................... 40

*Flores v. Lynch*,
   828 F.3d 898 (9th Cir. 2016) .................................................................. 40

*Gallanosa v. United States*,
   785 F.2d 116 (4th Cir. 1986) .................................................................. 42

*Galvan v. Press*,
   347 U.S. 522 (1954) ................................................................................ 29

*Garza v. Hargan*,
   874 F.3d 735 (D.C. Cir. 2017),
   *cert. granted, judgment vacated sub nom. Azar v. Garza*, 138 S. Ct. 1790 (2018) ................. 46

*Gent v. CUNA Mut. Ins. Soc'y*,
   611 F.3d 79 (1st Cir. 2010) .................................................................... 35

*Gonzalez v. Velez*,
   864 F.3d 45 (1st Cir. 2017) .............................................................. 24, 26

*Green v. McKaskle*,
   788 F.2d 1116 (5th Cir. 1986) ................................................................ 40

*Griffin v. Breckenridge*,
    403 U.S. 88 (1971) ................................................................. 39, 57

*Guzman-Rivera v. Rivera-Cruz*,
    55 F.3d 26 (1st Cir. 1995) ...................................................... 60

*Haig v. Agee*,
    453 U.S. 280 (1981) ................................................................ 31

*Harlow v. Fitzgerald*,
    457 U.S. 800 (1982) ................................................................ 38

*Hernandez v. Mesa*,
    137 S. Ct. 2003 (2017) ........................................................... 23

*Hernandez v. Mesa*,
    885 F.3d 811 (5th Cir. 2018) .................................................. 32

*Higazy v. Templeton*,
    505 F.3d 161 (2d Cir. 2007) ................................................... 37

*Hill v. Walsh*,
    884 F.3d 16 (1st Cir. 2018) .................................................... 38

*Holloman v. Clarke*,
    236 F. Supp. 3d 493 (D. Mass. 2017) ..................................... 60

*Hunter v. Bryant*,
    502 U.S. 224 (1991) ................................................................ 38

*Idaho v. Coeur d'Alene Tribe of Idaho*,
    521 U.S. 261 (1997) ................................................................ 26

*Imbler v. Pachtman*,
    424 U.S. 409 (1976) ........................................................... 59, 60

*In re Aiken Cty.*,
    725 F.3d 255 (D.C. Cir. 2013) ................................................ 33

*In re Sealed Case*,
    829 F.2d 50 (D.C. Cir. 1987) .................................................. 33

*Jacinto-Castanon de Nolasco v. ICE*,
    319 F. Supp. 3d 491 (D.D.C. 2018) .................................... 24, 44

*Jean v. Nelson*,
    727 F.2d 957 (11th Cir. 1984) ................................................ 49

*Jones v. Horne*,
    634 F.3d 588 (D.C. Cir. 2011) ................................................................................ 56

*Kandamar v. Gonzales*,
    464 F.3d 65 (1st Cir. 2006) .................................................................................... 49

*Laird v. Tatum*,
    408 U.S. 1 (1972) .................................................................................................... 35

*Landon v. Plasencia*,
    459 U.S. 21 (1982) .................................................................................................. 47

*Lebron v. Rumsfeld*,
    670 F.3d 540 (4th Cir. 2012) .................................................................................. 33

*Liff v. Office of Inspector Gen. for U.S. Dep't of Labor*,
    881 F.3d 912 (D.C. Cir. 2018) ................................................................... 23, 25, 31

*Linda R.S. v. Richard D.*,
    410 U.S. 614 (1973) ................................................................................................ 45

*Local No. 48, United Bhd. of Carpenters & Joiners of Am. v. United Bhd. of Carpenters &
    Joiners of Am.*,
    920 F.2d 1047 (1st Cir. 1990) ................................................................................. 57

*Lyons v. Clark*,
    694 F. Supp. 184 (E.D. Va. 1988) *aff'd*, 887 F.2d 1080 (4th Cir. 1989) ................ 42

*Mahmud v. Oberman*,
    508 F. Supp. 2d 1294 (N.D. Ga. 2007) ................................................................... 16

*Malley v. Briggs*,
    475 U.S. 335 (1986) ................................................................................................ 38

*Marin-Garcia v. Holder*,
    647 F.3d 666 (7th Cir. 2011) .................................................................................. 44

*Massachusetts Sch. of Law v. American Bar Ass'n*,
    142 F.3d 26 (1st Cir. 1998) ............................................................... 10, 11, 12, 14

*Mathews v. Diaz*,
    426 U.S. 67 (1976) ............................................................................................ 43, 49

*Mathews v. Eldridge*,
    424 U.S. 319 (1976) ........................................................................................... 47, 48

*McCabe v. Basham*,
    450 F. Supp. 2d 916 (N.D. Iowa 2006) ................................................................... 16

*Medeiros v. Vincent,*
  431 F.3d 25 (1st Cir. 2005) ........................................................................... 48

*Mendez v. Belton,*
  739 F.2d 15 (1st Cir. 1984) ........................................................................... 58

*Meshal v. Higgenbotham,*
  47 F. Supp. 3d 115 (D.D.C. 2014) *aff'd,* 804 F.3d 417 (D.C. Cir. 2015) ................................ 29

*Messerschmidt v. Millender,*
  565 U.S. 535 (2012) ....................................................................................... 38

*Minneci v. Pollard,*
  565 U.S. 118 (2012) ................................................................................. 23, 25

*Mirmehdi v. United States,*
  689 F.3d 975 (9th Cir. 2012) ................................................................... 31, 32

*Monell v. Dep't of Soc. Servs. of City of New York,*
  436 U.S. 658 (1978) ....................................................................................... 19

*Montanye v. Haymes,*
  427 U.S. 236 (1976) ....................................................................................... 42

*Morgan v. Shivers,*
  No. 1:14-cv-7921, 2018 WL 618451 (S.D.N.Y. Jan. 29, 2018) ............................... 25

*Moss v. U.S. Secret Service,*
  No. 06-3045, 2007 WL 2915608 (D. Or. Oct. 7, 2007),
  *rev'd in part, dismissed in part on other grounds,*
  *Moss v. U.S. Secret Service,* 572 F.3d 962 (9th Cir. 2009) ................................ 15, 16

*Moura v. New Prime, Inc.,*
  337 F. Supp. 3d 87 (D. Mass. 2018) ....................................................... 10, 11

*Ms. L. v. ICE,*
  310 F. Supp. 3d 1133 (S.D. Cal. 2018) .................................................... 42, 44

*Munns v. Clinton,*
  822 F. Supp. 2d 1048 (E.D. Cal. 2011) .................................................... 15, 16

*Narenji v. Civiletti,*
  617 F.2d 745 (D.C. Cir. 1979) ..................................................................... 49

*Newbold v. Stansberry,*
  No. 1:08CV1266 (LO/JPP), 2009 WL 86740 (E.D. Va. Jan. 12, 2009)
  *aff'd,* 332 F. App'x 927 (4th Cir. 2009) ..................................................... 42

*Newton v. INS*,
    736 F.2d 336 (6th Cir. 1984) ........................................................................ 44

*Noonan v. Winston Co.*,
    135 F.3d 85 (1st Cir. 1998) .................................................................... 10, 11

*Nwanze v. Philip Morris Inc.*,
    100 F. Supp. 2d 215 (S.D.N.Y. 2000) ............................................................ 16

*Olim v. Wakinekona*,
    461 U.S. 238 (1983) ...................................................................................... 42

*Ouzts v. Cummins*,
    825 F.2d 1276 (8th Cir. 1987) ...................................................................... 56

*Overton v. Bazzetta*,
    539 U.S. 126 (2003) ...................................................................................... 41

*Palmer v. Sheahan*,
    No. 93 C 181, 1994 WL 801474 (N.D. Ill. Feb. 15, 1994) ........................... 40

*Payne-Barahona v. Gonzales*,
    474 F.3d 1 (1st Cir. 2007) ................................................................. 42, 43, 44

*Pearson v. Callahan*,
    555 U.S. 223 (2009) ............................................................................ 38, 39, 45

*Pension Ben. Guar. Corp. v. LTV Corp.*,
    496 U.S. 633 (1990) ...................................................................................... 47

*Perez v. United States*,
    No. 13CV1417-WQH-BGS, 2014 WL 4385473 (S.D. Cal. Sept. 3, 2014) ...... 15, 16

*Phillips Exeter Academy v. Howard Phillips Fund*,
    196 F.3d 284 (1st Cir. 1999) .................................................................. passim

*Rajah v. Mukasey*,
    544 F.3d 427 (2d Cir. 2008) ........................................................................ 49

*Rank v. Hamm*,
    No. 204-0997, 2007 WL 894565 (S.D. W. Va. Mar. 21, 2007) .................... 16

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
    525 U.S. 471 (1999) ...................................................................................... 32

*Robbins v. Oklahoma*,
    519 F.3d 1242 (10th Cir. 2008) ...................................................... 52, 53, 58

*Romer v. Evans,*
   517 U.S. 620 (1996) ........................................................................................ 50

*Rosenberg v. Crandell,*
   56 F.3d 35 (8th Cir. 1995) .............................................................................. 56

*Saucier v. Katz,*
   533 U.S. 194 (2001) ................................................................................. 38, 59

*Schloss v. Bouse,*
   876 F.2d 287 (2d Cir. 1989) ........................................................................... 59

*Schweiker v. Chilicky,*
   487 U.S. 412 (1988) ................................................................................. 19, 31

*SCVNGR, Inc. v. Punchh, Inc.,*
   478 Mass. 324 (2017) ..................................................................................... 10

*Stafford v. Briggs,*
   444 U.S. 527 (1980) ................................................................................. 17, 18

*Stars for Art Prod. FZ, LLC v. Dandana, LLC,*
   806 F. Supp. 2d 437 (D. Mass. 2011) ............................................................ 18

*Swarthout v. Cooke,*
   562 U.S. 216 (2011) ....................................................................................... 47

*Swartz v. Bahr,*
   No. 16-12144-LTS, 2017 WL 2695290 (D. Mass. June 22, 2017) ............... 9, 15

*Ticoalu v. Gonzales,*
   472 F.3d 8 (1st Cir. 2006) .............................................................................. 45

*Trump v. Hawaii,*
   138 S. Ct. 2392 (2018) ....................................................................... 49, 50, 51

*Tucson Woman's Clinic v. Eden,*
   379 F.3d 531 (9th Cir. 2004) .......................................................................... 50

*United Bhd. of Carpenters & Joiners, Local 610 v. Scott,*
   463 U.S. 825 (1983) ....................................................................................... 57

*United States v. Alcaraz-Arellano,*
   441 F.3d 1252 (10th Cir. 2006) ..................................................................... 35

*United States v. Carpio-Leon,*
   701 F.3d 974 (4th Cir. 2012) .......................................................................... 47

*United States v. Delgado-Garcia*,
　374 F.3d 1337 (D.C. Cir. 2004) .............................................................. 32

*United States v. Dominguez-Portillo*,
　No. 17-mj-4409, 2018 WL 315759 (W.D. Tex. Jan. 5, 2018) .................... 43

*United States v. Nixon*,
　418 U.S. 683 (1974) .............................................................................. 33

*United States v. Smith*,
　178 F.3d 22 (1st Cir. 1999) .................................................................... 33

*United States v. Swiss Am. Bank, Ltd.*,
　274 F.3d 610 (1st Cir. 2001) ......................................................... 9, 13, 15

*United States v. Verdugo-Urquidez*,
　494 U.S. 259 (1990) .............................................................................. 46

*Uphoff Figueroa v. Alejandro*,
　597 F.3d 423 (1st Cir. 2010) .................................................................. 58

*Van de Kamp v. Goldstein*,
　555 U.S. 335 (2009) .............................................................................. 60

*Vanderklok v. United States*,
　868 F.3d 189 (3d Cir. 2017) ........................................................ 25, 32, 35

*Vu v. Meese*,
　755 F. Supp. 1375 (E.D. La. 1991) ........................................................ 16

*W. Radio Servs. Co. v. U.S. Forest Serv.*,
　578 F.3d 1116 (9th Cir. 2009) ............................................................... 24

*Wag-Aero, Inc. v. United States*,
　837 F. Supp. 1479 (E.D. Wis. 1993) ...................................................... 16

*Walden v. Fiore*,
　571 U.S. 277 (2014) ........................................................................... 9, 14

*Washington v. Glucksberg*,
　521 U.S. 702 (1997) .............................................................................. 40

*Wilkie v. Robbins*,
　551 U.S. 537 (2007) .................................................................... 23, 34, 35

*Wilson v. Layne*,
　526 U.S. 603 (1999) .............................................................................. 47

*Wood v. Moss*,
  572 U.S. 744 (2014) ........................................................................ 36

*Yellowbear v. Ashe*,
  612 F. App'x 918 (10th Cir. 2015) ................................................. 15

*Zadvydas v. Davis*,
  533 U.S. 678 (2001) ........................................................................ 46

*Ziglar v. Abbasi*,
  137 S. Ct. 1843 (2017) ............................................................. passim


Statutes

U.S. Const. art. I ............................................................................. 29, 33

U.S. Const. art. II .................................................................................. 33

5 U.S.C. § 554(a) .................................................................................. 47

6 U.S.C. §§ 111, 202 ............................................................................ 32

6 U.S.C. § 279(b) .............................................................................. 6, 22

6 U.S.C. § 279(g)(2) ......................................................................... 6, 46

6 U.S.C. §§ 542, 279(a) ........................................................................ 30

8 U.S.C. § 1158 ...................................................................................... 5

8 U.S.C. §§ 1158, 1182, 1225-31 ......................................................... 30

8 U.S.C. § 1182(d)(5)(A) ....................................................................... 5

8 U.S.C. § 1225(b) ............................................................................ 5, 30

8 U.S.C. § 1232 ..................................................................................... 22

8 U.S.C. § 1232(b)(1) ....................................................................... 6, 30

8 U.S.C. § 1232(c)(3) .............................................................................. 7

8 U.S.C. § 1325(a) ......................................................................... passim

8 U.S.C. §§ 1324, 1325, 1326 ................................................................ 7

18 U.S.C. § 1595 ................................................................................... 30

28 U.S.C. §§ 501, 503, 509, 515, 519, 547 ................................................................ 22

28 U.S.C. § 515(a) ................................................................................................ 33

28 U.S.C. §§ 1346(b), 2671-2680 .......................................................................... 25

28 U.S.C. § 1391(b)(3) ............................................................................................ 17

28 U.S.C. § 1391(e) .......................................................................................... 17, 18

28 U.S.C. § 1406 ..................................................................................................... 17

28 U.S.C. § 2675(a) ................................................................................................ 25

42 U.S.C. § 1983 ........................................................................................ 19, 40, 52

42 U.S.C. § 1985 ............................................................................................. passim

42 U.S.C. § 1986 ................................................................................................ 4, 58

M.G.L. c. 223A § 3 ........................................................................................... 12, 13

Trafficking Victims Protection Reauthorization Act of 2003,  Pub. L. No. 108-193,
     117 Stat 2875 .................................................................................................. 30

Victims of Trafficking and Violence Protection Act of 2000,  Pub. L. No. 106-386,
     114 Stat. 1464 ................................................................................................. 30

Prosecutorial Remedies and Tools against the Exploitation of Children Today Act of 2003
     Pub. L. No. 108-21, 117 Stat 650 .................................................................... 30

Intelligence Reform and Terrorism Prevention Act of 2004,  Pub. L. No. 108-458,
     118 Stat 3638 .................................................................................................. 30

Trafficking Victims Protection Reauthorization Act of 2005,  Pub. L. No. 109-164,
     119 Stat 3558 (2006) ....................................................................................... 30

William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008,
     Pub. L. No. 110-457,   122 Stat 5044 .............................................................. 30

National Defense Authorization Act for Fiscal Year 2013,  Pub. L. No. 112-239,
     126 Stat 1632 .................................................................................................. 30

Violence against Women Reauthorization Act of 2013,  Pub. L. No. 113-4, 127 Stat 54 .......... 30

Justice for Victims of Trafficking Act of 2015,  Pub. L. No. 114-22, 129 Stat 227 .................... 30

Combating Human Trafficking in Commercial Vehicles Act,  Pub. L. No. 115-99,
     131 Stat 2242 (2018) ....................................................................................... 30

No Human Trafficking on Our Roads Act,  Pub. L. No. 115-106, 131 Stat 2265 (2018)............ 30

Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 ......................................... 6

Department of Homeland Security Reorganization Plan Modification of January 30, 2003,
     H.R. Doc. No. 108-32 ...................................................................................................... 6

National Human Trafficking Hotline, Pub. L. No. 114-271,
     130 Stat 1398 (2016) ...................................................................................................... 30

Department of Defense and Labor, Health and Human Services, and Education Appropriations
     Act, 2019 and Continuing Appropriations Act, 2019, Pub. L. No. 115-245, 132 Stat 2981 .... 36

Joint Explanatory Statement of the Committee of Conference, H.R. Rep. No. 115-952 (2018).. 37

Rules

Fed. R. Civ. P. 4(k)(1).................................................................................................................. 9

Fed. R. Civ. P. 12(b) ........................................................................................................... passim

Fed. R. Civ. P. 23(a) .................................................................................................................. 4

Fed. R. Evid. 201(b)(2) ............................................................................................................. 35

Regulations

8 C.F.R. §§ 235.3(b)(2)(iii), 235.3(b)(4)(ii) ................................................................................ 5

28 C.F.R. § 0.5 ......................................................................................................................... 22

Other Authorities

6 Attorney General Announces Zero-Tolerance Policy for Criminal Illegal Entry,
     (April 6, 2018), 2018 WL 1666622............................................................................................ 8

Designating Aliens for Expedited Removal, 69 Fed. Reg. 48,877 (Aug. 11, 2004) ...................... 5

18 J. Moore et al., Moore's Federal Practice § 134.02[1][d] (3d ed. 2011) ................................. 45

## INTRODUCTION

To challenge Federal immigration policy, Plaintiffs ask this Court to recognize novel claims under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), against eleven current and former high-ranking government employees in their personal capacities: former White House Chief of Staff John F. Kelly; Senior Advisor to the President Stephen Miller; former Attorney General ("AG") Jefferson B. Sessions, III; Counselor to the AG Gene Hamilton; Secretary of the Department of Homeland Security ("DHS") Kirstjen Nielsen; Commissioner of U.S. Customs and Border Protection ("CBP") Kevin K. McAleenan; former Director of U.S. Immigration and Customs Enforcement ("ICE") Thomas Homan; Acting Director of ICE Ronald D. Vitiello; Director of United States Citizenship and Immigration Services ("USCIS") L. Francis Cissna; Secretary of the Department of Health and Human Services ("HHS") Alex Azar; and former Director of the Office of Refugee Resettlement ("ORR") Scott Lloyd. Even more remarkably, Plaintiffs purport to bring this individual-capacity suit as a class action, and they seek both money damages and the establishment of a fund for mental health treatment for the alleged constitutional and statutory civil rights violations. Compl. ¶ 2.

