UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| K.O. and E.O., Jr., by and through their parents and next friends, E.O. and L.J.; and C.J., by and through his father and next friend F.C.; each individually and on behalf of all others similarly situated, | ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) C.A. No. 18-40149-TSH |
| JEFFERSON BEAUREGARD SESSIONS III, Former Attorney General of the United States; KIRSTJEN NIELSEN, Secretary of the United States Department of Homeland Security (DHS); JOHN F. KELLY, White House Chief of Staff; STEPHEN MILLER, Senior Advisor to the President; GENE HAMILTON, Counselor to the Attorney General Sessions; THOMAS HOMAN, former Director of United States Immigration and Customs Enforcement (ICE); RONALD D. VITIELLO, Acting Director of ICE; L. FRANCIS CISSNA, Director of United States Citizenship and Immigration Services (USCIS); KEVIN K. MCALEENAN, Commissioner of United States Customs and Border Protection (CBP); ALEX AZAR, Secretary of the United States Department of Health and Human Services (HHS); SCOTT LLOYD, Director of the United States Office of Refugee Resettlement (ORR); JOHN DOE ICE AGENTS; JOHN DOE CBP AGENTS; and JOHN DOE ORR PERSONNEL, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF THE DEFENDANTS' MOTION TO DISMISS
(LEAVE GRANTED FEBRUARY 8, 2019)**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

FACTUAL AND PROCEDURAL BACKGROUND ...................................................... 2

    A.  Individual Allegations and Claims .......................................................... 2

    B.  Class Allegations ....................................................................................... 4

STATUTORY AND REGULATORY FRAMEWORK ................................................ 5

    A.  Expedited Removal, Credible Fear, and Mandatory Detention under the Immigration and Nationality Act ("INA") ......................................... 5

    B.  Statutes Governing the Care and Custody of Unaccompanied Alien Children .............. 5

        i.   *The Homeland Security Act of 2002 ("HSA")* .................................. 5

        ii.  *Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA")* ........ 6

    C.  Criminal Prosecution for Improper Entry ....................................... 8

    D.  The "Zero-Tolerance Policy" ............................................................... 8

ARGUMENT ..................................................................................................................... 9

I.     THE COURT SHOULD DISMISS THE FAC FOR LACK OF PERSONAL JURISDICTION OVER THE DEFENDANTS .................................................. 9

    A.  Plaintiffs Have Failed to Establish That the Massachusetts Long-Arm Statute Authorizes Personal Jurisdiction Over Any Defendant ................................ 13

    B.  Plaintiffs Have Failed to Establish That Due Process Permits Personal Jurisdiction Over Any Defendant ...................................................................... 14

II.    THE COURT SHOULD DISMISS THE FAC FOR LACK OF PROPER VENUE ........ 18

III.   THIS COURT SHOULD REJECT PLAINTIFFS' INVITATION TO EXTEND *BIVENS* TO CHALLENGE THE CONSTITUTIONALITY OF FEDERAL PROSECUTION OR DETENTION POLICY RELATING TO ALIENS CROSSING THE BORDER ......................................................................................................... 19

    A.  Plaintiffs' Claims Involve a New Context ................................................ 21

    B.  Multiple Alternative, Existing Processes Preclude the Creation of a *Bivens* Remedy .. 24

    C.  Other Factors Counsel Strongly Against Implying a *Bivens* Remedy Here ................. 27

       i.     *Bivens Actions May Not Be Used to Challenge U.S. Policy* ........................... 28

       ii.    *Congressional Action in the Context of Immigration Has Been "Frequent and Intense" and Implying a Damages Remedy Would Raise Serious Separation-of-Powers Concerns* ...................................................................... 30

       iii.   *National and Border Security Concerns Counsel Against Creation of an Individual Capacity Cause of Action in this Context* ...................................... 34

       iv.   *Additional Separation-of-Powers Principles Would Be Violated by Creating an Individual Capacity Claim for Prosecutorial Policy Decisions* .. 35

       v.    *The Scope and Number of Governmental Actions and Actors Plaintiffs Challenge Across Agencies Would Make Devising a Workable Individual-Capacity Cause of Action Impracticable* ........................................................ 36

IV.     DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY FOR ALL CONSTITUTIONAL AND FEDERAL STATUTORY CLAIMS ................................. 40

   A.   Plaintiffs Fail to Allege the Violation of a Clearly Established Due Process Right ...... 42

   B.   Plaintiffs Fail to Allege a Violation of a Clearly Established Equal Protection Right .. 50

   C.   Plaintiffs Fail to Allege the Violation of a Clearly Established Fourth Amendment Right ................................................................................................................ 54

   D.   Defendants Did Not Personally Violate Plaintiffs' Constitutional or Federal Statutory Rights ........................................................................................................ 57

   E.   The Court Should Dismiss Plaintiffs' Federal Statutory Claims For Additional Reasons ...................................................................................................................... 63

V.     PLAINTIFFS' CHALLENGE TO PROSECUTORIAL POLICYMAKING IS BARRED BY ABSOLUTE IMMUNITY ..................................................................... 65

   **CONCLUSION** .................................................................................................................. 67

# TABLE OF AUTHORITIES

<u>Cases</u>

*A Corp. v. All Am. Plumbing, Inc.*,
   812 F.3d 54 (1st Cir. 2016) ................................................................ 9, 10, 13, 17

*Adams v. Baker*,
   909 F.2d 643 (1st Cir. 1990) ................................................................ 31

*Aguilar v. ICE*,
   510 F.3d 1 (1st Cir. 2007) ................................................................ 44, 45, 46

*Air Sunshine, Inc. v. Carl*,
   663 F.3d 27 (1st Cir. 2011) ................................................................ 25

*Alfano v. Lynch*,
   847 F.3d 71 (1st Cir. 2017) ................................................................ 40

*Alvarez v. INS*,
   539 F.2d 1220 (9th Cir. 1976) ................................................................ 52

*Anderson v. Creighton*,
   483 U.S. 635 (1987) ................................................................ 28, 40

*Andrews v. Miner*,
   301 F. Supp. 3d 1128 (N.D. Ala. 2017) ................................................................ 26

*Arar v. Ashcroft*,
   585 F.3d 559 (2d Cir. 2009) ................................................................ 34

*Armour v. City of Indianapolis, Ind.*,
   566 U.S. 673 (2012) ................................................................ 50

*Ashcroft v. al-Kidd*,
   563 U.S. 731 (2011) ................................................................ 38, 40

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................ passim

*Atuahene v. City of Hartford*,
   10 F. App'x 33 (2d Cir. 2001) ................................................................ 60

*Aulson v. Blanchard*,
   83 F.3d 1 (1st Cir. 1996) ................................................................ 63

*Baker v. McCollan*,
   443 U.S. 137 (1979) ................................................................ 54

*Bank Markazi v. Peterson,*
   136 S. Ct. 1310 (2016) ......................................................................................... 34

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ...................................................................................... 58, 64

*Bisbee v. Bey,*
   39 F.3d 1096 (10th Cir. 1994) ..................................................................... 41, 58

*Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,*
   403 U.S. 388 (1971) ......................................................................... 1, 19, 20, 21

*Bolduc v. United States,*
   No. Civ.A.01-CV-11376-PBS, 2002 WL 1760882 (D. Mass. July 30, 2002) ......... 14

*Bridges v. Wixon,*
   326 U.S. 135 (1945) ............................................................................................. 49

*Bristol-Myers Squibb Co. v. Super. Ct. of Cal.,*
   137 S. Ct. 1773 (2017) ................................................................................ 9, 11, 14

*Burns v. Reed,*
   500 U.S. 478 (1991) ............................................................................................. 66

*Bush v. Lucas,*
   462 U.S. 367 (1983) .................................................................................. 20, 21, 22

*Camreta v. Greene,*
   563 U.S. 692 (2011) ...................................................................................... 41, 47

*Carlson v. Green,*
   446 U.S. 14 (1980) ................................................................................... 19, 26, 39

*Castro v. DHS,*
   835 F.3d 422 (3d Cir. 2016) ............................................................................... 49

*Cervantes v. INS,*
   510 F.2d 89 (10th Cir. 1975) .............................................................................. 46

*Chappell v. Wallace,*
   462 U.S. 296 (1983) ............................................................................................. 27

*Cheney v. U.S. Dist. Ct. for D.C.,*
   542 U.S. 367 (2004) ............................................................................................. 30

*City of Cleburne. v. Cleburne Living Ctr.,*
   473 U.S. 432 (1985) ............................................................................................. 52

*Claasen v. Brown,*
   No. Civ. A. 94-1018-GK, 1996 WL 79490 (D.D.C. 1996).................................................... 16

*Cobell v. Salazar,*
   679 F.3d 909 (D.C. Cir. 2012) ............................................................................................... 38

*Collins v. City of Harker Heights, Tex.,*
   503 U.S. 115 (1992) ................................................................................................................ 42

*Cordis Corp. v. Cardiac Pacemakers,*
   599 F.2d 1085 (1st Cir. 1979) ................................................................................................ 19

*Corr. Sers. Corp. v. Malesko,*
   534 U.S. 61 (2001) .......................................................................................................... passim

*Cortez–Flores v. INS,*
   500 F.2d 178 (5th Cir. 1974) .................................................................................................. 46

*Creative Environments, Inc. v. Estabrook,*
   680 F.2d 822 (1st Cir. 1982) .................................................................................................. 65

*Cty. of Sacramento v. Lewis,*
   523 U.S. 833 (1998) ................................................................................................................ 45

*D.B. v. Cardall,*
   826 F.3d 721 (4th Cir. 2016) .................................................................................................. 48

*D.C. v. Wesby,*
   138 S. Ct. 577 (2018) .................................................................................................. 42, 49, 57

*Davis v. Passman,*
   442 U.S. 228 (1979) ................................................................................................................ 19

*De La Paz v. Coy,*
   786 F.3d 367 (5th Cir. 2015).................................................................................... 24, 31, 33

*de Robles v. INS,*
   485 F.2d 100 (10th Cir. 1973)......................................................................................... 45, 46

*Delgado v. INS,*
   637 F.2d 762 (10th Cir. 1980)................................................................................................ 46

*Dellums v. Powell,*
   660 F.2d 802 (D.C. Cir. 1981) ......................................................................................... 66, 67

*Demore v. Kim,*
   538 U.S. 510 (2003) ................................................................................................................ 45

*DesRosiers v. Moran*,
   949 F.2d 15 (1st Cir. 1991) ........................................................................ 62

*Doe v. Kelly*,
   878 F.3d 710 (9th Cir. 2017) ...................................................................... 48

*Doe v. Rumsfeld*,
   683 F.3d 390 (D.C. Cir. 2012) ................................................................... 34

*Edwards v. Johnson*,
   209 F.3d 772 (5th Cir. 2000) ...................................................................... 44

*Estelle v. Gamble*,
   429 U.S. 97 (1976) ...................................................................................... 23

*F.D.I.C. v. Meyer*,
   510 U.S. 471 (1994) ........................................................................ 28, 38, 39

*Fed. Open Mkt. Comm. Of Fed. Reserve Sys. v. Merrill*,
   443 U.S. 340 (1979) .................................................................................... 30

*Fiallo v. Bell*,
   430 U.S. 787 (1977) ............................................................................. 31, 43

*Flores v. Johnson*,
   212 F. Supp. 3d 864 (C.D. Cal. 2015) ....................................................... 42

*Flores v. Lynch*,
   212 F. Supp. 3d 907 (C.D. Cal. 2015) ....................................................... 42

*Flores v. Lynch*,
   828 F.3d 898 (9th Cir. 2016) ...................................................................... 42

*Gallanosa v. United States*,
   785 F.2d 116 (4th Cir. 1986) ...................................................................... 44

*Galvan v. Press*,
   347 U.S. 522 (1954) .................................................................................... 31

*Garza v. Hargan*,
   874 F.3d 735 (D.C. Cir. 2017),
   *cert. granted, judgment vacated sub nom., Azar v. Garza*, 138 S. Ct. 1790 (2018) ................ 49

*Gent v. CUNA Mut. Ins. Soc'y*,
   611 F.3d 79 (1st Cir. 2010) ........................................................................ 37

*Gerstein v. Pugh*,
   420 U.S. 103 (1975) .................................................................................... 55

*Gonzalez v. Velez*,
   864 F.3d 45 (1st Cir. 2017) ................................................................ 24, 25, 27, 56

*Graham v. Connor*,
   490 U.S. 386 (U.S. 1989) ...................................................................... 55

*Green v. McKaskle*,
   788 F.2d 1116 (5th Cir. 1986) ............................................................... 42

*Griffin v. Breckenridge*,
   403 U.S. 88 (1971) .......................................................................... 41, 63

*Guzman-Rivera v. Rivera-Cruz*,
   55 F.3d 26 (1st Cir. 1995) ..................................................................... 67

*Haig v. Agee*,
   453 U.S. 280 (1981) .......................................................................... 34

*Harlow v. Fitzgerald*,
   457 U.S. 800 (1982) .......................................................................... 40

*Hernandez v. Mesa*,
   137 S. Ct. 2003 (2017) ....................................................................... 24

*Hernandez v. Mesa*,
   885 F.3d 811 (5th Cir. 2018) ............................................................... 34, 35

*Higazy v. Templeton*,
   505 F.3d 161 (2d Cir. 2007) .................................................................. 39

*Hill v. Walsh*,
   884 F.3d 16 (1st Cir. 2018) ................................................................... 40

*Holloman v. Clarke*,
   236 F. Supp. 3d 493 (D. Mass. 2017) ..................................................... 66

*Hunter v. Bryant*,
   502 U.S. 224 (1991) .......................................................................... 40

*Idaho v. Coeur d'Alene Tribe of Idaho*,
   521 U.S. 261 (1997) .......................................................................... 27

*Imbler v. Pachtman*,
   424 U.S. 409 (1976) ......................................................................... 65, 66

*In re Aiken Cty.*,
   725 F.3d 255 (D.C. Cir. 2013) ............................................................... 35

*In re Sealed Case*,
   829 F.2d 50 (D.C. Cir. 1987) ................................................................. 35

*Jacinto-Castanon de Nolasco v. ICE*,
   319 F. Supp. 3d 491 (D.D.C. 2018) ............................................... 25, 47

*Jean v. Nelson*,
   727 F.2d 957 (11th Cir. 1984) ............................................................... 52

*Jones v. Horne*,
   634 F.3d 588 (D.C. Cir. 2011) ............................................................... 62

*Kandamar v. Gonzales*,
   464 F.3d 65 (1st Cir. 2006) .................................................................... 51

*Laird v. Tatum*,
   408 U.S. 1 (1972) ................................................................................... 37

*Landon v. Plasencia*,
   459 U.S. 21 (1982) ................................................................................. 49

*Lebron v. Rumsfeld*,
   670 F.3d 540 (4th Cir. 2012) ................................................................. 36

*Lewellen v. Morley*,
   No. 88 C 1790, 1988 WL 116856 (N.D. Ill. Oct. 24, 1988),
   *aff'd on other grounds*, 875 F.2d 118 (7th Cir. 1989) ......................... 12

*Liff v. Office of Inspector Gen. for U.S. Dep't of Labor*,
   881 F.3d 912 (D.C. Cir. 2018) ..................................................... 25, 27, 33

*Linda R.S. v. Richard D.*,
   410 U.S. 614 (1973) ............................................................................... 47

*Local No. 48, United Bhd. of Carpenters & Joiners of Am. v. United Bhd. of Carpenters &*
   *Joiners of Am.*,
   920 F.2d 1047 (1st Cir. 1990) ............................................................... 63

*Lyons v. Clark*,
   694 F. Supp. 184 (E.D. Va. 1988),
   *aff'd,* 887 F.2d 1080 (4th Cir. 1989) ................................................... 44

*Mahmud v. Oberman*,
   508 F. Supp. 2d 1294 (N.D. Ga. 2007) ................................................. 17

*Malley v. Briggs*,
   475 U.S. 335 (1986) ............................................................................... 40

*Marin-Garcia v. Holder,*
  647 F.3d 666 (7th Cir. 2011) ................................................... 46

*Massachusetts Sch. of Law v. American Bar Ass'n,*
  142 F.3d 26 (1st Cir. 1998) ............................................. passim

*Mathews v. Diaz,*
  426 U.S. 67 (1976) ...................................................... 45, 52

*Mathews v. Eldridge,*
  424 U.S. 319 (1976) .......................................................... 50

*McCabe v. Basham,*
  450 F. Supp. 2d 916 (N.D. Iowa 2006) ................................. 17

*Medeiros v. Vincent,*
  431 F.3d 25 (1st Cir. 2005) ........................................... 50, 55

*Mendez v. Belton,*
  739 F.2d 15 (1st Cir. 1984) ................................................. 64

*Meshal v. Higgenbotham,*
  47 F. Supp. 3d 115 (D.D.C. 2014),
  *aff'd,* 804 F.3d 417 (D.C. Cir. 2015) ................................... 30

*Messerschmidt v. Millender,*
  565 U.S. 535 (2012) .......................................................... 40

*Minneci v. Pollard,*
  565 U.S. 118 (2012) ...................................................... 24, 26

*Mirmehdi v. United States,*
  689 F.3d 975 (9th Cir. 2012) ......................................... 33, 34

*Monell v. Dep't of Soc. Servs.,*
  436 U.S. 658 (1978) .......................................................... 20

*Montanye v. Haymes,*
  427 U.S. 236 (1976) .......................................................... 44

*Morales v. Chadbourne,*
  793 F.3d 208 (1st Cir. 2015) ......................................... 56, 57

*Morgan v. Shivers,*
  No. 1:14-cv-7921, 2018 WL 618451 (S.D.N.Y. Jan. 29, 2018) ............ 26

*Moss v. U.S. Secret Service*,
   No. 06-3045, 2007 WL 2915608 (D. Or. Oct. 7, 2007),
   *rev'd in part, dismissed in part on other grounds*, 572 F.3d 962 (9th Cir. 2009)..................... 17

*Moura v. New Prime, Inc.*,
   337 F. Supp. 3d 87 (D. Mass. 2018) ................................................................................. 10, 11

*Ms. L. v. ICE*,
   310 F. Supp. 3d 1133 (S.D. Cal. 2018) ............................................................................. 44, 47

*Munns v. Clinton*,
   822 F. Supp. 2d 1048 (E.D. Cal. 2011) ............................................................................. 16, 17

*Narenji v. Civiletti*,
   617 F.2d 745 (D.C. Cir. 1979) .............................................................................................. 51

*Newbold v. Stansberry*,
   No. 1:08CV1266 (LO/JPP), 2009 WL 86740 (E.D. Va. Jan. 12, 2009),
   *aff'd*, 332 F. App'x 927 (4th Cir. 2009) ................................................................................ 44

*Newton v. INS*,
   736 F.2d 336 (6th Cir. 1984)................................................................................................. 46

*Nieves v. McSweeney*,
   241 F.3d 46 (1st Cir. 2001) ................................................................................................... 54

*Noonan v. Winston Co.*,
   135 F.3d 85 (1st Cir. 1998) ............................................................................................... 10, 11

*Nwanze v. Philip Morris Inc.*,
   100 F. Supp. 2d 215 (S.D.N.Y. 2000) ................................................................................... 17

*Olim v. Wakinekona*,
   461 U.S. 238 (1983) ............................................................................................................. 44

*Ouzts v. Cummins*,
   825 F.2d 1276 (8th Cir. 1987)................................................................................................ 62

*Overton v. Bazzetta*,
   539 U.S. 126 (2003) ............................................................................................................. 43

*Palmer v. Sheahan*,
   No. 93 C 181, 1994 WL 801474 (N.D. Ill. Feb. 15, 1994) ..................................................... 42

*Payne-Barahona v. Gonzales*,
   474 F.3d 1 (1st Cir. 2007) ............................................................................................... 44, 46

*Pearson v. Callahan*,
  555 U.S. 223 (2009) ................................................................................ 41, 47

*Pension Ben. Guar. Corp. v. LTV Corp.*,
  496 U.S. 633 (1990) ...................................................................................... 50

*Perez v. United States*,
  No. 13CV1417-WQH-BGS, 2014 WL 4385473 (S.D. Cal. Sept. 3, 2014) ...................... 16, 17

*Phillips Exeter Academy v. Howard Phillips Fund*,
  196 F.3d 284 (1st Cir. 1999) .................................................................... passim

*Rajah v. Mukasey*,
  544 F.3d 427 (2d Cir. 2008) .......................................................................... 52

*Rank v. Hamm*,
  No. 204-0997, 2007 WL 894565 (S.D. W.Va. Mar. 21, 2007) ........................................ 17, 18

