UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| K.O. and E.O., Jr., by and through their parents and next friends, E.O. and L.J.; and C.J., by and through his father and next friend F.C.; each individually and on behalf of all others similarly situated, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | C.A. No. 18-40149-TSH |
| JEFFERSON BEAUREGARD SESSIONS III, Former Attorney General of the United States; KIRSTJEN NIELSEN, Secretary of the United States Department of Homeland Security (DHS); JOHN F. KELLY, White House Chief of Staff; STEPHEN MILLER, Senior Advisor to the President; GENE HAMILTON, Counselor to the Attorney General Sessions; THOMAS HOMAN, former Director of United States Immigration and Customs Enforcement (ICE); RONALD D. VITIELLO, Acting Director of ICE; L. FRANCIS CISSNA, Director of United States Citizenship and Immigration Services (USCIS); KEVIN K. MCALEENAN, Commissioner of United States Customs and Border Protection (CBP); ALEX AZAR, Secretary of the United States Department of Health and Human Services (HHS); SCOTT LLOYD, Director of the United States Office of Refugee Resettlement (ORR); JOHN DOE ICE AGENTS; JOHN DOE CBP AGENTS; and JOHN DOE ORR PERSONNEL, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

**REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
(LEAVE GRANTED FEBRUARY 8, 2019)**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION...................................................................................................... 1

ARGUMENT .............................................................................................................. 2

I.     PLAINTIFFS' REQUEST THAT THIS COURT IN ESSENCE CREATE
NATIONWIDE PERSONAL JURISDICTION OVER FEDERAL POLICYMAKERS
SUED IN THEIR PERSONAL CAPACITIES IS WHOLLY CONTRARY TO LAW.... 2

    A.   Plaintiffs Have Not Pled A Legally Valid Basis for Personal Jurisdiction Over
Any of the Eleven Defendants. ...................................................................... 2

    B.   Plaintiffs' Improper New Allegations in the Opposition Do Not Establish Personal
Jurisdiction Over Any of the Eleven Defendants. ........................................ 11

II.    PLAINTIFFS HAVE NOT MET THEIR BURDEN OF ESTABLISHING PROPER
VENUE. .................................................................................................................. 15

III.   THIS COURT SHOULD REJECT PLAINTIFFS' INVITATION TO CREATE AN
ENTIRE NEW CLASS OF *BIVENS* LITIGATION. ........................................... 17

    A.   The Context in which Plaintiffs' Allegations Arise Is New............................ 17

    B.   "Alternative, Existing Processes" Are Available.......................................... 20

    C.   Other Special Factors Counsel Hesitation...................................................... 24

        1.   Plaintiffs Challenge a Government Policy. ...................................... 25

        2.   Congressional Action in this Arena Counsels Hesitation................. 27

        3.   Plaintiffs' Claims Implicate Separation-of-Powers Concerns at the Border.... 30

        4.   Plaintiffs Challenge Prosecutorial Decisions. .................................. 31

        5.   Expanding the *Bivens* Remedy Here Would be Unworkable.......... 32

IV.   DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY FOR ALL
CONSTITUTIONAL AND FEDERAL STATUTORY CLAIMS. ................................. 32

    A.   Defendants Do Not Sufficiently Allege that Each Defendant Personally Violated
Plaintiffs' Clearly Established Rights............................................................ 32

    B.   Plaintiffs Have Not Alleged the Violation of Clearly Established Law. ....................... 36

        1.   Fourth Amendment (Count I) ............................................................ 37

        2.   Substantive Due Process Right to Family Integrity (Count II) ...................... 39

3.   Punishment of Civil Detainees (Count V) ......................................................... 41

4.   "Coerced" Waiver of Asylum (Count VI) ......................................................... 41

5.   Provision of Adequate Mental Health Services (Count VII) ........................... 42

6.   Procedural Due Process (Count III) ................................................................. 43

7.   Equal Protection (Count IV) ............................................................................ 43

8.   Violation of 42 U.S.C. §§ 1985(3) and 1986 (Counts VIII & IX) ................. 44

V.   DEFENDANTS ARE ENTITLED TO ABSOLUTE IMMUNITY FOR ANY
ACTS OF PROSECUTORIAL POLICYMAKING ......................................................... 46

**CONCLUSION** ..................................................................................................... 46

# TABLE OF AUTHORITIES

<u>Cases</u>

*Air Sunshine, Inc. v. Carl*,
  663 F.3d 27 (1st Cir. 2011) .................................................................................................. 23

*Alfano v. Lynch*,
  847 F.3d 71 (1st Cir. 2017) .................................................................................................. 39

*Anderson v. Creighton*,
  483 U.S. 635 (1987) ....................................................................................................... 37, 39

*Ashcroft v. al-Kidd,*
  563 U.S. 731 (2011) .............................................................................................................. 44

*Arar v. Ashcroft*,
  585 F.3d 559 (2d Cir. 2009) ................................................................................................. 28

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ....................................................................................... 26, 33, 34, 41

*Azizova v. U.S. Atty. Gen.*,
  442 F. App'x 531 (11th Cir. 2011).......................................................................................... 42

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) .............................................................................................................. 25

*BGI Inc. v. Merrifield*,
  No. CIV.A. 12-10658-RWZ, 2013 WL 297942 (D. Mass. Jan. 25, 2013) .............................. 14

*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*,
  403 U.S. 388 (1971) ....................................................................................................... 22, 32

*Boston Post Partners II, LLP v. Paskett*,
  No. 15-13804-FDS, 2016 WL 3746474 (D. Mass. July 8, 2016) ............................................ 12

*Bunikyte, ex rel. Bunikiene v. Chertoff*,
  No. A-07-CA-164-SS, 2007 WL 1074070 (W.D. Tex. Apr. 9, 2007)...................................... 40

*Bush v. Lucas*,
  462 U.S. 367 (1983) ....................................................................................................... 22, 28

*Calder v. Jones*,
  465 U.S. 783 (1984) ................................................................................................................ 9

*Camreta v. Greene,*
    563 U.S. 692 (2011) ............................................................................... 36

*Caplan v. Donovan,*
    450 Mass. 463 (2008) ............................................................................... 5

*Carlson v. Green,*
    446 U.S. 14 (1980) ......................................................................... passim

*Catrone v. Ogden Suffolk Downs, Inc.,*
    647 F. Supp. 850 (D. Mass. 1986) .......................................................... 13

*Chae Chan Ping v. United States,*
    130 U.S. 581 (1889) ............................................................................... 31

*Chappell v. Wallace,*
    462 U.S. 296 (1983) ......................................................................... 21, 28

*Commonwealth ex rel. Martino-Fleming v. S. Bay Mental Health Ctr., Inc.,*
    334 F. Supp. 3d  (D. Mass. 2018) .......................................................... 45

*Corr. Servs. Corp. v. Malesko,*
    534 U.S. 61 (2001) ......................................................................... 21, 23

*Cossart v. United Excel Corp.,*
    804 F.3d 13 (1st Cir. 2015) ............................................................. 12, 13

*D.C. v. Wesby,*
    138 S. Ct. 577 (2018) ..................................................................... 39, 43

*Davis v. Passman,*
    442 U.S. 228 (1979) ....................................................................... 23, 32

*Daynard v. Ness, Motley, Loadholt, Richardson & Poole,*
    290 F.3d 42 (1st Cir. 2002) ....................................................... 9, 10, 15

*De La Paz v. Coy,*
    786 F.3d 367 (5th Cir. 2015) ................................................................. 21

*Dellums v. Powell,*
    660 F.2d 802 (D.C. Cir. 1981) .............................................................. 46

*Diaz v. Devlin,*
    229 F. Supp. 3d 101 (D. Mass. 2017) .................................................... 45

*Donatelli v. Nat'l Hockey League,*
   893 F.2d 459 (1st Cir. 1990) ........................................................................ 7, 8

*Elliott v. Cheshire Cty., N.H.,*
   940 F.2d 7 (1st Cir. 1991) ............................................................................ 43

*F.D.I.C. v. Meyer,*
   510 U.S. 471 (1994) ................................................................................ 18, 19

*Farmer v. Brennan,*
   511 U.S. 825 (1994) ...................................................................................... 41

*Feliciano-Hernandez v. Pereira-Castillo,*
   663 F.3d 527 (1st Cir. 2011) ........................................................................ 33

*Fiore v. Walden,*
   688 F.3d 558 (9th Cir. 2012) .......................................................................... 3

*Flores v. Johnson,*
   212 F. Supp. 3d 864 (C.D. Cal. 2015) .......................................................... 40

*Flores v. Lynch,*
   212 F. Supp. 3d 907 (C.D. Cal. 2015) .......................................................... 40

*Flores v. Lynch,*
   828 F.3d 898 (9th Cir. 2016) ........................................................................ 40

*Fontana v. Haskin,*
   262 F.3d 871 (9th Cir. 2001) ........................................................................ 38

*Glaros v. Perse,*
   628 F.2d 679 (1st Cir. 1980) .................................................................. 13, 14

*Haitian Refugee Ctr. v. Smith,*
   676 F.2d 1023 (5th Cir. 1982) ...................................................................... 42

*Haynesworth v. Miller,*
   820 F.2d 1245 (D.C. Cir. 1987) .................................................................... 46

*Hernandez ex rel. Hernandez v. Foster,*
   657 F.3d 463 (7th Cir. 2011) .................................................................. 37, 38

*Hernandez v. Mesa,*
   885 F.3d 811 (5th Cir. 2018) ........................................................................ 29

*Hope v. Pelzer*,
  536 U.S. 730 (2002) ..................................................................................... 36

*Hubbard v. U.S. E.P.A. Adm'r*,
  809 F.2d 1 (D.C. Cir. 1986) ......................................................................... 23

*Imbler v. Pachtman*,
  424 U.S. 409 (1976) ..................................................................................... 46

*Jacinto-Castanon de Nolasco v. U.S. Immigration & Customs Enf't*,
  319 F. Supp. 3d 491 (D.D.C. 2018) ............................................................. 15

*Johnson Creative Arts, Inc. v. Wool Masters, Inc.*,
  743 F.2d 947 (1st Cir. 1984) .......................................................................... 7

*Keane v. Navarro*,
  345 F. Supp. 2d 9 (D. Mass. 2004) ......................................................... passim

*Kisela v. Hughes*,
  138 S. Ct. 1148 (2018) ................................................................................. 37

*LaFrance v. Bohlinger*,
  499 F.2d 29 (1st Cir. 1974) .......................................................................... 42

*Lanuza v. Love*,
  899 F.3d 1019 (9th Cir. 2018)................................................................. 19, 29

*Leader v. Harvard Univ. Bd. of Overseers*,
  Civil Action No. 16-10254-DJC, 2017 WL 1064160 (D. Mass. Mar. 17, 2017) ..................... 15

*Liff v. Office of Inspector Gen. for U.S. Dep't of Labor*,
  881 F.3d 912 (D.C. Cir. 2018) ...................................................................... 21

*Lorelei Corp. v. County of Guadalupe*,
  940 F.2d 717 (1st Cir. 1991) .......................................................................... 7

*Lynch v. City of Boston*,
  180 F.3d 1 (1st Cir. 1999) ............................................................................ 37

*Massachusetts Sch. of Law v. American Bar Ass'n*,
  142 F.3d 26 (1st Cir. 1998) ............................................................................ 3

*Miller v. Suffolk County House of Corr.*,
  No. CIV.A.01-11331-DPW, 2002 WL 31194866 n.1 (D. Mass. Sept. 27, 2002) ............... 4, 11

*Miller v. U.S. Dep't of Agr. Farm Servs. Agency,*
    143 F.3d 1413 (11th Cir. 1998) ............................................................. 23

*Minneci v. Pollard,*
    565 U.S. 118 (2010) ................................................................... 20, 22

*Mitchell v. Miller,*
    790 F.3d 73 (1st Cir. 2015) ...................................................... 39

*Munns v. Clinton,*
    822 F. Supp. 2d 1048 (E.D. Cal. 2011) .......................................... 9

*Navia-Duran v. Immigration & Naturalization Serv.,*
    568 F.2d 803 (1st Cir. 1977) ................................................... 42

*Perez v. United States,*
    No. 13cv1417-WQH-BGS, 2014 WL 4385473 (S.D. Cal. Sept. 3, 2014) ............... 8

*Phillips Exeter Academy v. Howard Phillips Fund,*
    196 F.3d 284 (1st Cir. 1999) ................................................. 8, 15

*Plumhoff v. Rickard,*
    572 U.S. 765 (2014) .............................................................. 36

*Plyler v. Doe,*
    457 U.S. 202 (1982) .............................................................. 44

*Redondo-Borges v. U.S. Dep't of Hous. & Urban Dev.,*
    421 F.3d 1 (1st Cir. 2005) ...................................................... 33

*Rivera-Corraliza v. Morales,*
    794 F.3d 208 (1st Cir. 2015) .................................................... 36

*Rodriguez v. Swartz,*
    899 F.3d 719 (9th Cir. 2018) .................................................... 29

*Schweiker v. Chilicky,*
    487 U.S. 412 (1988) .............................................................. 21

*Sinclair v. Hawke,*
    314 F.3d 934 (8th Cir. 2003) .................................................... 23

*Slotnick v. Staviskey,*
    560 F.2d 31 (1st Cir. 1977) ..................................................... 45

*Soto-Torres v. Fraticelli*,
    654 F.3d 153 (1st Cir. 2011) ........................................................ 33, 35

*Spagnola v. Mathis*,
    859 F.2d 223 (D.C. Cir. 1988) ........................................................ 23

*Stafford v. Briggs*,
    444 U.S. 527 (1980) ........................................................ 3, 16

*Stars for Art Production FZ v. Dandana, LLC*,
    806 F. Supp. 2d 437 (D. Mass. 2011) ........................................................ 16

*Summers v. City of Finchburg*,
    2016 WL 4926415 (D. Mass. Sept. 15, 2016) ........................................................ 15

*Susan Virginia Parker v. Henry & William Evans Home for Children, Inc.*,
    No. 18-1133, 2019 WL 994298 (4th Cir. Mar. 1, 2019) ........................................................ 38