To begin with, Plaintiffs have not alleged facts establishing either that this Court has personal jurisdiction over the Defendants or that venue is proper in this district. Plaintiffs' failure to plead facts establishing any colorable basis for the threshold issues of personal jurisdiction and proper venue coincides with the complaint's many other deficiencies and requires dismissal.

Among these deficiencies, the Supreme Court has held that core separation-of-powers principles preclude suits for money damages based on the sort of constitutional challenges to U.S. government policy and related actions that Plaintiffs make here. *See Ziglar v. Abbasi*, 137

S. Ct. 1843, 1861 (2017) (rejecting *Bivens* cause of action). Congress has never authorized the remedy Plaintiffs demand, and numerous alternative processes exist to more effectively and efficiently address any and all alleged constitutional infirmities in U.S. policy. Moreover, numerous other factors counsel against a money damages remedy against individual federal officials in the novel and sensitive context presented here – a challenge to the Executive Branch's enforcement of criminal immigration laws, an arena not only heavily regulated by Congress but one deeply connected to our national security and for which primacy rests with the political branches.

Not only does authoritative precedent compel the conclusion that no novel damages cause of action should be created here, all Defendants are entitled to qualified immunity because Plaintiffs have not alleged the violation of any clearly established constitutional or statutory right by any Defendant. Finally, Plaintiffs' claims against former AG Sessions, and all of the other individuals to whom the challenged policy of zero tolerance for improper entry is attributed, should fail because absolute immunity bars suit to the government's decision to prosecute all (or any) persons who violate a particular federal law.

Therefore, as explained more fully below, the complaint should be dismissed with prejudice pursuant to Federal Rules of Civil Procedure 12(b)(2), (3), and (6).

## FACTUAL AND PROCEDURAL BACKGROUND

### a. Individual Allegations and Claims

Plaintiffs K.O. and E.O., Jr. and their mother, L.J., attempted to enter the United States in Texas on May 19, 2018. Compl. ¶ 123.[1] K.O. was nine years old and E.O., Jr., was seventeen years old at the time of the crossing. *Id.* ¶ 124. K.O., E.O., Jr., and L.J., allegedly traveled to the

---

[1] On October 3, 2018, the Court granted Plaintiffs' motion to proceed under pseudonyms. Dkt. 29.

United States to seek asylum. *Id.* ¶ 125. After crossing into the United States, K.O., E.O., Jr., and L.J. were approached by an unidentified U.S. Border Patrol agent and detained. *Id*. ¶¶ 126–29. K.O. and E.O., Jr., were then separated from their mother and eventually transferred to Michigan. *Id*. ¶¶ 129–37, 152. K.O. and E.O., Jr., were reunited with their father in Massachusetts on June 19, 2018. *Id*. ¶ 158. L.J. passed a credible fear screening and was released from custody on June 26, 2018. *Id*. ¶¶ 160–61.[2]

Plaintiff C.J. and his father, F.C., entered the United States in El Paso, Texas on June 17, 2018. Compl. ¶ 165. C.J. was eleven years old the time. *Id.* C.J. and F.C. allegedly traveled to the United States to seek asylum. *Id.* After crossing into the United States, C.J. and F.C. approached a U.S. Border Patrol vehicle and were detained. *Id*. ¶¶ 166–67. C.J. and F.C. were detained together until June 20, 2018, when F.C. was taken to court to face federal criminal charges. *Id*. ¶ 170. While in court, F.C. was notified that he had "committed the federal crime of coming into the country illegally" and asked "if he wanted to leave C.J. in the United States or take C.J. with him if deported." *Id*. ¶ 175. F.C. responded that he wished to be with his son. *Id.* F.C. was held at multiple detention facilities and at some point was again asked whether he "would authorize C.J. to stay behind if F.C. were to be deported." *Id*. ¶ 178. F.C. refused. *Id.* C.J. was held at a facility with other children until July 26, 2018, when he was reunited with F.C. *Id.* ¶¶ 180, 183.

Based on these allegations, Plaintiffs seek to bring eight claims in this lawsuit against "all Defendants," *see, e.g.*, *id.* ¶ 200: (1) Count I - Substantive Due Process (Right to Family Integrity), *id.* ¶¶ 199–207; (2) Count II - Procedural Due Process, *id.* ¶¶ 208–216; (3) Count III - Equal Protection, *id.* ¶¶ 217–227; (4) Count IV - Substantive Due Process (Punishment of Civil

---

[2] Defendants, as they must, assume the truth of only well-pled factual allegations and only for the limited purpose of this motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Detainees), *id.* ¶¶ 228–238; (5) Count V - Due Process (Coerced Waiver of Asylum and Other Immigration Claims), *id.* ¶¶ 239–248; (6) Count VI - Substantive Due Process (Failure to Provide Adequate Mental Health Services), *id.* ¶¶ 249–258; (7) Count VII - Conspiracy to Interfere with Civil Rights in Violation of 42 U.S.C. § 1985(3), *id.* ¶¶ 259–268; and (8) Count VIII - Refusal or Neglect to Prevent or Aid in Preventing Conspiracy to Interfere with Civil Rights in Violation of 42 U.S.C. § 1986, *id.* ¶¶ 269–276.

   **b.   Class Allegations**

   Plaintiffs seek further to frame this case as a class action under Fed. R. Civ. P. 23(a) and 23(b)(1) and 23(b)(3). *Id.* ¶ 188. Plaintiffs purport to represent "a nationwide class of all minor children nationwide who enter or have entered the United States at or between designated ports of entry and who have been or will be separated from a parent or parents by DHS or its sub-agencies (CBP, ICE, or USCIS) and detained in ORR custody, ORR foster care, or CBP or ICE custody without a demonstration in a hearing that the parent is unfit or presents a danger to the child." *Id.* ¶ 189.

   Parents of potential class members are class members in a separate action. *See Ms. L. v. ICE*, No. 18-cv-428 (S.D. Cal.). On June 26, 2018, the *Ms. L.* court certified a nationwide class of parents separated from their children and granted a class-wide preliminary injunction based on the plaintiffs' claim that the federal government's separation of children from their parents violated the Fifth Amendment. *Ms. L.*, No. 18-cv-428 (S.D. Cal.), Dkt. 82–83. The following claims were brought on behalf of the class in *Ms. L*: (1) separation of the class members from their children violates procedural and substantive due process under the Fifth Amendment; (2) practices regarding separation of class members from their children are arbitrary and capricious, thus violating the Administrative Procedure Act ("APA"); and (3) separation of families violates

the federal laws that provide for asylum and other protections from removal and class members have a private right of action to challenge violations of their right to apply for asylum under 8 U.S.C. § 1158(a). *See Ms. L.*, No. 18-cv-428 (S.D. Cal.), Dkt. 1, 32, and 85.

## STATUTORY AND REGULATORY FRAMEWORK

The following specific statutory and regulatory schemes apply in the immigration context pled in the complaint, and thus inform the analysis of the Defendants' Motion to Dismiss.

**a. Expedited Removal, Credible Fear, and Mandatory Detention under the Immigration and Nationality Act ("INA")**

When Plaintiffs' parents attempted to enter the United States and were apprehended shortly thereafter, they were subject to a process commonly referred to as "expedited removal," which provides an accelerated removal process for certain aliens. *See* 8 U.S.C. § 1225(b); Designating Aliens for Expedited Removal, 69 Fed. Reg. 48,877 (Aug. 11, 2004). Congress has explicitly mandated the detention of individuals who are in the expedited removal process and whose claim of credible fear of persecution is still being considered, or has been rejected. *See* 8 U.S.C. § 1225(b)(1)(B)(iii)(IV) ("Any alien subject to the procedures under this clause *shall be detained* pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed.") (emphasis added). Individuals subject to such mandatory detention under expedited removal are eligible for release from immigration detention only if they are granted parole in limited circumstances. *See, e.g.*, 8 U.S.C. § 1182(d)(5)(A); 8 C.F.R. §§ 235.3(b)(2)(iii), 235.3(b)(4)(ii).

**b. Statutes Governing the Care and Custody of Unaccompanied Alien Children**

*i.    The Homeland Security Act of 2002 ("HSA")*

The HSA, enacted in 2002, created DHS and transferred most immigration functions formerly performed by the Immigration and Naturalization Service to the newly-formed DHS

and its components, including USCIS, CBP, and ICE. *See* Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135; *see also* DHS Reorganization Plan Modification of January 30, 2003, H.R. Doc. No. 108-32 (also set forth as a note to 6 U.S.C. § 542). Congress also transferred to the U.S. Department of Health and Human Services ("HHS") responsibility for caring for unaccompanied alien children ("UAC") "who are in Federal custody by reason of their immigration status." HSA, § 462(a)(b)(1)(A), codified as amended at 6 U.S.C. § 279(b)(1)(A) (2002). That is, Congress transferred to HHS the responsibility of caring for any UAC who HHS receives from DHS.

The HSA transferred to HHS the responsibility, in consultation with DHS, for making UAC placement decisions. The HSA defines an "unaccompanied alien child" as a child who:

(A) has no lawful immigration status in the United States;
(B) has not attained 18 years of age; and
(C) with respect to whom-
    (i) there is no parent or legal guardian in the United States; or
    (ii) no parent or legal guardian in the United States is available to provide care and physical custody.

6 U.S.C. § 279(g)(2). Congress prohibited HHS from releasing UACs on their own recognizance. *See id.* § 279(b)(l)(C), (D), (b)(2).

   *ii.*   *Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA")*

In 2008, the TVPRA codified protections related to the custody of UACs. The TVPRA requires that "the care and custody of all unaccompanied alien children, including responsibility for their detention, where appropriate, shall be the responsibility of the Secretary of Health and Human Services." 8 U.S.C. § 1232(b)(1). Congress also required that "[e]xcept in the case of exceptional circumstances, any department or agency of the Federal Government that has an unaccompanied alien child in custody shall transfer the custody of such child to the Secretary of Health and Human Services not later than 72 hours after determining that such child is an

unaccompanied alien child." *Id.* § 1232(b)(3).

The TVPRA requires that UACs in HHS custody be "promptly placed in the least restrictive setting that is in the best interest of the child." *Id.* § 1232(c)(2)(A). It delegates to the Secretary of HHS the authority to make such placement decisions, noting that the Secretary "may consider danger to self, danger to the community, and risk of flight." *Id.* Staff from HHS, and particularly ORR, make an initial care provider placement decision for each UAC. *See* ORR Policy Guide: Children Entering the United States Unaccompanied ("ORR Guide") § 1.3.2, http://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied.

The TVPRA makes clear that HHS is responsible for all placement decisions for UACs in its custody and provides guidelines for their placement with a custodian, including the requirement for HHS to evaluate the suitability of any placement. 8 U.S.C. § 1232(c)(3). The TVPRA provides that a child may be placed with a proposed custodian (either a person or an entity) if HHS

> . . . makes a determination that the proposed custodian is capable of providing for the child's physical and mental well-being. Such determination shall, at a minimum, include verification of the custodian's identity and relationship to the child, if any, as well as an independent finding that the individual has not engaged in any activity that would indicate a potential risk to the child.

*Id.* § 1232(c)(3)(A). Neither the TVPRA nor the HSA provides HHS with authority to apprehend or detain aliens, or enforce the INA through prosecutions for improper entry or otherwise. HHS is purely a custodian and provider of social services for UACs under those authorities.

### c. Criminal Prosecution for Improper Entry

Individuals in DHS custody may be subject to criminal prosecution for both criminal immigration violations and other criminal violations. *See, e.g.*, 8 U.S.C. §§ 1324, 1325, 1326.

For example, the United States Code makes it a federal crime for aliens to: (1) enter the United

States "at any time or place other than as designated by immigration officers," (2) elude

"examination or inspection by immigration officers," or (3) obtain entry to the United States "by

a willfully false or misleading representation or the willful concealment of a material fact." 8

U.S.C. § 1325(a). DHS has discretion to refer people to the U.S. Department of Justice ("DOJ")

for prosecution based on the particularized facts and circumstances.

### d.   The "Zero-Tolerance Policy"

On April 6, 2018, then-AG Sessions issued a "Memorandum for Federal Prosecutors

along the Southwest Border" that provided guidance on how to exercise prosecutorial discretion

with respect to illegal entry enforcement consistent with DOJ priorities and Congress's

legislative choices. *See* Apr. 6, 2018, Zero-Tolerance Memorandum, *available at*

https://www.justice.gov/opa/press-release/file/1049751/download (last visited Jan. 7, 2019); U.S.

DOJ, News Release: Attorney General Announces Zero-Tolerance Policy for Criminal Illegal

Entry (Apr. 6, 2018), 2018 WL 1666622; Compl. ¶ 68. The memorandum directed southwest

border prosecutors immediately to adopt a policy of accepting, to the extent practicable, all

offenses referred for prosecution under 8 U.S.C. § 1325(a) by DHS.[3]

### ARGUMENT

## I.        THE COURT LACKS PERSONAL JURISDICTION OVER ALL OF THE DEFENDANTS

Plaintiffs' lawsuit must be dismissed under Federal Rule of Civil Procedure 12(b)(2)

---

[3] On June 20, 2018, the President issued an executive order stating, it is the "policy of this Administration to maintain family unity, including by detaining alien families together where appropriate and consistent with law and available resources." Executive Order § 1, *available at* https://www.whitehouse.gov/presidential-actions/affording-congress-opportunity-address-family-separation/ (last visited Jan. 7, 2019) ("EO on Family Separation"); Compl. ¶ 71.

because the Court cannot exercise personal jurisdiction over any of the eleven Defendants. Fed.

R. Civ. P. 12(b)(2); *United States v. Swiss Am. Bank, Ltd.*, 274 F.3d 610, 617 (1st Cir. 2001) ("It

is basic law that a court must have personal jurisdiction over the parties to hear a case, that is, the

power to require the parties to obey its decrees.") (internal quotation marks and citations

omitted); *see Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, 137 S. Ct. 1773, 1783 (2017) (pre-

requisites for personal jurisdiction "must be met as to each defendant"). As the Supreme Court

has explained, "[f]ederal courts ordinarily follow state law in determining the bounds of their

jurisdiction over persons." *Walden v. Fiore*, 571 U.S. 277, 283 (2014) (usual rules apply to

establish in personam jurisdiction over government employees sued individually); *Swartz v.*

*Bahr*, No. 16-12144-LTS, 2017 WL 2695290, at *3 (D. Mass. June 22, 2017) (same). "This is

because . . . in most cases," personal jurisdiction depends upon proper service of a defendant

"'who is subject to the jurisdiction of a court of general jurisdiction in the state where the district

court is located.'" *Walden*, 571 U.S. at 283 (quoting Fed. R. Civ. P. 4(k)(1)). Here, none of the

eleven Defendants "is subject to the jurisdiction" of courts in Massachusetts, and Plaintiffs

cannot meet their burden of showing otherwise. *See A Corp. v. All Am. Plumbing, Inc.*, 812 F.3d

54, 58 (1st Cir. 2016) (plaintiff must "proffer[ ] evidence which, if credited, is sufficient to

support findings of all facts essential to personal jurisdiction") (internal quotation marks and

citation omitted); *Swiss Am. Bank, Ltd.,* 274 F.3d at 618 (on motion to dismiss for lack of

personal jurisdiction, "it is plaintiff's burden to demonstrate the existence of every fact required"

to show personal jurisdiction) (internal quotation marks and citations omitted).

To evaluate personal jurisdiction over a non-resident defendant (like the eleven

Defendants here[4]), federal courts in Massachusetts ask "[t]hree questions . . . : 1) whether the

---

[4] None of the Defendants lives in Massachusetts. *See, e.g.*, Docket Nos. 14, 16–18 (affidavits of service).