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
  525 U.S. 471 (1999) ...................................................................................... 35

*Robbins v. Oklahoma*,
  519 F.3d 1242 (10th Cir. 2008) .............................................................. 59, 60, 64

*Romer v. Evans*,
  517 U.S. 620 (1996) ...................................................................................... 52

*Rosenberg v. Crandell*,
  56 F.3d 35 (8th Cir. 1995) .............................................................................. 62

*Saucier v. Katz*,
  533 U.S. 194 (2001) .................................................................................. 40, 65

*Schall v. Martin*,
  467 U.S. 253 (1984) ...................................................................................... 57

*Schloss v. Bouse*,
  876 F.2d 287 (2d Cir. 1989) ............................................................................ 65

*Schweiker v. Chilicky*,
  487 U.S. 412 (1988) .................................................................................. 20, 33

*SCVNGR, Inc. v. Punchh, Inc.*,
  478 Mass. 324 (2017) .................................................................................... 10

*Stafford v. Briggs*,
  444 U.S. 527 (1980) ...................................................................................... 12

*Stars for Art Prod. FZ, LLC v. Dandana, LLC,*
    806 F. Supp. 2d 437 (D. Mass. 2011) .................................................. 19

*Swarthout v. Cooke,*
    562 U.S. 216 (2011) ........................................................................... 49

*Swartz v. Bahr,*
    No. 16-12144-LTS, 2017 WL 2695290 (D. Mass. June 22, 2017)................. 9, 16

*Taylor v. Waters,*
    81 F.3d 429 (4th Cir. 1996).................................................................. 54

*Terracom v. Valley Nat'l Bank,*
    49 F.3d 555 (9th Cir. 1995).................................................................. 18

*Terry v. Ohio,*
    392 U.S. 1 (1968) .......................................................................... 54, 55

*Thompson v. Whitman,*
    85 U.S. 457 (1873) .............................................................................. 54

*Ticoalu v. Gonzales,*
    472 F.3d 8 (1st Cir. 2006) ................................................................... 48

*Trump v. Hawaii,*
    138 S. Ct. 2392 (2018) .............................................................. 51, 52, 53

*Tucson Woman's Clinic v. Eden,*
    379 F.3d 531 (9th Cir. 2004)............................................................... 52

*United Bhd. of Carpenters & Joiners, Local 610 v. Scott,*
    463 U.S. 825 (1983) ........................................................................... 63

*United States v. Alcaraz-Arellano,*
    441 F.3d 1252 (10th Cir. 2006)............................................................ 38

*United States v. Carpio-Leon,*
    701 F.3d 974 (4th Cir. 2012)............................................................... 49

*United States v. Delgado-Garcia,*
    374 F.3d 1337 (D.C. Cir. 2004) ........................................................... 34

*United States v. Dominguez-Portillo,*
    No. 17-mj-4409, 2018 WL 315759 (W.D. Tex. Jan. 5, 2018) ................... 45

*United States v. Molina-Gomez,*
    781 F.3d 13 (1st Cir. 2015) ................................................................. 55

*United States v. Montoya de,*
 *Hernández,* 473 U.S. 531 (1985)............................................................. 55

*United States v. Nixon,*
 418 U.S. 683 (1974) ............................................................................... 35

*United States v. Portillo-Munoz,*
 643 F.3d 437 (5th Cir. 2011).................................................................. 55

*United States v. Smith,*
 178 F.3d 22 (1st Cir. 1999) .................................................................... 35

*United States v. Swiss Am. Bank, Ltd.,*
 274 F.3d 610 (1st Cir. 2001) .................................................. 9, 14, 16, 20

*United States v. Verdugo-Urquidez,*
 494 U.S. 259 (1990) ......................................................................... 49, 55

*Uphoff Figueroa v. Alejandro,*
 597 F.3d 423 (1st Cir. 2010) .................................................................. 65

*Van de Kamp v. Goldstein,*
 555 U.S. 335 (2009) ............................................................................... 66

*Vanderklok v. United States,*
 868 F.3d 189 (3d Cir. 2017)............................................................ passim

*Venmill Indus., Inc. v. ELM, Inc.,*
 100 F. Supp. 3d 59 (D. Mass. 2015) ...................................................... 18

*Vernonia Sch. Dist. 47J v. Acton,*
 515 U.S. 646 (1995) ......................................................................... 57, 58

*Vu v. Meese,*
 755 F. Supp. 1375 (E.D. La. 1991) ........................................................ 17

*W. Radio Servs. Co. v. U.S. Forest Serv.,*
 578 F.3d 1116 (9th Cir. 2009)................................................................ 25

*Wag-Aero, Inc. v. United States,*
 837 F. Supp. 1479 (E.D. Wis. 1993) ...................................................... 17

*Walden v. Fiore,*
 571 U.S. 277 (2014) ............................................................................ 9, 15

*Washington v. Glucksberg,*
 521 U.S. 702 (1997) ............................................................................... 42

*Wilkie v. Robbins*,
   551 U.S. 537 (2007) ...................................................................... 24, 36, 38

*Wilson v. Layne*,
   526 U.S. 603 (1999) ...................................................................... 49

*Wood v. Moss*,
   572 U.S. 744 (2014) ...................................................................... 38

*Yellowbear v. Ashe*,
   612 F. App'x 918 (10th Cir. 2015) ................................................. 16

*Zadvydas v. Davis*,
   533 U.S. 678 (2001) ...................................................................... 49, 54

*Ziglar v. Abbasi*,
   137 S. Ct. 1843 (2017) .................................................................. passim

<u>Statutes</u>

U.S. Const. art. I ........................................................................................ 31

U.S. Const. art. II ....................................................................................... 35

5 U.S.C. § 554(a) ....................................................................................... 50

6 U.S.C. § 279(b) ....................................................................................... 6, 23

6 U.S.C. § 279(g)(2) ................................................................................... 6, 48

6 U.S.C. §§ 111, 202 .................................................................................. 34

6 U.S.C. §§ 542, 279(a) ............................................................................. 31

8 U.S.C. § 1158(a) ..................................................................................... 5

8 U.S.C. §§ 1158, 1181, 1225-1231 ......................................................... 31

8 U.S.C. § 1225(b) ..................................................................................... 5, 31

8 U.S.C. § 1232 .......................................................................................... passim

8 U.S.C. §§ 1324, 1325, 1326 ................................................................... 8

8 U.S.C. § 1325(a) ..................................................................................... passim

18 U.S.C. § 1595 ........................................................................................ 33

28 U.S.C. §§ 501, 503, 509, 515, 519 .......................................................................... 23

28 U.S.C. § 515(a) ...................................................................................................... 35

28 U.S.C. §§ 1346(b), 2671-80 .................................................................................. 26

28 U.S.C. § 1391(b)(3) ............................................................................................... 18

28 U.S.C. § 1391(e) .................................................................................................... 12

28 U.S.C. § 1406 ........................................................................................................ 18

28 U.S.C. § 2675(a) .................................................................................................... 26

42 U.S.C. § 1983 .............................................................................................. 20, 42, 58

42 U.S.C. § 1985 ................................................................................................. passim

42 U.S.C. § 1986 .................................................................................................... 4, 65

M.G.L. c. 223A § 3 ......................................................................................... 13, 14, 18

Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386,
    114 Stat. 1464 ........................................................................................................ 31

Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 ......................... 6

Prosecutorial Remedies and Tools against the Exploitation of Children Today Act of 2003
    Pub. L. No. 108-21, 117 Stat 650 ......................................................................... 31

Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108-458,
    118 Stat 3638 ........................................................................................................ 31

Trafficking Victims Protection Reauthorization Act of 2005, Pub. L. No. 109-164,
    119 Stat 3558 (2006) ............................................................................................ 31

William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008,
    Pub. L. No. 110-457, 122 Stat 5044 ...................................................................... 31

National Defense Authorization Act for Fiscal Year 2013, Pub. L. No. 112-239,
    126 Stat 1632 ........................................................................................................ 32

Violence against Women Reauthorization Act of 2013, Pub. L. No. 113-4, 127 Stat 54 ........... 31

Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22, 129 Stat 227 ..................... 32

National Human Trafficking Hotline, Pub. L. No. 114-271,
    130 Stat 1398 (2016) ............................................................................................ 32

Combating Human Trafficking in Commercial Vehicles Act, Pub. L. No. 115-99,
131 Stat 2242 (2018) ................................................................................................ 32

No Human Trafficking on Our Roads Act, Pub. L. No. 115-106, 131 Stat 2265 (2018) ............. 32

Department of Defense and Labor, Health and Human Services, and Education Appropriations
Act, 2019 and Continuing Appropriations Act, 2019, Pub. L. No. 115-245, 132 Stat 2981 .... 32

Trafficking Victims Protection Reauthorization Act of 2003, Pub. L. No. 108-193,
117 Stat 2875 ........................................................................................................... 31

Department of Homeland Security Reorganization Plan Modification of January 30, 2003,
H.R. Doc. No. 108-32 ................................................................................................. 6

Consolidated Appropriations Act, 2019, H.R. Rep. No. 116-31 .................................................. 32

National Human Trafficking Hotline, Pub. L. No. 114-271,
130 Stat 1398 (2016) ................................................................................................ 32

Joint Explanatory Statement of the Committee of Conference, H.R. Rep. No. 115-952 (2018).. 32

## Rules

Fed. R. Civ. P. 4(k)(1)(C) ........................................................................................... 12

Fed. R. Civ. P. 12(b)(2) .................................................................................... 2, 9, 18

Fed. R. Civ. P. 12(b)(3) ...................................................................................... 18, 19

Fed. R. Civ. P. 23(a) ..................................................................................................... 4

Fed. R. Evid. 201(b)(2) .............................................................................................. 37

L. R. 7 ...................................................................................................................... 69

L.R. 83 ............................................................................................................... 67, 69

## Regulations

8 C.F.R. §§ 235.3(b)(2)(iii), 235.3(b)(4)(ii) ............................................................... 5

28 C.F.R. § 0.5 ........................................................................................................... 23

Other Authorities

Attorney General Announces Zero-Tolerance Policy for Criminal Illegal Entry,
    (April 6, 2018), 2018 WL 1666622.................................................................................... 8

Designating Aliens for Expedited Removal, 69 Fed. Reg. 48,877 (Aug. 11, 2004) ..................... 5

*Hearing on Prescription Drug Affordability and Innovation Before the S. Comm. on Finance*,
    115th Cong. (June 26, 2018) ...................................................................................... 32

*Oversight of Immigration Enforcement and Family Reunification Efforts Before the S. Comm.
    on the Judiciary*, 115th Cong. (July 31, 2018)........................................................... 32

*Oversight of the Department of Homeland Security Before the H. Comm. on the Judiciary*,
    115th Cong. (Dec. 20, 2018) ...................................................................................... 32

*Oversight of the Trump Administration's Family Separation Policy Before the H. Comm.
    on the Judiciary*, 116th Cong. (Feb. 26, 2019) ......................................................... 33

18 J. Moore et al., Moore's Federal Practice § 134.02[1][d] (3d ed. 2011) ................................. 47

## INTRODUCTION

To challenge Federal immigration policy, Plaintiffs ask this Court to recognize novel claims under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), against eleven current and former high-ranking government officials in their personal capacities: former White House Chief of Staff John F. Kelly; Senior Advisor to the President Stephen Miller; former Attorney General ("AG") Jefferson B. Sessions, III; Counselor to the AG Gene Hamilton; Secretary of Homeland Security Kirstjen Nielsen; Commissioner of U.S. Customs and Border Protection ("CBP") Kevin K. McAleenan; former Director of U.S. Immigration and Customs Enforcement ("ICE") Thomas Homan; Acting Director of ICE Ronald D. Vitiello; Director of United States Citizenship and Immigration Services ("USCIS") L. Francis Cissna; Secretary of Health and Human Services Alex Azar; and former Director of the Office of Refugee Resettlement ("ORR") Scott Lloyd. Even more remarkably, Plaintiffs purport to bring this individual-capacity suit as a class action, and they seek both money damages and the establishment of a fund for mental health treatment for the alleged constitutional and statutory civil rights violations. First Amended Complaint ("FAC") ¶ 2.

To begin with, Plaintiffs have not alleged facts establishing either that this Court has personal jurisdiction over the Defendants or that venue is proper in this district. Plaintiffs' failure to plead facts establishing any colorable basis for the threshold issues of personal jurisdiction and proper venue coincides with the FAC's many other deficiencies and requires dismissal.

Among these deficiencies, the Supreme Court has held that core separation-of-powers principles preclude suits for money damages based on the sort of constitutional challenges to U.S. government policy and related actions that Plaintiffs make here. *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1861 (2017) (rejecting *Bivens* cause of action). Congress has never authorized the

remedy Plaintiffs demand, and a number of alternative processes exist to more effectively and efficiently address any and all alleged constitutional infirmities in U.S. policy. Moreover, numerous other factors counsel against creating a money damages remedy against individual federal officials in the novel and sensitive context presented here: a challenge to the Executive Branch's enforcement of immigration laws, an arena not only heavily regulated by Congress but one deeply connected to our national security and for which primacy rests with the political branches.

Not only does authoritative precedent compel the conclusion that no novel damages cause of action should be created here, all Defendants are entitled to qualified immunity because Plaintiffs have not alleged the violation of any clearly established constitutional or statutory right by any Defendant. Finally, Plaintiffs' claims against former AG Sessions, and all of the other individuals to whom the challenged policy of zero tolerance for improper entry is attributed, should fail because absolute immunity bars suits such as this, which challenge the government's decision to prosecute all (or any) persons who violate a particular federal law.

Therefore, as explained more fully below, the FAC should be dismissed with prejudice pursuant to Federal Rules of Civil Procedure 12(b)(2), (3), and (6).

## FACTUAL AND PROCEDURAL BACKGROUND

### A.  Individual Allegations and Claims

Plaintiffs K.O. and E.O., Jr., and their mother, L.J., attempted to enter the United States in Texas on May 19, 2018. FAC ¶ 138.[1] K.O. was nine years old and E.O., Jr., was seventeen years old at the time. *Id.* ¶ 139. K.O., E.O., Jr., and L.J., allegedly traveled to the United States to seek asylum. *Id.* ¶ 140. After crossing into the United States, K.O., E.O., Jr., and L.J. were

---

[1] On October 3, 2018, the Court granted Plaintiffs' motion to proceed under pseudonyms. Dkt. 29.

approached by an unidentified U.S. Border Patrol agent and detained. *Id*. ¶¶ 141–44. K.O. and E.O., Jr., were then separated from their mother and eventually transferred to Michigan. *Id*. ¶¶ 144–52, 168. K.O. and E.O., Jr., were reunited with their father in Massachusetts on June 19, 2018. *Id*. ¶ 174. L.J. passed a credible fear screening and was released from custody on June 26, 2018. *Id*. ¶¶ 176–77.[2]

Plaintiff C.J. and his father, F.C., entered the United States in El Paso, Texas on June 17, 2018. FAC ¶ 181. C.J. was eleven years old the time. *Id.* C.J. and F.C. allegedly traveled to the United States to seek asylum. *Id.* After crossing into the United States, C.J. and F.C. approached a U.S. Border Patrol vehicle and were detained. *Id*. ¶¶ 182–83. C.J. and F.C. were detained together until June 20, 2018, when F.C. was taken to court to face federal criminal charges. *Id*. ¶ 186. While in court, F.C. was notified that he had "committed the federal crime of coming into the country illegally" and asked "if he wanted to leave C.J. in the United States or take C.J. with him if deported." *Id*. ¶ 191. F.C. responded that he wished to be with his son. *Id.* F.C. was held at multiple detention facilities and at some point was again asked whether he "would authorize C.J. to stay behind if F.C. were to be deported." *Id.* ¶ 194. F.C. refused. *Id.* C.J. was held at a facility with other children until July 26, 2018, when he was reunited with F.C. *Id.* ¶¶ 196, 199.

Based on these allegations, Plaintiffs assert nine claims in this lawsuit against "all Defendants," *see, e.g.*, *id.* ¶ 216: (1) Count I - Fourth Amendment (Unlawful and Unreasonable Seizure), *id.* ¶¶ 215–225; (2) Count II - Substantive Due Process (Right to Family Integrity), *id.* ¶¶ 226–234; (3) Count III - Procedural Due Process, *id.* ¶¶ 235–243; (4) Count IV - Equal Protection, *id.* ¶¶ 244–254; (5) Count V - Substantive Due Process (Punishment of Civil

---

[2] Defendants, as they must, assume the truth of only well-pled factual allegations and only for the limited purpose of this motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Detainees), *id.* ¶¶ 255–265; (6) Count VI - Due Process (Coerced Waiver of Asylum and Other Immigration Claims), *id.* ¶¶ 266–275; (7) Count VII - Substantive Due Process (Failure to Provide Adequate Mental Health Services), *id.* ¶¶ 276–285; (8) Count VIII - Conspiracy to Interfere with Civil Rights in Violation of 42 U.S.C. § 1985(3), *id.* ¶¶ 286–295; and (9) Count IX - Refusal or Neglect to Prevent or Aid in Preventing Conspiracy to Interfere with Civil Rights in Violation of 42 U.S.C. § 1986, *id.* ¶¶ 296–303.

### B.  Class Allegations

Plaintiffs seek to frame this case as a class action under Fed. R. Civ. P. 23(a), 23(b)(1), and 23(b)(3). *Id.* ¶ 204. Plaintiffs purport to represent a "class of all minor children nationwide who enter or have entered the United States at or between designated ports of entry and who have been or will be separated from a parent or parents by the U.S. Department of Homeland Security ("DHS") or its sub-agencies (CBP, ICE, or USCIS) and detained in ORR custody, ORR foster care, or CBP or ICE custody without a demonstration in a hearing that the parent is unfit or presents a danger to the child." *Id.* ¶ 205.

Parents of potential class members are class members in a separate action. *See Ms. L. v. ICE*, No. 18-cv-428 (S.D. Cal.). On June 26, 2018, the *Ms. L.* court certified a nationwide class of parents separated from their children and granted a class-wide preliminary injunction based on the plaintiffs' claim that the federal government's separation of children from their parents violated the Fifth Amendment. *Ms. L.*, No. 18-cv-428 (S.D. Cal.), Dkt. 82–83. The following claims were brought on behalf of the class in *Ms. L*: (1) separation of the class members from their children violates procedural and substantive due process under the Fifth Amendment; (2) practices regarding separation of class members from their children are arbitrary and capricious, thus violating the Administrative Procedure Act ("APA"); and (3) separation of families violates

the federal laws that provide for asylum and other protections from removal and class members have a private right of action to challenge violations of their right to apply for asylum under 8 U.S.C. § 1158(a). *See Ms. L.*, No. 18-cv-428 (S.D. Cal.), Dkt. 1, 32, and 85.

## STATUTORY AND REGULATORY FRAMEWORK

The following specific statutory and regulatory schemes apply in the immigration context pled in the FAC, and thus inform the analysis of the Defendants' Motion to Dismiss.

### A. Expedited Removal, Credible Fear, and Mandatory Detention under the Immigration and Nationality Act ("INA")

When Plaintiffs' parents attempted to enter the United States and were apprehended shortly thereafter, they were subject to a process commonly referred to as "expedited removal," which provides an accelerated removal process for certain aliens. *See* 8 U.S.C. § 1225(b); Designating Aliens for Expedited Removal, 69 Fed. Reg. 48,877 (Aug. 11, 2004). Congress has explicitly mandated the detention of individuals who are in the expedited removal process and whose claim of credible fear of persecution is still being considered, or has been rejected. *See* 8 U.S.C. § 1225(b)(1)(B)(iii)(IV) ("Any alien subject to the procedures under this clause *shall be detained* pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed.") (emphasis added). Individuals subject to such mandatory detention under expedited removal are eligible for release from immigration detention only if they are granted parole in limited circumstances. *See, e.g.*, *id.* § 1182(d)(5)(A); 8 C.F.R. §§ 235.3(b)(2)(iii), 235.3(b)(4)(ii).

### B. Statutes Governing the Care and Custody of Unaccompanied Alien Children

#### i. The Homeland Security Act of 2002 ("HSA")

The HSA, enacted in 2002, created DHS and transferred most immigration functions formerly performed by the Immigration and Naturalization Service to the newly-formed DHS

and its components, including USCIS, CBP, and ICE. *See* Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135; *see also* DHS Reorganization Plan Modification of January 30, 2003, H.R. Doc. No. 108-32 (also set forth as a note to 6 U.S.C. § 542). Congress also transferred to the U.S. Department of Health and Human Services ("HHS") responsibility for caring for unaccompanied alien children ("UAC") "who are in Federal custody by reason of their immigration status." HSA, § 462(a)(b)(1)(A), codified as amended at 6 U.S.C. § 279(b)(1)(A) (2002). That is, Congress transferred to HHS the responsibility of caring for any UAC who HHS receives from DHS.