*Targetsmart Holdings, LLC v. SHP Advisors, LLC*,
    No. 18-11365-DPW, 2019 WL 468367 (D. Mass. Feb. 6, 2019) ........................................................ 10

*Ticoalu v. Gonzales*,
    472 F.3d 8 (1st Cir. 2006) ........................................................ 42

*Toll v. Moreno*,
    458 U.S. 1 (1982) ........................................................ 30

*Tun-Cos v. Perrotte*,
    2019 WL 1867819 (4th Cir. Apr. 26, 2019) ........................................................ 21, 27, 29, 30

*Turkmen v. Ashcroft*,
    No. 02CV2307DLISMG, 2018 WL 4026734 (E.D.N.Y. Aug. 13, 2018) ........................................................ 24

*Uffner v. La Reunion Francaise, S.A.*,
    244 F.3d 38 (1st Cir. 2001) ........................................................ 17

*United States v. Curtiss-Wright Export Corp.*,
    299 U.S. 304 (1936) ........................................................ 30, 31

*United States v. Delgado-Garcia*,
    374 F.3d 1337 (D.C. Cir. 2004) ........................................................ 30

*United States v. Hernandez-Guerrero*,
    147 F.3d 1075 (9th Cir. 1998) ........................................................ 31

*United States v. Kim,*
     103 F. Supp. 3d 32 (D.D.C. 2015) ................................................................. 30

*United States v. Stanley,*
     483 U.S. 669 (1987) ....................................................................................... 21

*Van Schaick v. Church of Scientology,*
     535 F. Supp. 1125 (D. Mass. 1982) .......................................................... 13, 14

*Vance v. Rumsfeld,*
     701 F.3d 193 (7th Cir. 2012) ......................................................................... 24

*Vanderklok v. United States,*
     868 F.3d 189 (3d Cir. 2017) .......................................................................... 20

*W. Radio Servs. Co. v. U.S. Forest Serv.,*
     578 F.3d 1116 (9th Cir. 2009) .................................................................. 23, 24

*Wakefield v. Thompson,*
     177 F.3d 1160 (9th Cir. 1999) ....................................................................... 43

*Walden v. Fiore,*
     571 U.S. 277 (2014) ............................................................................... 3, 7, 9

*Wang v. Schroeter,*
     Civil Action No. 11-10009-RWZ, 2011 WL 6148579 (D. Mass. Dec. 9, 2011) ...................... 6

*Ward v. Auerbach,*
     No. CV 16-12543-FDS, 2017 WL 2724938 (D. Mass. June 23, 2017) ................................... 14

*Weinberg v. Grand Circle Travel, LCC,*
     891 F. Supp. 2d 228 (D. Mass. 2012) ............................................................. 10

*Wilkie v. Robbins,*
     551 U.S. 537 (2007) ......................................................................... 20, 23, 28

*Wilson v. Layne,*
     526 U.S. 603 (1999) ....................................................................................... 36

*Wilson v. Libby,*
     498 F. Supp. 2d 74 (D.D.C. 2007) ................................................................. 18

*Wilson v. Libby,*
     535 F.3d 697 (D.C. Cir. 2008) ....................................................................... 18

*World-Wide Volkswagen Corp. v. Woodson*,
    444 U.S. 286 (1980) ........................................................................................... 15

*XP Vehicles, Inc. v. Dep't of Energy*,
    118 F. Supp. 3d 38 (D.D.C. 2015) ..................................................................... 23

*Ziglar v. Abbasi*,
    137 S. Ct. 1843 (2017) ................................................................................ passim

Statutes

U.S. Const. art. VI ....................................................................................................... 30

8 U.S.C. § 1232(c)(3)(A) ............................................................................................ 38

8 U.S.C. § 1325(a) ...................................................................................................... 31

28 U.S.C. § 1391(b)(2) ............................................................................................... 16

28 U.S.C. § 1391(b)(3) ............................................................................................... 15

28 U.S.C. § 1391(e) ...................................................................................................... 2

28 U.S.C. § 1391(e)(1)(C) .......................................................................................... 16

42 U.S.C. §§ 1985(3) ............................................................................................ 44, 46

M.G.L. ch. 223A ............................................................................................. 6, 12, 13

Rules

Fed. R. Civ. P. 4(k)(1)(C) ............................................................................................ 6

Fed. R. Civ. P. 12(b)(3) .............................................................................................. 17

Rule 4(k)(1)(A) ............................................................................................................. 6

**INTRODUCTION**

Defendants demonstrated in their opening brief numerous fundamental, independent grounds for dismissing this unprecedented attempt to sue high-ranking federal officials personally for alleged constitutional violations stemming from national immigration policy. Specifically, Defendants argued that: (1) the Court lacks personal jurisdiction over all eleven non-resident Defendants; (2) this Court is not a proper venue; (3) authoritative precedent precludes recognition of any implied judicial remedy in the novel context of challenging federal immigration detention practices or related prosecutorial policy; (4) Defendants are entitled to qualified immunity; and (5) absolute immunity bars suit with respect to any challenge to prosecutorial decision-making. Faced with the clear prospect of dismissal, Plaintiffs attempt to use their opposition to recast their original allegations: Plaintiffs now claim they challenge discrete conduct by individuals (not widespread governmental policy or practice) and propose unwarranted and radical changes to binding law. *See* Docket No. 56 (filed Apr. 8, 2019) ("Opp."). But Plaintiffs cannot escape the consequence of their own pleading choices. They elected to sue high-ranking federal officials personally for money damages in a purported class action, in an improper forum, for alleged conduct in an arena fraught with sensitive separation-of-powers concerns – that is, an alleged "widespread practice of prosecuting or referring for prosecution the parents for illegally reentering the county." First Amended Complaint ("FAC") ¶ 48. Plaintiffs want this Court to create a new species of individual capacity *Bivens* litigation, with the attendant ability to sue high-ranking federal policymakers personally in federal district courts across the country. But the creation of a new class of cases is a decision with profound policy implications only appropriately addressed, if at all, by Congress. For the reasons set forth in Defendants' opening brief and below, all of Plaintiffs' claims should be dismissed.

**ARGUMENT**

I.      **PLAINTIFFS' REQUEST THAT THIS COURT IN ESSENCE CREATE
        NATIONWIDE PERSONAL JURISDICTION OVER FEDERAL
        POLICYMAKERS SUED IN THEIR PERSONAL CAPACITIES IS WHOLLY
        CONTRARY TO LAW.**

   A.   **Plaintiffs Have Not Pled A Legally Valid Basis for Personal Jurisdiction
        Over Any of the Eleven Defendants.**

As explained in the Defendants' opening brief, ("MTD"), the FAC does not satisfy

Plaintiffs' burden of establishing the Court's personal jurisdiction over the eleven Defendants.

*See* MTD at 9–18. Instead, the FAC cites inapplicable legal authority and identifies no contacts

at all, let alone constitutionally sufficient jurisdictional contacts, between any Defendant and

Massachusetts. *Id.* In their opposition, Plaintiffs claim that the authorities referenced in the FAC

– Federal Rule of Civil Procedure 4(k)(1)(C); the venue statute, 28 U.S.C. § 1391(e); and § 3(d)

of the Massachusetts long-arm statute – support personal jurisdiction. Opp. at 9–12, 14–15; *see*

FAC ¶¶ 34–35. In addition, Plaintiffs claim that all Defendants have sufficient contacts to satisfy

due process, because they allegedly have "national contacts" with the United States; run "vast

federal bureaucracies" that interact with Massachusetts; or have "imputed" contacts with

Massachusetts through subordinate employees who allegedly act as Defendants' "agents." *See*

Opp. at 16–21. Plaintiffs are wrong on all counts.[1]

First, Rule 4(k)(1)(C) and 28 U.S.C. § 1391(e) do not apply. As Defendants' motion

explains, the Supreme Court has made clear that § 1391(e) does not encompass individual-

---

[1] Plaintiffs' proposed jurisdictional "evidence" does nothing to cure the legal defects in their pleading. *See* Opp. at 15, 18 (referencing the Warecki Declaration and attached documents). Plaintiffs mention this "evidence" just twice in the opposition, once to allegedly show compliance with § 3(d) of the Massachusetts long-arm statute, *id.* at 15, and then allegedly in support of the Court's general jurisdiction over Defendants. For the reasons discussed *infra*, neither § 3(d) nor general personal jurisdiction applies here as a matter of law, and Plaintiffs' "evidence" does not change this.

capacity damages actions against federal employees. *See* MTD at 12; *Stafford v. Briggs*, 444 U.S. 527 (1980). The statute and its service provisions therefore cannot "authorize[ ]" personal jurisdiction under Rule 4(k)(1)(c) here. *Id.*; FED. R. CIV. P. 4(k)(1)(c). Plaintiffs' only response is to propose that *Stafford* does not mean what it says. *See* Opp. at 10–12. According to Plaintiffs, "[a]lthough [they] seek individual liability," the United States could indemnify any judgment, so "Defendants' personal financial exposure is nil," and thus "there is no reason to exclude Defendants from the reach of § 1391(e)." *Id.* Plainly, however, Plaintiffs cannot re-write Supreme Court case law for any reason, let alone based on an erroneous idea that a government-provided defense and the possibility of indemnification turn this *Bivens* case into one against the government – but *only* for purposes of evading the strictures of *Stafford*. Plaintiffs cite no legal support for such a convoluted theory, because there is none.[2] Section 1391(e) does not apply, and Plaintiffs' claim of personal jurisdiction under that statute and Rule 4(k)(1)(c) fails.[3]

Second, § 3(d) of the Massachusetts long-arm statute does not authorize personal

---

[2] The only case of which the undersigned are aware that even discusses indemnification and personal jurisdiction is the now-reversed Ninth Circuit opinion in *Fiore v. Walden*, 688 F.3d 558, 584 (9th Cir. 2012) (finding personal jurisdiction over federal employee permissible in part because "as a rule" the United States "provides for their [employees'] defense, and, ultimately, indemnifies them"). But that rationale has no bearing on *Stafford* and, regardless, does not survive the Supreme Court's unanimous reversal of *Fiore*. *See Walden v. Fiore*, 571 U.S. 277 (2014).

[3] Plaintiffs propose they are "entitled to discovery relating to each Defendant's representation agreement with DOJ and the indemnification policies and practices of each employing agency." Opp. at 12; *see also* Mot. for Juris. Discovery, Docket No. 57 (filed Apr. 8, 2019) ¶ 8 ("Juris. Mot."). Those matters have no bearing on the personal jurisdiction analysis, and Plaintiffs' only argument to the contrary – invoking *Stafford* – is legally meritless as just discussed. Plaintiffs propose elsewhere that they should have jurisdictional discovery "to test Defendants' representations that no Defendants reside here" or have other "relevant affiliation with Massachusetts." Opp. at 9 n.2 & 22; *see* Juris. Mot. ¶¶ 9–15. Again, Plaintiffs lack legal support for their demand. The declaration of counsel attached to the Defendants' opposition to the Jurisdictional Motion confirms representations already made in Defendants' motion concerning their residence and other contacts (or lack of) with Massachusetts. MTD at 10 n.4, 14–15; *see* Defs.' Opp. to Juris. Mot., Docket No. 61, Ex. A (filed May 8, 2019); *Massachusetts Sch. of Law v. American Bar Ass'n*, 142 F.3d 26, 34 (1st Cir. 1998) (court may consider uncontradicted "facts put forward by the defendants" in evaluating whether plaintiff meets "burden of persuading the court that jurisdiction exists").

jurisdiction over any of the Defendants. As discussed in the Defendants' motion, the FAC

includes one citation to § 3(d) and alleges no facts satisfying either of its requirements. *See* MTD

at 12–14. Plaintiffs attempt to bolster their inadequate pleading through statements in the

opposition that: (1) "Plaintiffs are each residents of Massachusetts and have suffered injury

within the Commonwealth"; and (2) "Defendants, particularly Defendants Sessions, Nielsen,

Homan, Vitiello, Cissna, McAleenan, Azar, and Lloyd in their official capacities, are or were in

charge of vast federal bureaucracies, each of which 'regularly does business' in Massachusetts."

Opp. at 14–15. Plaintiffs describe such "regular business" as "multiple physical locations within .

. . Massachusetts," where government personnel allegedly interact with "foreign nationals such

as Plaintiffs"; which employ "thousands of Massachusetts residents"; and "from which the

Defendants' agencies derive substantial revenue through fees, fines, and forfeitures." *Id*. at 15.

To begin with, Plaintiffs may not alter their pleading through an opposition to a motion to

dismiss. *See, e.g., Keane v. Navarro*, 345 F. Supp. 2d 9, 12 (D. Mass. 2004) (plaintiff made "new

allegations in his opposition" to dismissal, but court must "confine[ ] itself to the allegations of

the complaint"); *Miller v. Suffolk County House of Corr.*, No. CIV.A.01-11331-DPW, 2002 WL

31194866, at *2 n.1 (D. Mass. Sept. 27, 2002) (same). The FAC makes no allegations about any

Defendant injuring any Plaintiff in Massachusetts or conducting business activities there (aside

from the boilerplate language in ¶ 35). *See* MTD at 13–14.