Massachusetts long-arm statute authorizes jurisdiction; 2) whether the defendant has sufficient minimum contacts so that the exercise of jurisdiction does not offend due process; and 3) whether the exercise of jurisdiction is reasonable, and therefore does not offend due process." *Noonan v. Winston Co.*, 135 F.3d 85, 89 (1st Cir. 1998); *see also A Corp.*, 812 F.3d at 58–59; *Massachusetts Sch. of Law v. American Bar Ass'n,* 142 F.3d 26, 34–35 (1st Cir. 1998). Although the First Circuit often bypasses the statutory question and starts with the constitutional "minimum contacts" issue,[5] Massachusetts recently renounced such an approach. *See SCVNGR, Inc. v. Punchh, Inc.*, 478 Mass. 324, 325 (2017). The Supreme Judicial Court explained that the long-arm "statute imposes specific constraints on the exercise of personal jurisdiction that are not coextensive with the parameters of due process." *Id*. For this reason, and "to avoid unnecessary consideration of constitutional questions," *SCVNGR* advised that "a determination under the long-arm statute is to precede consideration" of due process. *Id*.; *see Moura v. New Prime, Inc.*, 337 F. Supp. 3d 87, 93 (D. Mass. 2018) (Hillman, J.) (same). If a plaintiff shows that the long-arm statute applies, the plaintiff must still establish the constitutional sufficiency of a defendant's alleged connections with Massachusetts before personal jurisdiction may lie. *Id*. Depending on "the quality and quantity" of those contacts, personal jurisdiction may take the form of either general or specific jurisdiction. *Phillips Exeter Academy v. Howard Phillips Fund*, 196 F.3d 284, 288 (1st Cir. 1999); *Massachusetts Sch. of Law*, 142 F.3d at 34.

For general jurisdiction, a defendant must be "essentially at home" in the forum. *See*

---

[5] *See, e.g., A Corp.*, 812 F.3d at 58–59; *Massachusetts Sch. of Law*, 142 F.3d at 34–35 ("We need not pause to consider the particulars of the Massachusetts long-arm statute," because "[e]ven if that statute, correctly applied, would purport to grant jurisdiction . . . a matter of state law on which we take no view – [plaintiff] still would have to demonstrate" that jurisdiction complied with due process); *Noonan*, 135 F.3d at 90 ("Because we determine that the assertion of personal jurisdiction over [two defendants] would offend due process, we decline to decide the difficult question whether plaintiffs have established a *prima facie* case authorizing personal jurisdiction over these defendants under the Massachusetts long-arm statute.").

*Moura*, 337 F. Supp. 3d at 94 ("[f]or an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile") (internal quotation marks and citation omitted). "Thus, a defendant who has maintained a continuous and systematic linkage with the forum state brings himself within the general jurisdiction of that state's courts in respect to all matters, even those that are unrelated to the defendant's contacts with the forum." *Phillips Exeter*, 196 F.3d at 288.[6] In the absence of general jurisdiction, "a court still may hear a particular case if that case relates sufficiently to, or arises from, a significant subset of contacts between the defendant and the forum." *Phillips Exeter*, 196 F.3d at 288. In other words, a plaintiff may establish specific jurisdiction where "a demonstrable nexus" exists "between [the] plaintiff's claims and a defendant's forum-based activities, such as when the litigation itself is founded directly on those activities." *Mass. Sch. of Law*, 142 F.3d at 34; *see Bristol-Myers Squibb*, 137 S. Ct. at 1781 (same). The First Circuit evaluates the constitutionality of specific jurisdiction through "a tripartite analysis." *Phillips Exeter*, 196 F.3d at 288 (citing *Mass. Sch. of Law*, 142 F.3d at 35). Courts ask "whether the claim that undergirds the litigation directly relates to or arises out of the defendant's contacts with the forum," then ask "whether those contacts constitute purposeful availment of the benefits and protections afforded by the forum's laws." *Id*. Upon finding "the first two hurdles . . . clear[ed]," courts also "analyze the overall reasonableness of an exercise of jurisdiction in light of a variety of pertinent factors that touch upon the fundamental fairness of an exercise of jurisdiction." *Id*.

Here, Plaintiffs include a single sentence in the complaint purporting to justify personal jurisdiction over all eleven personal-capacity Defendants. Compl. ¶ 31. Paragraph 31 asserts that

---

[6] The "standard for evaluating whether . . . contacts satisfy the constitutional general jurisdiction test is considerably more stringent than that applied to specific jurisdiction questions." *Noonan*, 135 F.3d at 93 (internal quotation marks and citation omitted).

the Court has such jurisdiction "under M.G.L. c. 223A § 3(d) because Plaintiffs' claims arise from Defendants having caused tortious injury in Massachusetts by an act or omission outside Massachusetts and each Defendant regularly does or solicits business or engages in a persistent course of conduct in Massachusetts." Compl. ¶ 31. Neither this conclusory reference to the long-arm statute nor anything else in the complaint suffices to show that § 3(d)[7] and due process permit personal jurisdiction. *See generally id.*; *A Corp.*, 812 F.3d at 58 (plaintiff cannot rely on "unsupported allegations in [its] pleadings" to establish personal jurisdiction) (internal quotation marks and citation omitted); *Mass. Sch. of Law*, 142 F.3d at 34 (courts need not "credit conclusory allegations or draw farfetched inferences" in deciding whether plaintiff meets his "burden of persuading the court that jurisdiction exists").

### a. Plaintiffs Have Failed to Establish That the Massachusetts Long-Arm Statute Authorizes Personal Jurisdiction Over Any Defendant

As Plaintiffs acknowledge, § 3(d) of the long-arm statute requires showing that defendants caused tortious injury to plaintiffs in Massachusetts *and* that defendants regularly conduct business or engage in a persistent course of conduct there. *See* Compl. ¶ 31; M.G.L. c. 223A § 3(d). Plaintiffs have not alleged any facts, however, that satisfy either prong of the statutory provision. *Id*. The complaint nowhere pleads that any Defendant injured any Plaintiff in Massachusetts. *See generally id*. Plaintiffs mention Massachusetts only six times in the complaint (aside from paragraph 31), and none of those allegations identifies any harm allegedly inflicted in the Commonwealth. *See id*. ¶¶ 10, 12, 139, 158, 161. Likewise, Plaintiffs fail to plead any facts showing that any Defendant, let alone each of them, "regularly does or solicits business, or engages in any other persistent course of conduct" in Massachusetts. *See generally*

---

[7] Plaintiffs do not rely on any other provision of the long-arm statute, and indeed no other provision could apply. *See* M.G.L. c. 223A § 3(a)–(h).

Compl.; M.G.L. c. 223A § 3(d). Apart from paragraph 31, the complaint never references any business activities or other course of conduct by any Defendant in Massachusetts. *See generally* Compl. Because Plaintiffs have not established that either part of § 3(d) applies to any Defendant, the Court lacks personal jurisdiction over all Defendants. *Swiss Am. Bank, Ltd.,* 274 F.3d at 618 (on motion to dismiss for lack of personal jurisdiction, plaintiff must "demonstrate the existence of every fact required to satisfy . . . the forum's long-arm statute") (internal quotation marks and citation omitted); *see also, e.g., Bolduc v. United States*, No. Civ.A.01-CV-11376-PBS, 2002 WL 1760882, at *6 (D. Mass. July 30, 2002) (granting FBI agent's motion to dismiss for lack of personal jurisdiction under § 3(d), because "Special Agent Craft, in his individual capacity, did not regularly conduct or solicit business in Massachusetts," nor "engage[] in any persistent course of conduct," but only "once directed" a writ of habeas corpus to correctional personnel in Massachusetts in the course of his official duties).

**b. Plaintiffs Have Failed to Establish That Due Process Permits Personal Jurisdiction Over Any Defendant**

Even if Plaintiffs could demonstrate that some provision of the long-arm statute reaches each Defendant, none of the Defendants has constitutionally sufficient contacts with Massachusetts to support either general or specific personal jurisdiction here. *See Philips Exeter Acad.*, 196 F.3d at 288 n.2 ("Jurisdictionally speaking, each defendant must stand or fall based on its own contacts with the forum."). Although the complaint does not indicate which type of personal jurisdiction Plaintiffs claim, they plead no facts even suggesting that any of the eleven Defendants maintains "continuous and systematic" contacts with Massachusetts permitting general jurisdiction. *Id*. at 288; *see generally* Compl. Plaintiffs do not allege, for example, that any Defendant lives or owns property in Massachusetts, or runs a business there. *Id*.; *see Bristol-Myers Squibb*, 137 S. Ct. at 1780 ("only a limited set of affiliations with a forum will render a

defendant amenable to general jurisdiction in that State") (internal quotation marks and citation omitted). Indeed, after diligent research, counsel for the Defendants has no information that any Defendant does any of those things. *See Mass. Sch. of Law*, 142 F.3d at 34 (court analyzed specific jurisdiction only, because plaintiff "does not argue, and we find no facts to suggest, that any of the Eight Individual Defendants can be brought before a Massachusetts court on a general jurisdiction theory"). In short, Plaintiffs have not pled and cannot carry their burden of establishing that Massachusetts may exercise general personal jurisdiction over any Defendant. *Id*.

Likewise, the complaint sets forth no facts linking any of the eleven Defendants to Massachusetts such that specific personal jurisdiction may apply. *Phillips Exeter Acad.*, 196 F.3d at 288. As noted above, the complaint includes only a few allegations that describe any "contacts" by anyone with Massachusetts. Compl. ¶¶ 10, 12, 139, 158, 161. All of those allegations pertain to *Plaintiffs*. *Id*. (stating where K.O., E.O., Jr., and their parents currently reside; where C.J. and F.C. also reside; where K.O. lived when he secured the release of his children to him; and where L.J. reunited with the rest of her family – all in Westborough, Massachusetts). But Plaintiffs' connections to Massachusetts have no bearing on the constitutional analysis. *Walden*, 571 U.S. at 283–91. As the Supreme Court emphasized in *Walden*, "we have consistently rejected attempts to satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating contacts between the plaintiff (or third parties) and the forum State." *Id*. at 284 (reversing court of appeals and finding no personal jurisdiction over federal defendant in *Bivens* suit). Thus, "mere injury to a forum resident is not a sufficient connection to the forum," and instead "the *defendant's* actions [must] connect him" to the forum state. *Id*. at 289–90. Here, the complaint never addresses how any Defendant (let alone each of them), in his

or her individual capacity, allegedly interacted with Massachusetts at any time such that due process permits specific personal jurisdiction. *Swiss Am. Bank*, 274 F.3d at 618 ("it is plaintiff's burden to demonstrate the existence of every fact required to satisfy both the forum's long-arm statute and the Due Process Clause of the Constitution") (internal quotation marks and citations omitted); *Swartz*, 2017 WL 2695290, at *3 (no personal jurisdiction "over the defendants in their individual capacities," because plaintiff failed to "allege as to any individual defendant . . . the type of connection or conduct that would support a finding of personal jurisdiction").

Additionally, to the extent Plaintiffs mean to suggest that all Defendants have constitutionally sufficient contacts with Massachusetts because they head federal agencies or have national authority over some aspect of immigration matters, such an argument fails. *See, e.g.*, Compl. ¶¶ 14–24 (alleging that Defendants "ha[d] responsibility for implementing United States immigration laws, policies, and practices," or helped develop those policies and practices, or had similar national oversight roles). Courts around the country have long explained that "allegations limited to national policy implementation and oversight are insufficient to support a finding of personal jurisdiction" against individual-capacity defendants. *Munns v. Clinton*, 822 F. Supp. 2d 1048, 1078 (E.D. Cal. 2011); *see Claasen v. Brown*, No. Civ. A. 94-1018-GK, 1996 WL 79490, at *2 (D.D.C. 1996) ("In order to exercise personal jurisdiction over a federal official in an individual capacity, a court must find minimum contacts other than those arising from federal employment or supervisory roles."). [8] A contrary result "would essentially subject the

---

[8] *See also Yellowbear v. Ashe*, 612 F. App'x 918, 921 (10th Cir. 2015) ("numerous courts, including our own, have held that broad supervisory authority is insufficient" to establish personal jurisdiction over "a government official . . . in an individual capacity suit"); *Perez v. United States*, No. 13CV1417-WQH-BGS, 2014 WL 4385473, at *22-23 (S.D. Cal. Sept. 3, 2014) (allegation that high-ranking officials supervised/implemented federal border-security policy insufficient to establish specific personal jurisdiction in *Bivens* suit); *Moss v. U.S. Secret Service*, No. 06-3045, 2007 WL 2915608, at *18–19 (D. Or. Oct. 7, 2007), *rev'd in part, dismissed in part on other grounds*, *Moss v. U.S. Secret Service*, 572 F.3d 962 (9th Cir. 2009) (no specific jurisdiction over federal official in *Bivens* suit based on

individual Defendants to personal liability in every state in the Union regardless of how tenuous

their actual contacts with a particular forum might be." *Munns*, 822 F. Supp. 2d at 1078. Such an

approach would ignore the "purposeful availment" requirement for specific personal jurisdiction,

an inquiry focused on "the defendant's intentionality" in interacting with the forum state. *A*

*Corp.*, 812 F.3d at 60; *Phillips Exeter Acad.*, 196 F.3d at 292. As one court put it, allegations that

high-level federal officials created or followed an allegedly impermissible policy or practice

"do[] not indicate any act by which [the officials], in their individual capacities, purposefully

availed themselves of the privilege of conducting activities within [the forum state]" or the

benefits of its laws. *McCabe*, 450 F. Supp. 2d at 924.[9] Because the complaint does not establish

---

adoption/implementation of a national policy); *Mahmud v. Oberman*, 508 F. Supp. 2d 1294, 1301–1302 (N.D. Ga. 2007) (no specific jurisdiction in *Bivens* suit based on "'mere fact that'" supervisory TSA official "'enforce[s] federal laws and policies . . . on a nationwide basis'") (quoting *Wag-Aero, Inc. v. United States*, 837 F. Supp. 1479, 1485 (E.D. Wis. 1993)); *Rank v. Hamm*, No. 204-0997, 2007 WL 894565, at *11–13 (S.D. W. Va. Mar. 21, 2007) ("adoption of a nationwide policy does not of itself result in [individual-capacity federal official] purposefully directing personal activities toward West Virginia"); *McCabe v. Basham*, 450 F. Supp. 2d 916, 924–27 (N.D. Iowa 2006) (no specific jurisdiction over former Secretary of Homeland Security or Director of Secret Service; complaint makes no "allegations of specific facts connecting [either defendant] to Iowa," and "[a]t bottom, Plaintiffs are premising jurisdiction over . . . senior-level federal government officials[ ] upon . . . [their] supervisory status . . . [and] the acts of low-level federal, state and/or local government employees"); *Nwanze v. Philip Morris Inc.*, 100 F. Supp. 2d 215, 220 (S.D.N.Y. 2000) ("[m]ere supervision over the Bureau of Prison, the reach of which extends into every state," does not support personal jurisdiction over individual-capacity defendant); *Wag-Aero, Inc.*, 837 F. Supp. at 1486 (no personal jurisdiction unless "a federal court . . . find[s] that a federal defendant sued in his or her personal capacity has minimum contacts with the forum"; if an agency head "could be sued personally in any district within his or her official authority merely for supervising acts of subordinates . . . , the minimum contacts requirement would be rendered meaningless"); *Vu v. Meese*, 755 F. Supp. 1375, 1378 (E.D. La. 1991) (no personal jurisdiction over federal officials "who enforce the federal laws and policies on a nationwide basis," including "Zero Tolerance" federal drug law enforcement policy, because "governmental officials must have the requisite minimum contacts with the forum state").

[9] *Accord Perez*, 2014 WL 4385473, at *8 (no purposeful interaction with California where complaint makes "general allegations of these federal officers' supervisory responsibilities and alleged implementation" of border-security policy); *Moss*, 2007 WL 2915608, at *18–19 (no purposeful interaction with Oregon where plaintiffs allege that agency head had "nation-wide policy of engaging in viewpoint discrimination"); *Rank*, 2007 WL 894565, at *11–13 (no purposeful direction of "personal activities toward West Virginia" based on federal official's adoption of nationwide policy).

that any Defendant had the constitutionally necessary "minimum contacts" with Massachusetts,

the Court lacks personal jurisdiction over all Defendants for this reason as well. Fed. R. Civ. P.

12(b)(2). As the Court cannot exercise personal jurisdiction over any of the eleven Defendants,

Plaintiffs' lawsuit must be dismissed.

## II.        THE COURT SHOULD DISMISS THE COMPLAINT FOR LACK OF
             PROPER VENUE

Plaintiffs' lawsuit also must be dismissed under Federal Rule of Civil Procedure 12(b)(3)

for improper venue. Fed. R. Civ. P. 12(b)(3); *see* 28 U.S.C. § 1406 (district court "in which is

filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest

of justice, transfer such case"). Plaintiffs allege that "[v]enue is proper in this District under 28

U.S.C. § 1391(b)(3), because the defendants are subject to personal jurisdiction in this District"

and "under 28 U.S.C. § 1391(e)(1) because the Plaintiffs reside in this district and no real

property is involved in the action." Compl. ¶ 32; *see* 28 U.S.C. §§ 1391(b)(3), (e)(1). As just

discussed, the Court lacks personal jurisdiction over all of the Defendants, and § 1391(b)(3)

therefore does not apply. *See supra* Sec. I; 28 U.S.C. § 1391(b)(3).[10] In addition, the Supreme

Court held decades ago that "[a] suit for money damages which must be paid out of the pocket of

the private individual who happens to be – or formerly was – employed by the Federal

Government plainly . . . is not encompassed by the venue provisions of § 1391(e)."[11] *Stafford v.*

*Briggs*, 444 U.S. 527, 542–45 (1980). As *Stafford* explained, "[i]f § 1391(e) were construed to

---

[10] Section 1391(b)(3) provides that when "there is no district in which an action may otherwise be brought
as provided in this section," a civil action may be brought "in any judicial district in which any defendant
is subject to the court's personal jurisdiction with respect to such action." 28 U.S.C. § 1391(b)(3).
Plaintiffs do not indicate why "there is no district in which [the] action may otherwise be brought."