The HSA transferred to HHS the responsibility, in consultation with DHS, for making UAC placement decisions. The HSA defines an "unaccompanied alien child" as a child who:

> (A) has no lawful immigration status in the United States;
> (B) has not attained 18 years of age; and
> (C) with respect to whom-
> > (i) there is no parent or legal guardian in the United States; or
> > (ii) no parent or legal guardian in the United States is available to provide care and physical custody.

6 U.S.C. § 279(g)(2). Congress prohibited HHS from releasing UACs on their own recognizance. *See id.* § 279(b)(l)(C), (D), (b)(2).

> ii.   *Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA")*

In 2008, the TVPRA codified protections related to the custody of UACs. The TVPRA requires that "the care and custody of all unaccompanied alien children, including responsibility for their detention, where appropriate, shall be the responsibility of the Secretary of Health and Human Services." 8 U.S.C. § 1232(b)(1). Congress also required that "[e]xcept in the case of exceptional circumstances, any department or agency of the Federal Government that has an unaccompanied alien child in custody shall transfer the custody of such child to the Secretary of

Health and Human Services not later than 72 hours after determining that such child is an unaccompanied alien child." *Id.* § 1232(b)(3).

The TVPRA requires that UACs in HHS custody be "promptly placed in the least restrictive setting that is in the best interest of the child." *Id.* § 1232(c)(2)(A). It delegates to the Secretary of HHS the authority to make such placement decisions, noting that the Secretary "may consider danger to self, danger to the community, and risk of flight." *Id.* Staff from HHS, and particularly ORR, make an initial care provider placement decision for each UAC. *See* ORR Policy Guide: Children Entering the United States Unaccompanied § 1.3.2, http://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied.

The TVPRA makes clear that HHS is responsible for all placement decisions for UACs in its custody and provides guidelines for their placement with a custodian, including the requirement for HHS to evaluate the suitability of any placement. 8 U.S.C. § 1232(c)(3). The TVPRA provides that a child may be placed with a proposed custodian (either a person or an entity) if HHS

> . . . makes a determination that the proposed custodian is capable of providing for the child's physical and mental well-being. Such determination shall, at a minimum, include verification of the custodian's identity and relationship to the child, if any, as well as an independent finding that the individual has not engaged in any activity that would indicate a potential risk to the child.

*Id.* § 1232(c)(3)(A). Neither the TVPRA nor the HSA provides HHS with authority to apprehend or detain aliens, or to enforce the INA through prosecutions for improper entry or otherwise. HHS is purely a custodian and provider of social services for UACs under those authorities.

### C.  Criminal Prosecution for Improper Entry

Individuals in DHS custody may be subject to prosecution for criminal violations of immigration or other laws. *See, e.g.*, 8 U.S.C. §§ 1324, 1325, 1326. For example, the United States Code makes it a federal crime for aliens to: (1) enter the United States "at any time or place other than as designated by immigration officers," (2) elude "examination or inspection by immigration officers," or (3) obtain entry to the United States "by a willfully false or misleading representation or the willful concealment of a material fact." 8 U.S.C. § 1325(a). DHS has discretion to refer people to the U.S. Department of Justice ("DOJ") for prosecution based on the particularized facts and circumstances.

### D.  The "Zero-Tolerance Policy"

On April 6, 2018, then-AG Sessions issued a "Memorandum for Federal Prosecutors along the Southwest Border" that provided guidance on how to exercise prosecutorial discretion with respect to illegal entry enforcement consistent with DOJ priorities and Congress's legislative choices. *See* Apr. 6, 2018, Zero-Tolerance Memorandum, *available at* https://www.justice.gov/opa/press-release/file/1049751/download (last visited Mar. 6, 2019); U.S. DOJ, News Release: Attorney General Announces Zero-Tolerance Policy for Criminal Illegal Entry (Apr. 6, 2018), 2018 WL 1666622; FAC. ¶ 79. The memorandum directed southwest border prosecutors immediately to adopt a policy of accepting, to the extent practicable, all offenses referred for prosecution under 8 U.S.C. § 1325(a) by DHS.[3]

---

[3] On June 20, 2018, the President issued an executive order stating, it is the "policy of this Administration to maintain family unity, including by detaining alien families together where appropriate and consistent with law and available resources." Executive Order § 1, *available at* https://www.whitehouse.gov/presidential-actions/affording-congress-opportunity-address-family-separation/ (last visited Mar. 6, 2019); FAC ¶ 86.

**ARGUMENT**

I.    **THE COURT SHOULD DISMISS THE FAC FOR LACK OF PERSONAL JURISDICTION OVER THE DEFENDANTS**

Plaintiffs' lawsuit must be dismissed under Federal Rule of Civil Procedure 12(b)(2) because the Court cannot exercise personal jurisdiction over any of the eleven Defendants. FED. R. CIV. P. 12(b)(2); *United States v. Swiss Am. Bank, Ltd.*, 274 F.3d 610, 617 (1st Cir. 2001) ("It is basic law that a court must have personal jurisdiction over the parties to hear a case, that is, the power to require the parties to obey its decrees.") (internal quotation marks and citations omitted); *see Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, 137 S. Ct. 1773, 1783 (2017) (prerequisites for personal jurisdiction "must be met as to each defendant"). As the Supreme Court has explained, "[f]ederal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Walden v. Fiore*, 571 U.S. 277, 283 (2014) (usual rules apply to establish in personam jurisdiction over government employees sued individually); *Swartz v. Bahr*, No. 16-12144-LTS, 2017 WL 2695290, at *3 (D. Mass. June 22, 2017) (same). "This is because . . . in most cases," personal jurisdiction depends upon proper service of a defendant "'who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located.'" *Walden*, 571 U.S. at 283 (quoting FED. R. CIV. P. 4(k)(1)(A)). Here, none of the eleven Defendants "is subject to the jurisdiction" of courts in Massachusetts, and Plaintiffs cannot meet their burden of showing otherwise. *See A Corp. v. All Am. Plumbing, Inc.*, 812 F.3d 54, 58 (1st Cir. 2016) (plaintiff must "proffer[ ] evidence which, if credited, is sufficient to support findings of all facts essential to personal jurisdiction") (internal quotation marks and citation omitted); *Swiss Am. Bank, Ltd.,* 274 F.3d at 618 (on motion to dismiss for lack of personal jurisdiction, "it is plaintiff's burden to demonstrate the existence of every fact required" to show personal jurisdiction) (internal quotation marks and citations omitted).

9

To evaluate personal jurisdiction over a non-resident defendant (like the eleven Defendants here[4]), federal courts in Massachusetts ask "[t]hree questions . . . : 1) whether the Massachusetts long-arm statute authorizes jurisdiction; 2) whether the defendant has sufficient minimum contacts so that the exercise of jurisdiction doeset not offend due process; and 3) whether the exercise of jurisdiction is reasonable, and therefore does not offend due process." *Noonan v. Winston Co.*, 135 F.3d 85, 89 (1st Cir. 1998); *see also A Corp.*, 812 F.3d at 58–59; *Massachusetts Sch. of Law v. American Bar Ass'n,* 142 F.3d 26, 34–35 (1st Cir. 1998). Although the First Circuit often bypasses the statutory question and starts with the constitutional "minimum contacts" issue,[5] Massachusetts recently renounced such an approach. *See SCVNGR, Inc. v. Punchh, Inc.*, 478 Mass. 324, 325 (2017). As the Supreme Judicial Court explained, the long-arm "statute imposes specific constraints on the exercise of personal jurisdiction that are not coextensive with the parameters of due process." *Id*. For this reason, and "to avoid unnecessary consideration of constitutional questions," *SCVNGR* concluded that "a determination under the long-arm statute is to precede consideration" of due process. *Id*.; *see Moura v. New Prime, Inc.*, 337 F. Supp. 3d 87, 93 (D. Mass. 2018) (Hillman, J.) (same). If a plaintiff shows that the long-arm statute applies, then courts turn to the constitutional sufficiency of a defendant's alleged connections with Massachusetts. *Id*. Depending on "the quality and quantity" of those contacts, personal jurisdiction may take the form of either general or specific jurisdiction. *Phillips Exeter*

---

[4] None of the Defendants lives in Massachusetts. *See, e.g.*, Docket Nos. 14, 16–18 (affidavits of service).

[5] *See, e.g.*, *A Corp.*, 812 F.3d at 58–59; *Massachusetts Sch. of Law*, 142 F.3d at 34–35 ("We need not pause to consider the particulars of the Massachusetts long-arm statute," because "[e]ven if that statute, correctly applied, would purport to grant jurisdiction . . . a matter of state law on which we take no view – [plaintiff] still would have to demonstrate" that jurisdiction complied with due process); *Noonan*, 135 F.3d at 90 ("Because we determine that the assertion of personal jurisdiction over [two defendants] would offend due process, we decline to decide the difficult question whether plaintiffs have established a *prima facie* case authorizing personal jurisdiction over these defendants under the Massachusetts long-arm statute.").

*Academy v. Howard Phillips Fund*, 196 F.3d 284, 288 (1st Cir. 1999); *Massachusetts Sch. of Law*, 142 F.3d at 34.

For general jurisdiction, a defendant must be "essentially at home" in the forum. *See Moura*, 337 F. Supp. 3d at 94 ("For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile . . . .") (internal quotation marks and citation omitted). "Thus, a defendant who has maintained a continuous and systematic linkage with the forum state brings himself within the general jurisdiction of that state's courts in respect to all matters, even those that are unrelated to the defendant's contacts with the forum." *Phillips Exeter*, 196 F.3d at 288.[6] Absent general jurisdiction, "a court still may hear a particular case if that case relates sufficiently to, or arises from, a significant subset of contacts between the defendant and the forum." *Id*. In other words, a plaintiff may establish specific jurisdiction where "a demonstrable nexus" exists "between [the] plaintiff's claims and a defendant's forum-based activities, such as when the litigation itself is founded directly on those activities." *Mass. Sch. of Law*, 142 F.3d at 34; *see Bristol-Myers Squibb*, 137 S. Ct. at 1781 (same). The First Circuit evaluates the constitutionality of specific jurisdiction through "a tripartite analysis." *Phillips Exeter*, 196 F.3d at 288 (citing *Mass. Sch. of Law*, 142 F.3d at 35). Courts ask "whether the claim that undergirds the litigation directly relates to or arises out of the defendant's contacts with the forum," then "whether those contacts constitute purposeful availment of the benefits and protections afforded by the forum's laws." *Id*. Upon finding "the first two hurdles . . . clear[ed]," courts also "analyze the overall reasonableness of an exercise of jurisdiction in light of a variety of pertinent factors that touch upon the fundamental fairness of an exercise of jurisdiction." *Id.*

---

[6] The "standard for evaluating whether . . . contacts satisfy the constitutional general jurisdiction test is considerably more stringent than that applied to specific jurisdiction questions." *Noonan*, 135 F.3d at 93 (internal quotation marks and citation omitted).

Here, Plaintiffs include two sentences in the FAC purporting to justify personal jurisdiction over all eleven individual-capacity defendants. FAC ¶¶ 34-45. First, Plaintiffs state, the Court:

> has personal jurisdiction over all Defendants under 28 U.S.C. § 1391(e) and Fed. R. Civ. P. 4(k)(1)(C), in that they are all subject to nationwide service of process within the United States, such process has actually been served upon them, and, owing to the Defendants' contacts with the United States, this court's exercise of personal jurisdiction over each of them would not violate due process under either the Fifth or Fourteenth Amendments to the United States Constitution.

FAC ¶ 34. Rule 4(k)(1)(C) provides that "[s]erving a summons . . . establishes personal jurisdiction over a defendant . . . when authorized by a federal statute." FED. R. CIV. P. 4(k)(1)(C). But Plaintiffs reference only one federal statute – 28 U.S.C. § 1391(e) – and it has no application to an individual-capacity action against federal employees like this case. As the Supreme Court held decades ago, § 1391(e) "[does] not encompass[ ] . . . [a] suit for money damages which must be paid out of the pocket of the private individual who happens to be – or formerly was – employed by the Federal Government." *Stafford v. Briggs*, 444 U.S. 527, 542 (1980); *see id*. at 543-44 ("§ 1391(e) does not cover the type of suits here at issue," that is, "[s]uits for money damages for which an individual officeholder may be found personally liable"). Because Plaintiffs identify no federal statute that satisfies Rule 4(k)(1)(C) with respect to a *Bivens* lawsuit – and indeed, there is no such statute[7] – they cannot meet their burden of establishing personal jurisdiction over any of the eleven defendants in this manner.

Plaintiffs also allege that the Court:

---

[7] *See, e.g., Lewellen v. Morley*, No. 88 C 1790, 1988 WL 116856, at *2 (N.D. Ill. Oct. 24, 1988) ("In federal question cases, such as this *Bivens* action, in which the defendant is not found within the forum state and there is no federal statute authorizing nationwide service of process, extraterritorial service is made pursuant to state law . . . ."), *aff'd on other grounds*, 875 F.2d 118 (7th Cir. 1989).

> has personal jurisdiction over all Defendants pursuant to the Massachusetts long-
> arm statute, M.G.L. c. 223A § 3(d), because Plaintiffs' claims arise from
> Defendants' having caused tortious injury in Massachusetts by an act or omission
> outside Massachusetts and each Defendant regularly does or solicits business or
> engages in a persistent course of conduct in Massachusetts.

FAC ¶ 35. But neither this conclusory reference to § 3(d)[8] nor anything else in the FAC suffices

to show that the long-arm statute and due process permit personal jurisdiction. *See generally*

FAC; *A Corp.*, 812 F.3d at 58 (plaintiff cannot rely on "unsupported allegations in [its]

pleadings" to establish personal jurisdiction) (internal quotation marks and citation omitted);

*Mass. Sch. of Law*, 142 F.3d at 34 (courts need not "credit conclusory allegations or draw

farfetched inferences" in deciding whether plaintiff meets his "burden of persuading the court

that jurisdiction exists").

### A. Plaintiffs Have Failed to Establish That the Massachusetts Long-Arm Statute Authorizes Personal Jurisdiction Over Any Defendant

As Plaintiffs acknowledge, § 3(d) of the long-arm statute requires showing that

defendants caused tortious injury to plaintiffs in Massachusetts *and* that defendants regularly

conduct business or engage in a persistent course of conduct there. *See* FAC ¶ 35; M.G.L. c.

223A § 3(d). Plaintiffs have not alleged any facts, however, that satisfy either prong of the

statutory provision. *See generally* FAC. The FAC nowhere pleads that any Defendant injured

any Plaintiff in Massachusetts. *Id.* Plaintiffs mention Massachusetts only six times in the FAC

(aside from paragraph 35), and none of those allegations identifies any harm allegedly inflicted

in the Commonwealth. *See id.* ¶¶ 13, 15, 154, 174, 177. Likewise, Plaintiffs fail to plead any

facts showing that any Defendant, let alone each of them, "regularly does or solicits business, or

---

[8] Plaintiffs do not rely on any other provision of the long-arm statute, nor does any other provision apply. *See* M.G.L. c. 223A § 3(a)–(h).

engages in any other persistent course of conduct" in Massachusetts. M.G.L. c. 223A § 3(d); *see generally* FAC. Apart from paragraph 35, the FAC never references any business activities or other course of conduct by any Defendant in Massachusetts. *Id.* Because Plaintiffs have not established that either part of § 3(d) applies to any Defendant, the Court lacks personal jurisdiction over all Defendants. *Swiss Am. Bank, Ltd.,* 274 F.3d at 618 (on motion to dismiss for lack of personal jurisdiction, plaintiff must "demonstrate the existence of every fact required to satisfy . . . the forum's long-arm statute") (internal quotation marks and citation omitted); *see also, e.g., Bolduc v. United States*, No. Civ.A.01-CV-11376-PBS, 2002 WL 1760882, at *6 (D. Mass. July 30, 2002) (granting FBI agent's motion to dismiss for lack of personal jurisdiction under § 3(d), because "Special Agent Craft, in his individual capacity, did not regularly conduct or solicit business in Massachusetts," nor "engage[] in any persistent course of conduct," but only "once directed" a writ of habeas corpus to correctional personnel in Massachusetts in the course of his official duties).

**B.  Plaintiffs Have Failed to Establish That Due Process Permits Personal Jurisdiction Over Any Defendant**

Even if Plaintiffs could demonstrate that some provision of the long-arm statute reaches each Defendant, none of the Defendants has constitutionally sufficient contacts with Massachusetts to support either general or specific personal jurisdiction here. *See Phillips Exeter*, 196 F.3d at 288 n.2 ("Jurisdictionally speaking, each defendant must stand or fall based on its own contacts with the forum."). Although the FAC does not indicate which type of personal jurisdiction Plaintiffs claim, they plead no facts even suggesting that any of the eleven Defendants maintains "continuous and systematic" contacts with Massachusetts permitting general jurisdiction. *Id.* at 288; *see generally* FAC. Plaintiffs do not allege, for example, that any Defendant lives or owns property in Massachusetts, or runs a business there. *Id.*; *see Bristol-*

*Myers Squibb*, 137 S. Ct. at 1780 ("[O]nly a limited set of affiliations with a forum will render a defendant amenable to general jurisdiction in that State.") (internal quotation marks and citation omitted). Indeed, after diligent research, counsel for the Defendants has no information that any Defendant has any relevant affiliation with Massachusetts. *See Mass. Sch. of Law*, 142 F.3d at 34 (court analyzed specific jurisdiction only, because plaintiff "does not argue, and we find no facts to suggest, that any of the Eight Individual Defendants can be brought before a Massachusetts court on a general jurisdiction theory"). In short, Plaintiffs have not pled and cannot carry their burden of establishing that Massachusetts may exercise general personal jurisdiction over any Defendant. *Id*.

Likewise, the FAC sets forth no facts linking any of the eleven Defendants to Massachusetts such that specific personal jurisdiction may apply. *Phillips Exeter*, 196 F.3d at 288. As noted above, the FAC includes only a few allegations (apart from the boilerplate of paragraph 35) that describe any "contacts" by anyone with Massachusetts. FAC ¶¶ 13, 15, 154, 174, 177. All of those allegations pertain to *Plaintiffs*. *Id*. (stating where K.O., E.O., Jr., and their parents currently reside; where C.J. and F.C. reside; where K.O. lived when he secured the release of his children to him; and where L.J. reunited with the rest of her family – all in Westborough, Massachusetts). But Plaintiffs' connections to Massachusetts have no bearing on the constitutional analysis. *Walden*, 571 U.S. at 283–91. As the Supreme Court emphasized in *Walden*, "[w]e have consistently rejected attempts to satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating contacts between the plaintiff (or third parties) and the forum State." *Id*. at 284 (reversing court of appeals and finding no personal jurisdiction over federal defendant in *Bivens* suit). Thus, "mere injury to a forum resident is not a sufficient connection to the forum," and instead "the *defendant's* actions [must] connect him" to the forum state. *Id*. at

15

289–90. Here, the FAC never addresses how any Defendant (let alone each of them), in his or

her individual capacity, allegedly interacted with Massachusetts at any time such that due

process permits specific personal jurisdiction. *Swiss Am. Bank, Ltd.*, 274 F.3d at 618 ("[I]t is

plaintiff's burden to demonstrate the existence of every fact required to satisfy both the forum's

long-arm statute and the Due Process Clause of the Constitution.") (internal quotation marks and

citations omitted); *Swartz*, 2017 WL 2695290, at *3 (no personal jurisdiction "over the

defendants in their individual capacities," because plaintiff failed to "allege as to any individual

defendant . . . the type of connection or conduct that would support a finding of personal

jurisdiction").