Beyond that, Plaintiffs' proposed new allegations do not satisfy the two requirements of

§ 3(d) anyway. *See* MTD at 12–14 (discussing requirements). With regard to the "injury" prong

of § 3(d), conceivably Plaintiffs mean to suggest (though they do not so plead or even specify in

the opposition) that on-going emotional or psychological effects from separation and detention

caused injury to Plaintiffs in Massachusetts. But Massachusetts has already considered and

rejected just such an argument. *Caplan v. Donovan*, 450 Mass. 463, 466–68 (2008). In *Caplan*, the plaintiff fled an abusive situation in Florida and returned home to Massachusetts. *Id*. at 463–65. There, she filed a complaint in state court for an abuse prevention order against the defendant, who resided in Florida. *Id*. at 464–65. Although the trial court denied the defendant's motion to dismiss for lack of personal jurisdiction, the Supreme Judicial Court took immediate appellate review and reversed. *Id*. at 465. First, the court explained, the defendant's only alleged conduct in Massachusetts – placing phone calls to plaintiff's family and other Massachusetts residents – did not "create a tortious injury within" the Commonwealth. *Id*. at 466. Next, the court said, while the "plaintiff did not state expressly . . . that she continued to experience emotional distress or fear stemming from the abusive incident in Florida, . . . one might reasonably infer that she did." *Id*. Nevertheless, "continuing manifestations, effects, and consequences of an out-of-State injury . . . experienced in Massachusetts . . . do not constitute 'injury in this commonwealth' within the meaning of § 3(d)." *Id*. (internal quotation marks and citation omitted). Instead, such "continued fears or emotional distress . . . would qualify as [m]anifestations, effects, and consequences of the injury [plaintiff] suffered in Florida and then transported to Massachusetts, not injuries created in the Commonwealth." *Id*. at 467 (internal quotation marks and citation omitted). So too here. Even if Plaintiffs mean to claim that their separation or detention elsewhere caused on-going distress in Massachusetts, those continuing effects "would not provide the 'tortious injury in this [C]ommonwealth' required by §3(d)." *Id*.

Likewise, Plaintiffs' assertion that some or maybe all Defendants "in their official capacities are or were in charge of vast federal bureaucracies, each of which 'regularly does business' in Massachusetts" fails to satisfy the second prong of § 3(d). *See* Opp. at 15. Plaintiffs essentially argue that Defendants led or lead federal agencies that operate in Massachusetts, so

therefore Defendants themselves "regularly do[ ] or solicit[ ] business, or engage in [a] . . . persistent course of conduct" in Massachusetts. M.G.L. ch. 223A, § 3(d). Plaintiffs cite no case law supporting this proposition, and Defendants have found none. Instead, § 3(d) requires business contacts by a defendant personally or through an *authorized* agent. Plaintiffs have not alleged the former, and as discussed *infra* at 7–11, neither have they shown the latter.

Finally, Plaintiffs' three alternative arguments that Defendants each have constitutionally sufficient forum contacts fail. Plaintiffs first claim that "in a federal question case," courts may "look[ ] to the defendant's aggregate contacts with the United States as a whole, without regard to the defendant's contacts with the forum state." Opp. at 16. According to Plaintiffs, Defendants "were served . . . at addresses located within the United States," and therefore the Court may exercise personal jurisdiction over them consistent with due process. *Id.* at 17. Plaintiffs are wrong. Where, as here, Plaintiffs have not sued under any statute authorizing nationwide service of process, *see supra* at 2–3 & MTD at 12, they cannot effect service pursuant to Rule 4(k)(1)(C). *See Wang v. Schroeter*, Civil Action No. 11-10009-RWZ, 2011 WL 6148579, at *4 (D. Mass. Dec. 9, 2011), *aff'd*, No. 12-1080 (1st Cir. Dec 11, 2012). Instead, Rule 4(k)(1)(A) applies and "requires that service of process be determined by the state long-arm statute." *Id*. The Massachusetts long-arm statute, in turn, allows service "on an out-of-state defendant if the court has personal jurisdiction over the defendant under the long-arm statute." *Id.*; *see* M.G.L. ch. 223A, § 4. As a result, "[a court] must conduct the same personal jurisdiction inquiry, and concomitant 'minimum contacts' analysis, regardless of whether the claims give rise to diversity or federal question jurisdiction." *Wang*, 2011 WL 6148579, at *4. As the First Circuit put it, "[i]t is the reference to the 'longarm' statutes of the various states [in Rule 4(k)(1)(A)] that incorporates the requirement of minimum contacts [with the forum states] as a precondition for

extraterritorial service of process." *Johnson Creative Arts, Inc. v. Wool Masters, Inc.*, 743 F.2d 947, 950 (1st Cir. 1984); *see Lorelei Corp. v. County of Guadalupe*, 940 F.2d 717, 719–20 (1st Cir. 1991) (in federal question case, service on resident outside forum state pursuant to long-arm statute incorporates into personal jurisdiction analysis "the familiar fourteenth amendment 'minimum contacts'" precondition); *see also Walden*, 571 U.S. at 283 ("Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons.") (citing Fed. R. Civ. P. 4(k)(1)(A)) (internal citation and quotation marks omitted). Plaintiffs, in other words, cannot establish personal jurisdiction by claiming that Defendants have contacts with the United States "as a whole." Opp. at 16.

Plaintiffs next argue that the Court may exercise general personal jurisdiction over Defendants. As explained in Defendants' motion, however, the FAC fails to establish any contacts, let alone constitutionally sufficient ones, between any Defendant and Massachusetts. *See* MTD at 14–18; *see also* Defs.' Opp. to Juris. Mot., Ex. A (affirming that none of the Defendants has any such contacts). Plaintiffs respond by stating that the Court may exercise general personal jurisdiction because, again, the Defendants "are current or former heads of vast federal bureaucracies," with "'continuous and systematic general business contacts' in Massachusetts," Opp. at 17, and "the contacts of the agencies may be imputed to the Defendants as principals so long as the agent is 'acting within the scope of his legitimate duty or authority,'" *id*. at 17–18 (quoting *Donatelli v. Nat'l Hockey League*, 893 F.2d 459, 465 (1st Cir. 1990)). Although difficult to decipher, Plaintiffs appear to argue that acts of *non-Defendant* federal agency employees in Massachusetts flow through each agency's whole chain-of-command to agency leaders such that *collective* "continuous and systematic" contacts of people coincidentally employed by each agency justify general personal jurisdiction over the Defendants. Opp. at 17–

18. Plaintiffs identify no legal authority for this remarkable theory and instead cite two cases that either have nothing to do with personal jurisdiction over individuals (*Donatelli*[4]) or granted the federal individual-capacity defendants' motion to dismiss for lack of personal jurisdiction (*Perez v. United States*, No. 13cv1417-WQH-BGS, 2014 WL 4385473, at *8–9 (S.D. Cal. Sept. 3, 2014)); *see* Opp. at 17–18. Moreover, Plaintiffs fail to negate the wealth of authority cited in the Defendants' motion holding that courts may not exercise personal jurisdiction over non-resident, high-ranking federal officials working in Washington, D.C., simply because a plaintiff claims injury from someone employed by the official's agency. *See* MTD at 16–18. In short, Plaintiffs have not shown any Defendant "maintained a continuous and systematic linkage with" Massachusetts as general jurisdiction requires, and indeed, the Defendants' briefing demonstrates otherwise. *Phillips Exeter Academy v. Howard Phillips Fund*, 196 F.3d 284, 288 (1st Cir. 1999); *see* MTD at 11 & 14–15; Defs.' Opp. to Juris. Mot., Ex. A (affirming no jurisdictionally relevant contacts with Massachusetts).

Plaintiffs also claim that the Court may exercise specific jurisdiction, because Defendants allegedly "knew" the "practice of family separation" would affect Massachusetts residents, and "agents" of the Defendants allegedly had "contacts" with Massachusetts relating to this case. *See* Opp. at 18–21. Those contacts, Plaintiffs say, consist of "John Doe CBP Agents, John Doe ICE Agents, and/or John Doe ORR Personnel's making phone calls and delivering correspondence to E.O. at his home" in Massachusetts; "facilitating phone calls by K.O. and E.O., Jr. to their father in Massachusetts," and "transporting the children to Massachusetts." *Id*. at 20. According to

---

[4] *Donatelli* evaluated whether an association – the National Hockey League – exercised sufficient control and influence over its constituent hockey teams such that activities of the latter in a forum state could be attributed to the NHL for purposes of general personal jurisdiction. 893 F.2d at 468–69, 470–72. *Donatelli* did not address personal jurisdiction over any individual in charge of the NHL or otherwise. *Id*.

Plaintiffs, "an agent's forum contacts may be imputed to principals," and so the "John Doe"

activity should count as the Defendants' contacts with Massachusetts. *Id.* at 19–20 (citing

*Daynard v. Ness, Motley, Loadholt, Richardson & Poole*, 290 F.3d 42, 54, 62 (1st Cir. 2002)).

As shown in Defendants' motion, however, the location of Plaintiffs' "claimed injury" in

Massachusetts "does not evince a connection between" *the Defendants* and the forum state.

*Walden*, 571 U.S. at 290 (discussing *Calder v. Jones*, 465 U.S. 783 (1984)); MTD at 15–16.

Indeed, the "proper question" for specific jurisdiction "is not where the plaintiff experienced a

particular injury or effect but whether the defendant's conduct connects him to the forum in a

meaningful way."[5] *Id.* Plaintiffs' suggestion that the Defendants "knew" national policies they

implemented could – by definition – impact residents in Massachusetts (or elsewhere in the

United States) provides no such link. Case law on this point is clear. *See* MTD at 16–18

(allegations of national policy implementation and oversight do not suffice to permit personal

jurisdiction over individual defendants; a contrary result "would essentially subject the

individual Defendants to personal liability in every state in the Union regardless of how tenuous

their actual contacts with a particular forum might be") (quoting *Munns v. Clinton*, 822 F. Supp.

2d 1048, 1078 (E.D. Cal. 2011)). Plaintiffs do little to counter the Defendants' authorities and

instead attempt to distinguish them through broad-brush statements (*e.g.*, "the facts here are

strikingly different") and cases that say nothing about the propriety of inferring forum contacts

from a federal official's understanding that his or her job responsibilities include nationwide

oversight that may touch every state (*Stafford*, *Walden*, and *Daynard*). *See* Opp. at 21 n.4.

Plaintiffs' argument that the "John Doe" employees' alleged contacts with Massachusetts

---

[5] Otherwise, a plaintiff could move to any of the fifty states and still hale Washington-based federal officials into court for personal-capacity litigation.

should be considered Defendants' contacts likewise fails. Opp. at 18–21. Even assuming that

telephone calls, correspondence, and transporting Plaintiffs to Massachusetts could support

specific jurisdiction over the "John Does" themselves, Plaintiffs offer no justification for

imputing such contacts to the high-ranking officials sued here. Neither *Daynard* nor any other

case Plaintiffs cite remotely suggests that federal employees have an "agency" relationship with

agency heads for purposes of jurisdictional contacts. Opp. at 20. To the contrary, a

principal/agent relationship requires "authoriz[ation] to act on behalf of a principal" or

subsequent "ratifi[cation] [of] the agent's conduct" by the principal. *Daynard*, 290 F.3d at 55–59

(noting examples such as joint ventures and partnerships). As the District of Massachusetts

recently put it, an alleged principal must "control . . . the conduct of the alleged agent," either

"by express consent of the parties" or as "implied from conduct by the principal which causes a

third person reasonably to believe that a particular person has authority to enter into negotiations

or to make representations as his agent." *Targetsmart Holdings, LLC v. SHP Advisors, LLC*, No.

18-11365-DPW, 2019 WL 468367, at *6–*8 (D. Mass. Feb. 6, 2019) (citations and internal

quotation marks omitted) (dismissing case for lack of personal jurisdiction); *Weinberg v. Grand

Circle Travel, LCC*, 891 F. Supp. 2d 228, 241 (D. Mass. 2012) (rejecting "agency" argument for

personal jurisdiction where plaintiffs' factual assertions did not show conduct that would lead "a

third party to believe that the agent has authority") (citations and internal quotation marks

omitted). Plaintiffs simply do not allege (let alone offer facts showing) any such arrangement

between the "John Does" and any Defendant; it would be an unprecedented conclusion to hold

that personal jurisdiction exists over agency heads under such circumstances. For these reasons,

as well as the substantial case law cited in Defendants' motion, no forum contacts may be

imputed. *Targetsmart Holdings*, 2019 WL 468367, at *8 (no imputed contacts where plaintiffs

do not show "two defendants contemplated [one of them] exercising the kind of formal control or influence that would be needed to render their relationship akin to a joint venture, partnership, or other agency relationship").

### B. Plaintiffs' Improper New Allegations in the Opposition Do Not Establish Personal Jurisdiction Over Any of the Eleven Defendants.

Because the FAC itself does not establish personal jurisdiction – even as allegedly supplemented by the Warecki declaration, *see supra* n.1 – Plaintiffs attempt to fill the gap by proposing wholly new grounds for such jurisdiction in their opposition brief. *See* Opp. at 12–14 (claiming §§ 3(a) and 3(c) of the Massachusetts long-arm statute authorize personal jurisdiction), 15–16 (claiming "conspiracy jurisdiction" applies). As noted above, however, Plaintiffs may not add allegations to the lawsuit through an opposition to a motion to dismiss. *Keane*, 345 F. Supp. 2d at 12; *Miller*, 2002 WL 31194866, at *2 n.1. This holds all the more true where, as here, Plaintiffs could have included additional allegations in the FAC months ago. Defendants first moved to dismiss the original complaint for lack of personal jurisdiction (and other reasons) on January 8, 2019. *See* Docket Nos. 38–39. Plaintiffs filed the FAC as of right on January 29, 2019. *See* Docket No. 45. Plaintiffs thus had ample notice of the Defendants' jurisdictional arguments before filing the FAC, yet they inexplicably delayed raising three new asserted grounds for personal jurisdiction until impermissibly putting them in the opposition. For this reason alone, the Court should disregard Plaintiffs' arguments concerning § 3(a), § 3(c), and "conspiracy jurisdiction." *Keane*, 345 F. Supp. 2d at 12; *Miller*, 2002 WL 31194866, at *2 n.1.

To the extent the Court considers Plaintiffs' new allegations, they in any event fail to support personal jurisdiction over any of the eleven Defendants for many of the reasons already

11

explained. First, Plaintiffs' suggestion that § 3(a)[6] of the long-arm statute should apply, Opp. at 12–14, rests on the same baseless "agency" argument discussed above. In particular, Plaintiffs claim that the Defendants "transact[ed] . . . business" in Massachusetts, because the John Doe CBP Agents, John Doe ICE Agents, and John Doe ORR Personnel made or facilitated telephone calls, sent correspondence, or transported plaintiffs to Massachusetts, or administered an ORR "presentation" there. Opp. at 13–14; M.G.L. ch. 223A, § 3(a). Plaintiffs apparently mean to "impute" these alleged "business" activities to the Defendants for purposes of § 3(a). But as already discussed, Plaintiffs have not shown an "agency" arrangement in any legally recognized sense between the "John Doe" employees and any Defendant. Absent that, no actions of the "agent" may be attributed to the "principal." *See supra* at 8–11.