[11] Section 1391(e)(1) provides that "[a] civil action in which a defendant is an officer or employee of the
United States or any agency thereof acting in his official capacity or under color of legal authority . . .
may . . . be bought in any judicial district in which . . . (C) the plaintiff resides if no real property is
involved in the action."

govern actions for money damages against federal officers individually, suits could be brought against these federal officers . . . in any one of the 95 federal districts covering the 50 states and other areas within federal jurisdiction," and "[t]his would place federal officers, solely by reason of their Government service, in a very different posture in personal damages suits from that of all other persons." *Id.* at 544. Section 1391(e) therefore does not apply, either, and Plaintiffs have failed to establish proper venue as they must. Fed. R. Civ. P. 12(b)(3); *see, e.g.*, *Stars for Art Prod. FZ, LLC v. Dandana, LLC*, 806 F. Supp. 2d 437, 447–48 (D. Mass. 2011) (granting motion to dismiss for improper venue, noting "[i]n the First Circuit . . . , the burden is on the plaintiff to establish that the chosen district is proper") (citing *Cordis Corp. v. Cardiac Pacemakers*, 599 F.2d 1085, 1086–87 (1st Cir. 1979)).

## III.     THIS COURT SHOULD REJECT PLAINTIFFS' INVITATION TO EXTEND BIVENS TO CHALLENGE THE CONSTITUTIONALITY OF FEDERAL PROSECUTION OR DETENTION POLICY OF ALIENS CROSSING THE BORDER

Plaintiffs attempt to bring a *Bivens* action against Defendants seeking damages for policy decisions of the United States, but Supreme Court precedent establishes that Plaintiffs have no such claim. *Abbasi*, 137 S. Ct. at 1861. Plaintiffs' claims "bear little resemblance to the three *Bivens* claims the [Supreme] Court has approved in the past: a claim against [federal] agents for handcuffing a man in his own home without a warrant [*see Bivens*, 403 U.S. at 388]; a claim against a Congressman for firing his female secretary [*Davis v. Passman*, 442 U.S. 228 (1979)]; and a claim against prison officials for failure to treat an inmate's asthma [*see Carlson v. Green*, 446 U.S. 14 (1980)]." *Abbasi*, 137 S. Ct. at 1860. And the Supreme Court has been exceedingly skeptical of any invitation to invent new *Bivens* claims, as Plaintiffs invite this Court to do, Compl. ¶¶ 14–18; *Abbasi*, 137 S. Ct. at 1860. Simply put, "a *Bivens* action is not 'a proper vehicle for altering an entity's policy,'" and this Court should leave to Congress the decision

whether to authorize a damages action to do just that. *Abbasi*, 137 S. Ct. at 1860 (quoting *Corr. Sers. Corp. v. Malesko*, 534 U.S. 61, 74 (2001)).

The Supreme Court has clearly and deliberately limited *Bivens* actions. *See, e.g.*, *Abbasi*, 137 S. Ct. at 1861. It has done so for a principled reason: respect for "separation-of-powers principles" establishing the creation of personal-liability claims should be "committed to those who write the laws rather than those who interpret them." *Id.* at 1857 (citations and internal quotation marks omitted). "It is not necessarily a judicial function to establish whole categories of cases in which federal officers must defend against personal liability claims in the complex sphere of litigation, with all of its burdens on some and benefits to others." *Id.* at 1858. Rather, when an issue "involves a host of considerations that must be weighed and appraised, it should be committed to those who write the laws rather than those who interpret them." *Id.* (quoting *Bush v. Lucas*, 462 U.S. 367, 380 (1983)) (internal quotations omitted). Thus, as the Supreme Court's "precedents now instruct," Congress is in a "better position" than the Judiciary "to consider if 'the public interest would be served' by imposing a 'new substantive legal liability.'" *Id.* at 1857–58 (quoting *Schweiker v. Chilicky*, 487 U.S. 412, 426–27 (1988)).

Congress has *never* provided a statutory damages remedy for claims that the acts of individual federal officers or entities were unconstitutional.[12] In fact, it was not until 1971, in *Bivens*, that the Supreme Court for the first time recognized an implied right of action for money damages against line-level federal law enforcement officials in their personal capacities for a

---

[12] By contrast, Congress has legislated damages remedies against state officials for constitutional violations. Congress passed the Civil Rights of Act of 1871 in the immediate aftermath of the Civil War, permitting (in the key provision now codified at 42 U.S.C. § 1983) suit against state officials for violating the federal constitution. *See generally Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978); *Abbasi*, 137 S. Ct. at 1865. This includes entity liability for an unconstitutional "policy or custom." *Monell*, 436 U.S. at 694. Plaintiffs' 42 U.S.C. §§ 1985(3), 1986 claims are addressed *infra* at 56–58.

violation of a specific constitutional right (the Fourth Amendment). The plaintiff in that case,

Webster Bivens, was subjected to a warrantless arrest and search in his home, allegedly not

supported by probable cause, during which line-level federal law enforcement agents purportedly

handcuffed him in front of his wife and children, "searched the apartment from stem to stern,"

and threatened to arrest the entire family. *Bivens*, 403 U.S. at 389. For Bivens, who was never

prosecuted for any offense, it was "damages or nothing." *Id.* at 410 (Harlan, J., concurring).

Although the Court implied a damages action directly from the Constitution "to provide a cause

of action for a plaintiff who lacked any alternative remedy for harms caused by" defendants'

conduct, *Malesko*, 534 U.S. at 70, it did so *only* after observing that there were "no special

factors counseling hesitation" against creating that remedy. *Bivens*, 403 U.S. at 396.

      In the decades since *Bivens*, *Davis*, and *Carlson* were decided, the legal landscape has

shifted away from implied causes of action, and the Supreme Court has "consistently refused to

extend *Bivens* to any new context or new category of defendants." *Abbasi*, 137 S. Ct. at 1857

(citation and quotations omitted). Most recently, the Court criticized the "*ancien regime*" of

implying rights of action under statutes in place when *Bivens* was decided. *Id*. at 1855 ("[T]he

arguments for recognizing implied causes of action for damages began to lose their force.")

(internal quotations and citation omitted). With respect to implying a remedy directly under the

Constitution, "the Court has made clear that expanding the *Bivens* remedy is now a 'disfavored'

judicial activity." *Id*. at 1857 (quoting *Iqbal*, 556 U.S. at 675). It is so disfavored, in the Court's

view, that "it is possible that the analysis in the Court's three *Bivens* cases [*Bivens*, *Davis*, and

*Carlson*] might have been different if they were decided today." *Abbasi*, 137 S. Ct. at 1855–56.

At bottom, "[t]he question is 'who should decide' whether to provide for a damages remedy,

Congress or the courts?'" *Id*. at 1857 (quoting *Bush*, 462 U.S. at 380). "The answer most often

will be Congress." *Id.*

a. **Plaintiffs' Claims Involve a New Context**

Under the modern analysis for determining whether to recognize a *Bivens* remedy, this Court must first assess whether Plaintiffs' allegations present "a new *Bivens* context." *Id.* at 1859. As *Abbasi* makes clear: "[i]f the case is different in a meaningful way from previous *Bivens* cases *decided by [the Supreme] Court*, then the context is new." *Id.* (emphasis added).[13] *Abbasi* listed non-exclusive examples of such differences:

> the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Id.* at 1860. Such "meaningful" differences may be "small, at least in practical terms." *Id.* at 1865. But "even a modest extension is still an extension." *Id.* at 1864.

Here, the differences are in no way small or modest, and all of the potential factors identified in *Abbasi* materially distinguish this case from *Bivens*, *Davis*, and *Carlson*. The "new-context inquiry is easily satisfied." *Id.* at 1865. First, unlike the "line-level" officers at issue in *Bivens*, Defendants are (or were) some of the nation's highest officials, responsible for enforcing and implementing federal legislation through high-level Executive Branch policy. *See* Compl. ¶¶ 14–24. Second, Plaintiffs' particular equal protection and due process claims arise in the context of immigration and related criminal enforcement activities, an area in which the Supreme Court has never affirmatively recognized an implied remedy. Third, these claims challenge the

---

[13] *Abbasi* strictly limits the "new context" inquiry to a comparison with the three cases in which the Supreme Court itself affirmatively approved of a *Bivens*-type remedy – *Bivens*, *Davis*, and *Carlson*. *Id.* at 1859. The analysis does not consider decisions of courts of appeals or district courts recognizing a *Bivens* remedy.

United States' broad authority to enforce the nation's borders through the implementation of policies that apply to all potential entrants to the United States, not the type of specific officer action at issue in *Bivens*. *See, e.g.*, Compl. ¶¶ 204, 213, 221.

Fourth, the judicial guidance on the constitutional standards governing the official actions at issue here is far less particular than the specific, binding guidance available to the officers involved in *Bivens*, *Davis*, and *Carlson*. *Cf. Abbasi*, 137 S. Ct. at 1864 ("[T]he judicial guidance available to this warden, with respect to his supervisory duties, was less developed."). For example, in the arena of Eighth Amendment denial of medical care, the Supreme Court had determined the applicable judicial standards prior to *Carlson*. *See Estelle v. Gamble*, 429 U.S. 97, 104–105 (1976). By contrast, the Defendants acted pursuant to statutory and other legal mandates governing the care, custody, and placement of UACs, 8 U.S.C. § 1232; 6 U.S.C. § 279(b), and the conduct of criminal prosecutions, 28 U.S.C. §§ 501, 503, 509, 515, 519; *see also id*. § 547; 28 C.F.R. § 0.5. Such authorities have received virtually no attention from any court, let alone the Supreme Court or the First Circuit.

Fifth, and relatedly, the statutory and legal mandates pursuant to which Defendants acted are meaningfully different from those at issue in *Bivens, Davis,* or *Carlson*. Sixth, the recognition of a *Bivens* claim in this context would risk significant and disruptive intrusion by the Judiciary into the functioning of both Congress, which has been very active in establishing both criminal punishment for unlawful entry and statutory mandates regarding UACs, and the Executive, which must marshal finite resources to carry out those mandates through the types of high-level policy decisions challenged here.

Finally, this case involves multiple special factors that the Supreme Court has not previously addressed in *Bivens*, *Davis*, or *Carlson*. *Abbasi*, 137 S. Ct. at 1860. These special

factors include the national and border security context, in which the judiciary has demonstrated particular deference to the political branches. They also include the separation-of-powers concerns implicated by allowing a *Bivens*-style claim to challenge prosecutorial policies in the context of immigration enforcement, an area frequently regulated by Congress. To the extent the Supreme Court has considered any of those factors, it has *rejected* the request to imply a non-statutory remedy. *See infra* at 26–37 *and cases cited therein*.

In short, the contextual attributes of this case are not only significant, they span *all* of the differences described as meaningful in *Abbasi*; certainly they are "meaningful enough" to preclude extension of *Bivens* to this context. *Abbasi*, 137 S. Ct. at 1859. Thus, in considering Plaintiffs' claim, this Court *must* address the "antecedent" issue of whether to imply a remedy at all. *Hernandez v. Mesa*, 137 S. Ct. 2003, 2006 (2017). That, in turn, involves asking: (1) whether "alternative, existing process[es]" protect the right at issue, and (2) whether any other "special factors counsel[] hesitation" in implying a damages remedy. *Abbasi*, 137 S. Ct. at 1858 (quoting *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007)). As shown below, the answer to both questions is yes – Plaintiffs have alternative avenues to obtain relief *and* there are numerous "special factors" counseling against recognizing the *Bivens* remedy Plaintiffs request.

### b. Multiple Alternative, Existing Processes Preclude the Creation of a *Bivens* Remedy

Plaintiffs have (or had) "available to [them] 'other alternative forms of judicial relief,'" and "when alternative methods of relief are available, a *Bivens* remedy usually is not." *Abbasi*. 137 S. Ct. at 1863 (quoting *Minneci v. Pollard*, 565 U.S. 118, 124 (2012)). "Under this rationale, the Supreme Court has declined to extend *Bivens* where Congress has provided at least a partial remedy via statute . . . as well as where other causes of action provide redress." *Liff v. Office of Inspector Gen. for U.S. Dep't of Labor*, 881 F.3d 912, 918 (D.C. Cir. 2018). The fact that a

constitutional tort claim might offer "other or different relief" from existing avenues of redress does not mean that the Court should create a *Bivens*-type remedy. *Gonzalez v. Velez*, 864 F.3d 45, 55 (1st Cir. 2017). Indeed, where a plaintiff has an alternative process, the Court has "*consistently* rejected invitations to extend *Bivens*." *Malesko,* 534 U.S. at 70 (emphasis added).

The availability of an avenue to pursue injunctive relief is thus "of central importance" in deciding whether to imply a *Bivens* remedy. *Abbasi*, 137 S. Ct. at 1862; *see also Malesko*, 534 U.S. at 74 (explaining plaintiff was not "in search of a remedy as in *Bivens* and *Davis*" and refusing to imply one in part because plaintiff could seek an injunction). The APA, for example, provides explicit authority to consider constitutional issues in official capacity actions, and is an alternative process counselling against a damages remedy. *See, e.g.*, *Air Sunshine, Inc. v. Carl*, 663 F.3d 27, 37 (1st Cir. 2011) (*Bivens* claim was not viable where plaintiff "had other options available" including "claims under the Administrative Procedure Act"); *W. Radio Servs. Co. v. U.S. Forest Serv.*, 578 F.3d 1116, 1123 (9th Cir. 2009) ("the APA leaves no room for *Bivens* claims based on agency action or inaction"). The availability of habeas is another potential process that counsels against a *Bivens* remedy, *see Abbasi*, 137 S. Ct. at 1849, and indeed "might" provide a "more direct route to relief than a suit for money damages." *Id.* at 1862–63.

Plaintiffs have alternative remedies available here. Indeed, parents of potential class members have already sought injunctive and habeas relief, and have filed statutory claims under the APA arising out of the same policies and related actions that Plaintiffs challenge here. *See, e.g.*, *Jacinto-Castanon de Nolasco v. ICE*, 319 F. Supp. 3d 491, 505 (D.D.C. 2018) (ordering the government to reunify plaintiff with her sons). Parents of the potential class members here also are (or could have been) members of the class in *Ms. L.*, which pursued APA relief.[14] Plaintiffs'

---

[14] Indeed, in that case, the court granted a class-wide preliminary injunction to a class of parents based on the claim that separation of the parents from their children without a determination that the parent was

constitutional challenges thus plainly can be, and have been, pursued through other avenues.

Plaintiffs also have a potential avenue for money damages in state tort law, and/or a suit under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671–80. Indeed, Plaintiffs state their intention to bring an FTCA claim in the complaint. Compl. ¶¶ 7, 68.[15] While the FTCA standing alone may not constitute a sufficient alternative process in all contexts, *see Carlson*, 446 U.S. at 20–23, the availability of the FTCA (and/or state law remedies) when considered with other factors is nonetheless probative of whether Congress "might doubt" or a court should hesitate to recognize a *Bivens* remedy.[16] *Abbasi*, 137 S. Ct. at 1861.

It is not even necessary to divine all potential avenues for alternative forms of judicial relief in this context because it is clear that many are available. *See generally Liff*, 881 F.3d at 921 ("We do not parse the specific applicability of this web of" alternatives "but instead note the spectrum of remedies they provide"). This Court should decline to supplement the avenues of

---

[15] unfit or a danger to their child violates the Fifth Amendment. *Ms. L.*, No. 18-cv-428 (S.D. Cal.), Dkt. 82–83. But even if the plaintiffs in *Ms. L.* had not been successful, or are not in the future, the actions themselves, and the ability to have the constitutionality of their claims addressed in federal court, demonstrate that alternative processes exist to address Plaintiffs' constitutional concerns. *Malesko*, 534 U.S. at 69 ("So long as the plaintiff had an avenue for some redress, bedrock principles of separation of powers foreclosed judicial imposition of a new substantive liability.").

[15] Plaintiffs have also proffered an administrative claim with the government—a necessary precursor to an FTCA claim in court. 28 U.S.C. § 2675(a) (requiring presentation of the claims "to the appropriate Federal agency").

[16] *See, e.g.*, *Minneci*, 565 U.S. at 130 (when "in general, state tort law remedies provide *roughly similar* incentives for potential defendants to comply with the Eighth Amendment while also providing *roughly similar* compensation to victims of violations," that may inform whether to imply a remedy); *Malesko*, 534 U.S. at 73–74 (refusing to imply a remedy for plaintiff whose "lack of alternative tort remedies was due solely to [the] strategic choice" not to sue for common-law negligence); *Vanderklok v. United States*, 868 F.3d 189, 204 (3d Cir. 2017) (noting availability of state tort claims against local law enforcement involved in air traveler's arrest at airport security checkpoint); *Andrews v. Miner*, 301 F. Supp. 3d 1128, 1134 (N.D. Ala. 2017) (acknowledging that, under *Carlson*, "[t]he FTCA remedy is not a substitute for a *Bivens* action," but still considering "an effective and available [FTCA] remedy" – whose "administrative prerequisites" the plaintiff "failed to follow" – in the mix with other "special factors"); *accord Morgan v. Shivers*, No. 1:14-cv-7921, 2018 WL 618451, at *5–6 (S.D.N.Y. Jan. 29, 2018).

relief provided by Congress with a non-statutory individual capacity claim for damages. The potential for relief through these avenues *alone* is sufficient to preclude creating a new *Bivens* remedy. *Abbasi.* 137 S. Ct. at 1863.