Additionally, to the extent Plaintiffs mean to suggest that all Defendants have

constitutionally sufficient contacts with Massachusetts because they head federal agencies or

have national authority over some aspect of immigration matters, such an argument fails. *See,

e.g.*, FAC ¶¶ 17–27 (alleging that Defendants "had responsibility for implementing United States

immigration laws, policies, and practices," or helped develop those policies and practices, or had

similar national oversight roles). Courts around the country have long held that "allegations

limited to national policy implementation and oversight are insufficient to support a finding of

personal jurisdiction" against individual-capacity defendants. *Munns v. Clinton*, 822 F. Supp. 2d

1048, 1078 (E.D. Cal. 2011); *see Claasen v. Brown*, No. Civ. A. 94-1018-GK, 1996 WL 79490,

at *2 (D.D.C. 1996) ("In order to exercise personal jurisdiction over a federal official in an

individual capacity, a court must find minimum contacts other than those arising from federal

employment or supervisory roles.").[9] A contrary result "would essentially subject the individual

_____

[9] *See also Yellowbear v. Ashe*, 612 F. App'x 918, 921 (10th Cir. 2015) ("[N]umerous courts, including
our own, have held that broad supervisory authority is insufficient" to establish personal jurisdiction over
"a government official . . . in an individual capacity suit."); *Perez v. United States*, No. 13CV1417-WQH-
BGS, 2014 WL 4385473, at *22-23 (S.D. Cal. Sept. 3, 2014) (allegation that high-ranking officials

Defendants to personal liability in every state in the Union regardless of how tenuous their actual contacts with a particular forum might be." *Munns*, 822 F. Supp. 2d at 1078. Such an approach would ignore the "purposeful availment" requirement for specific personal jurisdiction, an inquiry focused on "the defendant's intentionality" in interacting with the forum state. *A Corp.*, 812 F.3d at 60; *Phillips Exeter*, 196 F.3d at 292. As one court put it, allegations that high-level federal officials created or followed an allegedly impermissible policy or practice "do[] not indicate any act by which [the officials], in their individual capacities, purposefully availed themselves of the privilege of conducting activities within [the forum state]" or the benefits of its laws. *McCabe*, 450 F. Supp. 2d at 924.[10] Because the FAC does not establish that any Defendant

---

supervised/implemented federal border-security policy insufficient to establish specific personal jurisdiction in *Bivens* suit); *Moss v. U.S. Secret Service*, No. 06-3045, 2007 WL 2915608, at *18–19 (D. Or. Oct. 7, 2007), *rev'd in part, dismissed in part on other grounds*, 572 F.3d 962 (9th Cir. 2009) (no specific jurisdiction over federal official in *Bivens* suit based on adoption/implementation of a national policy); *Mahmud v. Oberman*, 508 F. Supp. 2d 1294, 1301–1302 (N.D. Ga. 2007) (no specific jurisdiction in *Bivens* suit based on "'mere fact that'" supervisory TSA official "'enforce[s] federal laws and policies . . . on a nationwide basis'") (quoting *Wag-Aero, Inc. v. United States*, 837 F. Supp. 1479, 1485 (E.D. Wis. 1993)); *Rank v. Hamm*, No. 204-0997, 2007 WL 894565, at *11–13 (S.D. W.Va. Mar. 21, 2007) ("[A]doption of a nationwide policy does not of itself result in [individual-capacity federal official] purposefully directing personal activities toward West Virginia."); *McCabe v. Basham*, 450 F. Supp. 2d 916, 924–27 (N.D. Iowa 2006) (no specific jurisdiction over former Secretary of Homeland Security or Director of Secret Service; complaint makes no "allegations of specific facts connecting [either defendant] to Iowa," and "[a]t bottom, Plaintiffs are premising jurisdiction over . . . senior-level federal government officials[ ] upon . . . [their] supervisory status . . . [and] the acts of low-level federal, state and/or local government employees"); *Nwanze v. Philip Morris Inc.*, 100 F. Supp. 2d 215, 220 (S.D.N.Y. 2000) ("[m]ere supervision over the Bureau of Prisons, the reach of which extends into every state," does not support personal jurisdiction over individual-capacity defendant); *Wag-Aero, Inc.*, 837 F. Supp. at 1486 (no personal jurisdiction unless "a federal court . . . find[s] that a federal defendant sued in his or her personal capacity has minimum contacts with the forum"; if an agency head "could be sued personally in any district within his or her official authority merely for supervising acts of subordinates . . . the minimum contacts requirement would be rendered meaningless"); *Vu v. Meese*, 755 F. Supp. 1375, 1378 (E.D. La. 1991) (no personal jurisdiction over federal officials "who enforce the federal laws and policies on a nationwide basis," including "Zero Tolerance" federal drug law enforcement policy, because "governmental officials must have the requisite minimum contacts with the forum state").

[10] *Accord Perez*, 2014 WL 4385473, at *8 (no purposeful interaction with California where complaint makes "general allegations of these federal officers' supervisory responsibilities and alleged implementation" of border-security policy); *Moss*, 2007 WL 2915608, at *18–19 (no purposeful interaction with Oregon where plaintiffs allege that agency head had "nation-wide policy of engaging in

had the constitutionally necessary "minimum contacts" with Massachusetts, the Court lacks

personal jurisdiction over all Defendants for this reason as well. FED. R. CIV. P. 12(b)(2).[11]

## II.        THE COURT SHOULD DISMISS THE FAC FOR LACK OF PROPER VENUE

Plaintiffs' lawsuit also should be dismissed for improper venue. FED. R. CIV. P. 12(b)(3);

28 U.S.C. § 1406 (district court "in which is filed a case laying venue in the wrong division or

district shall dismiss, or if it be in the interest of justice, transfer such case"). Plaintiffs allege that

"[v]enue is proper in this District under 28 U.S.C. § 1391(b)(3), because the defendants are

subject to personal jurisdiction in this District."[12] FAC ¶ 36. But Plaintiffs do not indicate, as

§ 1391(b)(3) requires, why "there is no district in which [the] action may otherwise be brought,"

and that characterization appears untrue. 28 U.S.C. § 1391(b)(3). Furthermore, as just discussed,

none of the Defendants "is subject to the court's personal jurisdiction." *See supra* Sec. I. Section

1391(b)(3) thus does not apply, and Plaintiffs have failed to establish proper venue as they must.

---

viewpoint discrimination"); *Rank*, 2007 WL 894565, at *11–13 (no purposeful direction of "personal activities toward West Virginia" based on federal official's adoption of nationwide policy).

[11] Plaintiffs include a statement in the FAC purporting to "reserve their right to seek jurisdictional discovery and assert other bases for jurisdiction under M.G.L. c. 223A § 3 upon review of the Defendants' responses thereto." FAC ¶ 35. Plaintiffs have no entitlement to such discovery, given, among other things, that they have sued individuals who all live outside of Massachusetts, own no property in Massachusetts, and run no businesses there. Plaintiffs cannot conduct a fishing expedition in the name of "jurisdictional discovery" when no information indicates that any facts exist to support personal jurisdiction over any of the eleven individual defendants. *See, e.g.*, *Venmill Indus., Inc. v. ELM, Inc.*, 100 F. Supp. 3d 59, 74 (D. Mass. 2015) (Hillman, J.) (denying motion for jurisdictional discovery where it "would amount to no more than a fishing expedition" and noting "'the Court need not permit even limited discovery'" where "'a plaintiff's claim of personal jurisdiction appears to be both attenuated and based on bare allegations in the face of specific denials made by defendants'") (quoting *Terracom v. Valley Nat'l Bank*, 49 F.3d 555, 562 (9th Cir. 1995)). This holds all the more true in a case against high-ranking federal officials like the Defendants here. As discussed above, ample case law confirms that no "nationwide" personal jurisdiction applies to these Defendants, and no discovery can change that.

[12] Section 1391(b)(3) provides: "if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action." 28 U.S.C. § 1391(b)(3).

FED. R. CIV. P. 12(b)(3); *see, e.g.*, *Stars for Art Prod. FZ, LLC v. Dandana, LLC*, 806 F. Supp.

2d 437, 447–48 (D. Mass. 2011) (granting motion to dismiss for improper venue, noting "[i]n the

First Circuit . . . the burden is on the plaintiff to establish that the chosen district is proper")

(citing *Cordis Corp. v. Cardiac Pacemakers*, 599 F.2d 1085, 1086–87 (1st Cir. 1979)).

## III.   THIS COURT SHOULD REJECT PLAINTIFFS' INVITATION TO EXTEND *BIVENS* TO CHALLENGE THE CONSTITUTIONALITY OF FEDERAL PROSECUTION OR DETENTION POLICY RELATING TO ALIENS CROSSING THE BORDER

Plaintiffs attempt to bring a *Bivens* action against Defendants seeking damages for policy

decisions of the United States, but Supreme Court precedent establishes that Plaintiffs have no

such claim. *Abbasi*, 137 S. Ct. at 1861. Plaintiffs' claims "bear little resemblance to the three

*Bivens* claims the [Supreme] Court has approved in the past: a claim against [federal] agents for

handcuffing a man in his own home without a warrant [*see Bivens*, 403 U.S. at 388]; a claim

against a Congressman for firing his female secretary [*Davis v. Passman*, 442 U.S. 228 (1979)];

and a claim against prison officials for failure to treat an inmate's asthma [*see Carlson v. Green*,

446 U.S. 14 (1980)]." *Abbasi*, 137 S. Ct. at 1860. And the Supreme Court has been exceedingly

skeptical of any invitation to invent new *Bivens* claims, as Plaintiffs invite this Court to do. FAC

¶¶ 17–21; *Abbasi*, 137 S. Ct. at 1860. Simply put, "a *Bivens* action is not 'a proper vehicle for

altering an entity's policy,'" and this Court should leave to Congress the decision whether to

authorize a damages action to do just that. *Abbasi*, 137 S. Ct. at 1860 (quoting *Corr. Sers. Corp.

v. Malesko*, 534 U.S. 61, 74 (2001)).

The Supreme Court has clearly and deliberately limited *Bivens* actions. *See, e.g.*, *Abbasi*,

137 S. Ct. at 1861. It has done so for a principled reason: respect for "separation-of-powers

principles" establishing the creation of personal-liability claims should be "committed to those

who write the laws rather than those who interpret them." *Id.* at 1857 (citations and internal

quotation marks omitted). "It is not necessarily a judicial function to establish whole categories of cases in which federal officers must defend against personal liability claims in the complex sphere of litigation, with all of its burdens on some and benefits to others." *Id.* at 1858. Rather, when an issue "involves a host of considerations that must be weighed and appraised, it should be committed to those who write the laws rather than those who interpret them." *Id.* (quoting *Bush v. Lucas*, 462 U.S. 367, 380 (1983)) (internal quotations omitted). Thus, as the Supreme Court's "precedents now instruct," Congress is in a "better position" than the Judiciary "to consider if 'the public interest would be served' by imposing a 'new substantive legal liability.'" *Id.* at 1857–58 (quoting *Schweiker v. Chilicky*, 487 U.S. 412, 426–27 (1988)).

Congress has *never* provided a statutory damages remedy for claims that the acts of individual federal officers or entities were unconstitutional.[13] In fact, it was not until 1971, in *Bivens*, that the Supreme Court for the first time recognized an implied right of action for money damages against line-level federal law enforcement officials in their personal capacities for a violation of a specific constitutional right. The plaintiff in that case, Webster Bivens, was subjected to a warrantless arrest and search in his home, allegedly not supported by probable cause, during which line-level federal law enforcement agents purportedly handcuffed him in front of his wife and children, "searched the apartment from stem to stern," and threatened to arrest the entire family. *Bivens*, 403 U.S. at 389. For Bivens, who was never prosecuted for any offense, it was "damages or nothing." *Id.* at 410 (Harlan, J., concurring). Although the Court

---

[13] By contrast, Congress has legislated damages remedies against state officials for constitutional violations. Congress passed the Civil Rights of Act of 1871 in the immediate aftermath of the Civil War, permitting (in the key provision now codified at 42 U.S.C. § 1983) suit against state officials for violating the federal Constitution. *See generally Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978); *Abbasi*, 137 S. Ct. at 1865. This includes entity liability for an unconstitutional "policy or custom." *Monell*, 436 U.S. at 694. Plaintiffs' 42 U.S.C. §§ 1985(3), 1986 claims are addressed *infra* at 56–58.

implied a damages action directly from the Constitution "to provide a cause of action for a plaintiff who lacked any alternative remedy for harms caused by" defendants' conduct, *Malesko*, 534 U.S. at 70, it did so *only* after observing that there were "no special factors counseling hesitation" against creating that remedy. *Bivens*, 403 U.S. at 396.

In the decades since *Bivens*, *Davis*, and *Carlson* were decided, the legal landscape has shifted away from implied causes of action, and the Supreme Court has "consistently refused to extend *Bivens* to any new context or new category of defendants." *Abbasi*, 137 S. Ct. at 1857 (citation and quotations omitted). Most recently, the Court criticized the "*ancien regime*" of implying rights of action under statutes in place when *Bivens* was decided. *Id*. at 1855 ("[T]he arguments for recognizing implied causes of action for damages began to lose their force.") (internal quotations and citation omitted). With respect to implying a remedy directly under the Constitution, "the Court has made clear that expanding the *Bivens* remedy is now a 'disfavored' judicial activity." *Id*. at 1857 (quoting *Iqbal*, 556 U.S. at 675). It is so disfavored, in the Court's view, that "it is possible that the analysis in the Court's three *Bivens* cases [*Bivens*, *Davis*, and *Carlson*] might have been different if they were decided today." *Abbasi*, 137 S. Ct. at 1855–56. At bottom, "[t]he question is 'who should decide' whether to provide for a damages remedy, Congress or the courts?'" *Id*. at 1857 (quoting *Bush*, 462 U.S. at 380). "The answer most often will be Congress." *Id.*

### A.  Plaintiffs' Claims Involve a New Context

Under the modern analysis for determining whether to recognize a *Bivens* remedy, this Court must first assess whether Plaintiffs' allegations present "a new *Bivens* context." *Id.* at 1859. As *Abbasi* makes clear: "[i]f the case is different in a meaningful way from previous *Bivens* cases *decided by [the Supreme] Court*, then the context is new" and a special factors

analysis must be performed. *Id.* (emphasis added).[14] *Abbasi* listed non-exclusive examples of such differences:

> the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Id.* at 1860. Such "meaningful" differences may be "small, at least in practical terms." *Id.* at 1865. But "even a modest extension is still an extension." *Id.* at 1864.

Here, the differences are in no way small or modest, and all of the potential factors identified in *Abbasi* materially distinguish this case from *Bivens*, *Davis*, and *Carlson*. The "new-context inquiry is easily satisfied." *Id.* at 1865. First, unlike the "line-level" officers at issue in *Bivens*, Defendants are (or were) some of the nation's highest officials, responsible for enforcing and implementing federal legislation through high-level Executive Branch policy. *See* FAC ¶¶ 17–27. Second, Plaintiffs' constitutional claims arise in the context of immigration and related criminal enforcement activities, an area in which the Supreme Court has never affirmatively recognized an implied remedy. Third, these claims challenge the United States' broad authority to enforce the nation's borders through the implementation of policies that apply to all potential entrants to the United States, not the type of specific officer action at issue in *Bivens*. *See, e.g.*, FAC ¶¶ 231, 240, 248.

Fourth, the judicial guidance on the constitutional standards governing the official actions at issue here is far less particular than the specific, binding guidance available to the officers

---

[14] *Abbasi* strictly limits the "new context" inquiry to a comparison with the three cases in which the Supreme Court itself affirmatively approved of a *Bivens*-type remedy – *Bivens*, *Davis*, and *Carlson*. *Id.* at 1859. The analysis does not consider decisions of courts of appeals or district courts recognizing a *Bivens* remedy.

involved in *Bivens*, *Davis*, and *Carlson*. *Cf. Abbasi*, 137 S. Ct. at 1864 ("[T]he judicial guidance available to this warden, with respect to his supervisory duties, was less developed."). For example, in the arena of Eighth Amendment denial of medical care, the Supreme Court had determined the applicable judicial standards prior to *Carlson*. *See Estelle v. Gamble*, 429 U.S. 97, 104–105 (1976). By contrast, the Defendants in this case acted pursuant to statutory and other legal mandates governing the care, custody, and placement of UACs, 8 U.S.C. § 1232; 6 U.S.C. § 279(b), and the conduct of criminal prosecutions, 28 U.S.C. §§ 501, 503, 509, 515, 519; *see also id*. § 547; 28 C.F.R. § 0.5. Such authorities have received virtually no attention from any court on any constitutional theory, let alone the Supreme Court or the First Circuit.

Fifth, and relatedly, the statutory and legal mandates pursuant to which Defendants – who worked for a variety of agencies with a variety of different roles – acted are meaningfully different from those at issue in *Bivens, Davis,* or *Carlson*. Sixth, the recognition of a *Bivens* claim in this context would risk significant and disruptive intrusion by the Judiciary into the functioning of both Congress, which has been very active in establishing both criminal punishment for unlawful entry and statutory mandates regarding UACs, and the Executive, which must marshal finite resources to carry out those mandates through the types of high-level policy decisions challenged here.

Finally, this case involves multiple "special factors" that the Supreme Court has not previously addressed in *Bivens*, *Davis*, or *Carlson* and alone warrant a finding of new context. *Abbasi*, 137 S. Ct. at 1860. These special factors include the national and border security context, in which the judiciary has demonstrated particular deference to the political branches. They also include the separation-of-powers concerns implicated by allowing a *Bivens*-style claim to challenge prosecutorial policies in the context of immigration enforcement, an area frequently

regulated by Congress. To the extent the Supreme Court has considered any of those factors, it has *rejected* the request to imply a non-statutory remedy. *See infra* at 28–39 *and cases cited therein*.[15]

In short, the contextual attributes of this case are not only significant, they span *all* of the differences described as meaningful in *Abbasi*; certainly they are "meaningful enough" to preclude extension of *Bivens* to this context. *Abbasi*, 137 S. Ct. at 1859. Thus, in considering Plaintiffs' claim, this Court *must* address the "antecedent" issue of whether to imply a remedy at all. *Hernandez*, 137 S. Ct. at 2006. That, in turn, involves asking: (1) whether "alternative, existing process[es]" protect the right at issue, and (2) whether any other "special factors counsel[] hesitation" in implying a damages remedy. *Abbasi*, 137 S. Ct. at 1858 (quoting *Wilkie*, 551 U.S. at 550). As shown below, the answer to both questions is yes – Plaintiffs have alternative avenues to obtain relief *and* there are numerous "special factors" counseling against recognizing the *Bivens* remedy Plaintiffs request.

### B.  Multiple Alternative, Existing Processes Preclude the Creation of a *Bivens* Remedy

Plaintiffs have (or had) "available to [them] 'other alternative forms of judicial relief,'" and "when alternative methods of relief are available, a *Bivens* remedy usually is not." *Abbasi*. 137 S. Ct. at 1863 (quoting *Minneci v. Pollard*, 565 U.S. 118, 124 (2012)). "Under this rationale, the Supreme Court has declined to extend *Bivens* where Congress has provided at least a partial

---

[15] Plaintiffs did not assert a Fourth Amendment claim in the original complaint. The addition of this count to the FAC in no way affects the new context inquiry. Multiple courts, including the Supreme Court, have found it inappropriate to imply a *Bivens* remedy for Fourth Amendment claims. *See, e.g.*, *Wilkie v. Robbins*, 551 U.S. 537 (2007) (declining to recognize proposed Fourth and Fifth Amendment claims); *accord Vanderklok v. United States*, 868 F.3d 189, 199–200 (3d Cir. 2017); *De La Paz v. Coy*, 786 F.3d 367, 375 (5th Cir. 2015); *Gonzalez v. Velez*, 864 F.3d 45, 53 n.3 (1st Cir. 2017); *see also Hernandez v. Mesa*, 137 S. Ct. 2003, 2007 (2017) (noting it "may be unnecessary to resolve" Fourth Amendment claim on remand, as there may be no such *Bivens* cause of action "in light of . . . *Abbasi*" and the particular context). The touchstone is not the amendment pled, but the context in which the claim arises.

remedy via statute . . . as well as where other causes of action provide redress." *Liff v. Office of Inspector Gen. for U.S. Dep't of Labor*, 881 F.3d 912, 918 (D.C. Cir. 2018) (internal citations omitted). The fact that a constitutional tort claim might offer "other or different relief" from existing avenues of redress does not mean that the Court should create a *Bivens*-type remedy. *Gonzalez*, 864 F.3d at 55. Indeed, where a plaintiff has an alternative process, the Court has "*consistently* rejected invitations to extend *Bivens.*" *Malesko,* 534 U.S. at 70 (emphasis added).

The availability of an avenue to pursue injunctive relief is thus "of central importance" in deciding whether to imply a *Bivens* remedy. *Abbasi*, 137 S. Ct. at 1862; *see also Malesko*, 534 U.S. at 74 (explaining plaintiff was not "in search of a remedy as in *Bivens* and *Davis*" and refusing to imply one in part because plaintiff could seek an injunction). The APA, for example, provides explicit authority to consider constitutional issues in official capacity actions, and is an alternative process counselling against a damages remedy. *See, e.g.*, *Air Sunshine, Inc. v. Carl*, 663 F.3d 27, 37 (1st Cir. 2011) (*Bivens* claim was not viable where plaintiff "had other options available" including "claims under the Administrative Procedure Act"); *W. Radio Servs. Co. v. U.S. Forest Serv.*, 578 F.3d 1116, 1123 (9th Cir. 2009) ("[T]he APA leaves no room for *Bivens* claims based on agency action or inaction."). The availability of habeas is another potential process that counsels against a *Bivens* remedy, *see Abbasi*, 137 S. Ct. at 1849, and indeed "might" provide a "more direct route to relief than a suit for money damages." *Id.* at 1862–63.