Furthermore, "in order to meet Section 3's 'arising from' requirement, the transacted business" in Massachusetts under § 3(a) "must be a 'but for cause of the harm alleged in the claim.'" *Boston Post Partners II, LLP v. Paskett*, No. 15-13804-FDS, 2016 WL 3746474, at *7 (D. Mass. July 8, 2016) (quoting *Cossart v. United Excel Corp.*, 804 F.3d 13, 18 (1st Cir. 2015)) (internal citation and quotation marks omitted). Plaintiffs, however, describe their injury as continuing "traumatic effects of their forcible separation from their parents." Opp. at 14. Plaintiffs do not contend that any "John Doe" employee acting in Massachusetts conducted the separations or did anything to cause Plaintiffs harm. *Id.* at 13–14. And, both the opposition and the FAC describe the separations as occurring at the southwestern border. *See, e.g.*, *id.* at 4, 6, 13; FAC ¶¶ 80, 91. Where conduct causing a plaintiff's injuries occurs outside Massachusetts, "Section 3(a) does not provide a proper basis for jurisdiction under the long-arm statute." *Boston*

---

[6] Section 3(a) of the long-arm statute provides: "A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's (a) transacting any business in this commonwealth." M.G.L. ch. 223A, § 3(a).

*Post Partners*, 2016 WL 3746474, at *8. Plaintiffs' belated suggestion that § 3(a) authorizes

personal jurisdiction here fails.[7]

Plaintiffs' theory of "conspiracy jurisdiction" fares no better. Opp. at 15–16. Plaintiffs

cite two cases purporting to authorize personal jurisdiction over non-resident defendants where a

plaintiff shows: (1) a conspiracy to deprive plaintiff of his rights; (2) that the out-of-state

defendants were parties to the conspiracy with in-state defendants; (3) that substantial acts in

furtherance of the conspiracy occurred in the forum state; and (4) that the co-conspirators knew

or should have known the acts would occur there. *Id.* at 15 (citing *Catrone v. Ogden Suffolk*

*Downs, Inc.*, 647 F. Supp. 850, 860 (D. Mass. 1986) & *Van Schaick v. Church of Scientology*,

535 F. Supp. 1125, 1132 (D. Mass. 1982)). But to begin with, as discussed in the Defendants'

motion and *infra* Sec. IV.B.8, Plaintiffs have failed to plausibly allege any conspiracy. Without

adequately pleading a conspiracy, Plaintiffs cannot establish "conspiracy jurisdiction." Beyond

that dispositive problem, as both *Catrone* and *Van Schaick* acknowledge, the First Circuit has not

actually approved a conspiracy-based concept of personal jurisdiction. *Catrone*, 647 F. Supp. at

860 ("The First Circuit has neither adopted nor foreclosed the conspiracy theory of jurisdiction,"

*Glaros v. Perse*, 628 F.2d 679, 682 (1st Cir. 1980), but *Glaros* "did demonstrate that adequate

grounds for dismissing a complaint exist when the conspiracy theory standard . . . [of] other

---

[7] Plaintiffs also reference § 3(c) of the long-arm statute but offer no explanation of how it could apply. *See* Opp. at 13–14. Section 3(c) provides: "A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's . . . (c) causing tortious injury by an act or omission in this commonwealth." M.G.L. ch. 223A, § 3(c). To the extent Plaintiffs mean to argue, again, that Defendants acted through the "John Doe" employees in Massachusetts and thereby "caus[ed] tortious injury" to Plaintiffs in the Commonwealth, *see* Opp. at 13–14, such an "agency" theory finds no support in the FAC or case law as discussed. Beyond that, Plaintiffs make no suggestion that the "John Doe" employees' alleged conduct harmed any Plaintiff. *See* Opp. at 13–14 (describing activities as making/facilitating telephone calls, sending correspondence, transporting plaintiffs, and administering ORR "presentation"). By the statute's plain language, § 3(c) does not apply.

courts, has not been met."); *Van Schaick*, 535 F. Supp. at 1132 (neither Massachusetts nor the

First Circuit has decided whether the state's long-arm statute contemplates a conspiracy theory

of personal jurisdiction). More recent cases confirm that this remains so, and courts continue to

consider such a theory only for purposes of rejecting it. *See, e.g., Ward v. Auerbach*, No. CV 16-

12543-FDS, 2017 WL 2724938, at *12 (D. Mass. June 23, 2017), *appeal dismissed sub nom.*

*Ward v. AlphaCore Pharma, LLC*, No. 17-1747, 2017 WL 7114184 (1st Cir. Oct. 11, 2017)

(conspiracy theory of personal jurisdiction "has not been adopted in this circuit," *Glaros*, 628

F.2d at 682, and plaintiff has not pled an actionable conspiracy in any event); *BGI Inc. v.*

*Merrifield*, No. CIV.A. 12-10658-RWZ, 2013 WL 297942, at *1 (D. Mass. Jan. 25, 2013) ("The

conspiracy theory of personal jurisdiction has never been recognized in the First Circuit. . . .

Indeed, it has been explicitly rejected by at least one other court in this circuit[,] . . . [a]nd even if

the theory were viable, it would not be appropriate here."). Furthermore, even if Plaintiffs *could*

establish a conspiracy *and that* "conspiracy jurisdiction" might apply, they have identified no

"substantial acts" in furtherance of the alleged conspiracy in Massachusetts. Indeed, Plaintiffs

describe the alleged conspiracy as one "to forcibly separate children from their parents." Opp. at

15. Again, both the FAC and the opposition reference Texas and the southwestern border as the

location of the separations. *See, e.g.,* FAC ¶¶ 80, 91; Opp. at 4, 6, 13. Plaintiffs make no

allegation that other separations occurred in Massachusetts or otherwise assert how anyone

facilitated separations at the border by conduct in Massachusetts. Opp. at 15–16.

At bottom, Plaintiffs have not identified in the FAC or the opposition any ties between

any of the eleven Defendants and Massachusetts permitting personal jurisdiction. (And no such

ties exist, *see* Defs.' Opp. to Juris. Mot., Ex. A.). Plaintiffs instead put forth far-fetched and

legally unsupported arguments in an effort to suggest a question about personal jurisdiction –

14

over Washington D.C.-based federal officials allegedly implementing nation-wide policy – when there is none. The Court should reject Plaintiffs' tactics, dismiss the suit for lack of personal jurisdiction, and deny Plaintiffs' request for jurisdictional discovery.[8]

## II.        PLAINTIFFS HAVE NOT MET THEIR BURDEN OF ESTABLISHING PROPER VENUE.

As discussed in the Defendants' motion, the FAC incorrectly asserts that venue lies in this District under 28 U.S.C. § 1391(b)(3). *See* MTD at 18–19. Plaintiffs' opposition neither mentions nor responds to the Defendants' argument. *See* Opp. at 22–24. Plaintiffs have therefore conceded the point, and the Court should find that they have failed to establish venue. *See, e.g., Leader v. Harvard Univ. Bd. of Overseers*, Civil Action No. 16-10254-DJC, 2017 WL 1064160, at *6 (D. Mass. Mar. 17, 2017) (where plaintiff "fail[ed] to address [defendant's] argument in her opposition to [the] motion to dismiss," she waived the claim in her complaint); *Summers v. City of Fitchburg*, Case No.: 15-cv-13358-DJC, 2016 WL 4926415, at *6 (D. Mass. Sept. 15, 2016) (because plaintiffs failed to address "arguments raised in Defendants' motion to dismiss surrounding . . . remaining claims in Counts IV and V," the claims "are considered waived and

---

[8] Because Plaintiffs have not shown that any Defendant has forum contacts sufficient to justify personal jurisdiction, the Court need not inquire into "the overall reasonableness of an exercise of jurisdiction." *Phillips Exeter*, 196 F.3d at 288; MTD at 11; *see* Opp. at 21–22 (claiming "the Court's exercise of jurisdiction must be reasonable under the so-called 'Gestalt' factors" and "all five Gestalt factors favor this Court's exercise of personal jurisdiction"). To the extent the Court were to analyze those factors, though, they would counsel against personal jurisdiction in Massachusetts. *See Daynard*, 290 F.3d at 62–63 (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980) (setting forth five factors)). First, the burden of appearing in Massachusetts to Defendants goes beyond financial cost. *Cf.* Opp. at 21–22. As discussed above and in the Defendants' motion, legal, policy, and practical concerns weigh against requiring high-level government officials to appear in district courts nationwide simply because they exercise national authority as part of their jobs and a lawsuit implicates such authority. Second, Massachusetts has no particular interest in adjudicating the litigation, whereas the District of Columbia, for example, does. Not only were most Defendants based in the D.C. area at the time of the challenged events, multiple other lawsuits arising out of similar family separation issues have proceeded or remain pending in the District of Columbia district court. *See, e.g., Jacinto-Castanon de Nolasco v. U.S. Immigration & Customs Enf't*, 319 F. Supp. 3d 491 (D.D.C. 2018). As for the last three factors, while Plaintiffs may find Massachusetts the most convenient forum, that does not control.

are dismissed without prejudice").

As before, Plaintiffs apparently recognize their pleading failure and impermissibly put forth new allegations about venue in the opposition. *See* Opp. at 22–24. In particular, Plaintiffs now claim proper venue under either 28 U.S.C. § 1391(e)(1)(C) or 28 U.S.C. § 1391(b)(2). Again, Plaintiffs cannot add allegations to the FAC in this fashion, and the Court should not consider them. *See supra* p. 4. Furthermore, neither new provision Plaintiffs cite permits venue here. As explained in the Defendants' motion and above, the Supreme Court held in *Stafford* that "§ 1391(e) does not cover . . . [s]uits for money damages for which an individual [federal] officeholder may be found personally liable." 444 U.S. at 542–45; *see* MTD at 12. If § 1391(e) "were construed to govern [such] actions," *Stafford* said, "suits could be brought against these federal officers . . . in any one of the 95 federal districts covering the 50 states and other areas within federal jurisdiction," and "[t]his would place federal officers, solely by reason of their Government service, in a very different posture in personal damages suits from that of all other persons." 444 U.S. at 544.

Likewise, Plaintiffs cannot establish that § 1391(b)(2) applies. Although Plaintiffs attempt to cast Massachusetts as the location where "a substantial part of the events or omissions giving rise to the claim occurred," 28 U.S.C. § 1391(b)(2), this is simply not true, *see* Opp. at 23-24. FAC hardly references Massachusetts at all, *see, e.g.,* MTD at 13–16, and Plaintiffs struggle mightily in the opposition to identify any activity there by anyone (including the Defendants) for purposes of personal jurisdiction. Claiming that a "substantial part" of "events or omissions" precipitating the lawsuit occurred in Massachusetts contradicts the FAC and re-defines the word "substantial." *See, e.g., Stars for Art Production FZ v. Dandana, LLC*, 806 F. Supp. 2d 437, 448 (D. Mass. 2011) (when almost "'entire sequence of events underlying the claim' occurred

elsewhere," a Massachusetts event that "is a mere outgrowth and tangential to [that] sequence . . . does not approach the requirement of being a 'substantial' event" for purposes of venue) (quoting *Uffner v. La Reunion Francaise, S.A.*, 244 F.3d 38, 41 (1st Cir. 2001)). Because Plaintiffs have not established venue, the Court should dismiss the case on this ground as well. Fed. R. Civ. P. 12(b)(3).

## III. THIS COURT SHOULD REJECT PLAINTIFFS' INVITATION TO CREATE AN ENTIRE NEW CLASS OF *BIVENS* LITIGATION.

In their opening brief, Defendants explained at length why binding authority compelled the conclusion that Plaintiffs' challenge to the immigration and prosecutorial policy of the United States presents a new *Bivens* context raising core separation-of-powers and related concerns, precluding a novel damages remedy against Defendants personally. MTD at 21–40. Plaintiffs concede that at least some of their claims present a new *Bivens* context, Opp. at 27–29, but argue that even if the context is new, the Court should imply a non-statutory damages remedy anyway. *Id.* at 29–38. Relying on selective authorities and antiquated legal theories, they contend this is so because they do not have any "adequate alternative remedies" available to them and because they claim that no other special factors counsel against implying a *Bivens* remedy here. None of these arguments saves Plaintiffs' claims or warrants the creation of a judicially-implied damages cause of action for the extensive class of cases Plaintiffs propose.

### A. The Context in which Plaintiffs' Allegations Arise Is New.

Plaintiffs' new context argument, even as to the limited counts on which they make it, fails for a number of reasons. The touchstone of the new context analysis is not merely the over-arching constitutional claim at play, but whether the *context* is meaningfully different than the only three *contexts* in which the Supreme Court has affirmatively recognized a *Bivens* remedy, and "even a modest extension is still an extension." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1864

(2017). In this regard, Plaintiffs far overestimate the importance of alleging claims under the same constitutional amendment as were raised in *Bivens*, *Carlson*, and *Davis*. While pursuing *Bivens* relief under a different amendment (for example, the First Amendment) would certainly make a context new, the fact that Plaintiffs' claims purportedly fall under the same amendment as the Supreme Court's three approving *Bivens* cases adds nothing to the new context analysis. *See Abbasi*, 137 S. Ct. 1859 (noting that although the "right at issue" and "mechanisms of injury" were the same in *Carlson* and *Malesko*, other meaningful differences made *Malesko* a new context); *see also F.D.I.C. v. Meyer*, 510 U.S. 471, 484 n.9 (1994) ("[A] Bivens action alleging a violation of the Due Process Clause of the Fifth Amendment may be appropriate in some contexts, but not in others."); *Wilson v. Libby*, 498 F. Supp. 2d 74, 86 (D.D.C. 2007), *aff'd*, 535 F.3d 697 (D.C. Cir. 2008) ("Bivens actions are not recognized Amendment by Amendment in a wholesale fashion."). Plainly, there is no context even remotely similar to the allegations of the FAC in which the Supreme Court has recognized a *Bivens* remedy.