### c.  Other Factors Counsel Strongly Against Implying a *Bivens* Remedy Here

In addition to the reasons discussed above, a wide range of "special factors" may or "might" make it inappropriate to create a *Bivens* remedy in a particular context, even where the plaintiff has no alternative remedy. *Abbasi*, 137 S. Ct. at 1861; *see Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 280 (1997) (Kennedy, J.) (citations omitted) (noting that the "*Bivens* line[] of cases reflect[s] a sensitivity to varying contexts, and courts should consider whether there are 'special factors counselling hesitation,' . . . before allowing a suit to proceed under [that] theory. The range of concerns to be considered in answering this inquiry is broad."). Although a single factor can suffice, special factors in the aggregate may also preclude a *Bivens* remedy. *See Chappell v. Wallace*, 462 U.S. 296, 304 (1983) (concluding that factors "[t]aken together" "constitute[d] 'special factors'"); *Abbasi*, 137 S. Ct. at 1862–63 (taking into account multiple factors, including congressional silence in a heavily legislated arena, the potential for injunctive relief, and national security considerations); *Gonzalez*, 864 F.3d at 55 ("[W]e hold that the CSRA and Title VII, taken together, preclude the plaintiffs' constitutional tort claims."). Plaintiffs' claims implicate at least five distinct and additional factors that compel hesitation and warrant not implying a damages remedy in this novel and sensitive context.

### i.   Bivens *Actions May Not Be Used to Challenge U.S. Policy*

Plaintiffs do not challenge the acts of lone, line-level officers, but instead decision-making of Congress and multiple government departments and agencies. Although styled as a suit against Defendants, Plaintiffs' real grievance is with legislative choices regarding the

detention of aliens and criminalization of illegal entry; the United States' zero-tolerance policy; DHS policies and practices regarding detaining migrants and caring for their children; and HHS policies and practices regarding the care of UACs. The complaint is replete with references to the "Trump Administration," and even specific statements made by the President of the United States. *See, e.g.*, Compl. ¶¶ 68, 72–75, 81, 95, 118. But the Supreme Court has clearly held that special factors preclude damages suits against federal agencies and entities. *See F.D.I.C. v. Meyer*, 510 U.S. 471, 485–86 (1994) (declining to imply a damages action directly against a federal agency). As the Court has explained, "injunctive relief [not an individual-capacity damages action] has long been recognized as the proper means for preventing *entities* from acting unconstitutionally." *Malesko,* 534 U.S. at 74; *see also Meyer*, 510 U.S. at 485 (observing that Court implied a cause of action against the officers in *Bivens* in part because direct action against the government was not available).

*Abbasi* confirms that individual-capacity constitutional lawsuits challenging agency policy raise serious separation-of-powers issues and other practical concerns. *Abbasi*, 137 S. Ct. at 1860. Interfering in government policymaking through the vehicle of an individual-capacity damages action accrues "substantial social costs" far beyond those imposed by a traditional *Bivens* action. *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). The entire thrust of *Bivens* and its progeny is that it is directed to the actions of lone, typically line-level officers, not government-wide decision-making. Plaintiffs should not be permitted to evade clear Supreme Court holdings on this point by simply naming individuals as defendants.

Furthermore, Plaintiffs' proposed *Bivens* claims would implicate the precise separation-of-powers concerns *Abbasi* identified. Far from claiming Defendants were on some personal lark, Plaintiffs maintain that Defendants violated their constitutional rights through implementing

27

and/or condoning policies *of the United States*. *See, e.g.*, Compl. ¶ 14 ("Defendant Sessions has responsibility for implementing United States immigration laws, policies, and practices, including practices related to family separation and family detention"); *id.* ¶ 15 ("Defendant Nielsen is responsible for implementing United States immigration laws, policies, and practices, including practices related to family separation and family detention"); *id.* ¶ 204 ("The Defendants in this action have adopted, implemented, enforced, condoned, sanctioned, acquiesced to, and encouraged a pattern, practice, or custom of violating the clearly established due process rights of the class members"). And these policies were informed by Congressional directives. *See, e.g.*, 8 U.S.C. §§ 1225(b)(1)(B)(iii)(IV), 1325(a). The creation of an individual capacity damages action in these circumstances would burden Defendants and future officials alike "from devoting the time and effort required for the proper discharge of their duties." *Abbasi*, 137 S. Ct. at 1860.

Moreover, "the discovery and litigation process would either border upon or directly implicate the discussion and deliberations that led to the formation" of the zero tolerance policy and any related policy or action, requiring "courts to interfere in an intrusive way with sensitive functions of the Executive Branch." *Id.*[17] The threat of discovery could inhibit the free flow of advice and fulsome analysis within the Executive Branch, *see Fed. Open Mkt. Comm. Of Fed. Reserve Sys. v. Merrill*, 443 U.S. 340, 360 (1979), and reduce the Executive's autonomy and confidentiality, *see Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 385 (2004). Indeed, Plaintiffs would likely seek such intrusive discovery even just to prove (or disprove) certain

---

[17] In this case, even the President himself is alleged to have had some involvement in U.S. policy on this front. Compl. ¶ 80 ("President Trump's clear animus based on race, ethnicity, and national origin provides the context for understanding the unlawful and irrational actions of the Defendants in this case.").

Defendants' alleged personal involvement in the creation of the zero-tolerance policy or any other policy or related action that may have led to Plaintiffs' separation. *See Iqbal*, 556 U.S. at 676 ("Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").

> ii.  *Congressional Action in the Context of Immigration Has Been "Frequent and Intense" and Implying a Damages Remedy Would Raise Serious Separation-of-Powers Concerns*

As *Abbasi* recognizes, Congress's failure to provide a damages remedy "is relevant . . . and . . . telling" when Congress has otherwise regulated in a particular arena. 137 S. Ct. at 1862. This is particularly true where Congress's interest has been "frequent and intense." *Id.*; *see Meshal v. Higgenbotham*, 47 F. Supp. 3d 115, 130 (D.D.C. 2014) (declining to imply a remedy where "Congress has legislated with respect to detainee rights both in the United States and abroad" and "none of these acts extends a cause of action for detainees similarly situated to Mr. Meshal to sue federal officials in federal court"), *aff'd*, 804 F.3d 417 (D.C. Cir. 2015).

In the exercise of its Constitutional power to "establish an uniform Rule of Naturalization," U.S. Const. art. I, § 8, cl. 4,[18] Congress has acted repeatedly on the issues of immigration prosecution and the custody of alien children, enacting and modifying the Immigration and Nationality Act ("INA"), the HSA, and the TVPRA. The INA provides for the expedited removal and mandatory detention of aliens who enter the United States without

---

[18] *See also Fiallo v. Bell*, 430 U.S. 787, 792 (1977) ("[O]ver no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens.") (internal citations and quotation marks omitted); *Galvan v. Press*, 347 U.S. 522, 531 (1954) (the principle that "the formulation of these policies [concerning the entry of aliens and their right to remain here] is entrusted exclusively to Congress has become about as firmly imbedded in the legislative and judicial tissues of our body politic as any aspect of our government."); *Adams v. Baker*, 909 F.2d 643, 647 (1st Cir. 1990) ("Nowhere is the scope of judicial inquiry more limited than in the area of immigration legislation.").

documentation allowing for their admission. *See* 8 U.S.C. § 1225(b). It further provides the circumstances under which an individual can be paroled, the procedures and requirements for asylum, and the procedures for challenging removal and detention. *See, e.g.*, 8 U.S.C. §§ 1158, 1182, 1225–31. The HSA created DHS and transferred to HHS the responsibility for the care and custody of UACs. *See* 6 U.S.C. §§ 542, 279(a). The TVPRA made HHS responsible for all placement decisions for UACs in its custody, and provides the requirements for HHS to evaluate the suitability of any placement. 8 U.S.C. § 1232(b)(1), (c)(3).

The passage of these statutes represents just some of Congress's actions in this area. Since enacting the INA in 1952, Congress has amended it at least six times. *De La Paz v. Coy*, 786 F.3d 367, 377 (5th Cir. 2015) (listing statutes). Likewise, Congress has amended the TVPRA and passed other legislation to care for UACs and combat human trafficking.[19]

Despite those repeated amendments, Congress has never provided a damages remedy against government officials who create or implement policy to enforce the nation's immigration laws – the damages remedy Plaintiffs seek in this suit.[20] This "institutional silence speaks volumes," and "counsels strongly against judicial usurpation of the legislative function." *De La*

---

[19] *See* Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, 114 Stat. 1464; Prosecutorial Remedies and Tools against the Exploitation of Children Today Act of 2003 (Protect Act), Pub. L. No. 108-21, 117 Stat 650; Trafficking Victims Protection Reauthorization Act of 2003, Pub. L. No. 108-193, 117 Stat 2875; Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108-458, 118 Stat 3638; Trafficking Victims Protection Reauthorization Act of 2005, Pub. L. No. 109-164, 119 Stat 3558 (2006); William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, 122 Stat 5044; Violence against Women Reauthorization Act of 2013, Pub. L. No. 113-4, 127 Stat 54; National Defense Authorization Act for Fiscal Year 2013, Pub. L. No. 112-239, 126 Stat 1632; Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22, 129 Stat 227; National Human Trafficking Hotline, Pub. L. No. 114-271, 130 Stat 1398 (2016); Combating Human Trafficking in Commercial Vehicles Act, Pub. L. No. 115-99, 131 Stat 2242 (2018); No Human Trafficking on Our Roads Act, Pub. L. No. 115-106, 131 Stat 2265 (2018).

[20] In contrast, for example, Congress *has* created a private right of action for victims of trafficking to sue their traffickers for damages, 18 U.S.C. § 1595.

*Paz*, 786 F.3d at 377; *see also Abbasi*, 137 S. Ct. at 1862 (noting that where policies "attract the attention of Congress," yet "Congress fails to provide a damages remedy," then "it is much more difficult to believe that 'congressional inaction' was 'inadvertent'" (citing *Schweiker*, 487 U.S. at 423)); *Mirmehdi v. United States*, 689 F.3d 975, 982 (9th Cir. 2012) ("Congress's failure to include monetary relief can hardly be said to be inadvertent, given that despite multiple changes to the structure of appellate review in the [INA], Congress never created such a remedy.") (citation omitted). Given Congress's "repeated and careful attention to immigration matters," *De La Paz*, 786 F.3d at 377, this Court should not supplant the legislative function by creating a *Bivens* claim here. *Id.* at 378 ("[T]he comprehensive regulations and remedies provided in civil immigration law and regulations preclude crafting an implied damage remedy here."); *Mirmehdi*, 689 F.3d at 982 (declining to allow *Bivens* action by aliens in part because "[t]he complexity and comprehensiveness of the existing remedial system is another factor among a broad range of concerns counseling hesitation); *see also Liff*, 881 F.3d at 920 (holding that even if the relevant statutes and regulations leave plaintiff without a remedy, "[t]he constellation of statutes and regulations governing federal contracts . . . provide a remedy").

    iii.    *National and Border Security Concerns Counsel Against Creation of an Individual Capacity Cause of Action in this Context*

       Because Plaintiffs' claims arise out of immigration enforcement activities at an international border, they necessarily implicate national security and foreign affairs. Like immigration, these areas are constitutionally committed to the political branches. *See, e.g.*, *Abbasi*, 137 S. Ct. at 1861; *Bank Markazi v. Peterson*, 136 S. Ct. 1310, 1328 (2016) (recognizing "controlling role of the political branches" in foreign affairs). Indeed, "[m]atters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention." *Haig v. Agee*, 453 U.S. 280, 292 (1981); *see Abbasi*, 137 S. Ct. at 1861;

*Hernandez v. Mesa*, 885 F.3d 811, 819 (5th Cir. 2018) (en banc) (risk to national security counseled against recognizing *Bivens* claim in border shooting case) (petition for certiorari filed). This most certainly includes judicial interference by extending *Bivens*. *See Doe v. Rumsfeld*, 683 F.3d 390, 394 (D.C. Cir. 2012) ("The Supreme Court has never implied a *Bivens* remedy in a case involving the military, national security, or intelligence."); *accord Vanderklok*, 868 F.3d at 207 (no *Bivens* action against TSA agent given national security implications of airport security).

The national security and border concerns at issue here counsel against recognizing a new *Bivens* claim. Congress has charged DHS and its components with securing the border, 6 U.S.C. §§ 111, 202, and courts have long recognized that "this country's border-control policies are of crucial importance to the national security and foreign policy of the United States." *United States v. Delgado-Garcia*, 374 F.3d 1337, 1345 (D.C. Cir. 2004). Related "immigration issues 'have the natural tendency to affect diplomacy, foreign policy, and the security of the nation,' which further 'counsels hesitation' in extending *Bivens*." *Mirmehdi*, 689 F.3d at 982 (quoting *Arar v. Ashcroft*, 585 F.3d 559, 574 (2d Cir. 2009)); *see also Hernandez*, 885 F.3d at 819–20; *Vanderklok*, 868 F.3d at 207. Indeed, the Supreme Court has recognized that concerns about "subjecting the prosecutor's motives and decisionmaking to outside inquiry" are magnified in the immigration context. *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490 (1999) (citation and quotation omitted). Thus, any supplemental damages remedy provided here should come from Congress.

### iv.   *Additional Separation-of-Powers Principles Would Be Violated by Creating an Individual Capacity Claim for Prosecutorial Policy Decisions*

Plaintiffs' claims raise additional separation-of-powers concerns related to the Executive's enforcement of the laws. "The Supreme Court has long recognized that 'the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute

a case.'" *In re Sealed Case*, 829 F.2d 50, 63 (D.C. Cir. 1987) (quoting *United States v. Nixon*, 418 U.S. 683, 693 (1974)); *see also United States v. Smith*, 178 F.3d 22, 26 (1st Cir. 1999). "The Presidential power of prosecutorial discretion is rooted in Article II, including the Executive Power Clause, the Take Care Clause, the Oath of Office Clause, and the Pardon Clause." *In re Aiken Cty.*, 725 F.3d 255, 262–63 (D.C. Cir. 2013) (citing U.S. Const. art. II, § 1, cl. 1 (Executive Power Clause); U.S. Const. art. II, § 1, cl. 8 (Oath of Office Clause); U.S. Const. art. II, § 2, cl. 1 (Pardon Clause); U.S. Const. art. II, § 3 (Take Care Clause); *see also* U.S. Const. art. I, § 9, cl. 3 (Bill of Attainder Clause)). To aid the President in the task of taking care that the laws are faithfully executed, Congress specifically delegated to the Attorney General and his or her subordinates in the DOJ the power to "conduct any kind of legal proceeding, civil or criminal," 28 U.S.C. § 515(a). To the extent that Defendants implemented a policy of criminally prosecuting all DHS referrals of section 1325(a) violations, they did so in compliance with the will of Congress, 8 U.S.C. § 1325(a), and pursuant to power granted specifically by the Constitution to the Executive. Separation-of-powers concerns counsel squarely against creating a *Bivens* remedy aimed at the exercise of that power. *Abbasi*, 137 S. Ct. at 1857 ("separation-of-powers principles are or should be central to the analysis" of whether to recognize a damages remedy); *see also Lebron v. Rumsfeld*, 670 F.3d 540, 548 (4th Cir. 2012) (explaining that "[p]reserving the constitutionally prescribed balance of powers is . . . [a] special factor counseling hesitation" in implying a *Bivens* remedy).

> v.  *The Scope and Number of Governmental Actions and Actors Plaintiffs Challenge Across Agencies Would Make Devising a Workable Individual-Capacity Cause of Action Impracticable*

The Supreme Court has recognized that a "serious difficulty of devising a workable cause of action" for a particular *Bivens* claim counsels against such a free-standing non-statutory

remedy. *See Wilkie*, 551 U.S. at 562. Relatedly, where recognizing a plaintiff's proposed remedy would open the floodgates, the unusual risk of "burden and demand" on federal officials that "might well prevent" them "from devoting the time and effort required for the proper discharge of their duties" (and related "practical concerns") will also counsel hesitation. *Abbasi*, 137 S. Ct. at 1860; *see also id.* at 1858 (discussing the "costs and consequences to the Government itself" of recognizing a new claim). These factors all inhere in this context.

Holding individuals personally liable for the United States' enforcement of immigration detention statutes and regulations and related actions is a fundamental mismatch for the *Bivens* doctrine. Most of the relevant federal statutes, policies, and other directives, including the TVPRA, section 1325(a), and the INA, preexisted Defendants' tenure in the federal government and, unless modified by Congress, will continue in effect after Defendants leave government service, as several of Defendants already have.