Plaintiffs have alternative avenues of review available here. Indeed, parents of potential class members have already sought injunctive and habeas relief, and have filed statutory claims under the APA arising out of the same policies and related actions that Plaintiffs challenge here. *See, e.g.*, *Jacinto-Castanon de Nolasco v. ICE*, 319 F. Supp. 3d 491, 505 (D.D.C. 2018) (ordering the government to reunify plaintiff with her sons). Parents of the potential class

members here also are (or could have been) members of the class in *Ms. L.*, which pursued APA

relief.[16] Plaintiffs' constitutional challenges thus plainly can be, and have been, pursued through

other avenues.

Plaintiffs also have at least a potential avenue for suit in state tort law, and/or a suit under

the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671–80. Plaintiffs in fact state

their intention to bring an FTCA claim in the FAC. FAC ¶¶ 10, 79.[17] While the FTCA standing

alone may not constitute a sufficient alternative process in all contexts, *see Carlson*, 446 U.S. at

20–23, the availability of the FTCA (and/or state law remedies) when considered with other

factors is nonetheless probative of whether Congress "might doubt" or a court should hesitate to

recognize a *Bivens* remedy.[18] *Abbasi*, 137 S. Ct. at 1861.

---

[16] Indeed, in that case, the court granted a class-wide preliminary injunction to a class of parents based on the claim that separation of the parents from their children without a determination that the parent was unfit or a danger to their child violates the Fifth Amendment. *Ms. L.*, No. 18-cv-428 (S.D. Cal.), Dkt. 82–83. But even if the plaintiffs in *Ms. L.* had not been successful, or are not in the future, the actions themselves, and the ability to have the constitutionality of their claims addressed in federal court, demonstrate that alternative processes exist to address Plaintiffs' constitutional concerns. *Malesko*, 534 U.S. at 69 ("So long as the plaintiff had an avenue for some redress, bedrock principles of separation of powers foreclosed judicial imposition of a new substantive liability.").

[17] Plaintiffs have also attempted to proffer an administrative claim with the government—a necessary precursor to an FTCA claim in court. 28 U.S.C. § 2675(a) (requiring presentation of the claims "to the appropriate Federal agency").

[18] *See, e.g.*, *Minneci*, 565 U.S. at 130 (when "in general, state tort law remedies provide *roughly similar* incentives for potential defendants to comply with the Eighth Amendment while also providing *roughly similar* compensation to victims of violations," that may inform whether to imply a remedy); *Malesko*, 534 U.S. at 73–74 (refusing to imply a remedy for plaintiff whose "lack of alternative tort remedies was due solely to [the] strategic choice" not to sue for common-law negligence); *Vanderklok*, 868 F.3d at 204 (noting availability of state tort claims against local law enforcement involved in air traveler's arrest at airport security checkpoint); *Andrews v. Miner*, 301 F. Supp. 3d 1128, 1134 (N.D. Ala. 2017) (acknowledging that, under *Carlson*, "[t]he FTCA remedy is not a substitute for a *Bivens* action," but still considering "an effective and available [FTCA] remedy" – whose "administrative prerequisites" the plaintiff "failed to follow" – in the mix with other "special factors"); *accord Morgan v. Shivers*, No. 1:14-cv-7921, 2018 WL 618451, at *5–6 (S.D.N.Y. Jan. 29, 2018).

It is not even necessary to divine all potential avenues for alternative forms of judicial relief in this context because it is clear that many are available. *See generally Liff*, 881 F.3d at 921 ("We do not parse the specific applicability of this web of" alternatives "but instead note the spectrum of remedies they provide"). This Court should decline to supplement the avenues of relief provided by Congress with a non-statutory individual capacity claim for damages. Review and the potential for relief through these avenues *alone* is sufficient to preclude creating a new *Bivens* remedy. *Abbasi.* 137 S. Ct. at 1863.

### C.  Other Factors Counsel Strongly Against Implying a *Bivens* Remedy Here

In addition to the reasons discussed above, a wide range of "special factors" may or "might" make it inappropriate to create a *Bivens* remedy in a particular context, even where the plaintiff has no alternative remedy. *Abbasi*, 137 S. Ct. at 1861; *see Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 280 (1997) (Kennedy, J.) (noting that the "*Bivens* line[] of cases reflect[s] a sensitivity to varying contexts, and courts should consider whether there are 'special factors counselling hesitation,' . . . before allowing a suit to proceed under [that] theory. The range of concerns to be considered in answering this inquiry is broad.") (citations omitted). Although a single factor can suffice, special factors in the aggregate may also preclude a *Bivens* remedy. *See Chappell v. Wallace*, 462 U.S. 296, 304 (1983) (concluding that factors "[t]aken together" "constitute[d] 'special factors'" and precluded creation of a *Bivens* remedy); *Abbasi*, 137 S. Ct. at 1862–63 (taking into account multiple factors, including congressional silence in a heavily legislated arena, the potential for injunctive relief, and national security considerations); *Gonzalez*, 864 F.3d at 55 ("[W]e hold that the CSRA and Title VII, taken together, preclude the plaintiffs' constitutional tort claims."). Plaintiffs' claims implicate at least five distinct and

additional factors that compel hesitation and warrant not implying a damages remedy in this novel and sensitive context.

i. Bivens *Actions May Not Be Used to Challenge U.S. Policy*

Plaintiffs do not challenge the acts of lone, line-level officers, but instead the decision-making of Congress and multiple government departments and agencies. Although styled as a suit against Defendants, Plaintiffs' real grievance is with legislative choices regarding the detention of aliens and criminalization of illegal entry; the United States' zero-tolerance policy; DHS policies and practices regarding detaining migrants and caring for their children; and HHS policies and practices regarding the care of UACs. The FAC is replete with references to the "Trump Administration," and even specific statements made by the President of the United States. *See, e.g.*, FAC ¶¶ 79, 88–91, 97, 111, 134. But the Supreme Court has clearly held that special factors preclude damages suits against federal agencies and entities. *See F.D.I.C. v. Meyer*, 510 U.S. 471, 485–86 (1994) (declining to imply a damages action directly against a federal agency). As the Court has explained, "injunctive relief [not an individual-capacity damages action] has long been recognized as the proper means for preventing *entities* from acting unconstitutionally." *Malesko,* 534 U.S. at 74; *see also Meyer*, 510 U.S. at 485 (observing that Court implied a cause of action against the officers in *Bivens* in part because direct action against the government was not available).

*Abbasi* confirms that individual-capacity constitutional lawsuits challenging agency policy raise serious separation-of-powers issues and other practical concerns. *Abbasi*, 137 S. Ct. at 1860. Interfering in government policymaking through the vehicle of an individual-capacity damages action accrues "substantial social costs" far beyond those imposed by a traditional *Bivens* action. *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). The entire thrust of *Bivens* and

its progeny is that it is directed to the actions of lone, typically line-level officers, not

government-wide decision-making. Plaintiffs should not be permitted to evade clear Supreme

Court holdings on this point by simply naming individuals as defendants.

Furthermore, Plaintiffs' proposed *Bivens* claims would implicate the precise separation-

of-powers concerns *Abbasi* identified. Far from claiming Defendants were on some personal

lark, Plaintiffs maintain that Defendants violated their constitutional rights through implementing

and/or condoning policies *of the United States*. *See, e.g.*, FAC ¶ 17 ("Defendant Sessions had

responsibility for implementing United States immigration laws, policies, and practices,

including practices related to family separation and family detention"); *id.* ¶ 18 ("Defendant

Nielsen is responsible for implementing United States immigration laws, policies, and practices,

including practices related to family separation and family detention"); *id.* ¶ 231 ("The

Defendants in this action have adopted, implemented, enforced, condoned, sanctioned,

acquiesced to, and encouraged a pattern, practice, or custom of violating the clearly established

due process rights of the class members"). And these policies were informed by Congressional

directives. *See, e.g.*, 8 U.S.C. §§ 1225(b)(1)(B)(iii)(IV), 1325(a). The creation of an individual

capacity damages action in these circumstances would burden Defendants and future officials

alike "from devoting the time and effort required for the proper discharge of their duties."

*Abbasi*, 137 S. Ct. at 1860.

Moreover, "the discovery and litigation process would either border upon or directly

implicate the discussion and deliberations that led to the formation" of any policy or practice

related to the separation of Plaintiffs and their children at the border, requiring "courts to

interfere in an intrusive way with sensitive functions of the Executive Branch." *Id.*[19] The threat of discovery could inhibit the free flow of advice and fulsome analysis within the Executive Branch, *see Fed. Open Mkt. Comm. Of Fed. Reserve Sys. v. Merrill*, 443 U.S. 340, 360 (1979), and reduce the Executive's autonomy and confidentiality, *see Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 385 (2004). Indeed, Plaintiffs would likely seek such intrusive discovery even just to prove (or disprove) certain Defendants' alleged personal involvement in the creation of the zero-tolerance policy or any other policy or related action that may have led to Plaintiffs' separation. *See Iqbal*, 556 U.S. at 676 ("Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").

ii. *Congressional Action in the Context of Immigration Has Been "Frequent and Intense" and Implying a Damages Remedy Would Raise Serious Separation-of-Powers Concerns*

As *Abbasi* recognizes, Congress's failure to provide a damages remedy "is relevant . . . and . . . telling" when Congress has otherwise regulated in a particular arena. 137 S. Ct. at 1862. This is particularly true where Congress's interest has been "frequent and intense." *Id.*; *see Meshal v. Higgenbotham*, 47 F. Supp. 3d 115, 130 (D.D.C. 2014) (declining to imply a remedy where "Congress has legislated with respect to detainee rights both in the United States and abroad" and "none of these acts extends a cause of action for detainees similarly situated to Mr. Meshal to sue federal officials in federal court"), *aff'd,* 804 F.3d 417 (D.C. Cir. 2015).

---

[19] In this case, even the President himself is alleged to have had some involvement in U.S. policy on this front. FAC ¶ 96 ("President Trump's clear animus based on race, ethnicity, and national origin provides the context for understanding the unlawful and irrational actions of the Defendants in this case.").

In the exercise of its Constitutional power to "establish an uniform Rule of Naturalization," U.S. Const. art. I, § 8, cl. 4,[20] Congress has acted repeatedly on the issues of immigration prosecution and the custody of alien children, enacting and modifying the Immigration and Nationality Act ("INA"), the HSA, and the TVPRA. The INA provides for the expedited removal and mandatory detention of aliens who enter the United States without documentation allowing for their admission. *See* 8 U.S.C. § 1225(b). It further provides the circumstances under which an individual can be paroled, the procedures and requirements for asylum, and the procedures for challenging removal and detention. *See, e.g.*, 8 U.S.C. §§ 1158, 1182, 1225–31. The HSA created DHS and transferred to HHS the responsibility for the care and custody of UACs. *See* 6 U.S.C. §§ 542, 279(a). The TVPRA made HHS responsible for all placement decisions for UACs in its custody, and provides the requirements for HHS to evaluate the suitability of any placement. 8 U.S.C. § 1232(b)(1), (c)(3).

The passage of these statutes represents just a sampling of Congress's actions in this area. Since enacting the INA in 1952, Congress has amended it at least six times. *De La Paz*, 786 F.3d at 377 (listing statutes). Likewise, Congress has amended the TVPRA and passed other legislation to care for UACs and combat human trafficking.[21]

---

[20] *See also Fiallo v. Bell*, 430 U.S. 787, 792 (1977) ("[O]ver no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens.") (internal citations and quotation marks omitted); *Galvan v. Press*, 347 U.S. 522, 531 (1954) (the principle that "the formulation of these policies [concerning the entry of aliens and their right to remain here] is entrusted exclusively to Congress has become about as firmly imbedded in the legislative and judicial tissues of our body politic as any aspect of our government."); *Adams v. Baker*, 909 F.2d 643, 647 (1st Cir. 1990) ("Nowhere is the scope of judicial inquiry more limited than in the area of immigration legislation.").

[21] *See* Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, 114 Stat. 1464; Prosecutorial Remedies and Tools against the Exploitation of Children Today Act of 2003 (Protect Act), Pub. L. No. 108-21, 117 Stat 650; Trafficking Victims Protection Reauthorization Act of 2003, Pub. L. No.108-193, 117 Stat 2875; Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108-458, 118 Stat 3638; Trafficking Victims Protection Reauthorization Act of 2005, Pub. L. No. 109-164, 119 Stat 3558 (2006); William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, 122 Stat 5044; Violence against Women Reauthorization Act of 2013, Pub. L. No.

Additionally, Congress is plainly aware of the particular issues at the core of this lawsuit – allegations regarding the separation of children from their parents in the context of immigration enforcement priorities – and has responded with legislation and other oversight. Indeed, Congress has appropriated $4 million to HHS' Substance Abuse and Mental Health Services Administration ("SAMHSA") in order to address the mental health service needs of UACs through the National Child Trauma Stress Initiative ("NCTSI"), with a special focus on children who were separated from their family. Department of Defense and Labor, Health and Human Services, and Education Appropriations Act, 2019 and Continuing Appropriations Act, 2019, Pub. L. No. 115-245, 132 Stat 2981; Joint Explanatory Statement of the Committee of Conference, H.R. Rep. No. 115-952, at *533 (2018); *see also* Consolidated Appropriations Act, 2019, H.R. Rep. No. 116-31, § 224 (prohibiting DHS from using appropriation funds to take actions against sponsors and potential sponsors of UACs). Both the House and the Senate have held multiple hearings on family separations. *See, e.g., Oversight of Immigration Enforcement and Family Reunification Efforts Before the S. Comm. on the Judiciary*, 115th Cong. (July 31, 2018). Among those persons subject to Congressional oversight and inquiry who have testified in these hearings are some of the individual Defendants in this case. *See, e.g., Oversight of the Department of Homeland Security Before the H. Comm. on the Judiciary*, 115th Cong. (Dec. 20, 2018) (Secretary Nielsen testifying about alleged policy of "family separation"); *Hearing on Prescription Drug Affordability and Innovation Before the S. Comm. on Finance*, 115th Cong. (June 26, 2018) (Secretary Azar responding to questions regarding family separations and

---

113-4, 127 Stat 54; National Defense Authorization Act for Fiscal Year 2013, Pub. L. No. 112-239, 126 Stat 1632; Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22, 129 Stat 227; National Human Trafficking Hotline, Pub. L. No. 114-271, 130 Stat 1398 (2016); Combating Human Trafficking in Commercial Vehicles Act, Pub. L. No. 115-99, 131 Stat 2242 (2018); No Human Trafficking on Our Roads Act, Pub. L. No. 115-106, 131 Stat 2265 (2018).

reunification); *Oversight of the Trump Administration's Family Separation Policy Before the H. Comm. on the Judiciary*, 116th Cong. (Feb. 26, 2019) (Former Director Lloyd testifying about ORR's care of UACs).

Despite statutes, repeated amendments, and recent congressional oversight, Congress has never provided a damages remedy against government officials who create or implement policy to enforce the nation's immigration laws – the damages remedy Plaintiffs seek in this suit.[22] This "institutional silence speaks volumes," and "counsels strongly against judicial usurpation of the legislative function." *De La Paz*, 786 F.3d at 377; *see also Abbasi*, 137 S. Ct. at 1862 (noting that where policies "attract the attention of Congress," yet "Congress fails to provide a damages remedy," then "it is much more difficult to believe that 'congressional inaction' was 'inadvertent'" (citing *Schweiker*, 487 U.S. at 423)); *Mirmehdi v. United States*, 689 F.3d 975, 982 (9th Cir. 2012) ("Congress's failure to include monetary relief can hardly be said to be inadvertent, given that despite multiple changes to the structure of appellate review in the [INA], Congress never created such a remedy.") (citation omitted). Given Congress's "repeated and careful attention to immigration matters," *De La Paz*, 786 F.3d at 377, this Court should not supplant the legislative function by creating a *Bivens* claim here. *Id.* at 378 ("[T]he comprehensive regulations and remedies provided in civil immigration law and regulations preclude crafting an implied damage remedy here."); *Mirmehdi*, 689 F.3d at 982 (declining to allow *Bivens* action by aliens in part because "[t]he complexity and comprehensiveness of the existing remedial system is another factor among a broad range of concerns counseling hesitation); *see also Liff*, 881 F.3d at 920 (holding that even if the relevant statutes and

---

[22] In contrast, for example, Congress *has* created a private right of action for victims of trafficking to sue their traffickers for damages, 18 U.S.C. § 1595.

regulations leave plaintiff without a remedy, "[t]he constellation of statutes and regulations governing federal contracts . . . provide a remedy").

iii.    *National and Border Security Concerns Counsel Against Creation of an Individual Capacity Cause of Action in this Context*

Because Plaintiffs' claims arise out of immigration enforcement activities at an international border, they necessarily implicate national security and foreign affairs. Like immigration, these areas are constitutionally committed to the political branches. *See, e.g.*, *Abbasi*, 137 S. Ct. at 1861; *Bank Markazi v. Peterson*, 136 S. Ct. 1310, 1328 (2016) (recognizing "controlling role of the political branches" in foreign affairs). Indeed, "[m]atters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention." *Haig v. Agee*, 453 U.S. 280, 292 (1981); *see Abbasi*, 137 S. Ct. at 1861; *Hernandez v. Mesa*, 885 F.3d 811, 819 (5th Cir. 2018) (en banc) (risk to national security counseled against recognizing *Bivens* claim in border shooting case) (petition for certiorari filed). This most certainly includes judicial interference by extending *Bivens*. *See Doe v. Rumsfeld*, 683 F.3d 390, 394 (D.C. Cir. 2012) ("The Supreme Court has never implied a *Bivens* remedy in a case involving the military, national security, or intelligence."); *accord Vanderklok*, 868 F.3d at 207 (no *Bivens* action against TSA agent given national security implications of airport security).

The national security and border concerns at issue here counsel against recognizing a new *Bivens* claim. Congress has charged DHS and its components with securing the border, 6 U.S.C. §§ 111, 202, and courts have long recognized that "this country's border-control policies are of crucial importance to the national security and foreign policy of the United States." *United States v. Delgado-Garcia*, 374 F.3d 1337, 1345 (D.C. Cir. 2004). Related "immigration issues 'have the natural tendency to affect diplomacy, foreign policy, and the security of the nation,' which further 'counsels hesitation' in extending *Bivens*." *Mirmehdi*, 689 F.3d at 982 (quoting *Arar v.*

*Ashcroft*, 585 F.3d 559, 574 (2d Cir. 2009)); *see also Hernandez*, 885 F.3d at 819–20;

*Vanderklok*, 868 F.3d at 207. Indeed, the Supreme Court has recognized that concerns about

"subjecting the prosecutor's motives and decisionmaking to outside inquiry" are magnified in the

immigration context. *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490 (1999)

(citation and quotation omitted). Thus, any supplemental damages remedy provided here should

come from Congress.

iv.    *Additional Separation-of-Powers Principles Would Be Violated by Creating an Individual Capacity Claim for Prosecutorial Policy Decisions*

Plaintiffs' claims raise additional separation-of-powers concerns related to the

Executive's enforcement of the laws. "The Supreme Court has long recognized that 'the

Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute

a case.'" *In re Sealed Case*, 829 F.2d 50, 63 (D.C. Cir. 1987) (quoting *United States v. Nixon*,

418 U.S. 683, 693 (1974)); *see also United States v. Smith*, 178 F.3d 22, 26 (1st Cir. 1999). "The

Presidential power of prosecutorial discretion is rooted in Article II, including the Executive

Power Clause, the Take Care Clause, the Oath of Office Clause, and the Pardon Clause." *In re

Aiken Cty.*, 725 F.3d 255, 262–63 (D.C. Cir. 2013) (citing U.S. Const. art. II, § 1, cl. 1

(Executive Power Clause); U.S. Const. art. II, § 1, cl. 8 (Oath of Office Clause); U.S. Const. art.

II, § 2, cl. 1 (Pardon Clause); U.S. Const. art. II, § 3 (Take Care Clause); *see also* U.S. Const. art.