Second, the rank of the federal officials in this case is meaningfully different from that in *Davis* and *Carlson*.[9] Plaintiffs' argument (drawn from the dissent in *Abbasi*, 137 S. Ct. at 1877) is at odds with the Court's treatment of the significance of the rank of the officials involved. As an initial matter, for example, "Congressman" and "White House Chief of Staff," or "Director of the Bureau of Prisons"[10] and "Attorney General," are different ranks, regardless of whether they might all be categorized as "high-level government officials." This Court need not speculate

---

[9] Plaintiffs do not dispute that the rank of the officers in their Fourth Amendment claim meaningfully distinguishes their claim from that in *Bivens* itself.

[10] Although the Director of the Bureau of Prisons was a defendant in *Carlson*, the question of the Director's rank was not an issue before the Court in that case. *See generally Carlson v. Green*, 446 U.S. 14 (1980). Indeed, although the Director's rank is mentioned in the caption, it is not discussed (or even mentioned) in the body of the opinion.

whether the Secretary of Homeland Security or the Secretary of Health and Human Services are "higher" ranks than Congressman, the fact that each has its own constitutionally-delegated and legally distinct responsibilities is sufficient to make challenges to their conduct different contexts. Additionally, the Congressman in *Davis* was not exercising the function of his rank to legislate, oversee the executive branch, or perform constituent services. Rather, he was acting as a supervisor in an individual employment action, sending a staff assistant a direct letter that he would prefer to hire a man for the position.

Third, to the extent this case involves specifically pled conduct by Defendants at all (and as explained, *infra*, in significant part it does not), the scope of any alleged actions was *far* broader than the actions at issue in *Bivens*, *Davis*, or *Carlson*. Plaintiffs claim that "Defendants' conduct led to a widespread practice," Opp. at 33, and the fact that they seek to bring this action on behalf of an extensive proposed class alone makes the case's expansive nature obvious, and the proposed context new. *See Meyer*, 510 U.S. at 486 ("We leave it to Congress to weigh the implications of such a significant expansion of Government liability."). Certainly, the class of cases Plaintiffs ask this Court to recognize is "new" when compared with the "common and recurrent sphere of law enforcement" at issue in *Bivens*. *Abbasi*, 137 S. Ct. at 1857.

Fourth, although Plaintiffs baldly state that the immigration and criminal contexts at issue here are not new, Opp. at 29, the case they cite in support of that proposition, *Lanuza v. Love*, 899 F.3d 1019 (9th Cir. 2018) (decided August 14, 2018), held exactly the opposite. *Id.* at 1028 (holding that it is "ineluctable" that a claim in the immigration and prosecution context is a "new context"). In any event, only cases decided by the Supreme Court "count" for new context

purposes, *Abbasi*, 137 S. Ct. at 1859,[11] and none of the three Supreme Court *Bivens* cases at issue even remotely involves a context similar to this. Lastly, as discussed extensively in Defendants' opening brief, MTD at 24–40, and below, this case involves multiple "special factors" that the Supreme Court has not previously addressed (a point to which Plaintiffs offer no rejoinder). In short, this case "easily" presents a new context, *Abbasi*, 137 S. Ct. at 1865, and Plaintiffs' suggestions to the contrary are specious.

>    **B.      "Alternative, Existing Processes" Are Available.**

In their opening brief, Defendants demonstrated that Plaintiffs have potential other avenues to address their separation and the alleged constitutional concerns it raised, and these processes are sufficient to preclude the creation of a new *Bivens* remedy. MTD at 24–26. Those potential alternatives included pursuing official capacity injunctive and/or habeas relief; suit under state tort law; and/or a suit under the Federal Tort Claims Act ("FTCA"). In response, Plaintiffs argue that none of these avenues is "adequate" because they do not "provid[e] roughly similar compensation" as a direct action for damages from individual employees. Opp. at 30, citing *Minneci v. Pollard*, 565 U.S. 118, 129–30 (2010). Plaintiffs' argument betrays a fundamental misunderstanding of *Minneci* specifically and *Bivens* jurisprudence in general.

As an initial matter, Plaintiffs' repeated use of the term "adequate alterative remedies," Opp. at 30, and their proffered standard for measuring the sufficiency of an "alternative existing *process*" misstates the relevant legal inquiry in several important respects. *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007) (emphasis added). The correct inquiry focuses on the existence of a *process* or "avenue" for relief, not the availability of a particular remedy to a particular individual (or

---

[11] *See Vanderklok v. United States*, 868 F.3d 189, 199 (3d Cir. 2017) (noting that in the new context analysis "past pronouncements [by the Circuit] are thus not controlling . . . . It is not enough to argue . . . that First Amendment retaliation claims have been permitted under *Bivens* before.").

even class of individuals). *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 69 (2001) ("So long as the plaintiff ha[s] *an avenue for some redress*, bedrock principles of separation of powers foreclose[ ] judicial imposition of a new substantive liability.") (emphasis added); *see Liff v. Office of Inspector Gen. for U.S. Dep't of Labor*, 881 F.3d 912, 923 (D.C. Cir. 2018) ("[I]t makes no difference in our *Bivens* inquiry whether the remedy that Congress has provided is complete in the sense that it makes a party whole for the injury asserted."). Central to all of Plaintiffs' arguments in this regard is the notion that the processes available to them are insufficient because they do not provide damages for past harms. Opp. at 30–32. But it is black letter law that alternative processes need not offer monetary relief at all in order to preclude a *Bivens* remedy. *See Abbasi*, 137 S. Ct. at 1865 ("alternative remedies available" could include "a writ of habeas corpus," an "injunction requiring the warden to bring his prison into compliance," or "some other form of equitable relief"); *De La Paz v. Coy*, 786 F.3d 367, 377 (5th Cir. 2015) ("The absence of monetary damages in the alternative remedial scheme is not ipso facto a basis for a *Bivens* claim."); *Tun-Cos v. Perrotte*, 2019 WL 1867819, at *8 (4th Cir. Apr. 26, 2019) ("[P]laintiffs are correct that the protections provided by the INA do not include a money damages remedy and often do not redress constitutional violations that occur apart from removal proceedings. But this misses the point . . . .").[12] Even in situations where a plaintiff has no possibility of relief, courts still refrain from implying a remedy if other special factors are present. *United States v. Stanley*, 483 U.S. 669, 683 (1987) ("[I]t is irrelevant to a 'special factors' analysis . . . whether the laws currently on the books afford . . . an 'adequate' federal remedy."); *see Malesko*, 534 U.S. at 69

---

[12] *See also Schweiker v. Chilicky*, 487 U.S. 412 (1988) ("agree[ing] that suffering months of delay in receiving the income on which one has depended for the very necessities of life cannot be fully remedied by the 'belated restoration of back benefits,'" but declining to create *Bivens* remedy where Congress did not); *Chappell v. Wallace*, 462 U.S. 296, 304 (1983) (declining to imply a *Bivens* remedy where Congress "has not provided a damages remedy").

(explaining that the Supreme Court had rejected any suggestion that "a *Bivens* remedy should be implied simply for want of any other means for challenging a constitutional deprivation in federal court").

Moreover, the Supreme Court does not require that available processes provide similar compensation, or backwards looking relief, particularly where those processes are created at the federal level. *See Bush v. Lucas*, 462 U.S. 367, 388 (1983) (declining to create an individual-capacity cause of action for damages even where existing federal processes "do not provide complete relief"). Plaintiffs urge this Court to follow a standard purportedly set out in *Minneci*, 565 U.S. at 129–30. But *Minneci* does not state any standard for considering alternative *federal* avenues or processes. *Minneci* was considering an alternative *state-law tort regime* (which, of course, could not by its very nature provide injunctive or forward-looking relief at all and would not implicate the separation-of-powers concerns that animated the Court in *Abbasi*), and in *Minneci* the Court simply held that state tort law's deterrence and compensation were sufficient (not required) to *deny* a *Bivens remedy*. *Minneci*, 565 U.S. at 130. *Minneci*'s analysis has no application to the consideration of alternative avenues for seeking constitutional and related review in federal court. Indeed, Plaintiffs make much of the availability of these federal avenues in their qualified immunity argument, Opp. at 45–46, when urging that the law at issue was clearly established, but would have this Court ignore those avenues altogether when considering whether a backwards looking non-statutory damages remedy should be implied.

Plaintiffs implicitly ask this Court to ignore any process available to them prior to the filing of this suit and only look to currently available processes. But that is not the law or the rationale underlying *Bivens*, *Carlson*, or *Davis*. Webster Bivens never had an opportunity to file suit to cease the officers' conduct, *Bivens v. Six Unknown Named Agents of Fed. Bureau of*

*Narcotics*, 403 U.S. 388, 389 (1971); there was no job for Shirley Davis to return to after she was fired and her boss retired from Congress, *Davis v. Passman*, 442 U.S. 228, 245 (1979); and Joseph Jones died as a result of the allegedly indifferent conduct, *Carlson*, 446 U.S. at 16 n.1. For them, "equitable relief . . . would [have] be[en] unavailing" at any time. *Davis*, 442 U.S. at 245. That is not the case for Plaintiffs, who had the opportunity to seek injunctive relief to be reunited, and did so. *See, e.g.*, *Ms. L. v. ICE*, No. 18-cv-428 (S.D. Cal.) (adopting the proposed Settlement Agreement submitted by the parties which provided for reunification of class members and resolution of their asylum claims). Having an avenue to pursue reunification (or expedited reunification) with their parents is not "nothing." And courts, including the Supreme Court in *Abbasi* and elsewhere, have found that processes which provide injunctive relief are relevant, and indeed "of central importance" in deciding whether to imply a *Bivens* remedy. *Abbasi*, 137 S. Ct. at 1862; *see also Malesko*, 534 U.S. at 74 (explaining plaintiff was not "in search of a remedy as in *Bivens* and *Davis*" and refusing to imply one in part because plaintiff could seek an injunction); *Hubbard v. U.S. E.P.A. Adm'r*, 809 F.2d 1, 14 (D.C. Cir. 1986), *on reh'g sub nom. Spagnola v. Mathis*, 859 F.2d 223 (D.C. Cir. 1988) ("The availability of injunctive relief here counsels against allowing a *Bivens* action as well.").

Relatedly, Plaintiffs would also have this Court ignore the case law holding that APA review can foreclose recognition a *Bivens* remedy. *See, e.g.*, *Air Sunshine, Inc. v. Carl*, 663 F.3d 27, 37 (1st Cir. 2011); *W. Radio Servs. Co. v. U.S. Forest Serv.*, 578 F.3d 1116, 1123 (9th Cir. 2009); *Sinclair v. Hawke*, 314 F.3d 934, 940 (8th Cir. 2003); *Miller v. U.S. Dep't of Agric. Farm Servs. Agency*, 143 F.3d 1413, 1416 (11th Cir. 1998); *XP Vehicles, Inc. v. Dep't of Energy*, 118 F. Supp. 3d 38, 70 n.15 (D.D.C. 2015); *see also Wilkie*, 551 U.S. at 553–54, 561 (relying in part on availability of "administrative and judicial review" in deciding not to imply *Bivens* remedy).

Plaintiffs cite no cases to the contrary and attempt to distinguish *Air Sunshine, Inc.* and *Western Radio Services* by urging that the conduct at issue in those cases (delayed certifications and inspections in *Air Sunshine*; denied application to place additional radio antennae on federal land in *Western Radio Services*) was amenable to correction by injunctive relief, whereas Plaintiffs' claims are not. That is a false distinction. Like Plaintiffs here, the plaintiffs in *Air Sunshine* and *Western Radio Services* were also unable to obtain "complete relief" through the APA for the past harms or delays they faced. *Western Radio Services*, 578 F.3d at 1120; *see also Vance v. Rumsfeld*, 701 F.3d 193, 205 (7th Cir. 2012) ("The normal means to handle defective policies and regulations is a suit under the [APA] or an equivalent statute, not an award of damages against the policy's author. . . . even if that regulation imposes billions of dollars in unjustified costs before being set aside."). Like Plaintiffs here, those plaintiffs had an opportunity to end allegedly ongoing violations. There, as here, the ability to challenge alleged unconstitutional conduct (or policy) through official capacity relief – whatever the particular avenue – "provided a faster and more direct route to relief than a suit for money damages." *Abbasi*, 137 S. Ct. at 1863. For the courts, that is enough to preclude the creation of a *Bivens* remedy.[13]

### C.    Other Special Factors Counsel Hesitation.

In their principal brief, Defendants demonstrated that at least five additional factors compel hesitation before creating an individual-capacity damages remedy in this novel context:

---

[13] Plaintiffs argue that the "FTCA is not an adequate alternative remedy to a *Bivens* action." Opp. at 31–32. But Defendants have never claimed that the FTCA standing alone is sufficient to preclude a *Bivens* remedy. Rather, Defendants simply suggested, as the Supreme Court has in the modern era, MTD at 24–26, that the potential availability of state law or related FTCA remedies, should be considered alongside the other factors counselling hesitation, as numerous courts have done. *See Turkmen v. Ashcroft*, No. 02CV2307DLISMG, 2018 WL 4026734, at *10–11 (E.D.N.Y. Aug. 13, 2018) (listing cases and holding that "[b]ecause plaintiffs could have brought their claims under the FTCA and been awarded damages for their injuries if they prevailed, [*Abbasi*] counsels that their *Bivens* claims should be dismissed").

(1) *Bivens* actions may not be used to challenge U.S. policy; (2) separation-of-powers concerns in this highly regulated area; (3) national and border security; (4) additional factors implicated in the prosecution context; and (5) practical concerns and the unworkability of a *Bivens* remedy in this context. MTD at 27–40. In disputing these factors, Plaintiffs try to distance themselves from their own allegations in the FAC – arguing that they are not challenging federal policy – and dismiss the clear separation-of-powers concerns raised. Opp. at 32–38. At its core, Plaintiffs' opposition ignores the repeated teaching of the Supreme Court that "[m]ost often it will be" up to Congress whether "to authorize a damages suit." *Abbasi*, 137 S. Ct. at 1848.