Moreover, the long list of relevant actors and complex issues of causation raised by a potential *Bivens* claim here make individual-capacity liability inappropriate and unworkable. What role, if any, each different Defendant's actions arguably played in Plaintiffs' separation, it was at most part of an over-arching government initiative in which no Defendant exercised even supervisory control over most of the other actors involved. The many border agents, prosecutors, detention officers, social workers, administrators, and policymakers who may have been involved are all subject to varying legal standards and mandates. And Plaintiffs were only at the border because of their parents' own circumstances and judgments.

Creating the *Bivens* action Plaintiffs seek would also have sweeping implications "on governmental operations systemwide." *Abbasi*, 137 S. Ct. at 1858. Those system-wide costs include "the burdens on Government employees who are sued personally, as well as the

projected costs and consequences to the Government itself . . . ." *Id.*; *see Laird v. Tatum*, 408 U.S. 1, 15 (1972) (rejecting the idea that "the federal courts [serve] as virtually continuing monitors of the wisdom and soundness of Executive action" and noting that "role is appropriate for the Congress acting through its committees and the 'power of the purse'"). In the context of immigration enforcement operations, claims similar to Plaintiffs' could readily be asserted by numerous other aliens facing detention. Given that every single one of the approximately 61,000 removals performed last year involved a person from a foreign country, *see* Fiscal Year 2017 ICE Enforcement and Removal Operations Report, *available at* https://www.ice.gov/removal-statistics/2017 (last visited Jan. 7, 2019), [21] this alone could open the floodgates of litigation over equal protection claims against government officials enforcing immigration laws. *Cf. Wilkie*, 551 U.S. at 561 (dismissing claims on special factors grounds in part because "a *Bivens* action to redress retaliation against those who resist Government impositions on their property rights would invite claims in every sphere of legitimate governmental action affecting property interests"). And, to the extent that claims are based on allegations about officials' personal motives, they may be relatively easy to plead and difficult to disprove. *See, e.g.*, *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1264 (10th Cir. 2006) ("[C]harges of racial discrimination . . . may be easy to make and difficult to disprove.") (citation omitted). The Court has consistently resisted efforts to embroil the judiciary in lawsuits over the subjective motive behind facially

---

[21] Federal Rule of Evidence 201 provides that "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). At several points in this brief, Defendants cite material from government websites, including statistical information, whose accuracy cannot be reasonably questioned, and is proper for judicial notice and consideration on a motion to dismiss. *See, e.g., Gent v. CUNA Mut. Ins. Soc'y*, 611 F.3d 79, 84 n.5 (1st Cir. 2010) (taking judicial notice of relevant facts provided on CDC website, which were "not subject to reasonable dispute"); *see also Vanderklok*, 868 F.3d at 205 n.16 (taking judicial notice of information "publicly available on government websites" in considering appeal of *Bivens* defendants' motion to dismiss).

lawful official conduct. *See, e.g.*, *Ashcroft v. al-Kidd*, 563 U.S. 731, 737 (2011);  *Wood v. Moss*, 572 U.S. 744, 761–62 (2014).

The potentially tremendous financial impact at issue also weighs heavily against supplanting Congress's role in deciding whether to create a damages remedy. *See, e.g.*, *Meyer*, 510 U.S. at 486 (discussing the "potentially enormous financial burden" of creating a *Bivens* remedy to challenge agency policies). In circumstances where Congress has chosen to allow broad-based challenges to policies and practices in the official capacity arena, the number of potential plaintiffs and potential damages can be enormous. *See, e.g.*, *Cobell v. Salazar*, 679 F.3d 909, 912 (D.C. Cir. 2012) (discussing the creation of $3.4 billion settlement fund). Plaintiffs allege here that the universe of "family separation" plaintiffs could number in the thousands. Compl. ¶ 190. From a practical perspective, even assuming there were viable claims, it is unlikely that any government official would have sufficient assets to pay the potential costs associated with remedying an unconstitutional policy of the United States. *See Carlson*, 446 U.S. at 21 (noting *Bivens* actions subject officials to "personal financial liability"). Ultimately, Congress, and not an individual judge, is best-equipped to decide whether and how to provide a financial remedy for past harms caused by government policies. Ultimately, Congress, and not an individual judge, is best-equipped to decide whether and how to provide a financial remedy for past harms caused by government policies. Indeed, Congress has appropriated $4 million to HHS' Substance Abuse and Mental Health Services Administration ("SAMHSA") in order to address the mental health service needs of UACs through the National Child Trauma Stress Initiative ("NCTSI"), with a special focus on children who were separated from their family. Department of Defense and Labor, Health and Human Services, and Education Appropriations Act, 2019 and Continuing Appropriations Act, 2019, Pub. L. No. 115-245, 132 Stat 2981; Joint

Explanatory Statement of the Committee of Conference, H.R. Rep. No. 115-952, at *533 (2018).

Plaintiffs' choices about how to structure their suit underscore the unworkability of implying a *Bivens* suit here. For example, Plaintiffs bring this suit as a class action, but class actions to challenge general government policies are uniquely ill-suited to litigate constitutional tort claims, which must be brought against federal officials for their "own individual actions." *Iqbal*, 556 U.S. at 676. Plaintiffs also seek injunctive relief against the Defendants "requiring the Defendants to establish a fund in an amount to be determined at trial for the mental health treatment and ongoing mental health monitoring of the class members," Compl. at 53, but *Bivens* suits allow only for money damages. *See, e.g.*, *Higazy v. Templeton*, 505 F.3d 161, 169 (2d Cir. 2007) ("The only remedy available in a *Bivens* action is an award for monetary damages from defendants in their individual capacities."). Individual-capacity suits of this nature against federal employees are simply not conducive to the sort of remedy Plaintiffs seek. *Cf. Meyer*, 510 U.S. at 486 ("We leave it to Congress to weigh the implications of such a significant expansion of Government liability.").

***

Plaintiffs' constitutional tort claims target the personal assets of federal officials from the White House and high-ranking decision-makers from virtually every federal agency involved in border security and immigration policy. The proposed claims implicate a remarkable number and variety of "factors counseling hesitation" and would involve a uniquely unwarranted judicial intrusion into Congressional and Executive decision-making. Such core of separation-of-powers concerns provide more than ample reasons why Congress "might" doubt the propriety of a money damages remedy against individuals, *Abbasi*, 137 S. Ct. at 1861, and why this Court should decline to create the novel *Bivens* cause of action Plaintiffs seek here.

**IV.      DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY FOR ALL CONSTITUTIONAL AND FEDERAL STATUTORY CLAIMS**

Plaintiffs' lawsuit should also be dismissed because all eleven Defendants are entitled to qualified immunity for all claims raised in Plaintiffs' complaint. Qualified immunity protects public officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). It is "an immunity from suit rather than a mere defense to liability." *Saucier v. Katz*, 533 U.S. 194, 200–201 (2001). Accordingly, courts should resolve "immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam). Qualified immunity "'gives government officials breathing room to make reasonable but mistaken judgments.'" *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (quoting *al-Kidd*, 563 U.S. at 743). It provides "ample" protection and shields "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). To overcome qualified immunity, a plaintiff must "plead[] facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *al-Kidd*, 563 U.S. at 735 (quoting *Harlow*, 457 U.S. at 818); *accord Hill v. Walsh*, 884 F.3d 16, 21 (1st Cir. 2018). "[T]he clearly established law must not be gauged at too high a level of generality; instead, it must be 'particularized' to the facts of the case." *Alfano v. Lynch*, 847 F.3d 71, 76 (1st Cir. 2017) (quoting *Anderson*, 483 U.S. at 640).

Courts may "exercise their sound discretion in deciding which of the two prongs of [that] analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Where a case can "be disposed of more readily" at the second step, *id*. at 237 (citation omitted) – because the court can "quickly and easily decide

38

that there was no violation of clearly established law before turning to the more difficult question whether the relevant facts make out a constitutional question at all," *id*. at 239 – the court may find that qualified immunity applies without reaching the initial "constitutional" question.[22] This rationale applies equally to Plaintiffs' federal statutory claims under 42 U.S.C. §§ 1985(3) and 1986, which incorporate constitutional standards by definition. *See, e.g.*, 42 U.S.C. § 1985 ("If two or more persons . . . conspire . . . for the purpose of depriving . . . any person or class of persons of the *equal protection of the laws* . . . .") (emphasis added); *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971) ("The language requiring intent to deprive of equal protection, or equal privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action."); *Bisbee v. Bey*, 39 F.3d 1096, 1102 (10th Cir. 1994) (explaining why the requirements of qualified immunity apply in § 1985 cases).

Here, Defendants' immunity can easily be resolved at step two—Plaintiffs' failure to identify the violation of a clearly established constitutional or related federal statutory right. Principles of constitutional avoidance favor this approach, particularly where, as here, the answer to the clearly established question is plain. *Camreta v. Greene*, 563 U.S. 692, 705 (2011) ("[O]ur usual adjudicatory rules suggest that a court should forbear resolving [the merits of a constitutional question]."). The absence of caselaw at the time of Plaintiffs' separation that would have put Defendants on notice of any clearly established right requires dismissing Plaintiffs' claims. *See D.C. v. Wesby*, 138 S. Ct. 577, 591 (2018) ("Tellingly, neither the panel

---

[22] *See Pearson*, 555 U.S. at 237 ("There are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right. District courts and courts of appeals with heavy caseloads are often understandably unenthusiastic about what may seem to be an essentially academic exercise."); *id*. at 241 (acknowledging "the 'older, wiser judicial counsel 'not to pass on questions of constitutionality . . . unless such adjudication is unavoidable'") (citations omitted).

majority nor the partygoers have identified a single precedent—much less a controlling case or robust consensus of cases—finding a [constitutional] violation 'under similar circumstances.'") (citations omitted).

### a.   Plaintiffs Fail to Allege the Violation of a Clearly Established Due Process Right

Plaintiffs ask this Court to recognize an across-the-board clearly established due process right of immigration detainees to be housed with their minor children,[23] but precedent does not clearly support the existence of any such right. As an initial matter, the Supreme Court has warned against analyzing claimed substantive due process rights at too general a level. *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997). It has also "been reluctant to expand the concept of substantive due process because guideposts for responsible decision making in this unchartered area are scarce and open-ended." *Collins v. City of Harker Heights*, *Tex.*, 503 U.S. 115, 125 (1992). When analyzed at the appropriate level of generality, it is clear that the right Plaintiffs claim is both too context-dependent to qualify as clearly established and is, in any event, not supported by Supreme Court or First Circuit precedent.

Although framed in a variety of different ways, at their core, Plaintiffs' substantive due process claims, Counts I ("Right to Family Integrity"), IV ("Punishment of Civil Detainees"), V

---

[23] Contrary to Plaintiffs' claim that the government could have held Plaintiffs and their parents together in "immigration family detention centers," Compl. ¶ 4, the government's ability to hold family units in ICE family residential centers is subject to the limitations of the *Flores* Settlement Agreement, as interpreted recently in a series of court decisions. *See Flores v. Johnson*, 212 F. Supp. 3d 864 (C.D. Cal. 2015); *Flores v. Lynch*, 212 F. Supp. 3d 907 (C.D. Cal. 2015); *Flores v. Lynch*, 828 F.3d 898 (9th Cir. 2016). Settlement agreements, it should be noted, do not establish the baseline for constitutional conduct. *See, e.g.*, *Palmer v. Sheahan*, No. 93 C 181, 1994 WL 801474, *2 n.4 (N.D. Ill. Feb. 15, 1994) ("If the defendants violated the terms of the consent decree, the appropriate remedy is an order . . . from the judge who entered the decree, not damages pursuant to § 1983.") (citing cases); *Green v. McKaskle*, 788 F.2d 1116, 1123 (5th Cir. 1986) ("[R]emedial court orders per se, apart from independent constitutional grounds affirmed there, cannot serve as a substantive basis for a § 1983 claim for damages because such orders do not create 'rights, privileges, or immunities secured by the Constitution and laws.'") (quoting 42 U.S.C. § 1983).

("Coerced Waiver of Asylum"), and VI ("Failure to Provide Adequate Mental Health Services"), are all rooted in the premise that Plaintiffs and their parents have a categorical constitutional right to remain "together as a family." Compl. ¶ 202; *see id.* ¶¶ 232, 243, 253–54. But any right which children may have regarding their relationship with their parents necessarily varies by context. *See, e.g.*, *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003) (recognizing that rights of familial association apply differently when an individual is imprisoned). The fact-specific nature of the inquiry required in this case, the necessity of balancing competing interests, and the complexity of managing adult and family detention at the United States border all compel the conclusion that the law applicable to Plaintiffs' constitutional and related federal statutory claims was not clearly established for qualified immunity purposes.

But even setting aside that problem, Plaintiffs' claim that aliens have a fundamental constitutional right to be detained as a family flies in the face of the entire statutory scheme governing immigration enforcement. It is well established that Congress has broad power to regulate immigration, even when its decisions touch on sensitive familial relationships. *See, e.g.*, *Fiallo*, 430 U.S. at 797–98 (rejecting constitutional challenge to sections of INA which excluded the relationship between illegitimate child and his natural father from the special preference status otherwise accorded a "child" or "parent" of a United States citizen or lawful permanent resident). It is equally well established that Congress has criminalized illegal entry into the United States without providing any exception from prosecution for aliens who enter illegally as a family unit. 8 U.S.C. § 1325(a). Courts have thus repeatedly rejected attempts to establish that aliens have any substantive due process right to family visitation, or to be detained in proximity to – much less to be released from detention with – family members. *See, e.g.*, *Aguilar v. ICE*, 510 F.3d 1, 22 (1st Cir. 2007) (immigration arrest which prevented parent from making

arrangements for the care of their children did not violate the right to family integrity); *see also Payne-Barahona v. Gonzales*, 474 F.3d 1, 2 (1st Cir. 2007) (valid removal of an alien did not infringe his children's constitutional right to family integrity); *Gallanosa by Gallanosa v. United States*, 785 F.2d 116, 120 (4th Cir. 1986) ("The courts of appeals that have addressed this issue have uniformly held that deportation of the alien parents does not violate any constitutional rights of the citizen children.").

Related case law confirms the point. From a legal perspective, courts consider immigration detainees analogous to pretrial detainees under certain circumstances. *See Edwards v. Johnson*, 209 F.3d 772, 778 (5th Cir. 2000) ("We consider a person detained for deportation to be the equivalent of a pretrial detainee."). But pretrial detainees, even those who are U.S. citizens, do not have a right to be housed with or even near family members while in criminal custody. *See Olim v. Wakinekona*, 461 U.S. 238, 247–48 & n.8 (1983) (interstate transfer of criminal detainee does not violate any due process right, even if the transfer leaves detainee separated hundreds of miles from his family) (citing *Montanye v. Haymes*, 427 U.S. 236, 241 n.4 (1976)); *Ms. L. v. ICE*, 310 F. Supp. 3d 1133, 1143 (S.D. Cal. 2018) (noting that "parents and children may lawfully be separated when the parent is placed in criminal custody").[24] The same legal analogy applies to UACs in the care of ORR. Whatever the parameters of their rights, aliens attempting to enter the United States certainly do not have greater constitutional rights

---

[24] *See also Newbold v. Stansberry*, No. 1:08CV1266 (LO/JPP), 2009 WL 86740, at *3 (E.D. Va. Jan. 12, 2009) (holding that "[a] prisoner has no due process interest in his placement at a particular prison, nor does the Constitution guarantee that the convicted prisoner will be placed in any particular prison. Nor does a prisoner have a constitutional right to receive visits from friends or family members.") (internal quotations and citations omitted), *aff'd*, 332 F. App'x 927 (4th Cir. 2009); *Lyons v. Clark*, 694 F. Supp. 184 (E.D. Va. 1988) (rejecting challenge to transfer of criminal detainee after finding no liberty interest of criminal detainee "in receiving visits from family, friends and community groups"), *aff'd*, 887 F.2d 1080 (4th Cir. 1989).

than U.S. citizens. *See Mathews v. Diaz*, 426 U.S. 67, 79–80 (1976) ("In the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens.").

There is also no historical precedent to support the novel substantive right that Plaintiffs claim. *See, e.g.*, *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998) (asserting that the "shock-the-conscience" inquiry "may be informed by a history of liberty protection"); *United States v. Dominguez-Portillo*, No. 17-mj-4409, 2018 WL 315759, at *5–6 (W.D. Tex. Jan. 5, 2018) (alien-parent's referral for prosecution under 8 U.S.C. § 1325(a) was not enough to show "outrageous government conduct" for purposes of the Fifth Amendment because "the case law provides little guidance on how . . . parental rights are actually manifested when a parent charged with . . . illegal entry . . . is separated from their child who allegedly accompanied them across the border" and noting "the lack of clearly established parental rights in these circumstances and under case law"). To the contrary, it has always been acknowledged that "the evenhanded enforcement of the immigration laws, in and of itself, cannot conceivably be held to violate substantive due process." *Aguilar*, 510 F.3d at 22 (citing *de Robles v. INS*, 485 F.2d 100, 102 (10th Cir. 1973)). Any associated interference with the right to family integrity alleged here was incidental to such enforcement and sprang from the federal government's legitimate interest in prosecuting illegal entrants and detaining them during the expedited removal and credible fear screening process. *See Demore v. Kim*, 538 U.S. 510, 523 (2003) ("detention during deportation proceedings [is] a constitutionally valid aspect of the deportation process"); *Payne-Barahona*, 474 F.3d at 3 (rejecting the argument that "family separation" based on a valid deportation "shocks-the-conscience"). This is a critically important point because *every* governmental detention of a parent runs the risk of interfering in some way with the parent's ability to care for

his or her children. *See Payne-Barahona*, 474 F.3d at 3 ("If there were such a right [to challenge a parent's valid deportation], it is difficult to see why children would not also have a constitutional right to object to a parent being sent to prison or, during periods when the draft laws are in effect, to the conscription of a parent for prolonged and dangerous military service.").