I, § 9, cl. 3 (Bill of Attainder Clause)). To aid the President in the task of taking care that the

laws are faithfully executed, Congress specifically delegated to the Attorney General and his or

her subordinates in the DOJ the power to "conduct any kind of legal proceeding, civil or

criminal," 28 U.S.C. § 515(a). To the extent that Defendants implemented a policy of criminally

prosecuting all DHS referrals of section 1325(a) violations, they did so in compliance with the

will of Congress, 8 U.S.C. § 1325(a), and pursuant to power granted specifically by the

Constitution to the Executive. Separation-of-powers concerns counsel squarely against creating a *Bivens* remedy aimed at the exercise of that power. *Abbasi*, 137 S. Ct. at 1857 ("separation-of-powers principles are or should be central to the analysis" of whether to recognize a damages remedy); *see also Lebron v. Rumsfeld*, 670 F.3d 540, 548 (4th Cir. 2012) (explaining that "[p]reserving the constitutionally prescribed balance of powers is . . . [a] special factor counseling hesitation" in implying a *Bivens* remedy).

v.     *The Scope and Number of Governmental Actions and Actors Plaintiffs Challenge Across Agencies Would Make Devising a Workable Individual-Capacity Cause of Action Impracticable*

The Supreme Court has recognized that a "serious difficulty of devising a workable cause of action" for a particular *Bivens* claim counsels against such a free-standing non-statutory remedy. *See Wilkie*, 551 U.S. at 562. Relatedly, where recognizing a plaintiff's proposed remedy would open the floodgates, the unusual risk of "burden and demand" on federal officials that "might well prevent" them "from devoting the time and effort required for the proper discharge of their duties" (and related "practical concerns") will also counsel hesitation. *Abbasi*, 137 S. Ct. at 1860; *see also id.* at 1858 (discussing the "costs and consequences to the Government itself" of recognizing a new claim). These factors all inhere in this context.

Holding individuals personally liable for the United States' enforcement of immigration detention statutes and regulations and related actions is a fundamental mismatch for the *Bivens* doctrine. Most of the relevant federal statutes, policies, and other directives, including the TVPRA, section 1325(a) of the U.S. Code, and the INA, preexisted Defendants' tenure in the federal government and, unless modified by Congress, will continue in effect after Defendants leave government service, as several of Defendants already have.

Moreover, the long list of relevant actors and complex issues of causation raised by a potential *Bivens* claim here make individual-capacity liability inappropriate and unworkable. Any actions by Defendants were at most part of an over-arching government initiative in which no Defendant exercised even supervisory control over most of the other actors involved. The many border agents, prosecutors, detention officers, social workers, administrators, and policymakers who may have been involved are all subject to varying legal standards and mandates. And Plaintiffs were only at the border because of their parents' own circumstances and judgments.

Creating the *Bivens* action Plaintiffs seek would also have sweeping implications "on governmental operations systemwide." *Abbasi*, 137 S. Ct. at 1858. Those system-wide costs include "the burdens on Government employees who are sued personally, as well as the projected costs and consequences to the Government itself . . . ." *Id.*; *see Laird v. Tatum*, 408 U.S. 1, 15 (1972) (rejecting the idea that "the federal courts [serve] as virtually continuing monitors of the wisdom and soundness of Executive action" and noting that "role is appropriate for the Congress acting through its committees and the 'power of the purse'"). In the context of immigration enforcement operations, claims similar to Plaintiffs' could readily be asserted by numerous other aliens facing detention. Given that every single one of the approximately 61,000 removals performed in 2017 involved a person from a foreign country, *see* Fiscal Year 2017 ICE Enforcement and Removal Operations Report, *available at* https://www.ice.gov/removal-statistics/2017 (last visited Mar. 6, 2019), [23] this alone could open the floodgates of litigation

---

[23] Federal Rule of Evidence 201 provides that "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). At several points in this brief, Defendants cite material from government websites, including statistical information, whose accuracy cannot be reasonably questioned, and is proper for judicial notice and consideration on a motion to dismiss. *See, e.g., Gent v. CUNA Mut. Ins. Soc'y*, 611 F.3d 79, 84 n.5 (1st Cir. 2010) (taking judicial notice of relevant

over equal protection claims against government officials enforcing immigration laws. *Cf.*
*Wilkie*, 551 U.S. at 561 (dismissing claims on special factors grounds in part because "a *Bivens*
action to redress retaliation against those who resist Government impositions on their property
rights would invite claims in every sphere of legitimate governmental action affecting property
interests"). And, to the extent that claims are based on allegations about officials' personal
motives, they may be relatively easy to plead and difficult to disprove. *See, e.g.*, *United States v.*
*Alcaraz-Arellano*, 441 F.3d 1252, 1264 (10th Cir. 2006) ("[C]harges of racial discrimination . . .
may be easy to make and difficult to disprove.") (citation omitted). The Court has consistently
resisted efforts to embroil the judiciary in lawsuits over the subjective motive behind facially
lawful official conduct. *See, e.g.*, *Ashcroft v. al-Kidd*, 563 U.S. 731, 737 (2011); *Wood v. Moss*,
572 U.S. 744, 761–62 (2014).

The potentially tremendous financial impact at issue also weighs heavily against
supplanting Congress's role in deciding whether to create a damages remedy. *See, e.g.*, *Meyer*,
510 U.S. at 486 (discussing the "potentially enormous financial burden" of creating a *Bivens*
remedy to challenge agency policies). In circumstances where Congress has chosen to allow
broad-based challenges to policies and practices in the official capacity arena, the number of
potential plaintiffs and potential damages can be enormous. *See, e.g.*, *Cobell v. Salazar*, 679 F.3d
909, 912 (D.C. Cir. 2012) (discussing the creation of $3.4 billion settlement fund). Plaintiffs
allege here that the universe of "family separation" plaintiffs could number in the thousands.
FAC ¶ 206. From a practical perspective, even assuming there were viable claims, it is unlikely
that any government official would have sufficient assets to pay the potential costs associated

---

facts provided on CDC website, which were "not subject to reasonable dispute"); *see also Vanderklok*,
868 F.3d at 205 n.16 (taking judicial notice of information "publicly available on government websites"
in considering appeal of *Bivens* defendants' motion to dismiss).

with remedying an unconstitutional policy of the United States. *See Carlson*, 446 U.S. at 21

(noting *Bivens* actions subject officials to "personal financial liability"). Ultimately, Congress is

best-equipped to decide whether and how to provide a financial remedy for past harms caused by

government policies.

Plaintiffs' choices about how to structure their suit underscore the unworkability of

implying a *Bivens* suit here. For example, Plaintiffs bring this suit as a class action, but class

actions to challenge general government policies are uniquely ill-suited to litigate constitutional

tort claims, which must be brought against federal officials for their "own individual actions."

*Iqbal*, 556 U.S. at 676. Plaintiffs also seek injunctive relief against the Defendants "requiring the

Defendants to establish a fund in an amount to be determined at trial for the mental health

treatment and ongoing mental health monitoring of the class members," FAC at 58, but *Bivens*

suits allow only for money damages. *See, e.g.*, *Higazy v. Templeton*, 505 F.3d 161, 169 (2d Cir.

2007) ("The only remedy available in a *Bivens* action is an award for monetary damages from

defendants in their individual capacities."). Individual-capacity suits of this nature against federal

employees are simply not conducive to the sort of remedy Plaintiffs seek. *Cf. Meyer*, 510 U.S. at

486 ("We leave it to Congress to weigh the implications of such a significant expansion of

Government liability.").

*** 

Plaintiffs' constitutional tort claims target the personal assets of federal officials from the

White House and high-ranking decision-makers from virtually every federal agency involved in

border security and immigration policy. The proposed claims implicate a remarkable number and

variety of "factors counseling hesitation" and would involve a uniquely unwarranted judicial

intrusion into Congressional and Executive decision-making. Such core separation-of-powers

concerns provide more than ample reasons why Congress "might" doubt the propriety of a money damages remedy against individuals, *Abbasi*, 137 S. Ct. at 1861, and why this Court "must," *id.* at 1858, decline to create the novel *Bivens* cause of action Plaintiffs seek here.

## IV. DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY FOR ALL CONSTITUTIONAL AND FEDERAL STATUTORY CLAIMS

Plaintiffs' lawsuit should also be dismissed because all eleven Defendants are entitled to qualified immunity for all claims raised in Plaintiffs' FAC. Qualified immunity protects public officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). It is "an immunity from suit rather than a mere defense to liability." *Saucier v. Katz*, 533 U.S. 194, 200–201 (2001). Accordingly, courts should resolve "immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam). Qualified immunity "'gives government officials breathing room to make reasonable but mistaken judgments.'" *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (quoting *al-Kidd*, 563 U.S. at 743). It provides "ample" protection and shields "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). To overcome qualified immunity, a plaintiff must "plead[] facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *al-Kidd*, 563 U.S. at 735 (quoting *Harlow,* 457 U.S. at 818); *accord Hill v. Walsh*, 884 F.3d 16, 21 (1st Cir. 2018). "[T]he clearly established law must not be gauged at too high a level of generality; instead, it must be 'particularized' to the facts of the case." *Alfano v. Lynch*, 847 F.3d 71, 76 (1st Cir. 2017) (quoting *Anderson*, 483 U.S. at 640).

Courts may "exercise their sound discretion in deciding which of the two prongs of [that] analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Where a case can "be disposed of more readily" at the second step, *id*. at 237 (citation omitted) – because the court can "quickly and easily decide that there was no violation of clearly established law before turning to the more difficult question whether the relevant facts make out a constitutional question at all," *id*. at 239 – the court may find that qualified immunity applies without reaching the initial "constitutional" question.[24] This rationale applies equally to Plaintiffs' federal statutory claims under 42 U.S.C. §§ 1985(3) and 1986, which incorporate constitutional standards by definition. *See, e.g.*, 42 U.S.C. § 1985 ("If two or more persons . . . conspire . . . for the purpose of depriving . . . any person or class of persons of the *equal protection of the laws* . . . .") (emphasis added); *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971) ("The language requiring intent to deprive of equal protection, or equal privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action."); *Bisbee v. Bey*, 39 F.3d 1096, 1102 (10th Cir. 1994) (explaining why the requirements of qualified immunity apply in § 1985 cases).

Here, Defendants' immunity can easily be resolved at step two – Plaintiffs' failure to identify the violation of a clearly established constitutional or related federal statutory right. Principles of constitutional avoidance favor this approach, particularly where, as here, the answer to the clearly established question is plain. *Camreta v. Greene*, 563 U.S. 692, 705 (2011) ("[O]ur

---

[24] *See Pearson*, 555 U.S. at 237 ("There are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right. District courts and courts of appeals with heavy caseloads are often understandably unenthusiastic about what may seem to be an essentially academic exercise."); *id*. at 241 (acknowledging "the 'older, wiser judicial counsel 'not to pass on questions of constitutionality . . . unless such adjudication is unavoidable''") (citations omitted).

usual adjudicatory rules suggest that a court should forbear resolving [the merits of a constitutional question].”). The absence of caselaw at the time of Plaintiffs’ separation that would have put Defendants on notice of any clearly established right requires dismissing Plaintiffs’ claims. *See D.C. v. Wesby*, 138 S. Ct. 577, 591 (2018) (“Tellingly, neither the panel majority nor the partygoers have identified a single precedent – much less a controlling case or robust consensus of cases – finding a [constitutional] violation ‘under similar circumstances.’”) (citations omitted).

## A. Plaintiffs Fail to Allege the Violation of a Clearly Established Due Process Right

Plaintiffs ask this Court to recognize an across-the-board clearly established due process right of immigration detainees to be housed with their minor children,[25] but precedent does not clearly support any such right. As an initial matter, the Supreme Court has warned against analyzing claimed substantive due process rights at too general a level. *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997). It has also “been reluctant to expand the concept of substantive due process because guideposts for responsible decision making in this unchartered area are scarce and open-ended.” *Collins v. City of Harker Heights*, *Tex.*, 503 U.S. 115, 125 (1992). When analyzed appropriately, it is clear that the right Plaintiffs claim is both too context-

---

[25] Contrary to Plaintiffs’ claim that the government could have held Plaintiffs and their parents together in “immigration family detention centers,” FAC ¶ 4, the government’s ability to hold family units in ICE family residential centers is subject to the limitations of the *Flores* Settlement Agreement, as interpreted recently in a series of court decisions. *See Flores v. Johnson*, 212 F. Supp. 3d 864 (C.D. Cal. 2015); *Flores v. Lynch*, 212 F. Supp. 3d 907 (C.D. Cal. 2015); *Flores v. Lynch*, 828 F.3d 898 (9th Cir. 2016). Settlement agreements, it should be noted, do not establish the baseline for constitutional conduct. *See*, *e.g.*, *Palmer v. Sheahan*, No. 93 C 181, 1994 WL 801474, *2 n.4 (N.D. Ill. Feb. 15, 1994) (“If the defendants violated the terms of the consent decree, the appropriate remedy is an order . . . from the judge who entered the decree, not damages pursuant to § 1983.”) (citing cases); *Green v. McKaskle*, 788 F.2d 1116, 1123 (5th Cir. 1986) (“[R]emedial court orders per se, apart from independent constitutional grounds affirmed there, cannot serve as a substantive basis for a § 1983 claim for damages because such orders do not create ‘rights, privileges, or immunities secured by the Constitution and laws.’”) (quoting 42 U.S.C. § 1983).

dependent to qualify as clearly established and is, in any event, not supported by Supreme Court or First Circuit precedent.

Although framed in a variety of different ways, at their core, Plaintiffs' substantive due process claims, Counts II ("Right to Family Integrity"), III ("Punishment of Civil Detainees"), IV ("Coerced Waiver of Asylum"), and V ("Failure to Provide Adequate Mental Health Services"), are all rooted in the premise that Plaintiffs and their parents have a categorical constitutional right to remain "together as a family." FAC ¶ 229; *see id.* ¶¶ 259, 270, 280–81. But any right which children may have regarding their relationship with their parents necessarily varies by context. *See, e.g.*, *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003) (recognizing that rights of familial association apply differently when an individual is imprisoned). The fact-specific nature of the inquiry required in this case, the necessity of balancing competing interests, and the complexity of managing adult and family detention at the United States border all compel the conclusion that the law applicable to Plaintiffs' constitutional and related federal statutory claims was not clearly established for qualified immunity purposes.

But even setting aside that problem, Plaintiffs' claim that aliens have a fundamental constitutional right to be detained as a family flies in the face of the entire statutory scheme governing immigration enforcement. It is well established that Congress has broad power to regulate immigration, even when its decisions touch on sensitive familial relationships. *See, e.g.*, *Fiallo*, 430 U.S. at 797–98 (rejecting constitutional challenge to sections of INA which excluded the relationship between illegitimate child and his natural father from the special preference status otherwise accorded a "child" or "parent" of a United States citizen or lawful permanent resident). It is equally well established that Congress has criminalized illegal entry into the United States without providing any exception from prosecution for aliens who enter illegally as

a family unit. 8 U.S.C. § 1325(a). Courts have thus repeatedly rejected attempts to establish that aliens have any substantive due process right to family visitation, or to be detained in proximity to – much less to be released from detention with – family members. *See, e.g.*, *Aguilar v. ICE*, 510 F.3d 1, 22 (1st Cir. 2007) (immigration arrest which prevented parent from making arrangements for the care of their children did not violate the right to family integrity); *see also Payne-Barahona v. Gonzales*, 474 F.3d 1, 2 (1st Cir. 2007) (valid removal of an alien did not infringe his children's constitutional right to family integrity); *Gallanosa by Gallanosa v. United States*, 785 F.2d 116, 120 (4th Cir. 1986) ("The courts of appeals that have addressed this issue have uniformly held that deportation of the alien parents does not violate any constitutional rights of the citizen children.").

Related case law confirms the point. From a legal perspective, courts consider immigration detainees analogous to pretrial detainees under certain circumstances. *See Edwards v. Johnson*, 209 F.3d 772, 778 (5th Cir. 2000) ("We consider a person detained for deportation to be the equivalent of a pretrial detainee."). But pretrial detainees, even those who are U.S. citizens, do not have a right to be housed with or even near family members while in criminal custody. *See Olim v. Wakinekona*, 461 U.S. 238, 247–48 & n.8 (1983) (interstate transfer of criminal detainee does not violate any due process right, even if the transfer leaves detainee separated hundreds of miles from his family) (citing *Montanye v. Haymes*, 427 U.S. 236, 241 n.4 (1976)); *Ms. L. v. ICE*, 310 F. Supp. 3d 1133, 1143 (S.D. Cal. 2018) (noting that "parents and children may lawfully be separated when the parent is placed in criminal custody").[26] The same

---

[26] *See also Newbold v. Stansberry*, No. 1:08CV1266 (LO/JPP), 2009 WL 86740, at *3 (E.D. Va. Jan. 12, 2009) (holding that "[a] prisoner has no due process interest in his placement at a particular prison, nor does the Constitution guarantee that the convicted prisoner will be placed in any particular prison. Nor does a prisoner have a constitutional right to receive visits from friends or family members.") (internal quotations and citations omitted), *aff'd*, 332 F. App'x 927 (4th Cir. 2009); *Lyons v. Clark*, 694 F. Supp. 184, 187 (E.D. Va. 1988) (rejecting challenge to transfer of criminal detainee after finding no liberty

legal analogy applies to UACs in the care of ORR. Whatever the parameters of their rights,
aliens attempting to enter the United States certainly do not have greater constitutional rights
than U.S. citizens. *See Mathews v. Diaz*, 426 U.S. 67, 79–80 (1976) ("In the exercise of its broad
power over naturalization and immigration, Congress regularly makes rules that would be
unacceptable if applied to citizens.").

There is also no historical precedent to support the novel substantive right that Plaintiffs
claim. *See, e.g.*, *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998) (asserting that the
"shock-the-conscience" inquiry "may be informed by a history of liberty protection"); *United
States v. Dominguez-Portillo*, No. 17-mj-4409, 2018 WL 315759, at *5–6 (W.D. Tex. Jan. 5,
2018) (alien-parent's referral for prosecution under 8 U.S.C. § 1325(a) was not enough to show
"outrageous government conduct" for purposes of the Fifth Amendment because "the case law
provides little guidance on how . . . parental rights are actually manifested when a parent charged
with . . . illegal entry . . . is separated from their child who allegedly accompanied them across
the border" and noting "the lack of clearly established parental rights in these circumstances and
under case law"). To the contrary, it has always been acknowledged that "the evenhanded
enforcement of the immigration laws, in and of itself, cannot conceivably be held to violate
substantive due process." *Aguilar*, 510 F.3d at 22 (citing *de Robles v. INS*, 485 F.2d 100, 102
(10th Cir. 1973)). Any associated interference with the right to family integrity alleged here was
incidental to such enforcement and sprang from the federal government's legitimate interest in
prosecuting illegal entrants and detaining them during the expedited removal and credible fear
screening process. *See Demore v. Kim*, 538 U.S. 510, 523 (2003) ("[D]etention during

---

interest of criminal detainee "in receiving visits from family, friends and community groups"), *aff'd,* 887
F.2d 1080 (4th Cir. 1989).

deportation proceedings [is] a constitutionally valid aspect of the deportation process."); *Payne-Barahona*, 474 F.3d at 3 (rejecting the argument that "family separation" based on a valid deportation "shocks-the-conscience"). This is a critically important point because *every* governmental detention of a parent runs the risk of interfering in some way with the parent's ability to care for his or her children. *See Payne-Barahona*, 474 F.3d at 3 ("If there were such a right [to challenge a parent's valid deportation], it is difficult to see why children would not also have a constitutional right to object to a parent being sent to prison or, during periods when the draft laws are in effect, to the conscription of a parent for prolonged and dangerous military service.").