### 1. Plaintiffs Challenge a Government Policy.

The premise running through all of Plaintiffs' arguments is that, contrary to the clear context pled in the FAC, they are challenging "Defendants' *conduct*," not government policy. Opp. at 33. The argument, Plaintiffs now contend, is that they cannot be challenging any government policy because administration officials disclaimed the existence of any "family separation" policy. *Id.* First of all, it may well be true that there was no policy of "family separation."[14] But as Plaintiffs know, at this juncture, the parties are bound by the allegations in the complaint, and the FAC in fact alleges a "family separation" policy, FAC ¶¶ 17–19, 79, 96, and/or "a widespread practice of prosecuting or referring for prosecution the parents for illegally

---

[14] The fact that government officials disclaim the existence of *a particular, specific* policy does not mean that the government does not have *any policy* at all. Here, the Department of Justice had a policy of criminally prosecuting DHS referrals of § 1325(a) violations. *See* FAC ¶¶ 5, 48–49. Just because that policy may allegedly have had the result (to a subset of applicants for admission: certain aliens crossing the southern border with their children between the ports of entry) of separating parents who were referred for criminal prosecution from their children, *id.*, it does not follow that the government had a "policy" of separating families. And to the extent Plaintiffs point to separations that occurred before or after the institution of the zero-tolerance policy, *see* FAC ¶ 79, they fail to allege any connection between the alleged separations and these Defendants, or even to establish that they were in office, beyond conclusory allegations. *See, e.g.*, *id.* ¶ 49 ("Defendants prosecuted or referred the parents for prosecution . . . ."). Such statements provide no notice to Defendants or explanation to the court, and should be discounted. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

reentering the county," *id*. ¶ 48, that resulted ("intentionally" as Plaintiffs aver) in family separation. Plaintiffs cannot evade the repeated statements of the Supreme Court preluding *Bivens* remedies for constitutional challenges to government or agency-wide policy by substituting in the word "practice" for "policy." Plaintiffs' assertion that "[t]he fact that Defendants' conduct led to a widespread practice does not transform that conduct into a 'policy,'" Opp. at 33, is nonsensical.

In any event, Plaintiffs' argument is based on an illusory distinction between Defendants' alleged conduct and government "policy." The first indication that Plaintiffs are suing over federal policy is the fact that all of the Defendants are or were high-ranking policymakers. Plaintiffs do not allege that they were physically separated due to the acts of some lone officer failing to follow the rules. To the contrary, the "conduct" Plaintiffs challenge was the creation (purportedly by Defendants) of the rules themselves – national immigration and related prosecutorial policy (allegedly to deter all immigration of individuals from particular countries).[15] Numerous other facets of the FAC make it crystal clear that whatever Plaintiffs now try to label it, what they are suing over is federal policy. FAC ¶ 206 (proposing class of "thousands of children"); *id*. ¶¶ 17–23, 91, 96–97 (alleging that separation "practice" spanned "Southwestern border"); *id*. ¶¶ 17–27 (suing Defendants for their roles as agency heads, rather than line-level officers); *id*. ¶ 79 (alleging that family separation aimed at deterring entire populations from regions and countries).

No matter how they label their allegations (policy or conduct leading to widespread

---

[15] Conversely, if Plaintiffs are not at least alleging that Defendants participated in the creation of some national policy, then they are not alleging that Defendants did anything, and this case should be dismissed on that basis. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").

practice), the underlying claims implicate the exact concerns discussed by the Supreme Court in *Meyer* and *Abbasi* as inappropriate for remedy through a non-statutory damages action. In *Meyer*, the Court declined to create a *Bivens* action against a federal agency, because doing so would involve decisions about federal fiscal policy and end-run the government's sovereign immunity. 510 U.S. at 486. In *Abbasi*, the Court again declined to create a *Bivens* action, noting "[e]ven if the action is confined to the conduct of a particular Executive Officer in a discrete instance, these claims would call into question the formulation and implementation of a general policy." 137 S. Ct. at 1860. *Abbasi* further recognized that such an inquiry would require "that the discovery and litigation process would either border upon or directly implicate the discussion and deliberations that led to the formation of the policy in question" – an unacceptable result. *Abbasi*, 137 S. Ct. at 1860–61. All of the concerns discussed in *Abbasi* and *Meyer* are present here, regardless of how Plaintiffs' recharacterize their claims.[16]

### 2. Congressional Action in this Arena Counsels Hesitation.

Plaintiffs argue that the frequent and intense congressional action in the immigration arena is not a special factor because Congress has not provided an adequate alternative remedial mechanism or explicitly decided that none should exist. Opp. at 34–35. Plaintiffs misapprehend the standard for what constitutes a "special factor counselling hesitation," and conflate "alternative processes" with "other special factors" more generally. Plaintiffs implicitly suppose

---

[16] The Fourth Circuit recently rejected a similar attempt to recast allegations in this manner in a complaint against ICE agents. *Tun-Cos*, 2019 WL 1867819, at *9 ("Allegations that [plaintiffs] made in their initial complaint specifically targeted the Trump Administration's immigration enforcement policy with the purpose of altering it, even though they attempted in their amended complaint to distance themselves – at least overtly – from alleging such a purpose, surely to avoid this very discussion. But their purpose was undoubtedly not abandoned, as betrayed by their extensive challenge to policy in their initial complaint based on the same facts and by their contention that the Trump Administration's policy gave rise to the conduct that they alleged in both complaints was illegal.").

that any special factor must meet the same standard as alternative, existing processes. Opp. at 34. But that notion finds no support in the law. *Wilkie*, 551 U.S. at 550, set out a two-step process for determining whether to provide "a new and freestanding remedy in damages" under *Bivens*. The first step asks whether any alternative processes exist to protect the relevant interest. *Id.* The second step looks to whether "*other* special factors" counsel hesitation. *Abbasi*, 137 S. Ct. at 1849 (emphasis added); *see Wilkie*, 551 U.S. at 550 (quoting *Bush*, 462 U.S. at 378) ("[E]ven in the absence of an alternative . . . 'the federal courts must make the kind of remedial determination that is appropriate for a common-law tribunal, paying particular heed, however, to any special factors counselling hesitation before authorizing a new kind of federal litigation.'") While an alternative process "alone" may preclude a *Bivens* remedy, *Abbasi*, 137 S. Ct. at 1858, special factors are considered in the aggregate. *See Chappell*, 462 U.S. at 304; MTD at 27.

The threshold for constituting a special factor is low, "remarkably low." *Arar v. Ashcroft*, 585 F.3d 559, 574 (2d Cir. 2009). "To be a 'special factor counselling hesitation,' a factor must cause a court to hesitate before answering that question [whether to recognize a freestanding damages remedy in the absence of action by Congress] in the affirmative." *Abbasi*, 137 S. Ct. at 1858. "Hesitation is a pause, not a full stop, or an abstention; and to counsel is not to require. 'Hesitation' is 'counseled' whenever thoughtful discretion would pause even to consider." *Arar*, 585 F.3d at 574. The issue is not whether a remedy should exist, but who should fashion it, "Congress or the courts?" *Abbasi*, 137 S. Ct. at 1857 (citing *Bush*, 462 U.S. at 380). "In sum, if there are sound reasons to think Congress *might doubt* the efficacy or necessity of a damages remedy as part of the system for enforcing the law and correcting a wrong, the courts *must* refrain from creating the remedy in order to respect the role of Congress in determining the nature and extent of federal-court jurisdiction under Article III." *Id*. at 1858 (emphasis added)

When analyzed using the correct standard, Congress's extensive actions in the immigration arena plainly "counsel hesitation." Defendants do not repeat the details of those extensive actions here, *see* MTD at 30–34, virtually all of which are simply ignored by the Plaintiffs. *See also Tun-Cos*, 2019 WL 1867819, at *8 ("Congress's legislative actions in this area persuasively indicate that Congress did not want a money damages remedy against ICE agents for their allegedly wrongful conduct, as indicated by its frequent amendment of the INA and its repeated refusal to provide a damages remedy."). The limited case law cited by Plaintiffs does not support a different conclusion. Plaintiffs rely extensively on *Rodriguez v. Swartz*, 899 F.3d 719, 726 (9th Cir. 2018), which involved the cross-border shooting of a Mexican citizen by a Border Patrol agent. As an initial matter, *Rodriguez* involved allegations that a line level law enforcement officer used excessive force in the sphere of law enforcement, a far cry from the sweeping challenge to agency policy alleged by Plaintiffs. Furthermore, *Rodriguez*'s reasoning is undermined by the Fifth Circuit's contrary *en banc* decision in *Hernandez v. Mesa*, 885 F.3d 811, 823 (5th Cir. 2018), and both cases are currently pending certiorari. Plaintiffs also rely on *Lanuza v. Love*, 899 F.3d 1019, 1022 (9th Cir. 2018), which involved a single government attorney allegedly submitting a forged document in a single immigration proceeding. Both *Lanuza* and *Rodriguez*, out-of-Circuit decisions from the Ninth Circuit, involved an isolated action by a single government employee against a single person. Neither case said anything about challenges to broad-based immigration policies of the United States. *See, e.g., Lanuza*, 899 F.3d at 1029 ("Lanuza does not challenge or seek to alter the policy of the political branches."). Both cases also carefully limit their holdings to the "particular set of facts" before them. *Rodriguez*, 899 F.3d at 748; *see Lanuza*, 899 F.3d at 1034 ("Failing to provide a narrow remedy for such an egregious constitutional violation would tempt others to do the same . . . ."). And

neither case contradicts the great weight of legal authority which holds that Congress's action in the immigration arena counsels hesitation in creating *Bivens* remedies. *See* MTD at 30–34; *Tun-Cos*, 2019 WL 1867819, at *7.

### 3. Plaintiffs' Claims Implicate Separation-of-Powers Concerns at the Border.

Plaintiffs suggest that Defendants' border security concerns are overblown, and contend national security cannot be used as a talisman to inappropriately dismiss otherwise valid claims. Opp. at 34–35. True, "national security" should not be invoked arbitrarily, but *border* security is a well-recognized subset of the over-arching security of the nation. *See, e.g., United States v. Delgado-Garcia*, 374 F.3d 1337, 1345 (D.C. Cir. 2004) ("[T]his country's border-control policies are of crucial importance to the national security and foreign policy of the United States."); *Tun-Cos*, 2019 WL 1867819, at *7 (noting that immigration enforcement affects national security). Border protection measures serve vital national security interests, among them, securing the nation's physical integrity, preventing hostile foreign actors from entering the country, allowing for a well-ordered immigration system, and halting the flow of dangerous drugs and weapons. *See, e.g.*, *Delgado-Garcia*, 374 F.3d at 1345; *United States v. Kim*, 103 F. Supp. 3d 32, 55 (D.D.C. 2015) ("[G]overnment's power at the border arises out of the sovereign's right and need to protect its territorial integrity and national security."). Whatever the "label" for special factors purposes, enforcing the terms and conditions on which foreign citizens enter the United States at an international border is delegated by the Constitution to the political branches and is a core function of sovereignty. *See* U.S. Const. art. I, § 8, cl. 4 (granting Congress the power to "establish an uniform Rule of Naturalization"), cl. 3 ("regulate Commerce with foreign Nations"); U.S. Const. art. VI, § 4 ("The United States shall . . . protect each [state] against Invasion"); *see, e.g., Toll v. Moreno*, 458 U.S. 1, 10 (1982) (citing *United States v.*

*Curtiss-Wright Export Corp.*, 299 U.S. 304, 318 (1936)) ("Federal authority to regulate the status

of aliens derives from various sources, including the Federal Government's power "[t]o establish

[a] uniform Rule of Naturalization," U.S.Const., Art. I, § 8, cl. 4, its power "[t]o regulate

Commerce with foreign Nations", *id.*, cl. 3, and its broad authority over foreign affairs."); *United*

*States v. Hernandez-Guerrero*, 147 F.3d 1075, 1076 (9th Cir. 1998) (quoting *Chae Chan Ping v.*

*United States*, 130 U.S. 581, 609 (1889)) ("[F]or more than a century, it has been universally

acknowledged that Congress possesses authority over immigration policy as an incident of

sovereignty."). The creation of a constitutional cause of action to challenge United States' action

in this regard would stymie, or at the very least interfere with, the political branches' clear

primacy in matters affecting territorial sovereignty. And in *Abbasi*, the Court made clear that

where Congress "might doubt" the efficacy of an individual-capacity damages remedy, the

courts "must" hesitate to create one. *Id*. at 1858.

### 4.  Plaintiffs Challenge Prosecutorial Decisions.

Plaintiffs say they do not challenge prosecutorial policy decisions. Opp. at 36–37.

Plaintiffs' statement is contradicted by the FAC and, if true, means that many (if not all) of the

Defendants have no connection to the separation of Plaintiffs from their parents whatsoever.

Plaintiffs allege in the FAC why the separations occurred: namely, that the government allegedly

referred Plaintiffs' parents for prosecution. FAC ¶¶ 48–49. Plaintiffs have not alleged they were

separated from their parents for a reason other than referral for criminal prosecution. Because

Plaintiffs challenge their separation from their parents, and they admit that the separation

occurred as a result of prosecutorial decisions of the government, Plaintiffs' claims raise

separation-of-powers concerns related to the Executive's power to enforce the laws. *See* 8 U.S.C.

§ 1325(a); MTD at 35–36.

### 5.  Expanding the *Bivens* Remedy Here Would be Unworkable.

Plaintiffs argue that nothing would be impracticable about expanding the *Bivens* remedy into this new context. Opp. at 37–38. Plaintiffs write that "[f]ederal courts apply varying legal standards to different claims and different parties in the same case all the time," without citing a single *Bivens* case doing so. Opp. at 37. There is good reason for the lack of precedent: the Supreme Court has not created *Bivens* remedies in cases where multiple defendants, subject to different standards and mandates, are sued for a broad-reaching course of conduct. In fact, the few Supreme Court cases allowing *Bivens* actions to proceed are notably uniform in their simplicity, with allegations of discrete constitutional violations by discrete individuals against a single individual. *Bivens*, 403 U.S. at 389 (entry into and search of apartment and manacling without probable cause); *Davis*, 442 U.S. at 230 (firing on the basis of sex); *Carlson*, 446 U.S. at 16 n.1 (failure to treat asthma). In contrast, Plaintiffs propose creating a new kind of *Bivens* case challenging a policy of the federal government by way of class action against high-level government officials. *Bivens* cases are court-created and are not "like any civil case," Opp. at 37, and this Court should decline to create the complex type of civil litigation *Bivens* remedy that Plaintiffs propose here without statutory direction.