It is for this reason that the overwhelming majority of cases run contrary to Plaintiffs' theories of substantive due process. "After all, the right to family integrity has been recognized in only a narrow subset of circumstances," *Aguilar*, 510 F.3d at 23, but not in deportations, which "are routine and do not of themselves dictate family separation," *Payne-Barahona*, 474 F.3d at 3. As described by numerous courts of appeals, "[i]f an alien could avoid the consequences of unlawful entry into the United States by having a child, it would create perverse incentives and undermine Congress's authority over immigration matters." *Marin-Garcia v. Holder*, 647 F.3d 666, 674 (7th Cir. 2011).[25] Although some district courts have recently indicated that they *might* find applications of the zero-tolerance policy that allegedly resulted in separation unconstitutional, this does not demonstrate that any of Defendants' alleged actions in this case violated any clearly established constitutional rights.[26]

---

[25] *See also Newton v. INS*, 736 F.2d 336, 343 (6th Cir. 1984) (finding "no constitutional rights of citizenship implicated in the decision to deport" parents of citizen children); *Delgado v. INS*, 637 F.2d 762, 764 (10th Cir. 1980) ("This Court has repeatedly held that the incidental impact visited upon the children of deportable, illegal aliens does not raise constitutional problems."); *Cortez–Flores v. INS*, 500 F.2d 178, 180 (5th Cir. 1974) ("[D]eportation of a parent does not deprive the child of any constitutional rights."); *de Robles*, 485 F.2d at 102 (rejecting argument that it is unconstitutional to break up a family and deprive children of "constitutional right to a continuation of the family unit"); *Cervantes v. INS*, 510 F.2d 89, 92 (10th Cir. 1975) ("The incidental impact on aliens' minor children caused by the enforcement of duly-enacted conditions on aliens' entrance and residence does not create constitutional problems.").

[26] Defendants are mindful that some courts have held that plaintiffs in other cases were *likely* to succeed on "their substantive due process claim that their continued separation, absent a determination that [the mother] is either an unfit parent or presents a danger to her sons, violates their right to family integrity under the Fifth Amendment." *Jacinto-Castanon*, 319 F. Supp. 3d at 499; *see also Ms. L.*, 310 F. Supp. 3d at 1145–46 (finding likelihood of success on plaintiffs' due process claim). However, although those cases raise similar legal issues to those raised by Plaintiffs, those decisions came in a different procedural posture (preliminary injunction), and were issued against a different defendant (the United States) facing

Plaintiffs' attempt to particularize their substantive due process claims fares no better. For instance, Count IV alleges that Defendants violated Plaintiffs' due process rights by subjecting them to "punitive conditions during their civil immigration detention." Compl. ¶ 231. Although Plaintiffs were only subject to civil detention, their parents were (and still may be) subject to criminal punishment to the extent they violated 8 U.S.C. § 1325(a) or other criminal law. Plaintiffs cannot demonstrate that they had a clearly established due process right for their parents not to be prosecuted for crimes they committed. *Cf. Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973) ("[A] private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another."). And any claims regarding the particular conditions of their detention, to the extent they existed, (*see, e.g.*, Compl. ¶¶ 132, 144 (freezing cold rooms), *id.* ¶¶ 144, 168 (inadequate bedding), *id.* ¶ 169 (inadequate food), *id.* ¶ 129–30, 132 (overcrowding)), or the failure to provide them with adequate mental health services (Count VI) would have to be brought against the line-level officers and/or custodians who allegedly committed the particular infraction. *Iqbal*, 556 U.S.at 676, ("[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").[27] Nor can Plaintiffs establish that alien asylum-seekers have some clearly

___

different plaintiffs seeking different relief (injunctive) in a different factual context (before reunification). More importantly, for qualified immunity purposes, even if there were a decision on the merits in those cases, district court decisions cannot clearly establish a legal proposition of the nature raised here. *See Camreta*, 563 U.S. at 709 n.7 (quoting 18 J. Moore et al., Moore's Federal Practice § 134.02[1][d] (3d ed. 2011)) ("'A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case.'"). They certainly cannot do so where they, as here, post-date the challenged conduct. *Pearson*, 555 U.S. at 232 ("[T]he court must decide whether the right at issue was 'clearly established' *at the time of defendant's alleged misconduct*.") (emphasis added).

[27] Depending on the facts and circumstances, a plaintiff may also be able to seek injunctive relief to remedy ongoing constitutionally deficient conditions of confinement. *See, e.g.*, *Doe v. Kelly*, 878 F.3d 710, 725 (9th Cir. 2017) (affirming grant of preliminary injunction requiring the government to provide detainees with mats and blankets after 12 hours).

established constitutional right to seek asylum (Count V). *See Ticoalu v. Gonzales*, 472 F.3d 8, 11 (1st Cir. 2006) ("Due process rights do not accrue to discretionary forms of relief . . . and asylum is a discretionary form of relief.").

Similarly, Plaintiffs cannot show that they had some clearly established substantive due process right *not* to be treated as "'unaccompanied minors' even though they entered the United States with their parents." Compl. ¶ 64. By federal statute (not the Constitution), a UAC is a child under 18 years of age with no lawful immigration status in the United States who either (1) does not have a parent or legal guardian in the United States or (2) does not have a parent or legal guardian in the United States "available to provide care and physical custody." 6 U.S.C. § 279(g)(2). Courts have struggled to apply this definition, with federal judges disagreeing on when the label is appropriate. *Compare D.B. v. Cardall*, 826 F.3d 721, 734 (4th Cir. 2016) ("Consequently, to be 'available to provide care' for a child, a parent must be available to provide what is necessary for the child's health, welfare, maintenance, and protection.") *with id.* at 744 (Floyd, J., dissenting) ("Congress has not empowered the federal Office of Refugee Resettlement to seize children from bad parents. The Office is only authorized to detain alien children whose parents are not available in the United States."). Judges also disagree about precisely when and under what circumstances aliens (whether adults or children) entering the United States gain constitutional protections.[28] And when judges disagree on such questions, all

---

[28] *Compare Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("[O]nce an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent.") *with United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990) ("[A]liens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country."); *Garza v. Hargan*, 874 F.3d 735, 747 (D.C. Cir. 2017), *cert. granted, judgment vacated sub nom. Azar v. Garza*, 138 S. Ct. 1790 (2018) (quoting *Bridges v. Wixon*, 326 U.S. 135, 161 (1945) (Murphy, J., concurring)) (Henderson, J., dissenting) ("[B]efore developing the 'substantial connections' that constitute 'entry' for an illegally present alien—'[t]he Bill of Rights is a futile authority for the alien seeking admission for the first time to these shores.'"); *Castro v. DHS*, 835 F.3d 422, 445 (3d Cir. 2016)

of which are implicated by Plaintiffs' claims, it is unfair to subject officials to "money damages for picking the losing side of the controversy." *Wilson v. Layne*, 526 U.S. 603, 618 (1999). Given the lack of clarity even on these general principles, Plaintiffs cannot show that clearly established substantive due process law prohibited Defendants' conduct with respect to Plaintiffs and their parents in the "particular circumstances" faced by the Defendants. *Wesby*, 138 S. Ct. at 590. Accordingly, Counts I, IV, V, and VI should be dismissed.

Plaintiffs also make a procedural due process claim (Count II, Compl. ¶ 208–216), but to the extent any due process claim lies here, it sounds in substantive, not procedural due process. Even if Plaintiffs were to press such a claim, it would fail. As with substantive due process, a procedural due process claim requires courts "ask whether there exists a liberty or property interest of which a person has been deprived," *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011), and as noted, *supra*, no such interest was clearly established with respect to immigration detainees. But even if such an interest did exist, ORR's care and custody of UACs does not violate any clearly established procedural due process rights because there are sufficient mechanisms to challenge the decision to maintain custody of those children. Due process only requires "the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quotation omitted); *id*. at 333–35 (prescribing a balancing test for procedural due process claims). Agencies are not required to provide trial-like procedures unless mandated to do so by Congress. 5 U.S.C. § 554(a); *see also Pension Ben.*

---

(quoting *Landon v. Plasencia*, 459 U.S. 21, 32 (1982)) ("The reason Petitioners' Suspension Clause claim falls at step one is because the Supreme Court has unequivocally concluded that 'an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application.'"); *United States v. Carpio-Leon*, 701 F.3d 974, 975 (4th Cir. 2012) ("[I]llegal aliens are not law-abiding members of the political community and aliens who have entered the United States unlawfully have no more rights under the Second Amendment than do aliens outside of the United States seeking admittance.").

*Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 655–56 (1990). Children are in ORR care and custody pursuant to the HSA and TVPRA, and there are mechanisms for challenging ORR's determination that their parents or other custodians are unable to provide for each child's care and custody. *See, e.g.*, Children Entering the United States Unaccompanied: Section 2, Safe and Timely Release from ORR, available at https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2#2.2. Additional procedural safeguards are not required under a *Mathews* balancing test. 424 U.S. at 333–35. Therefore, there was no clearly established procedural due process violation inherent in the government's custody of Plaintiffs, and Count II should be dismissed.

**b.  Plaintiffs Fail to Allege a Violation of a Clearly Established Equal Protection Right**

Plaintiffs cannot show that a policy of prosecuting everyone who illegally enters the United States along the southern border violates any clearly established equal protection right (Count III). The Supreme Court has long held that a policy that does not identify a suspect classification or fundamental right "cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Armour v. City of Indianapolis, Ind.*, 566 U.S. 673, 680 (2012) (internal quotation and citations omitted); *see Medeiros v. Vincent*, 431 F.3d 25, 29 (1st Cir. 2005) ("Legislation or regulation which neither employs a suspect classification nor impairs fundamental rights, will survive constitutional scrutiny, provided the remedy is 'rationally related' to a legitimate governmental purpose.") (internal citations omitted). On its face, the "zero-tolerance" policy Plaintiffs reference and any related actions by federal officials in separating Plaintiffs and their parents targeted only those who improperly entered the United States in violation of section 1325(a). This is not a suspect classification. Moreover, the vast majority of illegal entries to the

United States occur at its southern border,[29] and this, rather than any animus towards "immigrants from Latin America," Compl. ¶ 222, is an "obvious alternative explanation" explaining the impetus for the policy. *Iqbal*, 556 U.S. at 682–83 (rejecting animus allegations because "obvious alternative explanation" explained disparate treatment of Arab Muslims).[30]

But even if there were a fundamental right or national origin classification somehow at issue here, it is not clearly established in the immigration and related UAC context that a court must apply a heightened standard of review. Courts have repeatedly affirmed that "[d]istinctions on the basis of nationality may be drawn in the immigration field by the Congress or the Executive." *Narenji v. Civiletti*, 617 F.2d 745, 747 (D.C. Cir. 1979); *see Kandamar v. Gonzales*, 464 F.3d 65, 74 (1st Cir. 2006) (citing *Narenji* and applying the same standard); *accord Trump v. Hawaii*, 138 S. Ct. 2392, 2418–2419 (2018) ("Because decisions in these matters may implicate relations with foreign powers, or involve classifications defined in the light of changing political and economic circumstances, such judgments are frequently of a character more appropriate to either the Legislature or the Executive") (quotations and citation omitted); *see also, e.g.*, *Rajah v. Mukasey*, 544 F.3d 427, 435 (2d Cir. 2008); *Jean v. Nelson*, 727 F.2d 957, 978 n.30 (11th Cir. 1984). Where an equal protection challenge to a federal immigration law (as opposed to a state law based on alienage) is brought, only rational basis review applies. *See Mathews*, 426 U.S. at

---

[29] *See* Nationwide Apprehensions by Citizenship and Sector in Fiscal Year 2017, *available at* https://www.cbp.gov/sites/default/files/assets/documents/2018-May/usbp-apprehensions-citizenship-sector-fy2017.pdf (last visited Jan. 7, 2019); CBP Border Security Report for Fiscal Year 2017, *available at* https://www.cbp.gov/sites/default/files/assets/documents/2017-Dec/cbp-border-security-report-fy2017.pdf (last visited Jan. 7, 2019).

[30] Plaintiffs' attribution of animus is not only conclusory and tautological, but it is a poor fit for the facts alleged. "Latino immigrants" can enter from any border, not just the southern border, and persons subject to the detention or criminal referral come from many countries other than those in Central America. Compl. ¶ 75.

83. "[I]t is clear that classifications made under the immigration laws need only be supported by some rational basis to fulfill equal protection guarantees." *Alvarez v. INS*, 539 F.2d 1220, 1224 (9th Cir. 1976) (upholding preferential treatment for commuter aliens from Mexico and Canada against equal protection challenge).

"[I]t should come as no surprise that the Court hardly ever strikes down a policy as illegitimate under rational basis scrutiny." *Hawaii*, 138 S. Ct. at 2420. Rational basis review is highly deferential, especially because "[a]ny rule of constitutional law that would inhibit the flexibility of the President to respond to changing world conditions should be adopted only with the greatest caution." *Id.* at 2419–20 (quotation and citation omitted); *id.* at 2420 ("[T]he Court hardly ever strikes down a policy as illegitimate under rational basis scrutiny."). "A law will survive rational basis review 'so long as it bears a rational relation to some legitimate end.'" *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 543 (9th Cir. 2004) (quoting *Romer v. Evans*, 517 U.S. 620, 631 (1996)). "[I]t is difficult to show that a law violates the equal protection clause under rational basis review," because such review invalidates only laws "so irrational or absurd on their face [that] it is clear they can be motivated by nothing other than animus or prejudice against a group." *Id.* at 543; *see also Romer*, 517 U.S. at 632; *City of Cleburne. v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985).

Features of geography support a focus of prosecutorial efforts on the southern border. As a practical matter, it is relatively difficult for non-Canadian asylum seekers to approach the United States from the northern border because they must first travel by air or sea to Canada. *See, e.g.*, *Iqbal*, 556 U.S. at 679–81 (in deciding a motion under 12(b)(6), a court may draw on its judicial experience and common sense). In contrast, the nation of Mexico lies on the southern border of the United States; to the south of Mexico are the countries which make up Central

America, and to the south of Central America are the countries which make up South America.

Thus, asylum seekers from numerous countries south of the border face fewer natural barriers to

approaching the United States. Plaintiffs ask this Court to ignore these realities and the obvious

alternative and common sense explanation for zero tolerance and related separations along the

Southern border, *i.e.*, to the extent limited immigration enforcement resources are going to be

committed to end illegal entry into the United States, it is reasonable to commit more of those

resources to the geographic areas where the crime occurs most often. The zero-tolerance policy

was not a "pre-text," but (as the complaint acknowledges, Compl. ¶¶ 68, 81–83, 93) a rational

attempt to stop illegal entry of undocumented aliens along the U.S.-Mexico border. Plaintiffs

may dispute the "effectiveness and wisdom" of enforcing this policy through criminal

prosecution, with the attendant separation when the alien charged is a parent who comes to the

border with his or her child. *Hawaii*, 138 S. Ct. at 2421. But the Court may not substitute its

judgment, or Plaintiffs', for the Executive's judgment with regard to enforcing laws passed by

Congress; nor may the Court reject the rational basis underlying the policy. *See id*.

### c.   Defendants Did Not Personally Violate Plaintiffs' Constitutional or Federal Statutory Rights

As the Supreme Court has made clear, "[b]ecause vicarious liability is inapplicable to

*Bivens* . . . suits," to survive a motion to dismiss "a plaintiff must plead that each Government-

official defendant, *through the official's own individual actions*, has violated the Constitution."

*Iqbal*, 556 U.S. at 676 (emphasis added). In *Iqbal*, for example, the Supreme Court rejected as

insufficient allegations that (1) the former Attorney General and former Director of the FBI

"knew of, condoned, and willfully and maliciously agreed" to subject plaintiff to constitutional

violations because of race, religions or national origin, (2) the AG was the "principal architect"

of the policy, and (3) the FBI Director was "instrumental in [its] adoption, promulgation, and

implementation" as a conclusory, formulaic recitation of the elements of a claim, and not entitled

to an assumption of truth. *Id.* at 669, 680–81. Adequate allegations of fact establishing personal

participation are required both in *Bivens* and federal statutory civil rights claims. *See Iqbal*, 556

U.S. at 676 ("Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff

must plead that each Government-official defendant, through the official's own individual

actions, has violated the Constitution."); *Bisbee*, 39 F.3d at 1102 ("The justifications for the

doctrine of qualified immunity enunciated in *Harlow* are equally present in section 1985

claims.").

To show a defendant's personal misconduct, a plaintiff must set out factual allegations

that are "enough to raise a right to relief above the speculative level . . . on the assumption that

all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v.

Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). As the *Twombly* Court stated, a viable

claim for relief requires "more than labels and conclusions, and a formulaic recitation of the

elements of a cause of action will not do." *Id.*; *see also Iqbal*, 556 U.S. at 678. To state a claim

for relief, a plaintiff must allege facts that are "plausible" – suggestive of wrongdoing – with

enough allegations to give defendants fair notice of the claims against them. *Twombly*, 550 U.S.

at 557 n.5, 570. As the Tenth Circuit has observed in a suit under 42 U.S.C. § 1983:

> [C]ases against individual government actors pose a greater likelihood of failures
> in notice and plausibility because they typically include complex claims against
> multiple defendants. The *Twombly* standard may have greater bite in such contexts,
> appropriately reflecting the special interest in resolving the affirmative defense of
> qualified immunity at the earliest possible stage of litigation.