It is for this reason that the overwhelming majority of cases run contrary to Plaintiffs' theories of substantive due process. "After all, the right to family integrity has been recognized in only a narrow subset of circumstances," *Aguilar*, 510 F.3d at 23, but not in deportations, which "are routine and do not of themselves dictate family separation," *Payne-Barahona*, 474 F.3d at 3. As described by numerous courts of appeals, "[i]f an alien could avoid the consequences of unlawful entry into the United States by having a child, it would create perverse incentives and undermine Congress's authority over immigration matters." *Marin-Garcia v. Holder*, 647 F.3d 666, 674 (7th Cir. 2011).[27] Although some district courts have recently indicated that they *might* find applications of policies allegedly resulting in family separations at

---

[27] *See also Newton v. INS*, 736 F.2d 336, 343 (6th Cir. 1984) (finding "no constitutional rights of citizenship implicated in the decision to deport" parents of citizen children); *Delgado v. INS*, 637 F.2d 762, 764 (10th Cir. 1980) ("This Court has repeatedly held that the incidental impact visited upon the children of deportable, illegal aliens does not raise constitutional problems."); *Cortez–Flores v. INS*, 500 F.2d 178, 180 (5th Cir. 1974) ("[D]eportation of a parent does not deprive the child of any constitutional rights."); *de Robles*, 485 F.2d at 102 (rejecting argument that it is unconstitutional to break up a family and deprive children of "constitutional right to a continuation of the family unit"); *Cervantes v. INS*, 510 F.2d 89, 92 (10th Cir. 1975) ("The incidental impact on aliens' minor children caused by the enforcement of duly-enacted conditions on aliens' entrance and residence does not create constitutional problems.").

the border unconstitutional, this does not demonstrate that any of Defendants' alleged actions in this case violated any clearly established constitutional rights.[28]

Plaintiffs' attempt to particularize their substantive due process claims fares no better. For instance, Count V alleges that Defendants violated Plaintiffs' due process rights by subjecting them to "punitive conditions during their civil immigration detention." FAC ¶ 258. Although Plaintiffs were only subject to civil custody, their parents were (and still may be) subject to criminal punishment to the extent they violated 8 U.S.C. § 1325(a) or other criminal law. Plaintiffs cannot demonstrate that they had a clearly established due process right for their parents not to be prosecuted for crimes they committed. *Cf. Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973) ("[A] private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another."). And any claims regarding the particular conditions of their detention, to the extent they existed, (*see, e.g.*, FAC ¶¶ 147, 160 (freezing cold rooms), *id.* ¶¶ 160, 184 (inadequate bedding), *id.* ¶ 185 (inadequate food), *id.* ¶ 144–45, 147 (overcrowding)), or the failure to provide them with adequate mental health services (Count VII) would have to be brought against the line-level officers and/or custodians who allegedly

---

[28] Defendants are mindful that some courts have held that plaintiffs in other cases were *likely* to succeed on "their substantive due process claim that their continued separation, absent a determination that [the mother] is either an unfit parent or presents a danger to her sons, violates their right to family integrity under the Fifth Amendment." *Jacinto-Castanon*, 319 F. Supp. 3d at 499; *see also Ms. L.*, 310 F. Supp. 3d at 1145–46 (finding likelihood of success on plaintiffs' due process claim). However, although those cases raise similar legal issues to those raised by Plaintiffs, those decisions came in a different procedural posture (preliminary injunction), and were issued against a different defendant (the United States) facing different plaintiffs seeking different relief (injunctive) in a different factual context (before reunification). More importantly, for qualified immunity purposes, even if there were a decision on the merits in those cases, district court decisions cannot clearly establish a legal proposition of the nature raised here. *See Camreta*, 563 U.S. at 709 n.7 (quoting 18 J. Moore et al., Moore's Federal Practice § 134.02[1][d] (3d ed. 2011)) ("'A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case.'"). They certainly cannot do so where they, as here, post-date the challenged conduct. *Pearson*, 555 U.S. at 232 ("[T]he court must decide whether the right at issue was 'clearly established' *at the time of defendant's alleged misconduct*.") (emphasis added).

committed the particular infraction. *Iqbal*, 556 U.S.at 676, ("[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").[29] Such claims do not undercut dismissal of Defendants herein. Nor can Plaintiffs establish that alien asylum-seekers have some clearly established constitutional right to seek asylum (Count VI). *See Ticoalu v. Gonzales*, 472 F.3d 8, 11 (1st Cir. 2006) ("Due process rights do not accrue to discretionary forms of relief . . . and asylum is a discretionary form of relief.").

Similarly, Plaintiffs cannot show that they had some clearly established substantive due process right *not* to be treated as "'unaccompanied minors' even though they entered the United States with their parents." FAC ¶ 75. By federal statute (not the Constitution), a UAC is a child under 18 years of age with no lawful immigration status in the United States who either (1) does not have a parent or legal guardian in the United States or (2) does not have a parent or legal guardian in the United States "available to provide care and physical custody." 6 U.S.C. § 279(g)(2). Courts have struggled to apply this definition, with federal judges disagreeing on when the label is appropriate. *Compare D.B. v. Cardall*, 826 F.3d 721, 734 (4th Cir. 2016) ("Consequently, to be 'available to provide care' for a child, a parent must be available to provide what is necessary for the child's health, welfare, maintenance, and protection.") *with id.* at 744 (Floyd, J., dissenting) ("Congress has not empowered the federal Office of Refugee Resettlement to seize children from bad parents. The Office is only authorized to detain alien children whose parents are not available in the United States."). Judges also disagree about precisely when and under what circumstances aliens (whether adults or children) entering the

---

[29] Depending on the facts and circumstances, a plaintiff may also be able to seek injunctive relief to remedy ongoing constitutionally deficient conditions of confinement. *See, e.g.*, *Doe v. Kelly*, 878 F.3d 710, 725 (9th Cir. 2017) (affirming grant of preliminary injunction requiring the government to provide detainees with mats and blankets after 12 hours).

United States gain constitutional protections.[30] When judges disagree on such questions, all of which are implicated by Plaintiffs' claims, it is unfair to subject officials to "money damages for picking the losing side of the controversy." *Wilson v. Layne*, 526 U.S. 603, 618 (1999). Given the lack of clarity even on these general principles, Plaintiffs cannot show that clearly established substantive due process law prohibited Defendants' conduct with respect to Plaintiffs and their parents in the "particular circumstances" faced by the Defendants. *Wesby*, 138 S. Ct. at 590. Accordingly, Counts II, V, VI, and VII should be dismissed.

Plaintiffs also make a procedural due process claim (Count III, FAC ¶ 235–243), but to the extent any due process claim lies here, it sounds in substantive, not procedural due process. Even if Plaintiffs were to press such a claim, it would fail. As with substantive due process, a procedural due process claim requires courts to "ask whether there exists a liberty or property interest of which a person has been deprived," *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011), and as noted, *supra*, no such interest was clearly established with respect to immigration detainees. But even if such an interest did exist, ORR's care and custody of UACs does not

---

[30] *Compare Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("[O]nce an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent.") *with United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990) ("[A]liens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country."); *Garza v. Hargan*, 874 F.3d 735, 747 (D.C. Cir. 2017), *cert. granted, judgment vacated sub nom. Azar v. Garza*, 138 S. Ct. 1790 (2018) (quoting *Bridges v. Wixon*, 326 U.S. 135, 161 (1945) (Murphy, J., concurring)) (Henderson, J., dissenting) ("[B]efore developing the 'substantial connections' that constitute 'entry' for an illegally present alien—'[t]he Bill of Rights is a futile authority for the alien seeking admission for the first time to these shores.'"); *Castro v. DHS*, 835 F.3d 422, 445 (3d Cir. 2016) (quoting *Landon v. Plasencia*, 459 U.S. 21, 32 (1982)) (holding that petitioners, aliens who were apprehended after illegally entering the United States, could not state a proper Suspension Clause claim because "the Supreme Court has unequivocally concluded that 'an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application.'"); *United States v. Carpio-Leon*, 701 F.3d 974, 975 (4th Cir. 2012) ("[I]llegal aliens are not law-abiding members of the political community and aliens who have entered the United States unlawfully have no more rights under the Second Amendment than do aliens outside of the United States seeking admittance.").

violate any clearly established procedural due process rights because there are sufficient

mechanisms to challenge the decision to maintain custody of those children. Due process only

requires "the opportunity to be heard at a meaningful time and in a meaningful manner."

*Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quotation omitted); *id*. at 333–35 (prescribing a

balancing test for procedural due process claims). Agencies are not required to provide trial-like

procedures unless mandated to do so by Congress. 5 U.S.C. § 554(a); *see also Pension Ben.*

*Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 655–56 (1990). Children are in ORR care and custody

pursuant to the HSA and TVPRA, and there are mechanisms for challenging ORR's

determination that their parents or other custodians are unable to provide for each child's care

and custody. *See, e.g.*, Children Entering the United States Unaccompanied: Section 2, Safe and

Timely Release from ORR, *available at* https://www.acf.hhs.gov/orr/resource/children-entering-

the-united-states-unaccompanied-section-2#2.2. Additional procedural safeguards are not

required under a *Mathews* balancing test. 424 U.S. at 333–35. Therefore, there was no clearly

established procedural due process violation inherent in the government's custody of Plaintiffs,

and Count III should be dismissed.

### B.  Plaintiffs Fail to Allege a Violation of a Clearly Established Equal Protection Right

Plaintiffs cannot show that a policy of prosecuting everyone who illegally enters the

United States along the southern border violates any clearly established equal protection right

(Count IV). The Supreme Court has long held that a policy that does not identify a suspect

classification or fundamental right "cannot run afoul of the Equal Protection Clause if there is a

rational relationship between the disparity of treatment and some legitimate governmental

purpose." *Armour v. City of Indianapolis, Ind.*, 566 U.S. 673, 680 (2012) (internal quotation and

citations omitted); *see Medeiros v. Vincent*, 431 F.3d 25, 29 (1st Cir. 2005) ("Legislation or

regulation which neither employs a suspect classification nor impairs fundamental rights, will survive constitutional scrutiny, provided the remedy is 'rationally related' to a legitimate governmental purpose.") (internal citations omitted). On its face, the "zero-tolerance" policy Plaintiffs reference and any other practice or related actions by federal officials in separating Plaintiffs and their parents targeted only those who improperly entered the United States in violation of section 1325(a). This is not a suspect classification. Moreover, the vast majority of illegal entries to the United States occur at its southern border,[31] and this, rather than any animus towards "immigrants from Latin America," FAC ¶ 249, is an "obvious alternative explanation" explaining the impetus for the policy. *Iqbal*, 556 U.S. at 682–83 (rejecting animus allegations because "obvious alternative explanation" explained disparate treatment of Arab Muslims).[32]

But even if there were a fundamental right or national origin classification somehow at issue here, it is not clearly established in the immigration and related UAC context that a court must apply a heightened standard of review. Courts have repeatedly affirmed that "[d]istinctions on the basis of nationality may be drawn in the immigration field by the Congress or the Executive." *Narenji v. Civiletti*, 617 F.2d 745, 747 (D.C. Cir. 1979); *see Kandamar v. Gonzales*, 464 F.3d 65, 74 (1st Cir. 2006) (citing *Narenji* and applying the same standard); *accord Trump v. Hawaii*, 138 S. Ct. 2392, 2418–19 (2018) ("Because decisions in these matters may implicate

---

[31] *See* Nationwide Apprehensions by Citizenship and Sector in Fiscal Year 2017, *available at* https://www.cbp.gov/sites/default/files/assets/documents/2018-May/usbp-apprehensions-citizenship-sector-fy2017.pdf (last visited Mar. 6, 2019); CBP Border Security Report for Fiscal Year 2017, *available at* https://www.cbp.gov/sites/default/files/assets/documents/2017-Dec/cbp-border-security-report-fy2017.pdf (last visited Mar. 6, 2019).

[32] Plaintiffs' attribution of animus is not only conclusory and tautological, but it is a poor fit for the facts alleged. "Latino immigrants" can enter from any border, not just the southern border, and persons subject to the detention or criminal referral come from many countries other than those in Central America. FAC ¶ 91.

relations with foreign powers, or involve classifications defined in the light of changing political and economic circumstances, such judgments are frequently of a character more appropriate to either the Legislature or the Executive.") (quotations and citation omitted); *see also, e.g.*, *Rajah v. Mukasey*, 544 F.3d 427, 435 (2d Cir. 2008); *Jean v. Nelson*, 727 F.2d 957, 978 n.30 (11th Cir. 1984). Where an equal protection challenge to a federal immigration law (as opposed to a state law based on alienage) is brought, only rational basis review applies. *See Mathews*, 426 U.S. at 83. "[I]t is clear that classifications made under the immigration laws need only be supported by some rational basis to fulfill equal protection guarantees." *Alvarez v. INS*, 539 F.2d 1220, 1224 (9th Cir. 1976) (upholding preferential treatment for commuter aliens from Mexico and Canada against equal protection challenge).

"[I]t should come as no surprise that the Court hardly ever strikes down a policy as illegitimate under rational basis scrutiny." *Hawaii*, 138 S. Ct. at 2420. Rational basis review is highly deferential, especially because "[a]ny rule of constitutional law that would inhibit the flexibility of the President to respond to changing world conditions should be adopted only with the greatest caution." *Id.* at 2419–20 (quotation and citation omitted); *id.* at 2420 ("[T]he Court hardly ever strikes down a policy as illegitimate under rational basis scrutiny."). "A law will survive rational basis review 'so long as it bears a rational relation to some legitimate end.'" *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 543 (9th Cir. 2004) (quoting *Romer v. Evans*, 517 U.S. 620, 631 (1996)). "[I]t is difficult to show that a law violates the equal protection clause under rational basis review," because such review invalidates only laws "so irrational or absurd on their face [that] it is clear they can be motivated by nothing other than animus or prejudice against a group." *Id.* at 543; *see also Romer*, 517 U.S. at 632; *City of Cleburne. v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985).

Features of geography support a focus of prosecutorial efforts on the southern border. As a practical matter, it is relatively difficult for non-Canadian asylum seekers to approach the United States from the northern border because they must first travel by air or sea to Canada. *See, e.g.*, *Iqbal*, 556 U.S. at 679–81 (in deciding a motion under 12(b)(6), a court may draw on its judicial experience and common sense). In contrast, the nation of Mexico lies on the southern border of the United States; to the south of Mexico are the countries which make up Central America, and to the south of Central America are the countries which make up South America. Thus, asylum seekers from numerous countries south of the border face fewer natural barriers to approaching the United States. Plaintiffs ask this Court to ignore these realities and the obvious alternative and common sense explanation for zero tolerance and related separations along the Southern border, *i.e.*, to the extent limited immigration enforcement resources are going to be committed to end illegal entry into the United States, it is reasonable to commit more of those resources to the geographic areas where the crime occurs most often. The zero-tolerance policy was not a "pre-text," but (as the FAC acknowledges, FAC ¶¶ 79, 97–99, 109) a rational attempt to stop illegal entry of undocumented aliens along the U.S.-Mexico border. Plaintiffs may dispute the "effectiveness and wisdom" of enforcing this policy through criminal prosecution, with the attendant separation when the alien charged is a parent who comes to the border with his or her child. *Hawaii*, 138 S. Ct. at 2421. But the Court may not substitute its judgment, or Plaintiffs', for the Executive's judgment with regard to enforcing laws passed by Congress; nor may the Court reject the rational basis underlying the policy. *See id.*

**C. Plaintiffs Fail to Allege the Violation of a Clearly Established Fourth Amendment Right**

Plaintiffs also cannot show that the government's separation or custody of Plaintiffs, which followed their parents' referral for criminal prosecution, FAC ¶¶ 49–52, 155, 186, violated Plaintiffs' clearly established Fourth Amendment rights. The Fourth Amendment provides that

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . .

A "seizure" occurs only when a government official, "by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). "[S]eizure jurisprudence traditionally has centered on the initial deprivation of liberty that a seizure of the person entails." *Nieves v. McSweeney*, 241 F.3d 46, 55 (1st Cir. 2001); *see Thompson v. Whitman*, 85 U.S. 457, 471 (1873) ("A seizure is a single act, and not a continuous fact.").

Plaintiffs do not complain of any seizure in a constitutionally-recognized sense. Plaintiffs were apprehended once: at the time they were initially detained soon after crossing the border. FAC ¶¶ 140–41, 182. Nowhere does the FAC contest the validity of this initial apprehension. After that initial apprehension, any constitutional challenge to government custody might arguably implicate the Fifth Amendment (or other constitutional provisions which as explained, *supra*, were not clearly established here), but not the Fourth Amendment. *See, e.g.*, *Baker v. McCollan*, 443 U.S. 137, 144 (1979) (stating that the speedy trial right or Eighth Amendment, and not the Fourth Amendment, provide redress for indefinite detention where probable cause otherwise exists); *Zadvydas*, 533 U.S. at 690 (analyzing allegations of "indefinite civil detention" under the Fifth Amendment); *cf. Taylor v. Waters*, 81 F.3d 429, 436 (4th Cir. 1996) ("Once such a determination of probable cause has been rendered, however, the Fourth Amendment does not

impose any further requirement of judicial oversight or reasonable investigation to render pretrial seizure reasonable."); *Graham v. Connor*, 490 U.S. 386, 394 n.10 (U.S. 1989) ("Our cases have not resolved the question whether the Fourth Amendment continues to provide individuals with protection against the deliberate use of excessive physical force beyond the point at which arrest ends and pretrial detention begins, and we do not attempt to answer that question today."). To the extent Plaintiffs allege that "their interest of being in the care and custody of their parents" was "burdened" by unreasonably long custody, FAC ¶ 222, that would speak to their family integrity claim (Count II, FAC ¶¶ 226–234), discussed above, not a stand-alone Fourth Amendment claim. *See supra* at 41–45. Plaintiffs' attempt to shoehorn the Fourth Amendment – which was "tailored explicitly for the criminal justice system" – into the context of government care and custody of alien children, falls far short. *Gerstein v. Pugh*, 420 U.S. 103, 125 n.27 (1975). At the very least, Plaintiffs have not alleged any challenged actions that would amount to a clearly established "seizure" for the purposes of the Fourth Amendment.[33]

It is also not clearly established that if there were a "seizure" it was unreasonable in these circumstances. *Terry*, 392 U.S. at 9 (noting that the Constitution prohibits "unreasonable" seizures); *see United States v. Molina-Gomez*, 781 F.3d 13, 18 (1st Cir. 2015) (quoting *United States v. Montoya de Hernández,* 473 U.S. 531, 538 (1985)) ("It is well established, however, that 'the Fourth Amendment's balance of reasonableness is qualitatively different at the

---

[33] Nor has it been clearly established that Plaintiffs had the requisite substantial connections with the United States such that the Fourth Amendment applied to them at all. *See Verdugo-Urquidez*, 494 U.S. at 265 ("'[T]he people' protected by the Fourth Amendment . . . refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community."); *United States v. Portillo-Munoz*, 643 F.3d 437, 440 (5th Cir. 2011), as revised (June 29, 2011) ("[N]either this court nor the Supreme Court has held that the Fourth Amendment extends to a native and citizen of another nation who entered and remained in the United States illegally.").

international border than in the interior' due to the 'longstanding concern for the protection of the integrity of the border.'"). In support of their claim that Defendants violated the Fourth Amendment, Plaintiffs allege that Defendants "mischaracterized Plaintiffs as UACs, without a plan for reunification of Plaintiffs with their parents and in direct contravention of well-established law governing the release of children detained in immigration custody." FAC ¶ 220. This legal conclusion finds no basis in clearly established law. As discussed above, Plaintiffs cannot show that it was clearly established that they were not "unaccompanied alien children" after their parents were referred for prosecution and taken into criminal custody. *See supra* at 48–49; *see also* 8 U.S.C. § 1232(a)(4) (requiring that CBP immediately transfer a child to HHS custody, including in cases where "no determination can be made within 48 hours of apprehension"). Indeed, there can be no doubt that Plaintiffs' parents were not "available to provide care and physical custody" during the time they were referred for prosecution or in criminal custody. 6 U.S.C. § 279(g)(2)(C)(ii); FAC ¶¶ 155, 192. And once Plaintiffs were determined to be UACs, the terms of their release would be an agency decision governed by the TVPRA – not a decision by any Defendant herein. 8 U.S.C. § 1232(c)(3)(A); *see* FAC ¶ 44. No clearly established law required HHS to bypass TVPRA requirements because Plaintiffs entered the United States with an adult.