## IV.    DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY FOR ALL CONSTITUTIONAL AND FEDERAL STATUTORY CLAIMS.

### A.    Defendants Do Not Sufficiently Allege that Each Defendant Personally Violated Plaintiffs' Clearly Established Rights.

Sufficiently alleging personal participation is an absolute foundation of suing officials otherwise protected by qualified immunity. MTD at 57–59. Plaintiffs attempt to broadly allege that Defendants personally participated in a violation of Plaintiffs' rights by claiming that these high-ranking and in some cases Cabinet-level officials were generally aware of what was

happening to those situated like Plaintiffs at the border and were deliberately indifferent to their rights. Opp. at 63. Plaintiffs propose a novel theory of personal participation with respect to most or all Defendants: if a high-level official is on notice that the government is engaging in a practice that allegedly violates someone's rights, then that official can be personally liable for failing to intervene and stop the practice. *Id.* Not only is this theory novel, it has been rejected by the Supreme Court. *Iqbal*, 556 U.S. at 677 ("That is to say, respondent believes a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution. We reject this argument.").

The FAC contains very few specific allegations of personal participation by any Defendant, let alone enough to conclude that each of the eleven Defendants personally violated Plaintiffs' clearly established constitutional rights. *See Iqbal*, 556 U.S. at 676 ("[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."). As the First Circuit has explained:

> [I]n a civil rights action as in any other action subject to notice pleading standards, the complaint should at least set forth minimal facts as to who did what to whom, when, where, and why. Notice pleading requirements may be minimal – but minimal requirements are not tantamount to nonexistent requirements. Even within the generous confines of notice pleading, courts must continue to eschew reliance on bald assertions [and] unsupportable conclusions.

*Redondo-Borges v. U.S. Dep't of Hous. & Urban Dev.*, 421 F.3d 1, 9 (1st Cir. 2005) (internal quotation marks and citations omitted) (alterations in *Redondo-Borges*); *see Soto-Torres v. Fraticelli*, 654 F.3d 153, 159 (1st Cir. 2011) ("In some sense, all high officials in charge of a government operation 'participate in' or 'direct' the operation. *Iqbal* makes clear that this is plainly insufficient to support a theory of supervisory liability and fails as a matter of law."). Sufficient allegations of personal involvement are particularly vital in suits naming high ranking government officials. *See Feliciano-Hernandez v. Pereira-Castillo*, 663 F.3d 527, 534 (1st Cir.

2011) (noting the "vast responsibilities" of "high-level" officials before holding "broad allegations against high-ranking government officials fail to state a claim"). The agencies over which Defendants here had general oversight are enormous; spend over one trillion dollars combined annually; operate across the country; exert weighty constitutional and statutory powers; employ hundreds of thousands of people; and affect millions of others. *See, e.g.,* MTD at 35 (discussing Department of Justice); HHS FY 2018 Budget in Brief, *available at* https://www.hhs.gov/about/budget/fy2018/budget-in-brief/index.html (last visited May 8, 2019) (listing annual budget of over $1 trillion for HHS); About DHS, *available at* https://www.dhs.gov/about-dhs (last visited May 8, 2019) (noting DHS' wide range of responsibilities and more than 240,000 employees). Under Plaintiffs' theory of liability, individuals dissatisfied with overarching agency policy could always sue agency heads personally for the government's actions they disagreed with. According to Plaintiffs, certain passive "acts" by some (though not all) Defendants – for instance, receiving letters or complaints from Senators about a particular practice – created a constitutional obligation on those Defendants to intervene and change agency policy, or be exposed to individual liability. Opp. at 64; FAC ¶¶ 126, 135. Such potential liability would open up agency heads and high-level officials to potentially thousands of lawsuits, and would deter anyone from undertaking high-level government service. *Iqbal*, 556 U.S. at 686 ("[W]e are impelled to give real content to the concept of qualified immunity for high-level officials who must be neither deterred nor detracted from the vigorous performance of their duties.").

Critically, nowhere do Plaintiffs allege that any Defendant was involved with the actual separation of Plaintiffs at issue here. Indeed, they sue some Defendants whose entire agencies had no general oversight over the challenged activities at the border. See MTD at 61–63. And

Plaintiffs' bulleted list of supposed Defendant-specific allegations, Opp. at 64–65, belies any notion that any Defendant "personally participated" in a constitutional violation as that term has been understood in case law. The kinds of conduct alleged (note the verbs used) are particularly telling. Many of these allegations simply state in passive voice that these Defendants were the heads of their agencies or had some kind of oversight authority. *See, e.g.*, Opp. at 64–65 ("had responsibility," "was empowered," "directs each of the component agencies," is "responsible for," "under Homan's leadership"). But First Circuit "precedents make clear that it is not enough to state that a defendant 'was the officer in charge during the incident' and that he 'participated in or directed the constitutional violations' alleged." *Soto-Torres,* 654 F.3d at 159; *id.* ("The complaint would have had to plead facts supporting a plausible inference that [the defendant] personally directed the officers to take those steps against plaintiff which themselves violated the Constitution in some way."). Other allegations are simply statements (often to the media) that could not have violated Plaintiffs' constitutional rights. *See, e.g.*, Opp. at 64–65 ("Sessions stated," "Nielsen justified," "Kelly voiced," "Hamilton said," "Azar claimed," "Homan justified," "made clear"). Many of the other allegations speak – at most – to a claimed knowledge or desire, without actually identifying specific acts or connecting Defendants to Plaintiffs' separations. *See, e.g.*, *id.* ("received a letter," was "considering," was "a driving force," "enjoys seeing," is a "close ally," "refused to allow media cameras," "pushed for"). If these are indeed the "bones" of each claim, Opp. at 65, this lawsuit doesn't have any legs.[17]

---

[17] Defendants dispute the notion that "there is a question of fact as to whether each Defendant's conduct was objectively reasonable." Opp. at 40. For purposes of this motion, Defendants take as true the non-conclusory factual allegations in the FAC (of which there are remarkably few regarding any individual Defendant). Plaintiffs do not identify any facts that are disputed or that Defendants would need to show to prove their legal defenses here.

**B.    Plaintiffs Have Not Alleged the Violation of Clearly Established Law.**

In their opening brief, Defendants demonstrated that they are entitled to qualified immunity for all claims raised in Plaintiffs' FAC. Plaintiffs disagree, arguing there is "controlling authority and a consensus of persuasive authority such that each right that Plaintiffs assert was clearly established." Opp. at 39. But in making this argument, Plaintiffs repeatedly stitch together a variety of legal principles from a variety of contexts, and ask the Court to hold (for the first time in this Circuit) that the law is clearly established. Such attempts to develop new theories in the law cannot, by definition, lay the foundation for a violation of clearly established law. *See Rivera-Corraliza v. Morales*, 794 F.3d 208, 214–15 (1st Cir. 2015) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)) ("The clearly-established step requires plaintiffs to identify 'controlling authority or a robust consensus' of 'persuasive authority' such that any reasonable official in the defendant's position would have known that the challenged conduct is illegal 'in the particular circumstances that he or she faced' – then-existing precedent, in other words, 'must have placed the statutory or constitutional question . . . beyond debate.'") (internal quotations omitted). Furthermore, district court cases and out-of-Circuit cases from disparate contexts cannot form the basis of clearly established law or a "consensus of cases of *persuasive* authority." *Wilson v. Layne*, 526 U.S. 603, 617 (1999) (emphasis added); *see Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011) ("'A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case.'") (quoting 18 J. Moore et al., Moore's Federal Practice § 134.02[1][d] (3d ed. 2011)). But reliance on such cases infects *all* of Plaintiffs' qualified immunity arguments. Similarly, whatever the Court's language in *Hope v. Pelzer*, 536 U.S. 730 (2002), means, it does not clearly establish the parameters of permissible or impermissible government activity in novel

contexts such as immigration and prosecutorial discretion where government interests are at their

apex. *See* MTD at 31, 35. With that foundation, Defendants turn to each count in turn.

### 1.  Fourth Amendment (Count I)

Plaintiffs argue Defendants violated their Fourth Amendment rights and contend "it was

clearly established at the time of Plaintiffs' seizure that their Fourth Amendment rights extended

beyond their initial apprehension to the continued unconstitutional separation from their parents

while in immigration detention." Opp. at 41. They then cite broad propositions from a handful of

cases, contending, without explanation, that their application is "self-evident." *Id.* at 43. Even

assuming such case law established the Fourth Amendment violation itself (and as explained it

does not), it cannot, as a matter of law show that any alleged violation was clearly established.

Almost none of the cases cited arose in the context of border enforcement, aliens entering the

United States illegally, or prosecutorial decision-making. And the cases that do arise in the

immigration context are cited for the unremarkable proposition that "The First Circuit Court of

Appeals [has] confirmed that 'immigration stops and arrests [are] subject to the same Fourth

Amendment requirements that apply to other stops and arrests – reasonable suspicion for a brief

stop, and probable cause for any further arrest and detention.'" *Id.* at 41. But qualified immunity

can never be resolved at such a "high level of generality." *Kisela v. Hughes*, 138 S. Ct. 1148,

1152 (2018).

The crux of Plaintiffs' Fourth Amendment argument, that the "continued withholding"

doctrine somehow clearly establishes the law, isn't clearly established in any context, let alone in

this unique scenario.[18] It appears foreign to the First Circuit, and there is a circuit split regarding

---

[18] Of the four cases Plaintiffs cite in support of the "continued withholding" doctrine, only one actually endorses the theory in any context (*Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463, 478 (7th Cir. 2011)). Such meager support cannot form the basis of a clearly established right. *Lynch v. City of Boston*, 180 F.3d 1, 14 (1st Cir. 1999) (quoting *Anderson*, 483 U.S. at 640) ("A single decision from another court

the related doctrine of "continuing seizures." *Fontana v. Haskin*, 262 F.3d 871, 879 n.5 (9th Cir.

2001). Even in the far more routine context of social services enforcement and child

endangerment proceedings, the constitutional principles Plaintiffs posit are not clearly

established. *See, e.g., Susan Virginia Parker v. Henry & William Evans Home for Children, Inc.*,

No. 18-1133, 2019 WL 994298, at *4 (4th Cir. Mar. 1, 2019) (holding that because the Fourth

Circuit had "not yet articulated the constitutional standard that governs the removal of children

from their parents' custody" it was not clearly established that social services could not remove

the children from their parents). Plaintiffs do not allege, and Defendants do not assert, that

Plaintiffs were taken from their parents into protective custody because of any suspicion of "past

or imminent danger of abuse." *Foster*, 657 F.3d at 478. Rather, Plaintiffs were temporarily

removed from the custody of their parents when their parents were "prosecuted or referred . . .

for prosecution." FAC ¶ 49. At that point, Plaintiffs became "unaccompanied alien children," as

defined by the Trafficking Victims Protection Reauthorization Act (TVPRA), and their release

was thereafter governed by the procedures outlined in the TVPRA. 8 U.S.C. § 1232(c)(3)(A); *see*

FAC ¶ 44. Defendants have never suggested that the TVPRA "provided blanket authority to

traverse the Fourth Amendment." Opp. at 44. Rather, in this limited context (the apprehension of

aliens who entered the United States without inspection or admission and were subsequently

separated from their parents as a result of a parent's referral for criminal prosecution), the

TVPRA sets out the applicable statutory standard, and Plaintiffs do not cite any clearly

established constitutional law that required or even allowed HHS to bypass the TVPRA's

requirements because Plaintiffs entered the United States with a parent or legal guardian.

---

of appeals applying its own precedents is plainly insufficient to meet the requirement 'that in the light of
pre-existing law the unlawfulness must be apparent' to a reasonable government official.").

### 2.   Substantive Due Process Right to Family Integrity (Count II)

Plaintiffs argue that Defendants violated a substantive due process right to family integrity, but do not cite a single case that would have put Defendants on notice that their actions violated clearly established law in the "particular circumstances" before them. *D.C. v. Wesby*, 138 S. Ct. 577, 590 (2018). Plaintiffs begin their analysis with the broad principle that Plaintiffs have a right to family integrity that includes being in their parents' care and custody. Opp. at 44–45. After (again) making this statement of law at a "high level of generality," Plaintiffs cite no cases that could have given Defendants fair warning as to the alleged unlawfulness of their particular conduct in this unique context. *Alfano v. Lynch*, 847 F.3d 71, 76 (1st Cir. 2017) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) ("[T]he clearly established law . . . must be 'particularized' to the facts of the case."). Instead, Plaintiffs cite a string of out-of-circuit district court cases decided after the conduct in question. Opp. at 45–46. Those cases, which Plaintiffs concede were only "recently" decided, Opp. at 45, cannot show that the right in question was clearly established at the time relevant to Plaintiffs' claims. *See* MTD at 47 n.28. Moreover, those cases did not evaluate whether the defendants' particular conduct violated clearly established law, but whether the plaintiffs were likely to succeed on their underlying constitutional claims against the government. *See id.* (distinguishing the line of cases cited by Plaintiffs). Plaintiffs' contention that the cases cited in Defendants' motion are "distinguishable," Opp. at 47 n.14, misses the point. It is Plaintiffs' burden to identify clearly established law from appropriate forums and at the requisite degree of specificity. *See Mitchell v. Miller*, 790 F.3d 73, 77 (1st Cir. 2015) ("The plaintiff bears the burden of demonstrating that the law was clearly established at the time of the alleged violation, and it is a heavy burden indeed."). That Defendants offer precedent (including controlling First Circuit precedent) addressing the

contours of an alien's rights and specifically the contention that they are entitled on due process grounds to family visitation or to be detained in proximity to family members underscores Plaintiffs' inability to carry their burden.