*Robbins v. Oklahoma*, 519 F.3d 1242, 1249 (10th Cir. 2008) (internal citations and quotations

omitted). In such cases, like the instant one, the complaint must make clear "exactly who is

alleged to have done what to whom" so as to give each individual defendant fair notice of the

basis of the claims against him or her. *Id.* at 1250.

Each Count in the complaint in this case relies on conclusory, formulaic allegations that are not entitled to the assumption of truth and cannot establish the personal participation of any of the Defendants. An illustrative example is paragraph 204, which alleges:

> The Defendants in this action have adopted, implemented, enforced, condoned, sanctioned, acquiesced to, and encouraged a pattern, practice, or custom of violating the clearly established due process rights of the class members by forcibly separating young children from their parents without justification.

This allegation, and the related ones in almost every Count (Compl. ¶¶ 213, 235, 245, 256, 263) all contain collective references that fail to identify with sufficient particularity personal involvement by each Defendant in the alleged denial of Plaintiffs' rights, and are precisely the sort of allegations that the *Iqbal* Court found insufficient to establish personal participation of the high-ranking individuals there. *Iqbal*, 556 U.S. at 669, 680–81. Plaintiffs' allegations in this regard are particularly troubling because they have grouped together government officials from different agencies, at different levels of service, with differing statutory authorities and responsibilities. Faced with a similar plaintiff-assembled grouping of defendants, at least one federal Circuit has observed, "[p]resumably, the allegedly tortious acts committed by [the Director of the Oklahoma Department of Human Services, the operator of a daycare, and individual social workers] are entirely different in character and therefore are mistakenly grouped in a single allegation." *Robbins*, 519 F.3d at 1250; *see also Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001) ("By lumping all the defendants together in each claim and providing no factual basis to distinguish their conduct, [the plaintiff's] complaint failed to satisfy [the] minimum standard" that "a complaint give each defendant fair notice of what the plaintiff's claim is and the ground upon which it rests." (internal quotation marks omitted)). Plaintiffs' allegations fail to give notice of what specific actions by which specific

Defendants are at issue.[31] They are textbook examples of the sorts of conclusory, vague, and general claims insufficient to establish any defendant's personal participation in any clearly unconstitutional conduct. *See, e.g.*, Compl. ¶ 213 ("The Defendants in this action have adopted, implemented, enforced, condoned, sanctioned, acquiesced to, and encouraged a pattern, practice, or custom of violating the clearly established due process rights of the class members by forcibly separating young children from their parents without due process of law.").

However, even if these allegations were accepted as sufficient for notice purposes, merely condoning, sanctioning, or acquiescing to a policy is insufficient to establish personal liability. Rather, each Defendant needed to take some personal action to violate Plaintiffs' constitutional rights. *Iqbal*, 556 U.S. at 680, 683. To establish personal participation, at a minimum, Plaintiffs must also "plead sufficient factual matter to show that [Defendants] adopted and implemented the detention policies at issue not for a neutral" immigration "reason but for the purpose of discriminating on account of race, religion, or national origin." *Id*. at 677 ("purpose rather than knowledge is required"). Plaintiffs baldly claim that "Defendants and others in the Trump Administration have openly admitted that the practice of forcibly separating families at the Southwestern border, among other enforcement practices, was intended to target immigrants by their race, ethnicity, or national origin," Compl. ¶ 75, but the public remarks they recite by some individuals in support of this allegation do not support the accusation. None of the statements demonstrates a desire by any Defendant to discriminate against persons based on national origin. Rather, some of the statements reflect an unremarkable policy position –

---

[31] Indeed, several Defendants (e.g., Secretary Azar and former Director Lloyd) serve at agencies that do not even have statutory authority over the apprehension, detention, or separation of aliens at the border. And on the flip side, other Defendants serve at agencies who have no statutory authority over UACs (e.g., former AG Sessions and Secretary Nielsen).

enforcing the legislative choices made by Congress – that increased measures must be taken to

secure the southern border because the vast majority of illegal entry into the United States occurs

there. *See, e.g.*, Compl. ¶ 91. Other statements reflect similarly unremarkable positions. *See, e.g.*,

Compl. ¶ 62 (quoting a statement by Defendant Azar in which he details ORR's commitment to

transparency, underscores that ORR is seeking to vindicate child welfare, and states that the

UAC program run by ORR is generous and charitable). Any claim of unconstitutional purpose

behind these statements is wholly conclusory and therefore must be ignored. *See Iqbal*, 556 U.S.

at 682 ("As between that obvious alternative explanation for the arrests, and the purposeful,

invidious discrimination respondent asks us to infer, discrimination is not a plausible

conclusion.") (citations omitted).

Similarly, Plaintiffs' broad-brush allegations that Defendants collectively failed to

provide adequate conditions or mental health care, *e.g.* Compl. ¶¶ 232, 253, are insufficient and

fail for lack of personal participation. Even presuming constitutionally inadequate conditions or

care were alleged (and they are not),[32] Defendants were many steps removed from custodians or

medical professionals who even might have been personally responsible for Plaintiffs' medical

care while detained or are alleged to have been aware of Plaintiffs' medical conditions. And it is

black letter law that there is no respondeat superior liability in *Bivens* actions. *Iqbal*, 556 U.S. at

676 ("Government officials may not be held liable for the unconstitutional conduct of their

subordinates under a theory of *respondeat superior*."). To the extent Defendants can be held

liable at all it is for their own actions, not the acts of others. *See id*. For that reason, Defendants

also cannot be liable for the actions of other government employees who are alleged to have

---

[32] *See DesRosiers v. Moran*, 949 F.2d 15, 19 (1st Cir. 1991) (explaining the high standard for alleging a deliberate indifference claim).

mistreated Plaintiffs. *See, e.g.*, Compl. ¶¶ 148, 149 (alleging CBP agents kicked E.O., Jr., and

pulled K.O.'s ponytail). Defendants all are or were in high-level policymaking positions, and

were not even direct supervisors of federal employees within DHS or ORR with custodial

responsibility for Plaintiffs. In a related (though even less removed) context, even Wardens at the

same institution in which an individual is detained cannot be held personally liable based on such

generic accusations.[33] Here, Defendants carry or carried out very different roles, over different

facets of the federal government, within at least four different agencies that operate under

distinct statutory authorities, with distinct roles in either creating or promulgating national

policies. Certainly, the national officials of the sort sued here cannot be sued on such flimsy

allegations of personal participation.

### d. The Court Should Dismiss Plaintiffs' Federal Statutory Claims For Additional Reasons

For essentially the same reasons Defendants are entitled to qualified immunity with

respect to Plaintiffs' constitutional claims, the Court should also dismiss the claims under

Sections 1985 (Count VII) and 1986 (Count VIII). *See, e.g.*, *Abbasi*, 137 S. Ct. at 1866 (applying

qualified immunity to Section 1985 claim). To state a claim under Section 1985(3), a plaintiff

must allege "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any

person or class of persons of the equal protection of the laws, or of equal privileges and

immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person

is either injured in his person or property or deprived of any right or privilege of a citizen of the

---

[33] *E.g.*, *Estate of Rosenberg by Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995) ("The general responsibility of a warden for supervising the operation of a prison is not sufficient to establish personal liability."); *Ouzts v. Cummins*, 825 F.2d 1276, 1277 (8th Cir. 1987) ("Further, a warden's general responsibility for supervising the operations of a prison is insufficient to establish personal involvement."); *Jones v. Horne*, 634 F.3d 588, 602 (D.C. Cir. 2011) (dismissing claim against a warden where plaintiff failed to allege warden's personal involvement in his conditions of confinement).

United States." *United Bhd. of Carpenters & Joiners, Local 610 v. Scott*, 463 U.S. 825, 828–29

(1983). Section 1985(3), however, "provides no substantive rights itself." *Id.* at 833. Instead,

"[t]he rights, privileges, and immunities that § 1985(3) vindicates must be found elsewhere." *Id*.

And "a plaintiff may recover [under Section 1985(3)] only when the conspiratorial conduct of

which he complains is propelled by 'some racial, or perhaps otherwise class-based, invidiously

discriminatory animus.'" *Aulson v. Blanchard*, 83 F.3d 1, 3 (1st Cir. 1996) (quoting *Griffin*, 403

U.S. at 102). Here, Plaintiffs invoke their due process and equal protection rights. Compl.

¶¶ 199–258.

In addition to the reasons already given by Defendants about why they are entitled to

qualified immunity for Plaintiffs' equal protection and due process claims, *supra*, Section II.a.–c,

Defendants are also entitled to qualified immunity on Plaintiffs' statutory claims. *See Local No.

48, United Bhd. of Carpenters & Joiners of Am. v. United Bhd. of Carpenters & Joiners of Am.*,

920 F.2d 1047, 1058 (1st Cir. 1990) ("Having failed to show that their federally secured rights

were abrogated in any respect, it follows *a fortiori* that appellants possess no colorable claim

under section 1985(3)."). As an initial matter, the extent to which Section 1985(3) even applies

to federal actors who are formulating general policy has not been not clearly established. For

example, *Abbasi* discussed the viability of a Section 1985(3) against multiple Executive Branch

officials for discussions that "were the preface to, and the outline of, a general and far-reaching

policy." 137 S. Ct. at 1867. Although the Court declined to decide on the applicability of

intracorporate-conspiracy doctrine with reference to Section 1985(3) conspiracies, the Court did

find the law was "sufficiently open" that the government employees were entitled to qualified

immunity. *Id.* at 1868–69. Just as in *Abbasi*, many of the Defendants here work or worked in the

same agencies, and all Defendants worked for the same branch of government, raising similar

intracorporate-conspiracy problems. Because the law is no clearer now than it was at the time *Abbasi* was decided, Defendants are entitled to qualified immunity.

Furthermore, Plaintiffs' Section 1985(3) claim, including their conspiracy allegation, is wholly conclusory. Plaintiffs allege only that "[t]wo or more of the Defendants conspired or furthered a conspiracy to deprive Plaintiffs and class members of equal protection of the laws." Compl. ¶ 262. The Supreme Court has rejected such attempts to state a claim by merely providing "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. And, as elsewhere, Plaintiffs' repeated use of the collective "Defendants" provides no basis to place any Defendant on notice of "exactly who is alleged to have done what to whom." *Robbins*, 519 F.3d at 1250. Plaintiffs' conspiracy allegations thus fail as a matter of law. *Cf. Mendez v. Belton*, 739 F.2d 15, 19 (1st Cir. 1984) (affirming summary judgment on a Section 1985(3) claim where plaintiff "offered nothing beyond conclusory statements" in support of her conspiracy allegation). For all of these reasons, Defendants are entitled to qualified immunity with respect to Plaintiffs' Section 1985(3) claim. *See Uphoff Figueroa v. Alejandro*, 597 F.3d 423, 432 (1st Cir. 2010) (affirming dismissal of plaintiff's Section 1985(3) claim where the complaint "set forth no facts alleging a conspiracy").

Plaintiffs' claim under 42 U.S.C. § 1986 must derivatively fail because a violation of Section 1986 depends on an underlying violation of Section 1985. Section 1986 provides that "[e]very person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 . . . are about to be committed, and having power to prevent or aid … neglects or refuses so to do . . . shall be liable to the party injured. . . ." 42 U.S.C. § 1986. If a plaintiff fails to demonstrate a claim under Section 1985, however, courts consistently conclude that a plaintiff cannot sustain a cause of action under Section 1986. *See, e.g., Creative*

*Environments, Inc. v. Estabrook*, 680 F.2d 822, 834–35 (1st Cir. 1982) ("With no section

1985(3) claim to support it, [plaintiff's] section 1986 claim must similarly fail."). In short,

Plaintiffs' Section 1986 claim is doomed by their failure to allege facts sufficient to state a claim

under Section 1985, and both claims should be dismissed on the basis of qualified immunity. *See*

*Saucier*, 533 U.S. at 201.

## V.      PLAINTIFFS' CHALLENGE TO PROSECUTORIAL POLICYMAKING IS BARRED BY ABSOLUTE IMMUNITY

In *Imbler v. Pachtman*, the Supreme Court held that "in initiating a prosecution and in

presenting the [government's] case, the prosecutor is immune from a civil suit for damages . . . ."

424 U.S. 409, 431 (1976); *see also Schloss v. Bouse*, 876 F.2d 287, 290 (2d Cir. 1989) (absolute

immunity also protects the decision not to prosecute). This immunity extends to any activities of

the prosecutor "intimately associated with the judicial phase of the criminal process . . . ."

*Imbler*, 424 U.S. at 430. The Court based its holding on two interrelated concerns. First, a

prosecutor would be effectively disabled from discharging the public trust if called upon to

account for damages for conducting a criminal trial. *Id.* at 425–26. Second, any protection less

than absolute immunity would impede the criminal justice system's goal of accurately

determining guilt or innocence by curtailing prosecutorial discretion in the conduct of the trial

and presentation of evidence. *Id.* The Court noted that a wide variety of sensitive issues

prosecutors must confront were appropriate for the protection of absolute immunity – including

whether to present a case to a grand jury, whether to file an information, and whether and when

to prosecute. *Id.* at 431 n.33. The Court has continued to employ *Imbler*'s functional approach in

determining whether absolute prosecutorial immunity applies in a given case. *See Burns v. Reed*,

500 U.S. 478, 492 (1991) (listing cases). The Supreme Court has confirmed that, like line

prosecutors, policymakers are absolutely immune for claims that arise out of the formulation of

prosecutorial policies. *See Van de Kamp v. Goldstein*, 555 U.S. 335, 349 (2009) (supervising prosecutors had absolute immunity for general claims that their "supervision, training, or information-system management was constitutionally inadequate"); *accord Dellums v. Powell*, 660 F.2d 802, 803 (D.C. Cir. 1981) (extending *Imbler*'s prosecutorial immunity to the Attorney General for acts of prosecutorial policymaking)

The sole non-conclusory allegation of unconstitutional conduct by former AG Sessions is that in April 2018 he announced a "zero tolerance" policy to criminally prosecute all DHS referrals of section 1325(a) violations. Compl. ¶ 68. This decision to initiate prosecutions against a class of offenders (whether, as Plaintiffs claim, it was a "pretext" for "discrimination," Compl. ¶ 68, or not) was the kind of core activity protected by *Imbler*. 424 U.S. at 431. *See Holloman v. Clarke*, 236 F. Supp. 3d 493, 495 (D. Mass. 2017) (holding that a prosecutor was entitled to absolute immunity against equal protection claim). To the extent former AG Sessions, or any Defendant, is alleged to have created or implemented the policy of criminal prosecution at issue, such acts are protected by absolute immunity, and all related claims must be dismissed.[34] *Dellums*, 660 F.2d at 806. As discussed above, the immunity derives from the function of the prosecutorial act, not the particular title of the government official. *Guzman-Rivera v. Rivera-Cruz*, 55 F.3d 26, 29 (1st Cir. 1995).

## CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court dismiss the complaint with prejudice.

---

[34] For example, the complaint suggests that Defendants Homan, Cissna, and McAleenan "pushed for" the government's zero-tolerance policy, *see* Compl. ¶ 69, and implies that others were involved in the creation of the policy as well. *See id.* ¶ 88.

Respectfully submitted,

JOSEPH H. HUNT
*Assistant Attorney General*
*Civil Division*

C. SALVATORE D'ALESSIO, JR.
*Acting Director*
*Constitutional & Specialized Tort Litigation*
*Torts Branch, Civil Division*

MARY HAMPTON MASON
NY Bar No. 2255198, under L.R. 83.5.3(c)
*Senior Trial Counsel*
*Constitutional & Specialized Tort Litigation*
*Torts Branch, Civil Division*

/s/ Paul Quast
PAUL QUAST
CO Bar No. 49154, under L.R. 83.5.3(c)
*Trial Attorney*
*Constitutional & Specialized Tort Litigation*
*Torts Branch, Civil Division*
*Department of Justice*
*Box 7146 Washington, DC 20044*
*(202) 616-4150*
paul.c.quast@usdoj.gov

*Counsel for Defendants*

61

## L. R. 7.1 CERTIFICATION

Pursuant to Local Rule 7.1, Defendants' counsel asserts that he has conferred with

Plaintiffs' counsel and has attempted in good faith to resolve and narrow the issues presented in

this motion.

/s/ Paul Quast
PAUL QUAST
CO Bar No. 49154, under L.R. 83.5.3(c)
*Trial Attorney*
*Constitutional & Specialized Tort Litigation*
*Torts Branch, Civil Division*
*Department of Justice*
*Box 7146 Washington, DC 20044*
*(202) 616-4150*
paul.c.quast@usdoj.gov

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of

record for each other party by means of the District Clerk's CM/ECF electronic filing system on

January 8, 2019.

/s/ Paul Quast
PAUL QUAST
CO Bar No. 49154, under L.R. 83.5.3(c)
*Trial Attorney*
*Constitutional & Specialized Tort Litigation*
*Torts Branch, Civil Division*
*Department of Justice*
*Box 7146 Washington, DC 20044*
*(202) 616-4150*
paul.c.quast@usdoj.gov

*Counsel for Defendants*