Plaintiffs cite *Morales v. Chadbourne*, 793 F.3d 208 (1st Cir. 2015), in support of their allegation that Plaintiffs were detained "for an unreasonable duration unsupported by probable cause." FAC ¶ 221. *Morales* held that a United States citizen was subjected to a new seizure that must be supported by a new probable cause justification when, due to an immigration detainer by a law enforcement officer, the citizen was kept in custody after she was subject to release. 793 F.3d at 217. *Morales* is readily distinguishable and does not clearly establish that Defendants

violated Plaintiffs' Fourth Amendment rights. Here, the alien Plaintiffs were not placed in adult

immigration detention. Rather the children were transferred to a care and legal custody system

under the aegis of HHS because their parents or legal guardians – having violated federal law,

been referred for prosecution, and been held in criminal custody – were unavailable to care for

them. *See* FAC ¶¶ 48–51; *cf. Schall v. Martin*, 467 U.S. 253, 265 (1984) ("Children, by

definition, are not assumed to have the capacity to take care of themselves. They are assumed to

be subject to the control of their parents, and if parental control falters, the State must play its

part as *parens patriae*."). *Morales*, in contrast, analyzed the application of the Fourth

Amendment to immigration detainers for naturalized U.S. citizen adults already in government

custody. 793 F.3d at 217. *Morales* does not clarify the definition of "unaccompanied alien child"

or discuss government care of children, who often have different constitutional interests than

their parents. *See Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 654–55 (1995) (discussing as

an example "the right to come and go at will"). *Morales* also involved an affirmative, intervening

action by a law enforcement officer that extended the plaintiff's detention for a new purpose

after she was subject to release, circumstances not present here. *Morales*, 793 F.3d at 217. In

short, *Morales* could not have put Defendants on notice that any alleged actions would violate

any clearly established constitutional right in the "particular circumstances" before them. *Wesby*,

138 S. Ct. at 590. Accordingly, Count I should be dismissed.

### D. Defendants Did Not Personally Violate Plaintiffs' Constitutional or Federal Statutory Rights

As the Supreme Court has made clear, "[b]ecause vicarious liability is inapplicable to

*Bivens* . . . suits," to survive a motion to dismiss "a plaintiff must plead that each Government-

official defendant, *through the official's own individual actions*, has violated the Constitution."

*Iqbal*, 556 U.S. at 676 (emphasis added). In *Iqbal*, for example, the Supreme Court rejected as

insufficient allegations that (1) the former Attorney General and former Director of the FBI

"knew of, condoned, and willfully and maliciously agreed" to subject plaintiff to constitutional

violations because of race, religions or national origin, (2) the AG was the "principal architect"

of the policy, and (3) the FBI Director was "instrumental in [its] adoption, promulgation, and

implementation" as a conclusory, formulaic recitation of the elements of a claim, and not entitled

to an assumption of truth. *Id.* at 669, 680–81. Adequate allegations of fact establishing personal

participation are required both in *Bivens* and federal statutory civil rights claims. *See Iqbal*, 556

U.S. at 676 ("Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff

must plead that each Government-official defendant, through the official's own individual

actions, has violated the Constitution."); *Bisbee*, 39 F.3d at 1102 ("The justifications for the

doctrine of qualified immunity enunciated in *Harlow* are equally present in section 1985

claims.").

To show a defendant's personal misconduct, a plaintiff must set out factual allegations

that are "enough to raise a right to relief above the speculative level . . . on the assumption that

all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). As the *Twombly* Court stated, a viable

claim for relief requires "more than labels and conclusions, and a formulaic recitation of the

elements of a cause of action will not do." *Id.*; *see also Iqbal*, 556 U.S. at 678. To state a claim

for relief, a plaintiff must allege facts that are "plausible" – suggestive of wrongdoing – with

enough allegations to give defendants fair notice of the claims against them. *Twombly*, 550 U.S.

at 557 n.5, 570. As the Tenth Circuit has observed in a suit under 42 U.S.C. § 1983:

> [C]ases against individual government actors pose a greater likelihood of failures
> in notice and plausibility because they typically include complex claims against
> multiple defendants. The *Twombly* standard may have greater bite in such contexts,

appropriately reflecting the special interest in resolving the affirmative defense of qualified immunity at the earliest possible stage of litigation.

*Robbins v. Oklahoma*, 519 F.3d 1242, 1249 (10th Cir. 2008) (internal citations and quotations omitted). In such cases, like the instant one, the complaint must make clear "exactly who is alleged to have done what to whom" so as to give each individual defendant fair notice of the basis of the claims against him or her. *Id.* at 1250.

Each Count in the FAC in this case relies on conclusory, formulaic allegations that are not entitled to the assumption of truth and cannot establish the personal participation of any of the Defendants. An illustrative example is paragraph 231, which alleges:

> The Defendants in this action have adopted, implemented, enforced, condoned, sanctioned, acquiesced to, and encouraged a pattern, practice, or custom of violating the clearly established due process rights of the class members by forcibly separating young children from their parents while in immigration detention without justification.

This allegation, and the related ones in almost every Count (FAC ¶¶ 240, 262, 272, 283, 290; *see also* FAC ¶ 219) all contain collective references that fail to identify with sufficient particularity personal involvement by each Defendant in the alleged denial of Plaintiffs' rights, and are precisely the sort of allegations that the *Iqbal* Court found insufficient to establish personal participation of the high-ranking individuals there. *Iqbal*, 556 U.S. at 669, 680–81. The inappropriate use of conclusory claims is evident throughout the allegations in the FAC. *See, e.g.*, FAC ¶ 100 (Defendant Miller was a "driving force" behind separations); *id.* ¶ 21 (Defendant "Hamilton is widely reported to have been closely involved in promoting the Defendants' forcible separation of migrant families"); *id.* ¶ 80 (Defendants Homan, Cissna, and McAleenan "pushed for the across-the-board implementation of the" zero tolerance policy). Plaintiffs' allegations are particularly troubling because they have grouped together government officials from different agencies, at different levels of service, with differing statutory authorities and

responsibilities. Faced with a similar plaintiff-assembled grouping of defendants, at least one

federal Circuit has observed, "[p]resumably, the allegedly tortious acts committed by [the

Director of the Oklahoma Department of Human Services, the operator of a daycare, and

individual social workers] are entirely different in character and therefore are mistakenly

grouped in a single allegation." *Robbins*, 519 F.3d at 1250; *see also Atuahene v. City of

Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001) ("By lumping all the defendants together in each

claim and providing no factual basis to distinguish their conduct, [the plaintiff's] complaint

failed to satisfy [the] minimum standard" that "a complaint give each defendant fair notice of

what the plaintiff's claim is and the ground upon which it rests." (internal quotation marks

omitted)). Plaintiffs' allegations fail to give notice of what specific actions by which specific

Defendants are at issue.[34] They are textbook examples of the sorts of conclusory, vague, and

general claims insufficient to establish any defendant's personal participation in any clearly

unconstitutional conduct. *See, e.g.*, FAC ¶ 240 ("The Defendants in this action have adopted,

implemented, enforced, condoned, sanctioned, acquiesced to, and encouraged a pattern, practice,

or custom of violating the clearly established due process rights of the class members by forcibly

separating young children from their parents without due process of law.").

However, even if these allegations were accepted as sufficient for notice purposes,

merely condoning, sanctioning, or acquiescing to, or being the architect of a policy is insufficient

to establish personal liability. Rather, each Defendant needed to take some personal action to

violate Plaintiffs' constitutional rights. *Iqbal*, 556 U.S. at 680, 683. To establish personal

---

[34] Indeed, several Defendants (e.g., Secretary Azar and former Director Lloyd) serve at agencies that do
not even have statutory authority over the apprehension, detention, or separation of aliens at the border.
And on the flip side, other Defendants serve at agencies who have no statutory authority over the care and
custody of UACs (e.g., former AG Sessions and Secretary Nielsen).

participation, at a minimum, Plaintiffs must also "plead sufficient factual matter to show that [Defendants] adopted and implemented the detention policies at issue not for a neutral" immigration "reason but for the purpose of discriminating on account of race, religion, or national origin." *Id*. at 677 ("[P]urpose rather than knowledge is required."). Plaintiffs baldly claim that "Defendants and others in the Trump Administration have openly admitted that the forcible separation of families in immigration detention at the Southwestern border was intended to target immigrants by their race, ethnicity, or national origin," FAC. ¶ 91, but the public remarks they recite by some individuals in support of this allegation do not support the accusation. None of the statements demonstrates a desire by any Defendant to discriminate against persons based on national origin. Rather, some of the statements reflect an unremarkable policy position – enforcing the legislative choices made by Congress – that increased measures must be taken to secure the southern border because the vast majority of illegal entry into the United States occurs there. *See, e.g.*, FAC ¶ 107. Other statements reflect similarly unremarkable positions. *See, e.g.*, FAC ¶ 73 (quoting a statement by Defendant Azar in which he details ORR's commitment to transparency, underscores that ORR is seeking to vindicate child welfare, and states that the UAC program run by ORR is generous and charitable). Any claim of unconstitutional purpose behind these statements is wholly conclusory and therefore must be ignored. *See Iqbal*, 556 U.S. at 682 ("As between that obvious alternative explanation for the arrests, and the purposeful, invidious discrimination respondent asks us to infer, discrimination is not a plausible conclusion.") (citations omitted).

Similarly, Plaintiffs' broad-brush allegations that Defendants collectively failed to provide adequate conditions or mental health care, *e.g.* FAC ¶¶ 259, 280, are insufficient and fail for lack of personal participation. Even presuming constitutionally inadequate conditions or care

were alleged (and they are not),[35] Defendants were many steps removed from custodians or medical professionals who even might have been personally responsible for Plaintiffs' medical care while detained or are alleged to have been aware of Plaintiffs' medical conditions. And it is black letter law that there is no respondeat superior liability in *Bivens* actions. *Iqbal*, 556 U.S. at 676 ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*."). To the extent Defendants can be held liable at all it is for their own actions, not the acts of others. *See id*. For that reason, Defendants also cannot be liable for the actions of other government employees who are alleged to have mistreated Plaintiffs. *See, e.g.*, FAC ¶¶ 164, 165 (alleging CBP agents kicked E.O., Jr., and pulled K.O.'s ponytail); *id.* ¶ 223 (alleging the use of "excessive force" and "abusive measures"). Defendants all are or were in high-level policymaking positions, and were not even direct supervisors of federal employees within DHS or ORR with custodial responsibility for Plaintiffs. In a related (though less removed) context, even Wardens at the same institution in which an individual is detained cannot be held personally liable based on such generic accusations.[36] Here, Defendants carry or carried out very different roles, over different facets of the federal government, within at least four different agencies that operate under distinct statutory authorities, with distinct roles in either creating or promulgating national policies. Certainly, the

---

[35] *See DesRosiers v. Moran*, 949 F.2d 15, 19 (1st Cir. 1991) (explaining the high standard for alleging a deliberate indifference claim).

[36] *E.g.*, *Estate of Rosenberg by Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995) ("The general responsibility of a warden for supervising the operation of a prison is not sufficient to establish personal liability."); *Ouzts v. Cummins*, 825 F.2d 1276, 1277 (8th Cir. 1987) ("Further, a warden's general responsibility for supervising the operations of a prison is insufficient to establish personal involvement."); *Jones v. Horne*, 634 F.3d 588, 602 (D.C. Cir. 2011) (dismissing claim against a warden where plaintiff failed to allege warden's personal involvement in his conditions of confinement).

national officials of the sort sued here cannot be sued on such flimsy allegations of personal participation.

### E. The Court Should Dismiss Plaintiffs' Federal Statutory Claims For Additional Reasons

For essentially the same reasons Defendants are entitled to qualified immunity with respect to Plaintiffs' constitutional claims, the Court should also dismiss the claims under Sections 1985 (Count VIII) and 1986 (Count IX). *See, e.g.*, *Abbasi*, 137 S. Ct. at 1866 (applying qualified immunity to Section 1985 claim). To state a claim under Section 1985(3), a plaintiff must allege "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *United Bhd. of Carpenters & Joiners, Local 610 v. Scott*, 463 U.S. 825, 828–29 (1983). Section 1985(3), however, "provides no substantive rights itself." *Id.* at 833. Instead, "[t]he rights, privileges, and immunities that § 1985(3) vindicates must be found elsewhere." *Id*. And "a plaintiff may recover [under Section 1985(3)] only when the conspiratorial conduct of which he complains is propelled by 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus.'" *Aulson v. Blanchard*, 83 F.3d 1, 3 (1st Cir. 1996) (quoting *Griffin*, 403 U.S. at 102). Here, Plaintiffs invoke their due process and equal protection rights. FAC ¶¶ 226–285.

In addition to the reasons already given by Defendants about why they are entitled to qualified immunity for Plaintiffs' equal protection and due process claims, *supra*, Section IV.A–D, Defendants are also entitled to qualified immunity on Plaintiffs' statutory claims. *See Local No. 48, United Bhd. of Carpenters & Joiners of Am. v. United Bhd. of Carpenters & Joiners of*

*Am.*, 920 F.2d 1047, 1058 (1st Cir. 1990) ("Having failed to show that their federally secured rights were abrogated in any respect, it follows *a fortiori* that appellants possess no colorable claim under section 1985(3)."). As an initial matter, the extent to which Section 1985(3) even applies to federal actors who are formulating general policy has not been not clearly established. For example, *Abbasi* discussed the viability of a Section 1985(3) claim against multiple Executive Branch officials for discussions that "were the preface to, and the outline of, a general and far-reaching policy." 137 S. Ct. at 1867. Although the Court declined to decide on the applicability of intracorporate-conspiracy doctrine with reference to Section 1985(3) conspiracies, the Court did find the law was "sufficiently open" that the government employees were entitled to qualified immunity. *Id.* at 1868–69. Just as in *Abbasi*, many of the Defendants here work or worked in the same agencies, and all Defendants worked for the same branch of government, raising similar intracorporate-conspiracy problems. Because the law is no clearer now than it was at the time *Abbasi* was decided, Defendants are entitled to qualified immunity.

Furthermore, Plaintiffs' Section 1985(3) claim, including their conspiracy allegation, is wholly conclusory. Plaintiffs allege only that "[t]wo or more of the Defendants conspired or furthered a conspiracy to deprive Plaintiffs and class members of equal protection of the laws." FAC ¶ 289. The Supreme Court has rejected such attempts to state a claim by merely providing "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. And, as elsewhere, Plaintiffs' repeated use of the collective "Defendants" provides no basis to place any Defendant on notice of "exactly who is alleged to have done what to whom." *Robbins*, 519 F.3d at 1250. Plaintiffs' conspiracy allegations thus fail as a matter of law. *Cf. Mendez v. Belton*, 739 F.2d 15, 19 (1st Cir. 1984) (affirming summary judgment on a Section 1985(3) claim where plaintiff "offered nothing beyond conclusory statements" in support of her conspiracy

allegation). For all of these reasons, Defendants are entitled to qualified immunity with respect to Plaintiffs' Section 1985(3) claim. *See Uphoff Figueroa v. Alejandro*, 597 F.3d 423, 432 (1st Cir. 2010) (affirming dismissal of plaintiff's Section 1985(3) claim where the complaint "set forth no facts alleging a conspiracy").

Plaintiffs' claim under 42 U.S.C. § 1986 must derivatively fail because a violation of Section 1986 depends on an underlying violation of Section 1985. Section 1986 provides that "[e]very person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 . . . are about to be committed, and having power to prevent or aid … neglects or refuses so to do . . . shall be liable to the party injured. . . ." 42 U.S.C. § 1986. If a plaintiff fails to demonstrate a claim under Section 1985, however, courts consistently conclude that a plaintiff cannot sustain a cause of action under Section 1986. *See, e.g.*, *Creative Environments, Inc. v. Estabrook*, 680 F.2d 822, 834–35 (1st Cir. 1982) ("With no section 1985(3) claim to support it, [plaintiff's] section 1986 claim must similarly fail."). In short, Plaintiffs' Section 1986 claim is doomed by their failure to allege facts sufficient to state a claim under Section 1985, and both claims should be dismissed on the basis of qualified immunity. *See Saucier*, 533 U.S. at 201.

## V.  PLAINTIFFS' CHALLENGE TO PROSECUTORIAL POLICYMAKING IS BARRED BY ABSOLUTE IMMUNITY

In *Imbler v. Pachtman*, the Supreme Court held that "in initiating a prosecution and in presenting the [government's] case, the prosecutor is immune from a civil suit for damages . . . ." 424 U.S. 409, 431 (1976); *see also Schloss v. Bouse*, 876 F.2d 287, 290 (2d Cir. 1989) (absolute immunity also protects the decision not to prosecute). This immunity extends to any activities of the prosecutor "intimately associated with the judicial phase of the criminal process . . . ." *Imbler*, 424 U.S. at 430. The Court based its holding on two interrelated concerns. First, a

prosecutor would be effectively disabled from discharging the public trust if called upon to account for damages for conducting a criminal trial. *Id.* at 425–26. Second, any protection less than absolute immunity would impede the criminal justice system's goal of accurately determining guilt or innocence by curtailing prosecutorial discretion in the conduct of the trial and presentation of evidence. *Id.* The Court noted that a wide variety of sensitive issues prosecutors must confront were appropriate for the protection of absolute immunity – including whether to present a case to a grand jury, whether to file an information, and whether and when to prosecute. *Id.* at 431 n.33. The Court has continued to employ *Imbler*'s functional approach in determining whether absolute prosecutorial immunity applies in a given case. *See Burns v. Reed*, 500 U.S. 478, 492 (1991) (listing cases). The Supreme Court has confirmed that, like line prosecutors, policymakers are absolutely immune for claims that arise out of the formulation of prosecutorial policies. *See Van de Kamp v. Goldstein*, 555 U.S. 335, 349 (2009) (supervising prosecutors had absolute immunity for general claims that their "supervision, training, or information-system management was constitutionally inadequate"); *accord Dellums v. Powell*, 660 F.2d 802, 803 (D.C. Cir. 1981) (extending *Imbler*'s prosecutorial immunity to the Attorney General for acts of prosecutorial policymaking).

The sole non-conclusory allegation of unconstitutional conduct by former AG Sessions is that in April 2018 he announced a "zero tolerance" policy to criminally prosecute all DHS referrals of section 1325(a) violations. FAC ¶ 79. This decision to initiate prosecutions against a class of offenders (whether, as Plaintiffs claim, it was a "pretext" for "discrimination," FAC ¶ 79, or not) was the kind of core activity protected by *Imbler*. 424 U.S. at 431. *See Holloman v. Clarke*, 236 F. Supp. 3d 493, 495 (D. Mass. 2017) (holding that a prosecutor was entitled to absolute immunity against equal protection claim). To the extent former AG Sessions, or any

66

Defendant, is alleged to have created or implemented the policy of criminal prosecution at issue, such acts are protected by absolute immunity, and all related claims must be dismissed.[37] *Dellums*, 660 F.2d at 806. As discussed above, the immunity derives from the function of the prosecutorial act, not the particular title of the government official. *Guzman-Rivera v. Rivera-Cruz*, 55 F.3d 26, 29 (1st Cir. 1995).

## CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court dismiss the FAC with prejudice.

Respectfully submitted,

JOSEPH H. HUNT
*Assistant Attorney General*
*Civil Division*

C. SALVATORE D'ALESSIO, JR.
*Acting Director*
*Constitutional & Specialized Tort Litigation*
*Torts Branch, Civil Division*

MARY HAMPTON MASON
NY Bar No. 2255198, under L.R. 83.5.3(c)
*Senior Trial Counsel*
*Constitutional & Specialized Tort Litigation*
*Torts Branch, Civil Division*

/s/ Paul Quast
PAUL QUAST
CO Bar No. 49154, under L.R. 83.5.3(c)
*Trial Attorney*
*Constitutional & Specialized Tort Litigation*
*Torts Branch, Civil Division*

---

[37] For example, the FAC suggests that Defendants Homan, Cissna, and McAleenan "pushed for" the government's zero-tolerance policy, *see* FAC ¶ 80, and implies that others were involved in the creation of the policy as well. *See id.* ¶ 104. The FAC also alleges that earlier prosecutorial efforts resulted in separations before the announcement of the zero tolerance policy. FAC ¶¶ 48, 58–59. Although it is not clear what Defendants are alleged to have done, Defendants would also be entitled to absolute immunity for any role they had in establishing prosecutorial priorities.

*Department of Justice*
*Box 7146 Washington, DC 20044*
*(202) 616-4150*
paul.c.quast@usdoj.gov

*Counsel for Defendants*

## L. R. 7.1 CERTIFICATION

Pursuant to Local Rule 7.1, Defendants' counsel asserts that he has conferred with

Plaintiffs' counsel and has attempted in good faith to resolve and narrow the issues presented in

this motion.

/s/ Paul Quast
PAUL QUAST
CO Bar No. 49154, under L.R. 83.5.3(c)
*Trial Attorney*
*Constitutional & Specialized Tort Litigation*
*Torts Branch, Civil Division*
*Department of Justice*
*Box 7146 Washington, DC 20044*
*(202) 616-4150*
paul.c.quast@usdoj.gov

*Counsel for Defendants*


## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of

record for each other party by means of the District Clerk's CM/ECF electronic filing system on

March 8, 2019.

/s/ Paul Quast
PAUL QUAST
CO Bar No. 49154, under L.R. 83.5.3(c)
*Trial Attorney*
*Constitutional & Specialized Tort Litigation*
*Torts Branch, Civil Division*
*Department of Justice*
*Box 7146 Washington, DC 20044*
*(202) 616-4150*
paul.c.quast@usdoj.gov

*Counsel for Defendants*