Plaintiffs then argue that the TVPRA is irrelevant to the question of the clearly established law at the time of government's alleged conduct because Plaintiffs could have been detained with their parents. Opp. at 47–48. In support of this argument, Plaintiffs cite an unpublished district court case from Texas, *Bunikyte, ex rel. Bunikiene v. Chertoff*, No. A-07-CA-164-SS, 2007 WL 1074070 (W.D. Tex. Apr. 9, 2007). But subsequent case law interpreting the *Flores* Settlement Agreement greatly curtailed the government's ability to house Plaintiffs with their detained parents. *See Flores v. Lynch*, 828 F.3d 898 (9th Cir. 2016); *Flores v. Lynch*, 212 F. Supp. 3d 907 (C.D. Cal. 2015); *Flores v. Johnson*, 212 F. Supp. 3d 864 (C.D. Cal. 2015); *see also* MTD at 42 n.25. Relatedly, while Plaintiffs state that they only challenge the government's practice of holding Plaintiffs and their parents separately in immigration custody, and not the initial separation that occurred when the parents were referred for prosecution, Opp. at 47, that wrongly attempts to decouple the initial separation from its natural result. Once their parents were referred for prosecution, Plaintiffs became "unaccompanied" and were immediately sent to the *care and custody* of HHS pursuant to the statutory requirements outlined in the TVPRA; and once Plaintiffs were transferred to HHS as unaccompanied alien children, they could only be released after certain procedures were followed. MTD at 56. For that reason, Plaintiffs' and their parents' continued separation cannot be analyzed apart from the reason they were separated in the first place. At the very least, the legal question of their continued separation once Plaintiffs were in the care and custody of HHS was unsettled at the time of Plaintiffs' separation. Plaintiffs cite no law saying otherwise.

### 3.   Punishment of Civil Detainees (Count V)

Plaintiffs argue that their conditions while in immigration detention amounted to punishment for two reasons: (1) the conditions were allegedly appalling; and (2) they were separated from their parents. Opp. at 50–51. As discussed in Defendants' opening brief, any claims regarding the particular "conditions of confinement" would need to be brought against the line-level officers and/or custodians who allegedly were "deliberate[ly] indifferen[t]" to those conditions. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); MTD at 42; *accord Iqbal*, 556 U.S. at 676. Plaintiffs do not allege that Defendants were personally responsible for the conditions, and as Defendants have explained, even prison wardens at a particular institution can't be held liable based on such scant and conclusory allegations. MTD at 62.

Plaintiffs' second rationale, that the detention was punitive because they were not detained with their parents, finds no support in the law and improperly conflates constitutional causes of action. Plaintiffs cite no cases for the proposition that detaining children apart from their parents constitutes an unlawful condition of confinement. Opp. at 50–51. To the extent the separation itself violated Plaintiffs' rights, it at best implicates Plaintiffs' claimed right to family integrity, not any right related to their conditions of confinement. *See* MTD at 42–50.

### 4.   "Coerced" Waiver of Asylum (Count VI)

Plaintiffs argue that the government violated Plaintiffs' clearly established rights by "coercing" some parents of separated children into waiving their children's rights to pursue asylum and other immigration claims. Opp. at 55–56. Again, Plaintiffs do not cite any law suggesting such actions violated clearly established rights. Plaintiffs cite only to one, unpublished, out-of-circuit case for the proposition that Plaintiffs have a *constitutional* right to

seek asylum. *Azizova v. U.S. Atty. Gen.*, 442 F. App'x 531, 536 (11th Cir. 2011).[19] Such weak

support cannot establish clear law in the face of binding law to the contrary. *See Ticoalu v.

Gonzales*, 472 F.3d 8, 11 (1st Cir. 2006) ("Due process rights do not accrue to discretionary

forms of relief . . . and asylum is a discretionary form of relief."). Furthermore, as Plaintiffs do

not allege *their parents* were coerced into waiving their right to seek asylum, FAC ¶¶ 130–34

(alleging this happened to "many parents"), *their* rights were not violated and they lack standing

to sue on behalf of others. *See LaFrance v. Bohlinger*, 499 F.2d 29, 34 (1st Cir. 1974)

("[P]ersons not themselves the victims of illegal government conduct typically lack standing to

assert the constitutional rights of others."). Regardless, Plaintiffs and their parents continue to

pursue asylum claims, undercutting any notion that they have been prevented from seeking

asylum. FAC ¶¶ 13, 15. And again, any claim would need to be brought against the line-level

officers who allegedly prevented Plaintiffs from seeking asylum, not high-level policymakers

uninvolved with Plaintiffs' asylum claims.[20]

### 5.   Provision of Adequate Mental Health Services (Count VII)

Plaintiffs argue that Defendants were aware of the harm that separation would cause, and

knowingly failed to provide Plaintiffs adequate medical care for the resulting trauma. Opp. at

53–54. Yet again, Plaintiffs cite no cases that clearly establish this principle in the particularized

context of the case – and instead rely on generalized statements of law. *Id.* Critically, none of the

---

[19] The second case they cite, also out of circuit, merely quotes *Azizova*. *Haitian Refugee Ctr. v. Smith*, 676
F.2d 1023, 1037–38 (5th Cir. 1982).

[20] Such was the case in *Navia-Duran v. Immigration & Naturalization Serv.*, 568 F.2d 803, 810 (1st Cir.
1977), which involved "an overzealous immigration agent seeking to intimidate an alien in order to
effectuate deportation without the procedural niceties of a hearing." But Plaintiffs do not challenge a
discrete interrogation by a lone, overzealous, officer – they bring suit against eleven high-ranking
government officials for an allegedly unconstitutional nationwide policy.

cases cited by Plaintiffs show that the law was clearly established that high-level policymakers could be liable for alleged deliberate indifference to a detainee's adequate medical care. *See, e.g.*, *Wakefield v. Thompson*, 177 F.3d 1160, 1162 (9th Cir. 1999) (denying a *line level correctional officer* qualified immunity); *Elliott v. Cheshire Cty., N.H.*, 940 F.2d 7, 12 (1st Cir. 1991) (denying *corrections personnel* qualified immunity). Plaintiffs also do not specifically allege how the care available to them was deficient or how any of the high-ranking policymakers sued here failed to provide them care.

### 6. Procedural Due Process (Count III)

Plaintiffs argue it was clearly established that: (1) they were entitled to some kind of pre-separation process; and (2) they were entitled to challenge the separation after the fact. Opp. at 53–54. Plaintiffs' arguments miss the mark and, as discussed above, attempt to shoehorn the facts of this case into the law regarding protective custody. *See supra* Sec. IV.B.1. Plaintiffs cite no case holding that parents referred to criminal custody from immigration detention (or elsewhere) are entitled to a hearing before separation from their children. Indeed, there is no such due process right – let alone a clearly established one. *See* MTD at 44–45. As for the claim of insufficient post-deprivation processes, the government was bound to maintain custody over and subsequently release Plaintiffs pursuant to the HSA, TVPRA, and the mechanisms that accompany those laws. *See* MTD at 50. Plaintiffs cite no law holding that the applicable mechanisms are insufficient or that Defendants can be faulted because the United States followed those statutes and the accompanying regulations. Any alleged due process violation was not clearly established in the "particular circumstances" here. *Wesby*, 138 S. Ct. at 590.

### 7. Equal Protection (Count IV)

Plaintiffs argue that Defendants violated their equal protection rights and that

"Defendants' qualified immunity argument can only succeed if they establish a clear right to separate South and Central American children, like the Plaintiffs, from their parents." Opp. at 58. Plaintiffs completely invert the burden of proof under the qualified immunity standard: whether a plaintiff pleads facts showing that the right was clearly established at the time of the challenged conduct. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). Plaintiffs did not plead such a violation here. And they cite only to cases that speak to principles of law at a high level of generality, without referencing any cases that would have given Defendants fair notice that the government's conduct violated Plaintiffs' clearly established rights in the circumstances here. *See* MTD at 50–53. Plaintiffs' reliance on *Plyler v. Doe*, 457 U.S. 202, 220 (1982) is misplaced. Unlike the plaintiffs in *Plyler*, who challenged Texas's withholding of state money for the education of children in the United States illegally, here the government was not "penalizing" Plaintiffs for "their presence within the United States." *Id.* Plaintiffs do not allege that the government denied them a benefit, like Texas did to the plaintiffs in *Plyler*. Rather, Plaintiffs complain that they were treated the same as other unaccompanied alien children once the government took them into its care and custody while their parents were referred for criminal prosecution. FAC ¶¶ 48–51. And the government had an interest in referring Plaintiffs' parents for criminal prosecution: punishing criminal wrongdoing and deterring future illegal conduct on the Southwest border. *See* MTD at 53. Given the inherent focus on nationality in the immigration context, allowing Plaintiffs' conclusory claims (*e.g.*, FAC ¶ 248) to proceed, particularly against high-level officials such as Defendants, would risk disrupting the entire immigration system.

### 8.   Violation of 42 U.S.C. §§ 1985(3) and 1986 (Counts VIII & IX)

Plaintiffs claim that their 42 U.S.C. § 1985(3) claim should survive because Defendants worked for different government agencies and Plaintiffs have adequately alleged an implicit

agreement and actions in furtherance thereof. Opp. at 60–62. Plaintiffs cite a single district court case to show that it is clearly established that the intracorporate-conspiracy doctrine does not apply. *Commonwealth ex rel. Martino-Fleming v. S. Bay Mental Health Ctr., Inc.*, 334 F. Supp. 3d 395 (D. Mass. 2018). *Martino-Fleming* held that the intracorporate-conspiracy doctrine barred a conspiracy claim against two corporations where one of the corporations owned a majority stake in the second corporation and controlled a majority of that corporation's board. *Id.* at 403. That case said nothing about the application of the intracorporate-conspiracy doctrine in the context of an alleged agreement between different high-level Executive Branch officials.

Plaintiffs' citation to statements by some Defendants regarding overarching issues of immigration enforcement does nothing to bolster Plaintiffs' conclusory allegation that Defendants "furthered their conspiracy by, at various times, creating, adopting, implementing, enforcing, condoning, sanctioning, acquiescing to, and encouraging a pattern, practice, or custom of taking children and parents . . . and forcibly separating them." FAC ¶ 290. That is particularly true as the identified statements, Opp. at 61–62, only reflect an intent to do what federal law explicitly allows: have a zero-tolerance policy for illegal entry by referring those caught illegally crossing the border for prosecution. Plaintiffs' failure to allege a conspiracy and unlawful agreement with the requisite specificity would be fatal in any context, *Diaz v. Devlin*, 229 F. Supp. 3d 101, 111 (D. Mass. 2017) (citing *Slotnick v. Staviskey*, 560 F.2d 31, 33 (1st Cir. 1977)) ("[A] claim of conspiracy to deprive a plaintiff of civil rights will not survive a motion to dismiss if it makes conclusory allegations without making supporting factual assertions."), but in the context of the overarching allegations against the federal officials here, that failure is particularly egregious. General statements about immigration law, consideration of potential policy proposals, and "leading the discussion" are not enough to prove an unlawful conspiracy. Under

Plaintiffs' theory, any time high-ranking federal officials publically discuss an issue of concern to the United States they would thereby be agreeing to "conspire" with one another. That is simply not the law.[21]

## V.      DEFENDANTS ARE ENTITLED TO ABSOLUTE IMMUNITY FOR ANY ACTS OF PROSECUTORIAL POLICYMAKING.

Plaintiffs argue that none of the Defendants are entitled to absolute immunity because neither the initial separation nor subsequent "refusing to reunite" was intimately associated with the judicial phase of the criminal process. Opp. at 65–67. But the FAC states that the separation was caused by the United States' prosecuting Plaintiffs' parents or referring them for prosecution. FAC ¶¶ 5, 48–50. The core activity protected by absolute prosecutorial immunity is the decision to initiate a prosecution. *See Imbler v. Pachtman*, 424 U.S. 409, 431 (1976). This protection extends to "prosecutorial policymaking." *Haynesworth v. Miller*, 820 F.2d 1245, 1264 (D.C. Cir. 1987), *abrogated on other grounds by Hartman v. Moore*, 547 U.S. 250 (2006). Indeed, with respect to former AG Sessions, initiating prosecution of a class of offenders is the only activity that is even arguably pled. To the extent Plaintiffs allege that he, or any other Defendant, announced the prioritization of a class of criminal offenders, that decision is protected by absolute immunity. *Dellums v. Powell*, 660 F.2d 802, 806 n.13 (D.C. Cir. 1981) (explaining that the Attorney General is entitled to absolute immunity for issuing general instructions to initiate prosecutions against entire classes of offender).

## CONCLUSION

Defendants respectfully request that the Court dismiss all counts of the FAC.

---

[21] Plaintiffs offer no real response to the self-evident proposition that failing to make out a claim under § 1985(3) means their § 1986 claim also necessarily fails. MTD at 65.

Respectfully submitted,

JOSEPH H. HUNT
*Assistant Attorney General*
*Civil Division*

C. SALVATORE D'ALESSIO, JR.
*Acting Director*
*Constitutional & Specialized Tort Litigation*
*Torts Branch, Civil Division*

MARY HAMPTON MASON
NY Bar No. 2255198, under L.R. 83.5.3(c)
*Senior Trial Counsel*
*Constitutional & Specialized Tort Litigation*
*Torts Branch, Civil Division*

/s/ Paul Quast
PAUL QUAST
CO Bar No. 49154, under L.R. 83.5.3(c)
*Trial Attorney*
*Constitutional & Specialized Tort Litigation*
*Torts Branch, Civil Division*
*Department of Justice*
*Box 7146 Washington, DC 20044*
*(202) 616-4150*
paul.c.quast@usdoj.gov

*Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by means of the District Clerk's CM/ECF electronic filing system on May 8, 2019.

<u>/s/ Paul Quast</u>
PAUL QUAST
CO Bar No. 49154, under L.R. 83.5.3(c)
*Trial Attorney*
*Constitutional & Specialized Tort Litigation*
*Torts Branch, Civil Division*
*Department of Justice*
*Box 7146 Washington, DC 20044*
*(202) 616-4150*
paul.c.quast@usdoj.gov

*Counsel for Defendants*